UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 1:21-CR-214 |
| : | |
| JOSEPH LINO PADILLA, : | |
| : | |
| Defendant. : | |
| : | |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S
## MOTION TO REVOKE DETENTION ORDER

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to the Defendant's Motion to Revoke Detention Order ("Defendant's Motion).

Defendant does not appear to argue that he is ineligible for pretrial detention based on the offenses charged. He is charged in counts three and five of 18 U.S.C. § 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon), a "crime of violence" pursuant to 18 U.S.C. § 3142(f)(1)(A). *See United States v. Federico Klein*, 1:21-cr-236-JDB, ECF no. 29 at 8 and 12 (D.D.C. April 12, 2021) ("The Court thus sees no reason to depart from the weight of authority concluding that § 111(b) qualifies as a 'crime of violence.'"). The defendant is also eligible for pretrial detention based on flight risk. 18 U.S.C. § 3142(f)(2)(A).

In summary, Defendant argues he is similar to Federico Klein, who this Court "close[ly]" just released pretrial over the objections of the United States. However, Klein and Padilla are easily distinguishable as outlined in more detail below. The Court in *Klein* considered the type of violent conduct employed against police—i.e. whether the violence was premediated and whether the defendant intended to injury or incapacitate officers. Unlike Klein, the defendant in this case

is guilty of committing these severe categories of violence. Accordingly, there are no conditions or combinations of conditions which can reasonably assure the defendant's appearance and effectively assure the safety of any other person and the community. 18 U.S.C. § 3142.

**PROCEDURAL POSTURE**

On February 22, 2021, a criminal complaint was brought against defendant Padilla charging him with five felony counts and one misdemeanor. The defendant was arrested in the Eastern District of Tennessee on February 23, 2021.

He appeared before Magistrate Judge Susan K. Lee the same day, after interviewing with pretrial services officer Kimberly Williams. The defendant waived a detention hearing and preliminary hearing and asked that his hearings and further proceedings be held in the U.S. District Court, District of Columbia. Judge Lee issued a temporary order of detention while the U.S. Marshals transported the defendant.

Padilla was charged in a 12-count indictment by a federal grand jury on March 12, 2021:

1) 18 U.S.C. §§ 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers)
2) 18 U.S.C. § 231(a)(3) (Civil Disorder)
3) 18 U.S.C. §§ 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon)
4) 18 U.S.C. § 231(a)(3)(Civil Disorder)
5) 18 U.S.C. §§ 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon)
6) 18 U.S.C. § 231(a)(3) (Civil Disorder)
7) 18 U.S.C. §§ 1512(c)(2), 2 (Obstruction of an Official Proceeding)
8) 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon)
9) 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon)
10) 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon)
11) 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in the Capitol Grounds or Buildings)
12) 40 U.S.C. § 5104(e)(2)(F) (Act of Physical Violence in the Capitol Grounds or Buildings)

Defendant appeared before Magistrate Judge Zia Faruqui on March 31, 2021. Judge

Faruqui held that the defendant was not a flight risk, but that he posed a significant danger to the community and should be detained pending trial.

## FACTUAL BACKGROUND

**1. The Attack on the United States Capitol on January 6, 2021**

The government hereby proffers that, two months after the November 3, 2020 presidential election, on January 6, 2021, a joint session of the United States Congress convened at the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election. *See* Compl., Aff. Supp. Crim. Compl. & Arrest Warrant ("Aff.") ¶ 3, ECF No. 1. The joint session began at approximately 1:00 p.m., with then–Vice President Mike Pence presiding. *Id.* By 1:30 p.m., the United States House of Representatives and the United States Senate adjourned to separate chambers within the Capitol to resolve an objection raised in the joint session. *Id.* Vice President Pence continued to preside in the Senate chamber. *Id.*

