### In the United States District Court for the District of Columbia

| | | |
|---|---|---|
| **United States of America** | ) | |
| | ) | |
| v. | ) | Criminal No. 1:21-CR-214 |
| | ) | The Hon. John D. Bates |
| **Joseph Padilla,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### Defendant's reply to government's opposition

The government's case for detention is - and must be - focused on the allegations of January 6. Before that date, Mr. Padilla never did anything suggesting he was a danger. Mr. Padilla has no criminal record: not as a member of the military and not as a father raising a young family and engaging with treatment for his posttraumatic stress disorder.

Mr. Padilla has done nothing since January 6 to suggest he is a danger. In the six weeks from January 6 to his February 23 arrest, there are no allegations that Mr. Padilla committed any dangerous acts or threatened to do so.[1] After January 6, the FBI came to his house twice without incident or resistance of any kind. He was arrested without incident.

Thus, Mr. Padilla's life before and after January 6, 2021 has forced the government to argue that his conduct on that day alone requires detention. As this Court determined in *Klein*, it is possible to craft suitable release conditions for individuals with no prior or subsequent dangerous activity – even where they are accused of violent conduct toward police on that day. *U.S v. Federico Klein*, 1:21-cr-236, ECF no. 29.

---

[1] The government alleges that an online post "I'm done being passive" attributed to Mr. Padilla constitutes a threat. *Government Memorandum*, ECF 20 at 4. This allegation is belied by the absence of any subsequent language or actions by Mr. Padilla that could be interpreted as threatening or dangerous. It is also belied by a lack of specificity as to whom or what might be threatened, how they might be threatened, or when they might be threatened.

I.   **A specific review of the facts illustrates that Mr. Padilla is not a danger to the community and that his conduct resembles that of Mr. Klein.**

   A.  <u>Mr. Padilla wore a scuba mask – a safety measure recommended for protests by sources from Reader's Digest to Amnesty International.</u>

The government asks the Court to interpret Mr. Padilla's scuba mask as "clear premeditation of anticipated clashing with police." ECF no. 20 at 6. As protests have roiled the country in the last year, masks or goggles have become commonplace. Media from Reader's Digest[2] to Amnesty International[3] recommend that individuals bring safety goggles to protests. It is not credible to imply Mr. Padilla's scuba mask is evidence of premeditated violence. On the other hand, where the government is charging that others brought stun guns, baseball bats, and pepper spray to the Capitol, the government acknowledges that "Padilla did not bring a weapon with him to the Capitol." ECF no. 20 at 6.

   B.  <u>Mr. Klein and Mr. Padilla are accused of relatively similar conduct.</u>

Both Mr. Klein and Mr. Padilla are accused of serious conduct. In its opposition to Mr. Padilla's motion, the government described Mr. Klein's conduct as "us[ing] a riot shield to push against a line of officers." ECF no. 20 at 6. The government has previously described that conduct differently:

> …<u>Klein placed himself in the thick of the violence</u> aimed at breaking through the center doorway of the Lower West Terrace to gain entrance to the Capitol Building. He was among the first wave of rioters to enter the center archway and attempt to breach the door; he first entered the archway at approximately 2:43 p.m. and formed part of the mob inside the tunnel battling officers. Klein was not a mere bystander, however, and <u>used physical violence against a line of police officers who were protecting the entrance</u>.

---

[2] *See* Neesan, Johanna, *Ten Things You Should Bring (And Wear) to a Protest,* Reader's Digest (April 7, 2021), available at: https://www.rd.com/list/what-to-bring-to-a-protest/.
[3] *See* Amnesty International, *Safety during Protest,* available at: https://www.amnestyusa.org/pdfs/SafeyDuringProtest_F.pdf.

> …He ignored police orders to "back up," and repeatedly attempted to break through the line, including <u>by engaging in hand-to-hand violence against police officers</u> while wielding an apparently stolen police riot shield.
>
> …at approximately 3:00 p.m., Klein was captured ignoring orders to "Back up" and "Let it go." <u>Instead of complying, Klein shoved a riot shield in between the Capitol Building doors</u>, preventing officers from closing them.
>
> …At that point, Klein used the riot shield to assault the front-line officers by violently shoving the shield into their bodies. … Open-source videos also confirmed that <u>Klein was in the tunnel physically fighting against the front line of officers.</u> Notably, one video captured Klein encouraging other rioters to attempt to breach the Capitol by shouting, "We need fresh people, we need fresh people" multiple times.
>
> … However, even after being forced out of the tunnel, he lingered on the Lower West Terrace with the mass of rioters who remained there. While out on the Terrace, <u>Klein was again captured on video hindering an officer seeking to help another officer who had been dragged into the mob on the Lower West Terrace</u>.

*U.S v. Federico Klein*, 1:21-cr-236, *Government's opposition to defendant's motion for review and revocation of detention order*, ECF no. 25 at 5-7.

