### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**v.**<br><br>**JOSEPH LINO PADILLA,**<br>**also known as "Jose Padilla,"**<br><br>**Defendant.** | **Crim. No. 21-214 (JDB)** |

### <u>MEMORANDUM OPINION</u>

Defendant Joseph Lino Padilla is charged via indictment with ten felony and two misdemeanor offenses based on his participation in the events at the United States Capitol on January 6, 2021.  The government has proffered video evidence showing that, over the span of three hours, Padilla committed three separate assaults on law enforcement officers, two of which involved the use of dangerous weapons.  Padilla's statements on social media also demonstrate that he expected violence might occur on January 6 and that he called for increased violence in the wake of those events.  Padilla appeared before Magistrate Judge Faruqui on March 29, 2021 and was ordered detained pending trial.  Padilla now asks this Court to revoke that order and place him on pretrial release under strict conditions.

The government has sought to detain Padilla based on both dangerousness and risk of flight.  Although the government has not presented sufficient proof that Padilla poses a flight risk, the Court finds that the government has established, by clear and convincing evidence, that Padilla presents an articulable prospective threat to public safety that cannot be mitigated by any combination of release conditions.  For the following reasons, then, the Court will deny Padilla's motion to revoke his detention order.

## <u>Background</u>[1]

Padilla is a forty-year-old resident of Cleveland, Tennessee, and veteran of the Iraq War. Def.'s Mot. to Revoke Det. Order ("Def.'s Mot.") [ECF No. 15] at 5, 7. On January 6, 2021, he actively participated in an attempt to gain entry into the U.S. Capitol in a self-professed effort to stop the U.S. Congress from certifying the vote count of the Electoral College for the 2020 presidential election. Statement of Facts ("SOF") [ECF No. 1-1] at 1, 9.

Two-and-a-half weeks prior, Padilla messaged another user on Facebook: "Honestly I don't think anything less than taking DC with an a [sic] heavily armed protest is the only thing that will work. Remind them We The People are in charge, not the deepstate." May 3, 2021 Hr'g ("H'rg") Ex. 10. When the user responded, "[y]ou gonna pack?"—which this Court interprets in context to mean "pack" a firearm—Padilla replied, "[o]nly if I can find an organized group who is as well" because "[i]f people straggle in in ones and twos, cops can arrest anyone who is packing." <u>See</u> Hr'g Ex. 11. Padilla added: "Might just have to fight Proud Boys style." <u>Id.</u> The following day, Padilla messaged: "All I can say is that this is the tipping point. Take a weapon, I plan on buying a rifle in the next couple days. If sh*t kicks off you'll upgrade your weapon." Hr'g Ex. 12.

The video footage from January 6 of Padilla begins at approximately 1:31 p.m. when he approaches a metal barricade positioned in front of a line of Metropolitan Police Department officers guarding entry onto the Capitol grounds. SOF at 3. He is wearing a blue jacket, jeans, and a black backpack, and has a scuba mask over his eyes. <u>Id.</u> After Padilla verbally engages with officers for several seconds, an officer pushes Padilla back with a baton. <u>Id.</u> at 4; <u>Raw Footage of</u>

---

[1] The following facts are drawn from the parties' filings, the statement of facts attached to the criminal complaint, the two publicly available YouTube videos cited extensively in that complaint, and the exhibits that the government presented at the May 3, 2021 hearing on the instant motion.

the Capitol Yesterday – This is What Really Happened, YouTube (Jan. 7, 2021), https://www.youtube.com/watch?v=0zyjCvDN4Ig&t=3145s ("YouTube Video #1") (Mins. 4:20–4:43). Padilla steps back up to the barricade moments later and verbally engages with another officer. YouTube Video #1 (Mins. 4:44–5:16). Padilla refers to several officers as "f**king oathbreakers," Hr'g Ex. 1, and tells one officer that he is "defending a machine that doesn't even f**king care about you, man, but if you let us in there that machine will be gone and we will f**king protect you people," Hr'g Ex. 2.

At approximately 1:37 p.m., Padilla places his hands on the barricade and says to the police line: "Ya'll beat me, ya'll tased me, and I ain't stoppin'. You understand?" Hr'g Ex. 3. About a minute later, Padilla starts pushing the metal barricade into the line of police officers using both hands and shouts: "Push! Push! F**king push! F**king push!" YouTube Video #1 (Mins. 8:09–8:25); Hr'g Ex. 4. No one else appears to join in. See Hr'g Ex. 4. After officers remove Padilla's scuba mask, deploy baton strikes, and shove him backward, he steps away. SOF at 4. Shortly thereafter, other members of the crowd begin moving a large sign with wheels and a metal frame toward the barricade. Id. at 5. Padilla grabs onto the sign with his right hand in an effort to ram it against the barricade. Id. An officer tries to push Padilla to loosen his grip, but he does not let go of the sign for several seconds. See Hr'g Ex. 6. The barricade appears to fall to the ground soon after, and the crowd begins advancing forward. See id.

Three hours later, at around 4:47 p.m, Padilla is captured on video outside the archway to the Lower West Terrace entrance to the Capitol, where another set of officers is standing guard. SOF at 6; Indictment [ECF No. 6] at 3. Padilla remains some distance away from the archway as adjacent rioters are shown striking the officers with sticks and throwing various objects at them. SOF at 6; January 6, 2021 Capitol Insurrection Violence Against Police, YouTube (Jan. 12, 2021),

https://www.youtube.com/watch?v=DBIg2s_B0IY ("YouTube Video #2") (Mins. 2:36–2:45). Padilla then cocks back a pole that he has been holding and throws it at the mass of officers in the archway.  SOF at 6–8; YouTube Video #2 (Mins. 2:46–2:50).  The pole appears to hit an officer before sliding to the ground.  YouTube Video #2 (Mins. 2:46–2:50).  Padilla remains in the same spot for another minute as other individuals around him continue to assault police.  Id. (Mins. 2:50–3:46).