As the House and Senate proceedings took place, a large crowd of protestors gathered outside the Capitol. *Id.* ¶ 4. "[T]emporary and permanent barricades were in place around the exterior of the . . . building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside." *Id.* Shortly after 2:00 p.m., a violent mob of rioters "forced entry" into the Capitol, Aff. ¶ 6, and mayhem broke out inside the building, putting an hours-long halt to the electoral vote count while elected representatives, congressional staff, and members of the press hid from the mob. *Id.* The joint session, and thus the constitutional ritual of confirming the results of the 2020 Presidential Election, "was effectively suspended until shortly after 8:00 p.m." *Id.*

**2. Jose Padilla's Criminal Conduct**

After receiving tips and reviewing Facebook posts, the FBI was able to identify Padilla in

a collection of video footage, including body worn camera worn by Metropolitan Police Officers and videos posted online, which captured portions of the riot. *Id.* ¶¶ 8-11. At approximately 1:31pm, Padilla approached a barricade line wearing a blue jacket, black backpack and scuba mask. He began pushing the barricade screaming, "Push! Push! Fucking push!" *Id.* ¶ 13.

After officers successfully repelled Padilla, he, along with other rioters, used a large sign with a metal frame as a battering ram to push back law enforcement at around 1:40 pm. *Id.* ¶ 16-17.

About three hours later at approximately 4:30 pm, Padilla was observed gathering with a large crowd in front of the archway of the U.S. Capitol Lower West Terrace Doors. Padilla hurled a flagpole at officers who were being attacked by rioters. *Id.* ¶ 18.

Speaking of his participation in the riot, Padilla posted online the following:

> Honestly, the guy breaking the windows weren't Antifa. They were Patriots trying to find a new way in so we could flank the cops who were holding the doorway.
> ….
> If we could have occupied the Capitol, we could have invoked the right given to us in the 2nd paragraph of the Declaration of Independence….We would have been in the Seat of Power. All we would need to do is declare our grievances with the government and dissolve the legislature, and replace it with Patriots who were there. Then simply re-adopt the Constitution with amendments added to secure future Federal elections." *Id.* ¶ 21.

> Don't you realize it yet? The was has been upon us for years and we've just been wringing hands about it. After the events of the 6th, I'm done being passive

> What happened Wednesday is what needs to be done again and again.

Additionally, Padilla documented his view of the Capitol building in a twenty-second video that was posted to his Facebook page. *Id.* ¶ 20. He can be heard on the video shouting loudly, "let's go" and "come on", ushering more people towards the Capitol Building.

Pursuant to a lawfully-obtained search warrant, law enforcement was able to recover from the defendant's premise the blue jacket, black backpack worn by the defendant on January 6, 2021. The defendant's wife confirmed that the defendant took goggles with him to attend the protests in Washington, D.C. in case he got near pepper spray, but that he did not return with the goggles.

## **LEGAL STANDARD**

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987)). Thus, a detention hearing must be held at the government's request only "in a case that involves" a charged offense falling in one of five enumerated categories, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimidate a witness or juror, *id*. § 3142(f)(2)(A)–(B). The BRA "requires that detention be supported by 'clear and convincing evidence' when the justification is the safety of the community." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). Even if the defendant does not pose a flight risk, danger to the community alone is sufficient reason to order pretrial detention. *Salerno*, 481 U.S. at 755.

To determine whether conditions exist that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the judicial officer is instructed by the BRA consider four factors: (1) "the nature and the circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(l)-(4).

**ARGUMENT**

The United States submits that there are no conditions or combination of conditions the Court could impose that would reasonably assure the safety of the community or the appearance defendant Padilla.

*(1) The Nature and Circumstances of the Offense Charged*:

Mr. Padilla has been charged with grave offenses. He forcibly entered and remained on the Capitol grounds and sought to stop, delay, and hinder Congress's certification of the Electoral College vote. He was at the front of the crowd, engaged directly with officers, and pushed against the barricade screaming "Push! Push! Fucking push!" He then assisted in pushing forward a large metal sign to be used as a battering ram with the intent to harm officers. And later, he attacked officers by throwing a flagpole. As captured in body worn cameras, Padilla yelled directly at the valiant line of law enforcement: "Ya'll beat me, ya'll tased me, and I ain't stoppin'." His consistent violent attempts to harm officers deployed to protect the Capitol highlight his complete disregard for authority and the sanctity of the law.