The government's opposition also focuses on an allegation that Mr. Padilla threw a pole at officers. This allegation does not require recharacterization by Mr. Padilla: video of the allegation is publicly available.[4] The Court can evaluate for itself the allegations against Mr. Padilla relative to those of Mr. Klein and other individuals present at the Capitol on January 6.

Mr. Padilla is not asking the Court to determine if his conduct was more or less dangerous than that of Mr. Klein on January 6. Rather, Mr. Padilla asks that the Court

---

[4] *See* https://www.youtube.com/watch?app=desktop&v=DBIg2s_B0IY. (The allegations occur at approximately the 2:48 mark in the video; Mr. Padilla is alleged to be the individual at the bottom of the screen in a blue jacket, just to the right of center. *Detention H'rng*, government exhibit 7-8.) Mr. Padilla remains in the video until approximately 3:47, standing in the crowd as individuals push past him to engage with police.

determine that the similarities in their conduct – as well as their similarly absent criminal histories – merit similar release conditions.

> II. **"Mental Health" as risk is an out-of-date and ineffective means of evaluating danger.**

The Eastern District of Tennessee Pretrial Report states "mental health conditions" as a reason it recommends detention. The government restates this as a reason for detention in its opposition. ECF no. 20 at 13. Neither articulates a reason why Mr. Padilla's mental health history presents a danger. Neither articulates a reason because no reason exists.

There are two mentions of mental health issues in Mr. Padilla's pretrial report. The first is that he is on disability for posttraumatic stress disorder after his military service. The report also indicates that he is actively engaged in treatment with a V.A. provider. The report does not report a single issue of threats, violence, or instability as a result of Mr. Padilla's condition. In 2021, it is simply insufficient to argue that a mental health diagnosis equals a risk of danger. While a specific mental health history might indicate a risk of danger or flight, it might also be evidence of engagement with services and ties to the community, as well as proactive efforts at self-improvement. For example, someone who is actively engaged in regular treatment with no arrest record would be assessed differently than someone who has abandoned treatment or is self-medicating. Listing Mr. Padilla's mental health history as evidence of potential danger fails to identify any reasoning and instead trades on outdated stereotypes about mental health.

The second mention of mental health in the report is suicidal thoughts. At the detention hearing, counsel clarified that Mr. Padilla did not report his own suicidal thoughts – only that the suicide of someone with whom he had served in the military

catalyzed a difficult time he had in 2018. It is worth noting that there are no reports of any threats, danger, or arrests during this period.

This Court has certainly seen errors or miscommunications in pretrial service reports before. However, even if the Court credits the report and the government's argument that suicide might be regarded as flight, custody is hardly the answer. In a period from 2011-2013, 165 people attempted suicide in the Washington D.C. jail; from November, 2012 to November, 2013, four people did commit suicide in the D.C. Jail.[5] Between 2014-2018, more than 40 inmates committed suicide in custody in the D.C. area – and more than 400 attempted suicide.[6] There have been documented suicides at the D.C. jail in recent years.[7] If the government considered Mr. Padilla a suicide risk, they might have requested he receive mental health services or be placed on suicide watch. They did not. Raising Mr. Padilla as a suicide risk is simply a pretense for requesting detention.

---

[5] Hughes, Sarah Anne, *165 People Have Attempted Suicide In D.C. Jail Since 2011*, dcist (Nov. 8, 2013)  available at: https://dcist.com/story/13/11/08/dc-jail-hearing/.

[6] Scott MacFarlane and Rick Yarborough, *More than 40 D.C.-Area Inmates Died from Suicide in Custody Since 2014*, NBC Washington (Updated July 28, 2018), available at: https://www.nbcwashington.com/news/local/more-than-40-suicides-in-dc-area-jails-since-2014/176669/.

[7] *See, e.g.,* Hermann, Peter, *Authorities suspect suicide after inmate found unresponsive in D.C. jail cell dies*, The Washington Post (Jan. 1, 2017), available at: https://www.washingtonpost.com/local/public-safety/authorities-suspect-suicide-after-inmate-found-unresponsive-in-dc-jail-cell-dies/2017/01/01/e76d1fc4-d01d-11e6-9cb0-54ab630851e8_story.html; D.C. Department of Corrections, Report of Suicide at the D.C. Central Cell Block (Feb. 7, 2015), available at: https://doc.dc.gov/release/report-suicide-doc-central-cell-block.

**Conclusion**

This is not a case where detention is required under the provisions of the Bail Reform Act. Pretrial release conditions are sufficient to safeguard the community and ensure that Mr. Padilla appears in Court.

WHEREFORE, Mr. Padilla respectfully requests that this Court revoke the order of detention previously imposed.

Respectfully submitted,

_____/s/_____
Nathaniel Wenstrup,
Attorney for Joseph Padilla
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: 703.600.0849
Fax: 703.600.0880
Nate_Wenstrup@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2021, I will electronically file the foregoing pleading with the Clerk of the Court and will provide a copy of that filing to counsel of record.

_____/s/_____
Nathaniel Wenstrup
Attorney for Joseph Padilla
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: 703.600.0849
Fax: 703.600.0880
Nate_Wenstrup@fd.org