On January 7, 2021, Padilla posted to Facebook:

> There's a lot of memes and posts flying around saying that the people who were fighting last night were Antifa provacateurs [sic] etc. I just want to say that as a first hand observer of every point of last night, that it was not Antifa. They were Patriots who were trying to Restore the Republic after being attacked by cops, who struck first. Even those who broke the windows next to the doorway to the Capitol were Patriots trying to find a way to turn the Flanks of the cops.

SOF at 8.  Padilla also sent a Facebook message to another user stating: "Yeah I'm proud of what I did yesterday. Its [sic] guns next, that's the only way."  Hr'g Ex. 17.

The following day, Padilla posted a link on his Facebook to a twenty-one-second video titled "Just after we stormed the 2nd tier of the Capitol."  SOF at 8.  The caption to the Facebook post read: "Most Beautiful thing I saw in DC on Wednesday."  Id.  A voice off-screen is shouting "let's go" and "come on."  See Gov't Mem. in Opp'n to Def.'s Mot. to Revoke Det. Order ("Gov't Opp'n") [ECF No. 20] at 4.

From January 7 to January 18, Padilla also posted a number of comments in chats on the website thedonald.win under the username "Ghost_Soul167."  SOF at 9; see also Hr'g Exs. 13–16.  The Federal Bureau of Investigation ("FBI") linked this username to Padilla because he had used the same username for other social media accounts and the operator of the username posted biographical and location information that was "identical" to Padilla's. SOF at 9.  The comments

included:

> After I had my right hand knuckles and ring finger crushed for just talking to an officer I knew was a soldier and reminding him of his duty to refuse unlawful orders, I got pissed, and so did many others. That's when we started pushing.
>
> I was right there. I have the wounds to prove it. I pushed the rails, I pushed the stairs, and then pushed the doorway. I was beaten unconscious twice, sprayed more times than I care to count, received strikes from batons that should have been lethal (Multiple temple and carotid strikes) except that God was on my side.
>
> Some chode had stalled everyone out saying he had an "announcement" that amounted to "if we quit pushing the cops will quit beating us[.]" Basically surrender. If that asshat hadn't stalled our momentum, the cops wouldn't have been able to reinforce their position and we would have occupied the Capitol.
>
> If we could have occupied the Capitol, we could have invoked the right given to us in the 2nd paragraph of the Declaration of Independence….We would have been in the Seat of Power. All we would need to do is declare our grievances with the government and dissolve the legislature, and replace it with Patriots who were there. Then simply re-adopt the Constitution with amendments added to secure future Federal elections.
>
> What happened Wednesday is what needs to be done again and again. I'm not talking about those b*tches that were just let in, I'm talking about those of us who got pissed when the cops starting bashin [sic] hands and pepper spraying people who were only talking and shouting.
>
> Don't you realize it yet? The war has been upon us for years and we've just been wringing hands about it. After the events of the 6th, I'm done being passive.

SOF at 9; Gov't's Opp'n at 4; Hr'g Exs. 13–16.

In the wake of January 6, two witnesses identified Padilla in video footage circulating online and on television.  SOF at 2.  Law enforcement attempted to interview Padilla on January 14; he responded by stating "I do not answer questions."  Id. at 9.  On February 23, Padilla was arrested at his home following a criminal complaint.  Arrest Warrant Return [ECF No. 10].

Pursuant to a search warrant, law enforcement recovered the blue jacket and black backpack that he had worn to the Capitol.  Gov't's Opp'n at 5.  His wife informed law enforcement that Padilla brought goggles with him to attend the protests in Washington, D.C. in case he got near pepper spray.  Id.

Padilla appeared before a magistrate judge in the Eastern District of Tennessee on the same day as his arrest and waived his right to a detention hearing and a preliminary hearing, requesting that those proceedings occur in this District.  Id. at 2.  Padilla was temporarily ordered detained pending transport to this District.  Id.

On March 12, 2021, a grand jury returned a twelve-count indictment against Padilla.  The indictment charges Padilla with three counts of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); two counts of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); one count of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); Obstruction of an Official Proceeding (Aiding and Abetting), in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); Disorderly Conduct in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(D); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).  The first ten counts are felonies; the last two are misdemeanors.

Padilla appeared before Magistrate Judge Faruqui for a preliminary hearing on March 29

and entered a plea of not guilty before this Court the following day.  Min. Entry (Mar. 29, 2021); Min. Entry (Mar. 30, 2021).  Judge Faruqui held a detention hearing on March 31 and ordered that Padilla be detained pending trial, finding that the government had shown by clear and convincing evidence that no condition or combination of release conditions could reasonably assure the safety of any other person and the community.  Min. Entry (Mar. 31, 2021); Order of Det. Pending Trial (Apr. 21, 2021) ("Det. Order") [ECF No. 23] at 4.  Judge Faruqui did not find that Padilla was a flight risk.

Padilla filed a motion to revoke his detention order two weeks later, and a briefing schedule was set.  See Def.'s Mot. at 1.  A detention hearing was originally scheduled for April 28 but was postponed until May 3 at defense counsel's request.  See Min. Order (Apr. 16, 2021); Min. Order (Apr. 19, 2021).  The government presented some additional evidence, including videos and social media postings, at the May 3rd hearing.  The motion is now ripe for decision.