Defendant claims this conduct is similar to defendant Klein's. It is not.

*Premeditation*: Although Padilla did not bring a weapon with him to the Capitol, he did bring a scuba mask—indicating clear premeditation of anticipated clashing with police. The Court noted in its *Klein* opinion that Klein appeared in the riot wearing only a green jacket, dark dress pants, a blue dress shirt, and a red baseball cap.

*Intended to injure or incapacitate officers*: Klein used a riot shield to push against a line of officers. Padilla, on the other hand, grabbed barricades and pushed these objects directly against police, making direct contact with police with his head. In coordination with other rioters, Padilla used huge sign as a battering ram, making contact with police again. Finally, Padilla threw a

6

flagpole into a tunnel crammed with police.

This last act of violence served no purpose other than to injure and/or incapacitate officers. These two defendants are very dissimilar in the type of violence they engaged in at the Capitol. As this Court stated in *Klein*, "[Klein's] actions are distinguishable from other detained defendants charged under § 111(b) who clearly sought to incapacitate and injure members of law enforcement by striking them with fists, batons, baseball bats, ***poles***, or other dangerous weapons." at 16. (emphasis added).

Defendant suggest that he is "distinguishable from those defendants striking officers directly with dangerous objects, repeatedly and at close range." Defendant's Motion at 4. However, Defendant describes his own conduct. Padilla did strike officers directly with dangerous objects. The violence was repeated. He engaged in both violence at close range and violence from a distance. He did so for a prolonged period of time of three hours and at different locations around the Capitol, despite attempts by law enforcement to push him back and deter further violence. Regardless, it is unclear how the use of a dangerous weapon from a distance or use of a dangerous weapon at close range yields a different result in terms of the danger a defendant presents to the community. These distinctions proposed by Defendant are nonsensical, unworkable, and represents an effort to over-analyze what is, at its core, disturbing violent criminal acts against law enforcement. One can analyze anything to vapor.

Padilla used force on multiple instances to subvert a democratic election and arrest the peaceful transfer of power. By his own admission, his hope was to "dissolve the legislature, and replace it with Patriots." Such conduct threatens the republic itself. Indeed, few offenses are more threatening to our way of life. Padilla's alleged conduct demonstrates a flagrant disregard for the rule of law. Padilla is alleged to have taken part in a mob, which displaced the elected legislature

in an effort to subvert our constitutional government and the will of more than 81 million voters. Padilla's alleged conduct and the violence he promoted to "flank the cops who were holding the doorway" indicates that he is willing to use force to promote his political ends. Such conduct poses a clear risk to the community. As stated by Chief Judge Beryl A. Howell, "[t]he actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law." *See United States v. Chestman*, 21-mj-218 (BAH), ECF No. 23, at *13, 16 (D.D.C. February 26, 2021) ("Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification"). Here, the defendant attempted to breach the police lines, but due to the heroic efforts of law enforcement, thankfully failed.

Judge Faruqui commented twice that the defendant's actions were "horrifying." Padilla engaged in repeated, directed violence at police with a clear intent to injure. For those reasons, the nature and circumstances of the charged offenses strongly support a finding that no conditions of release would protect the community. Additionally, someone who demonstrates such contempt from the rule of law cannot reasonably assure future court appearances.

*(2) The Weight of Evidence Against the Person*:

Substantial evidence supports the position that Padilla poses a threat to the community. Padilla's violent words and actions at the Capitol were captured on film, both through body worn camera footage and social media video. Padilla's unrepentant statements were cataloged online once he left and the blue jacket and black backpack worn by Padilla were recovered in a lawfully-obtained search warrant of his home. Moreover, Padilla's wife confirmed that he took the scuba mask with him in case he got pepper sprayed, which demonstrates his understanding that his

conduct would result in law enforcement might have to use it to detract rioters such as himself from further violence. Padilla cannot dispute that these events indeed occurred. The weight of the evidence thus strongly supports a finding that no conditions of release would protect the community.