## Discussion

### A.  Legal Standard

A defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment of the order" with "the court having original jurisdiction over the offense."  18 U.S.C. § 3145(b).  Although the D.C. Circuit has not ruled on the matter, every circuit to consider the issue has found that a magistrate judge's detention order is subject to de novo review.  See United States v. Hunt, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017) (referencing cases from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits that support this proposition).  This Court has adopted this view.  See United States v. Klein, 2021 WL 1377128, at *3 (D.D.C. Apr. 12, 2021) (Bates, J.).

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial

detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses."  United States v. Singleton, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting United States v. Salerno, 481 U.S. 739, 747 (1987)).  Hence, a detention hearing must be held only if a case involves certain enumerated categories of offenses, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, id. § 3142(f)(2)(A)–(B).

If a defendant is eligible for a detention hearing, the BRA provides that the court "shall" order pretrial detention if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id. § 3142(e)(1).  "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'"  United States v. Vasquez-Benitez, 919 F.3d 546, 550 (D.C. Cir. 2019).  To assess a defendant's dangerousness and risk of flight, the court must "take into account the available information" concerning four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."   18 U.S.C. § 3142(g)(1)–(4).

As the D.C. Circuit recently stated in United States v. Munchel, "[t]o justify detention on the basis of dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'"  991 F.3d 1273, 1279–80 (D.C. Cir. 2021) (quoting 18 U.S.C. § 3142(f)). That requires the government to establish that the defendant poses a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions.  Id.

at 1280 (quoting <u>Salerno</u>, 481 U.S. at 751); <u>see also</u> <u>id.</u> ("[A] defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety."). Furthermore, "[d]etention cannot be based on a finding that defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness . . . [as] otherwise the scope of detention would extend beyond the limits set by Congress." <u>Id.</u> at 1283; <u>see also</u> <u>Salerno</u>, 481 U.S. at 746 ("[P]retrial detention under the Bail Reform Act is regulatory, not penal."). "When the basis for pretrial detention is the defendant's risk of flight, the government is required to demonstrate the appropriateness of detention . . . by a preponderance of the evidence." <u>United States v. Sabol</u>, 2021 WL 1405945, at *4 (D.D.C. Apr. 14, 2021) (Sullivan, J.) (citing <u>United States v. Xulam</u>, 84 F.3d 441, 442 (D.C. Cir. 1996)).

At the outset, Padilla does not dispute that he is eligible for pretrial detention based on the offenses charged. The BRA authorizes pretrial detention "in a case that involves . . . a crime of violence." 18 U.S.C. § 3142(f)(1)(A). Counts 3 and 5 of the Indictment charge Padilla with assaulting, resisting, or impeding officers using a dangerous weapon in violation of 18 U.S.C. § 111(a)(1) and (b)—an offense which this Court has already concluded qualifies as a "crime of violence" under the BRA. <u>See</u> <u>Klein</u>, 2021 WL 1377128, at *6. The government also contends that Padilla is eligible for pretrial detention based on flight risk. <u>See</u> Gov't's Opp'n at 1 (citing 18 U.S.C. § 3142(f)(2)(A)). The Court will consider each basis for detention in turn.

## B.  Danger to the Community

### i.   Nature and Circumstances of the Offense

The Court first considers "the nature and circumstances of the offense charged." 18 U.S.C. § 3142(g)(1). Chief Judge Howell has set forth a number of considerations, which this Court finds

helpful, to differentiate the severity of the conduct of the hundreds of defendants connected to the events of January 6.  See United States v. Chrestman, — F. Supp. 3d —, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) (Howell, C.J.).  These considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses"; (2) "engaged in prior planning before arriving at the Capitol"; (3) carried or used a dangerous weapon during the riot; (4) "coordinat[ed] with other participants before, during, or after the riot"; or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct"; and (6) the nature of "the defendant's words and movements during the riot," including whether he "damaged or attempted to damage federal property," "threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot."  Id. at *7–8.

Although Padilla worked in tandem with other rioters and shouted words of encouragement like "push," "let's go," and "come on," the government does not really argue that he coordinated with other participants before, during, or after the riot—aside from discussing his plans to attend— or assumed a de facto leadership role.  See Gov't Opp'n at 6–8; Hr'g Exs. 9–12.

The remaining Chrestman considerations nonetheless demonstrate a clear risk of danger to the community.  Padilla is charged with ten felony and two misdemeanor offenses.  None of the offenses gives rise to a rebuttable presumption of dangerousness under the BRA.  But the crimes alleged are serious.  Counts 3, 5, and 7—which charge Padilla with obstructing an official proceeding and assaulting, resisting, or impeding certain officers using a dangerous weapon— carry a statutory maximum of twenty years in prison.  See 18 U.S.C. §§ 1512(c), 111(b).  The other felony charges carry five, eight, or ten years in prison.  See id. §§ 111(a), 231(a), 1752(b)(1)(A).