   *(3) History and Characteristics of the Person*:

   The United States adopts the factual proffer related to the defendant's history and characteristics in the February 23, 2021 pretrial services report generated by Kimberly Williams, United States Probation Officer in the Eastern District of Tennessee.

   P.O. Williams actually interviewed Padilla.  D.C. pretrial did not, but still came to the same conclusion regarding their recommendation for the Padilla's detention.  The defendant is unhappy with the content of the Tennessee report, claiming that it is inaccurate in some respects.  However, to quote directly from the pretrial service report generated by P.O. Williams, "**The defendant reported he is currently unemployed** and receiving Veteran's Association (VA) benefits, as well as Social Security Disability Income" (emphasis added).  Padilla also reported having suicidal ideation in 2018 "when he *lost his job* and became homeless for a couple of days."  (emphasis added).  P.O. Williams documented that Padilla "advised he had thoughts of suicide at that time, but is not currently having suicidal thoughts."  Padilla may not like what this officer of the Court uncovered about his history and characteristics, but it is the role of the pretrial services report to uncover such facts.

   Given the defendant's reported unemployment, his mental health conditions, and his previous thoughts of suicide, he presents a serious risk of flight. *See United States v. Cody*, 498 F.3d 582, 591 (6th Cir. 2007) (recognizing that it is logical to "treat suicide as a form of flight."). P.O. Williams reported, "The defendant poses a risk of nonappearance for the following reasons:

9

1. Offense Charged and/or Defendant's Conduct During Arrest for Instant Offense; 2. Mental Health History." The United States concurs.

*(4) Nature and Seriousness of the Danger to Community*:

Padilla's words and actions evince a serious threat to the community. Per *Chrestman*, grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct. 21-mj-218, at *13. On several occasions, Padilla was seen engaging in acts of violence. First, he was seen pushing against barriers while wearing scuba mask, which meant he was prepared to push forward against law enforcement despite knowing pepper or mace spray would be deployed with the intent to detract from the violence. *See Chrestman*, at *30 ("Nearly as significant is defendant's use of force to advance towards the Capitol and his use of words to lead and guide the mob in obstructing the police and pushing against police barriers"). He assisted in pushing forward a large sign as a battering ram intended to injure officers, and he threw a long metal flagpole with its only intention to hurt officers. These factors measure the extent of a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to assure the safety of the community.

Padilla gleefully entered the Capitol in the midst of a riot. He did so to stop or delay the peaceful transfer of power. And he used dangerous weapons. Padilla took these actions in front of hundreds of police officers, indicating that he cannot be deterred easily.

The defense claims that "[f]rom January 6 to his arrest on February 23, Mr. Padilla made no threats or suggestions of any civil disobedience or resisting authority." This is not accurate.

After the riot but before his arrest, Padilla posting on thedonald.win the following: "After the events of the 6th, I'm done being passive" and "[w]hat happened Wednesday is what needs to be done again and again."  Unlike in *Klein* where this Court found that the Defendant never boasted "about his confrontations with law enforcements after the fact" (17) or "advocated for political violence" (22), Padilla made it clear that he was proud of his actions and wished to continue them. The Court has heard directly from the defendant that he is *done* being passive and that the events of January 6th need to occur again and again.  He has broadcast his intent to resort to violence in the future as he did in the past.  The Court should believe him. The danger Padilla poses to the community is concrete and continuing.  As Judge Sullivan made clear in the *Sabol* opinion, the Defendant's belief that a "fight is not finished" "mak[es] the threat of further violence *present, concrete, and continuing*."  *Sabol* at 61 (emphasis added).