There is also ample evidence that Padilla came to Washington, D.C. to disrupt the

certification of the election and anticipated that he might commit violent acts.  See Chrestman,
2021 WL 765662, at *8 ("[S]teps taken in anticipation of an attack on Congress speak volumes to
both the gravity of the charged offense, as a premeditated component of an attempt to halt the
operation of our democratic process, and the danger a defendant poses.").  Padilla spoke of the
need to "tak[e] DC with [] a heavily armed protest" and appears to have decided against bringing
weapons with him to the Capitol for fear that it would be too easy for the cops to arrest him unless
a "whole group" brought weapons as well.  See Hr'g Exs. 10–11.  To be sure, there is not as
extensive evidence of advance planning as in some other cases.  See, e.g., Chrestman, 2021 WL
765662, at *15 ("This defendant traveled to the nation's capital equipped with tactical gear in
preparation for conflict with law enforcement, including a helmet and gas mask for defensive use
and an axe handle for offensive use," and also "coordinated with members of the Proud Boys and
others to come to Washington, D.C.").  Padilla ultimately dressed in ordinary clothing, except for
his scuba mask, and did not bring any weapons with him.[2]  But the messages that Padilla
exchanged before January 6 demonstrate a considered plan to come to Washington as part of a
large group with the expectation that he "[m]ight just have to fight" and that weapons might be
"the only thing that will work."  See Hr'g Exs. 10–11.

Moreover, upon arriving at the Capitol, Padilla began verbally engaging with several
officers, and when—in his words—he "got pissed," he "started pushing."  SOF at 9.  He is charged
with three separate assaults on law enforcement officers—one of which involved using his bare

---

[2] The parties sharply dispute the relevance of Padilla's scuba mask: the government says it shows "clear
premeditation of anticipated clashing with police," Gov't's Opp'n at 6, whereas Padilla contends that "masks [and]
goggles have become commonplace" at protests in the last year and are even recommended by mainstream online
media, see Def.'s Reply to Gov't's Opp'n ("Def.'s Reply") [ECF No. 22] at 2.  The mask evinces some expectation
of a confrontation with law enforcement—in the sense that chemical irritants might be sprayed—but it does not alone
establish premeditated violence.  Nonetheless, Padilla's suggestion that he wore a scuba mask as any other peaceful
protester might rings hollow given his social media postings prior to January 6 stating that "a heavily armed protest"
in D.C. was needed.

hands to forcefully push a metal barricade into a line of officers, and two of which employed dangerous weapons.  See Def.'s Mot. at 4.  The assaults took place over the span of three hours, and when police officers tried to subdue him, he told law enforcement: "I ain't stoppin'.  You understand?"  See Hr'g Ex. 3; Gov't's Opp'n at 6.  Furthermore, in the days that followed, Padilla repeatedly celebrated the attempt to stop the certification of the election, as well as the violence perpetrated against law enforcement.  See SOF at 8–9.  He criticized those individuals who tried to quell the violence against the police and "surrender."  See Hr'g Ex. 13.  And he stated that the next step was "guns."  Hr'g Ex. 17.

Padilla tries to downplay the severity of his conduct by arguing that unlike some detained defendants he never "str[uck] officers directly with dangerous objects, repeatedly and at close range."  Def.'s Mot. at 4.  This is not true.  Nor does it provide a meaningful basis for distinction.  For starters, Padilla did "repeatedly" employ force against officers by committing three distinct assaults, each of which was perpetrated in a different way, and two of which were indeed "at close range."  Of course, the two "close range" assaults could, as defense counsel suggested, have been even more violent if Padilla had also "engage[d] in hand-to-hand combat with the officers" or "tr[ied] to go for their weapons."  See Rough Tr. of H'rg (May 3, 2021) ("Hr'g Tr.") 31:12–15; 32:3–5.[3]  But that argument gives Padilla too much credit.  He was not merely engaged in a "shoving match" with officers.  See id. 31:6–10.  He forcefully pushed a metal barricade—designed to protect police officers—directly into their bodies, and, then, minutes later, helped to successfully knock down that barricade with a large metal sign.  Those actions were violent, persistent, and created a real risk of injury to others, which Padilla does not deny.  See id. 33:13–22.

---

[3] Citations to the May 3, 2021 hearing transcript are to an uncertified rough draft of the transcript.  When finalized, the transcript will be posted to the docket.  Discrepancies between the rough and final transcripts may exist.

The fact that Padilla threw a pole at a group of officers from several feet away—rather than up close—does not mitigate the violent nature of that assault either.  He not only obtained the pole, but he then took a moment to steady his aim before hurling it at officers who were already under threat from several other rioters.  His conduct plainly was designed to incapacitate or injure law enforcement, and Padilla does not argue otherwise.[4]

To the extent that Padilla seeks to analogize his conduct to that of another defendant—Federico Klein—whom this Court recently ordered released from pretrial detention, the comparison falls short.  Both men are alleged to have engaged in deeply troubling acts against law enforcement at the Capitol on January 6.  But in finding that the nature and circumstances of Klein's offense weighed only "modestly" in favor of pretrial detention, the Court emphasized that "[t]he government [had] not submit[ed] that Klein intended to injure officers" nor that Klein "h[ad] made [any] attempts to 'battle' or 'fight' the officers with his bare hands or other objects."  See Klein, 2021 WL 1377128, at *8.  Instead, the Court observed that Klein's actions—which primarily involved "employ[ing] persistent force against multiple officers [by] repeatedly pressing a stolen riot shield against them"—were "distinguishable from other detained defendants charged

---

[4]  Judge Lamberth's decision in United States v. Fairlamb, 2021 WL 1614821, at *8 (D.D.C. Apr. 26, 2021), recently took issue with this Court's assessment in Klein that a "spectrum of violence [ ] occurred and was threatened" on January 6, see Klein, 2021 WL 1377128, at *11, and that how violently a defendant behaved at the Capitol may be one relevant consideration in the dangerousness analysis.  As Klein itself noted, the D.C. Circuit in Munchel observed that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way."  Klein, 2021 WL 1377128, at *11 (quoting Munchel, 991 F.3d at 1284).  That dichotomy is useful, as this Court acknowledged in Klein and again references here as well.  But this Court respectfully disagrees with Judge Lamberth that the line drawn in Munchel absolves the district court of the need to probe the precise nature of a defendant's actions—including the type of any force employed—when assessing both the "nature and circumstances of the offense" and the "nature of the threat" posed by the defendant under § 3142(g).  Assaults can take many forms, and although a defendant's eligibility for pretrial detention is often determined by a categorical approach, see 18 U.S.C. § 3142(f)(1)(A)-(E), the propriety of detention under the BRA is not.  Therefore, while it may be that many—or even most—of the defendants who fall in Munchel's heightened "category of dangerousness" are sufficiently dangerous to warrant pretrial detention, any finding of an unmitigable threat to public safety must rest on the facts of each case, including an assessment of the particular violent conduct involved.