For purposes of evaluating a Capitol Riot defendant's dangerousness, the D.C. Circuit has drawn a distinction between Capitol Riot defendants who, like Padilla, engaged in violence at the U.S. Capitol on January 6, 2021, and those who, like the defendants in Munchel, did not. *See Munchel*, 2021 WL 1149196, at *8 ("[T]hose who actually assaulted police officers and broke through windows, doors and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way.").  Judge Emmet G. Sullivan recently held,

> While the circumstances of January 6, 2021 were unique, and the day has passed, it cannot be said that every Capitol Riot defendant is no longer a danger because those exact circumstances are unlikely to arise again. The D.C. Circuit certainly did not say as much; instead, the court observed that for the defendants in that case who "did not vandalize any property or commit violence, the presence of the group was critical to their ability to obstruct the vote and to cause danger to the community."

11

*Sabol* at 60.

Padilla, however, did commit acts of violence by pushing forward a large metal sign intended as a battering ram and throwing a metal pole directly into a crowded tunnel filled with law enforcement, with no other intention but to harm the officers crammed into a small area, making them an easy target for his weapon. Thus, Padilla is categorically different from defendants like Frederico Klein who engaged in "forceful conduct" but did not direct that conduct toward inflicting injury.

Moreover, the presence of fellow rioters was not necessary for Padilla to cause danger to the community. Indeed, Padilla would have acted violently that day without the support of fellow rioters. In Padilla's first violent assault when he pushed the barricade into the line of officers, almost no other rioters supported him, and the officers were able to repel him. Thus, there is ample reason to believe that fight is not finished for Padilla and others like him, making the threat of further violence present, concrete, and continuing.

Moreover, Padilla may try to flee or prevent his prosecution if released. Padilla is facing a lengthy potential prison sentence if convicted of the crimes charged. Release Padilla from custody and allowing him to return to his home in Tennessee, even with strict conditions, would be insufficient to mitigate the danger he poses to the community and the risk he would flee. Afterall, Padilla was in Tennessee before he committed the instant offenses. He was in Tennessee with his wife and children when he planned his participation in the riot; when he arrived with a scuba mask; and when he developed the beliefs that motivated him to attack police. Padilla's "actions demonstrate that he is willing to follow his beliefs, and act on them violently, no matter how far they take him from his home and no matter what 'strangers' are on the other side of the 'battle' he intends to wage in violation of the laws designed to protect our democracy." *See United States v. Jeffrey Sabol*, 21-cr-35, ECF no. 56 at 63 (D.D.C. April 14, 2021). P. O. Williams

outlined the risk of danger posed by Padilla, stating that he allegedly threw a flagpole at law enforcement, underwent baton strikes from police and was "encouraging the crowd to force their way through the barricades and resist law enforcement's efforts to stop their entry into the Capitol." Those factors led P.O. Williams to conclude that there is no condition or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of the community due to the following: 1. Nature of Instant Offense; 2. Mental Health History; 3. Safety Concerns for the Community or a Specific Individual.

By word and deed, Padilla has supported the violent overthrow of the United States government and his recounting of the events on January 6th represent his continued violent attitude and lack of remorse. He poses a clear danger to our republic. All of the release conditions available to the Court depend-at least in part-on voluntary compliance. Accordingly, the potential danger Padilla poses to the community strongly supports a finding that no conditions of release would protect the community.

## **CONCLUSION**

Pretrial detention is necessary in this case to assure the safety of people and the community, and the appearance of the defendant as required. 18 U.S.C. § 3142(f). There is clear and convincing evidence that the defendant would pose a danger to the community if released, and that there are no release conditions or combination of conditions that would assure the safety of the community.

There is probable cause that the defendant would be a flight risk and would not appear at trial as required.

                              Respectfully submitted,

                              CHANNING D. PHILLIPS
                              ACTING UNITED STATES ATTORNEY

                              */s/ JACOB STRAIN*
                              JACOB J. STRAIN
                              Utah Bar No. 12680
                              PUJA BHATIA
                              D.C. Bar No. 1009466
                              Assistant United States Attorneys
                              U.S. Attorney's Office for the District of Columbia
                              555 4th Street, N.W.
                              Washington, D.C. 20530