under § 111(b) who clearly sought to incapacitate and injure members of law enforcement by striking them with fists, batons, baseball bats, poles, or other dangerous weapons." See id. at *8, 11. The nature of Padilla's conduct is not distinguishable in the same way. Indeed, Padilla plainly did seek to injure police officers using a pole.[5]

Hence, the Court finds that the nature and circumstances of the charged offenses weigh strongly in favor of detention. Padilla came to the Capitol with an expectation that violence might occur. He repeatedly engaged in violent conduct once there and evinced a willingness to injure or incapacitate law enforcement in order to advance his political beliefs.

### ii.      The Weight of the Evidence

There is strong evidence that Padilla attempted to gain entry into the Capitol building on January 6 and committed assaults against multiple officers. His conduct is captured by several videos. Two witnesses reported his identity to the FBI, and he does not dispute that he is the individual depicted on camera. His social media postings also acknowledge that he engaged in physical altercations with law enforcement at the Capitol on January 6, and some of the clothing that he wore that day was recovered in the FBI's search of his home. See SOF at 8–9. In sum, this factor weighs firmly in favor of detention, although it "is the least important." See United States v. Gebro, 948 F.2d 1118, 1121–22 (9th Cir. 1991).

### iii.     History and Characteristics of the Defendant

Padilla's history and characteristics are neutral. As part of this factor, the Court must

---

[5] Several other facts—in addition to the nature of the force employed—distinguish the detention analysis in this case from Klein. For instance, Klein had not engaged in any advance planning, and he "ha[d] not, to the government's knowledge, ever verbally threatened others or advocated political violence either before or after January 6." 2021 WL 1377128, at *11. Indeed, the record in Klein was "strikingly silent as to what . . . Klein actually said during his time at the Capitol" or thereafter and, unlike Padilla, Klein "[was] never shown verbally threatening any officers or even boasting about his confrontations with law enforcement after the fact." Id. at *9. That is not to suggest Klein's conduct was not deeply troubling. The Court made clear that it was. See id. But the "detention issue [t]here [was] close," id. at *1, and there are sufficient factual differences here that convince the Court that pretrial detention is warranted in Padilla's case.

consider Padilla's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).

Padilla is 40 years old and has lived in Tennessee for most of his life.  He previously served in the U.S. Army during the Iraq War.  Def.'s Mot. at 5.  After he returned home, he was diagnosed with posttraumatic stress disorder ("PTSD") and began receiving disability benefits.  Id. at 5–6. Prior to his arrest, he was a stay-at-home dad who managed his family's household affairs and cared for his three sons during the day while his wife worked as a librarian.  Id. at 6.  He has no criminal history or history of substance abuse.  Id.  He also has no known ties to extremist groups and receives strong social support from his mother-in-law.  Det. Order at 3.

These aspects of Padilla's background largely inure to his credit. And the government does not argue in its briefing that this factor alone actually supports a finding of dangerousness.  See Gov't's Opp'n at 9–10 (stating only that Padilla's "history and characteristics" evince a "serious risk of flight").  At the hearing, however, the government contended that two features of Padilla's background favor pretrial detention: (1) his role as a stay-at-home dad, which, according to the government, gives him "idle time to . . . engage in conspiracy theories" and "[run] down rabbit holes through social media," see Hr'g Tr. 18:9–13; and (2) his prior military service, see id. 18:23–25; 19:1–2.[6]  The Court cannot accept the proposition that stay-at-home parents pose a greater threat to public safety.  And although the Court agrees with Judge Faruqui's statement that, as a

---

[6] The government has not argued that Padilla's mental health status renders him a threat to public safety. Although the Court must "take into account the available information concerning" a defendant's "mental condition" under § 3142(g)(3)(A), the current record—which establishes only that Padilla was diagnosed with PTSD at some point after he returned from Iraq and has been actively seeking some type of treatment for PTSD for an unspecified period of time, see Def.'s Reply at 4—leaves the Court without sufficient basis to make an informed assessment of Padilla's mental health status.

former service member, Padilla had every reason to know that "what occurred on January 6th was totally unacceptable," <u>see</u> Det. Order at 4, the fact of military service is complicated and can cut both ways, <u>see</u> Hr'g Tr. 19:16–25.

Nevertheless, the Court recognizes that Padilla's decisions on January 6 "show that he is willing to allow his own personal beliefs to override the rule of law, which reflects poorly on his character." <u>Klein</u>, 2021 WL 1377128, at *10 (quotation omitted); <u>see also</u> <u>Sabol</u>, 2021 WL 1405945, at *15 ("That [the defendant] acted violently against law enforcement protecting the peaceful transition of power based on a belief that the 2020 Presidential Election was stolen is also very alarming [and] indeed raises concerns about [his] character and the danger [he] may present to the community if he were released."). Padilla's post-January 6 statements on social media further suggest he "remained proud of his actions after the fact," diminishing the "basis to assume that [he] will refrain from similar activities, if instructed, in the future." <u>See</u> <u>United States v. Whitton</u>, 2021 WL 1546931, at *11 (D.D.C. Apr. 20, 2021) (Sullivan, J.) (revoking magistrate judge's pretrial release order); <u>see also</u> Hr'g Ex. 17. Moreover, while there is no allegation that Padilla attempted to obstruct the FBI's investigation or evade arrest, there is also no evidence that he chose to cooperate with law enforcement, voluntarily surrender, or has renounced the beliefs that animated his conduct on January 6. <u>See, e.g.</u>, <u>Chrestman</u>, 2021 WL 765662, at *14 (analyzing such considerations); <u>Whitton</u>, 2021 WL 1546931, at *11 (same).

Padilla's history and characteristics, therefore, are mixed, and the Court finds that on balance they do not point definitively in one direction or the other.

### iv.   Nature and Seriousness of the Danger

The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." 18 U.S.C.

§ 3142(g)(4).  "Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," as it requires the Court to engage in an "open-ended assessment of the 'seriousness' of the risk to public safety."  United States v. Cua, 2021 WL 918255, at *5 (D.D.C. Mar. 10, 2021) (Moss, J.) (quoting United States v. Taylor, 289 F. Supp. 3d 55, 70 (D.D.C. 2018)).

As described above, Padilla's conduct on January 6 demonstrated a clear and brazen disregard for the rule of law and for the safety of others.  The government has shown by clear and convincing evidence that he committed three separate assaults on law enforcement.  The final assault occurred nearly three hours after the first, eliminating any suggestion—which is further belied by his social media postings—that Padilla was caught up in the heat of any single moment. In connection with his first assault, he approached the line of officers protecting entry into the Capitol by himself, at a time when few other rioters were engaged with police.  He then forcefully pushed the barricade protecting those officers into their bodies, seemingly again without assistance from others.  In his third and final assault, he steadied his aim and then threw a pole at a group of officers, who were already being struck by other objects, in an effort to further incapacitate or injure them.  That this attempt was unsuccessful is fortuitous, see Hr'g Tr. 8:1–8, but does not change the fact that Padilla intended to engage in violent conduct to harm others.  Moreover, the nature of his actions—which were deliberate and, on two occasions, committed largely on his own accord—indicates that the "presence of the group" was not "critical to [his] ability to obstruct the vote and to cause danger to the community."  See Munchel, 991 F.3d at 1284.

Padilla premises his argument for release on his law-abiding conduct before and after January 6 and on the "unique circumstances" of that day.  Specifically, he emphasizes that he has no prior criminal history and that he "did not make any threats of violence" or "civil unrest" "before January 6 and has not made any since," even when Congress certified the election,

President Biden took office, and the FBI appeared on his doorstep. Def.'s Mot. at 7–8. For starters, that contention is not accurate. Padilla stated before January 6 that "a heavily armed protest" in D.C. "is the only thing that [would] work." Hr'g Ex. 10. And he later warned that "[w]hat happened Wednesday [the 6th] is what needs to be done again and again," and that "[a]fter the events of the 6th, I'm done being passive." See SOF at 9; Gov't's Opp'n at 4. Those statements demonstrate a continued willingness to engage in violence to advance his political objectives, as well as an abiding belief that continued violence is justified in spite of the rule of law. Furthermore, while Padilla's social media commentary appears to have ceased on January 18 and he never engaged in any other protest-related activity in the intervening time period before his arrest, see Hr'g Tr. 43:13–22, there is no evidence that he has disavowed his prior postings.

Of course, it bears on the Court's analysis that Padilla is not alleged to have committed additional crimes after January 6 and that he did not purchase a firearm, despite his stated intention to do so. Those facts undermine some of Padilla's statements on social media "a little bit," as defense counsel put it. See Hr'g Tr. 27:24–25. But those facts alone "do[] not demonstrate that" the violent conduct and "the character [Padilla] displayed at the U.S. Capitol" and in the days that followed are "fleeting and no longer of concern." See Whitton, 2021 WL 1546931, at *10. While the "specific concerns in the wake of the January 6 events over future protests and violent attacks on the government . . . have dissipated to some degree now" several months later, Klein, 2021 WL 1277128, at *12, the record here suggests that Padilla was invigorated by those tragic events. In the days that followed, he described video of the riot—which ultimately left five people dead and hundreds more injured—as the "Most Beautiful Thing [he] saw in D.C. on Wednesday," and suggested that the January 6 events had catalyzed him from a state of passivity to a state of action. Padilla continued to post online about those events for eleven days. See SOF at 9; Gov't's Opp'n

at 4.

Padilla also publicly stated his objective at the Capitol on January 6 in no uncertain terms: to "dissolve the legislature, and replace it with Patriots who were there.  Then simply re-adopt the Constitution with amendments added to secure future Federal elections."  See SOF at 9.  He told a police officer that he sought to destroy the "machine" that governed within the U.S. Capitol.  See Hr'g Ex. 2.  His comments take issue not simply with the 2020 presidential election, but regard a broader years-long struggle against a government he perceives to be illegitimate.  See id. ("This war has been upon us for years and we've just been wringing hands about it."); see also Hr'g Ex. 10.  And he demonstrated a belief that force is justified to counteract government measures that he personally considers unlawful.  His words, as well as the nature of his actions, thus create "ample reason to believe that [the] fight is not finished for [Padilla]," even though the transition of power to the current administration has come and gone.  See Sabol, 2021 WL 1405945, at *18.  Indeed, Padilla's own statements suggest that his fight has just begun.

The D.C. Circuit recently remarked that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way."  Munchel, 991 F.3d at 1284.  Padilla's actions on January 6 place in him squarely in the former category and, coupled with his repeated comments signaling the need for more violence in the wake of those events, provide clear and convincing evidence that he "poses a concrete, prospective threat to public safety."  See id. at 1280.  That threat includes using physical violence to advance his political objectives and harming public servants carrying out orders that he views as illegitimate according to a misguided understanding of our constitutional democracy that he has yet to repudiate.  His conduct further

establishes that, even without possessing weapons in his home or resorting to extensive planning in advance, he has both the "resources and capabilities" to execute that threat. See id at 1283.[7]

The government has also presented clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." See id. at 1280 (quoting 18 U.S.C. § 3142(f)).  Padilla argues that "[if] released, [he] would return to his wife and children in Tennessee, where he has never faced criminal allegations [and] he would obey any Court orders regarding home detention, computer monitoring, and avoidance of political activities or gatherings."  Def.'s Mot. at 8.  He further emphasizes that "nothing about [his] history suggests an unwillingness or inability to follow orders of the court or conditions of release [and] his time would largely be occupied by raising his three boys."  Id. Padilla also notes that his arrest and its effect on his family has "had a real impact on him," and that he realizes, for the sake of his family, he "can't afford" to engage in political organizing in the future.  See Hr'g Tr. 37:3–13; 38:1–7.

The Court agrees with Judge Faruqui's assessment that "[i]t is difficult to reconcile the image" that Padilla paints "of a caring stay-at-home dad"—who has a strong support network and

---

[7] For his part, Padilla does not attempt to analogize himself to other defendants, besides Klein, who have been deemed not to pose an unmitigable threat to public safety.  The D.C. Circuit did not opine on the relevance of other detention decisions in Munchel, noting that "those facts and circumstances are best evaluated by the District Court in the first instance." 991 F.3d at 1284.  But Judge Lamberth in Fairlamb recently criticized this Court's decision in Klein for "anchoring its [dangerousness] analysis to other courts' decisions about other defendants" and thus "fail[ing] to decide detention individually."  See 2021 WL 1614821, at *8.  Klein did consider the detention outcomes in other cases, but not for the purpose of examining "potential disparities between defendants," as Fairlamb states. See id.  Hence, again this Court must respectfully disagree with Fairlamb.  Klein did not say that disparities are part of the Bail Reform Act analysis; they are not.  Instead, Klein explained the purpose of looking to other detention decisions as follows: although "any determination of dangerousness must rest on the specific circumstances of each defendant . . . where so much of the proffered justification for Klein's detention relies on the type of force he employed, the Court sees some relevance in the fact that several defendants who also face charges under § 111(b) for assaulting officers and did not engage in planning activities were released without objection from the government."  Klein, 2021 WL 1377128, at *12 (emphases added).  The relevance then was whether the use of similar types of force had or had not been considered to demonstrate an unmitigable prospective threat to public safety in other cases.  Padilla's circumstances differ from Klein's in that the proffered basis for Padilla's detention involves not only his forceful (indeed violent) conduct, but also his planning, threats of future violence, and justification for using violence at the Capitol.  Any comparison across cases based on the nature of the force alone would of course be less probative.

history of prior service to this country—"with the violent acts [Padilla] allegedly committed on January 6." <u>See</u> Det. Order at 4.  The Court recognizes Padilla's commitment to his family and the effect that his detention has had on them.  But the Court is not reasonably assured that Padilla can "be trusted to abide by any conditions of release that might be imposed instead of pretrial detention." <u>See</u> <u>Chrestman</u>, 2021 WL 765662, at *16.  Indeed, other judges in this District have similarly declined to take at their word defendants who on January 6 demonstrated a clear willingness to engage in violence in furtherance of their beliefs and in a perceived battle against a government they viewed to be illegitimate.  <u>See, e.g.</u>, <u>Sabol</u>, 2021 WL 1405945, at *18; <u>United States v. Pezzola</u>, 2021 WL 1026125, at *9 (D.D.C. Mar. 16, 2021) (Kelly, J.).  And this Court is hard-pressed to believe that its orders would deter future acts of violence by Padilla when he was undeterred—and seemingly invigorated by—what he says transpired on January 6.  In his own words, Padilla alleges that he was "beaten unconscious twice, sprayed more times than [he] care[s] to count, received strikes from batons that should have been lethal," <u>see</u> SOF at 9, and yet he continued for hours to try to stop the certification of the election and emerged steadfast in his belief that "what happened" at the Capitol "is what needs to be done again and again." <u>See</u> <u>id.</u>  Indeed, Padilla stressed on January 7 that he was "proud of what [he] did yesterday. Its [sic] guns next, that's the only way."  Hr'g Ex. 17.

The Court acknowledges that Padilla is not alleged to have committed any criminal activity in his home or to have acquired tactical equipment there.  Nonetheless, he was at home when he planned to travel to Washington, determined that "a heavily armed protest [was] the only thing that [would] work," and assessed that he "[m]ight just have to fight Proud Boys style." <u>See</u> Hr'g Exs. 10–11.  And he was also at home when he proclaimed after January 6 that his days of being passive were over and that guns were necessary in the future.  <u>Cf.</u> <u>Klein</u>, 2021 WL 1277128, at

*13 (finding home detention warranted "where [defendant] is not alleged to have engaged in any unlawful or even threatening conduct [from there] before") (emphasis added).  Padilla had ample time to engage in this behavior despite his parental obligations, and he did so notwithstanding the consequences that his family might face.  As other judges in this District have noted, any restrictions that this Court might place on Padilla "ultimately rely to some degree on [his] voluntary compliance," see, e.g., Pezzola, 2021 WL 1026125, at *9, and given the determination that Padilla evinced on January 6 and thereafter to forcefully advance his own personal beliefs over the rule of law, the Court is not reasonably assured he would comply.

 "It cannot be gainsaid that the violent breach of the [U.S.] Capitol on January 6 was a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community."  Munchel, 991 F.3d at 1284–85.  Padilla is one such individual.  His participation in the events of January 6 and his assessment of what should transpire next demonstrate his disdain for the law and his willingness to follow his political objectives to disturbing ends.  Hence, this Court agrees with Judge Faruqui that Padilla presents a concrete, prospective threat to public safety that cannot be mitigated by any combination of release conditions.  The Court therefore will deny Padilla's motion to revoke his detention order.

### C.  Flight Risk

The government also seeks to detain Padilla on the ground that he poses a serious risk of flight.  See Gov't's Opp'n at 1; see also 18 U.S.C. § 3142(f)(2)(A).  In assessing a defendant's flight risk under the BRA, the Court considers the same four factors under § 3142(g) that were integral to the dangerousness analysis.  See Vasquez-Benitez, 919 F.3d at 550–51.  The government's burden, however, is only a preponderance of the evidence.  Id. at 551.

The substantial term of imprisonment authorized by Padilla's charges and the strength of

the government's case provide Padilla with reason to flee, and therefore the "nature and circumstances of the offense" and the "weight of the evidence" favor pretrial detention. See Sabol, 2021 WL 1405945, at *13–14; see also United States v. Chansley, 2021 WL 861079, at *14 (D.D.C. Mar. 8, 2021) (Lamberth, J.). But Padilla's "history and characteristics" as well as "the nature and seriousness of the danger" do not sufficiently demonstrate he poses a flight risk to justify pretrial detention on this ground.

The government contends that Padilla's "reported unemployment, his mental health conditions, and his previous thoughts of suicide" suffice to establish a serious flight risk. Gov't's Opp'n at 9. While Padilla may lack a formal employer, he serves as "a stay-at-home dad to his three sons" and "manag[es] the house while his wife is at work, picking the boys up from school, and watching them throughout the afternoon and early evening." See Def.'s Mot. at 6. His close ties to his family and commitment to caring for his children do not suggest that he is likely to flee. Furthermore, the government's assertion that Padilla's "mental health conditions" evince a risk of flight is unsubstantiated by the current record. Although Padilla was diagnosed with PTSD following his military service, he has been "actively engaged in treatment with a V.A. provider," see Def.'s Reply at 4, and no other specifics about his mental health status have been provided to the Court.

The government also posits that Padilla had suicidal ideations in 2018—a fact that he sharply disputes.[8] But even if that is true, the government admits that he is "not currently having suicidal thoughts." See Gov't's Opp'n at 9. Nor has the government taken any steps—such as requesting that he receive mental health services in prison or be placed on suicide watch—that

---

[8] The government indicates that Padilla reported to a pretrial services officer in Tennessee that "he had thoughts of suicide" in 2018 "when he lost his job and became homeless for a couple of days." See Gov't's Opp'n at 9. Padilla, in turn, states that he "did not report his own suicidal thoughts – only that the suicide of someone with whom he had served in the military catalyzed a difficult time he had in 2018." Def.'s Reply at 4–5.

would suggest this is a real concern for the government.  See Def.'s Reply at 5.  The Court is not

even sure that suicidal ideations are probative of flight risk.  Some courts have "treat[ed] suicide

as a form of flight" in the context of analyzing "evidence of consciousness of guilt," see, e.g.,

United States v. Cody, 498 F.3d 582, 591 (6th Cir. 2007), but the government has not clearly

articulated a nexus between suicidal thoughts and flight risk in the pretrial detention context, see

Hr'g Tr. 25:8–20.  Hence, absent any specification as to how Padilla's "mental health conditions"

create a likelihood that he would flee, the Court does not find them very informative here.

The government also does not allege that Padilla attempted to flee or destroy evidence in

this case, even after he knew he was under investigation by the FBI.  Cf. Sabol, 2021 WL 1405945,

at *16 (concluding that defendant's "attempted flight and his destruction of evidence that could be

used against him in a criminal prosecution unquestionably weighs against pre-trial release").  Nor

has evidence been put forward that Padilla even has the means to flee.  He receives limited income

from his disability benefits, and he has lived in Tennessee for the majority of his life, with no

known ties to any other community.  See 18 U.S.C. § 3142(g)(3)(A) (mandating consideration,

inter alia, of defendant's "family ties," "family resources, length of residence in the community,

[and] community ties"); see also United States v. Nwokoro, 651 F.3d 108, 228–29 (D.C. Cir. 2011)

(describing the sophisticated nature of defendant's alleged crimes, resources in the United States,

and substantial connections overseas as relevant to the BRA flight-risk analysis).  That Padilla was

"willing" and able "to leave [his] family to come to D.C." on January 6 does not alone establish

that he can or would flee if released.  See Hr'g Tr. 24:8–20.

In sum, then, the Court does not find that the government has met its burden of establishing

by a preponderance of the evidence that Padilla poses a serious risk of flight and thus will not order

that Padilla be detained pending trial on this ground.

## **Conclusion**

For the reasons explained above, the Court finds based on clear and convincing evidence that Padilla's pretrial detention is warranted because he poses a concrete, prospective threat to the safety of the community that cannot be mitigated by any combination of release conditions. Accordingly, the Court will deny Padilla's motion to revoke his detention order.

/s/
_____
JOHN D. BATES
United States District Judge

Dated:  May 4, 2021