1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3      United States of America,        ) Criminal Action
                                        ) No. 21-cr-214
4                     Plaintiff,        )
                                        ) Video Status Hearing
5      vs.                              )
                                        ) Washington, DC
6      Joseph Lino Padilla,             ) August 25, 2021
                                        ) Time:  2:00 p.m.
7                     Defendant.        )
       _____
8

9                TRANSCRIPT OF VIDEO STATUS HEARING
                            HELD BEFORE
                 THE HONORABLE JUDGE JOHN D. BATES
10                 UNITED STATES DISTRICT JUDGE

11     _____

                      A P P E A R A N C E S
12

13     For Plaintiff:      JACOB STRAIN
                           DOJ-USAO
14                         111 South Main Street, Suite 1800
                           Salt Lake City, UT  84111
15                         801-325-3285
                           Email:  Jacob.strain@usdoj.gov

16     For Defendant:      NATHANIEL c. WENSTRUP
                           Federal Defenders for the Eastern District
17                           of Virginia
                           1650 King Street, Suite 500
18                         Alexandria, VA  22314
                           513-532-6730
19                         Email:  Nate_wenstrup@fd.org

20     _____

21     Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
                               Official Court Reporter
22                             United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
23                             Washington, DC  20001
                               202-354-3267
24

25

1              THE COURTROOM DEPUTY:  Your Honor, we have criminal

2       action 21-214, United States of America versus Joseph Padilla.

3       I'm going to ask that counsel please identify yourself,

4       starting with government counsel.

5              MR. STRAIN:  Jacob Strain and Emily Miller for the

6       United States.

7              THE COURTROOM DEPUTY:  Defense counsel.

8              MR. WENSTRUP:  Good afternoon, Your Honor.  Nate

9       Wenstrup, and with me is Cadence Mertz from our office, for

10      Mr. Padilla.

11             THE COURT:  All right.  Good afternoon to everyone.

12      I think we were last together in mid June.  There's been some

13      information with respect to the status of discovery, what I'll

14      call the global discovery, as opposed to the more specific

15      discovery related to this case.  But beyond that, I don't know

16      what has been happening in the case, so let me ask counsel.

17             Mr. Strain, maybe I should start with you?

18             MR. STRAIN:  Yes, Your Honor.  So, as you know, we've

19      taken the position that we have provided sufficient discovery

20      for Mr. Wenstrup to do -- conduct his own due diligence to

21      determine if it's in his client's best interest to plead at

22      this point.  And there have been negotiations.  The plea offer

23      that was made was rejected last week because Mr. Padilla is

24      interested in seeing full discovery before he makes his

25      ultimate decision.

1          So, the defense has made it clear that it is not

2     ready to enter a plea without full discovery.  And, so, that

3     means that the status of this case is we are barreling forward,

4     seeking to produce full global discovery as fast as we can.

5     And that is why Ms. Miller is here, she can speak to it more

6     specifically, provide you with additional information that's

7     related to the filing that was put on the docket last night.

8          THE COURT:  To the Relativity database and the

9     Evidence.com database?

10          MS. MILLER:  We can talk about it for as long as you

11     would like, Your Honor.  I can go into amazing amount of detail

12     about these platforms.

13          THE COURT:  Well, the detail that I would like,

14     Ms. Miller, is a timeline.  I think that understanding the

15     process and how things are going to work is important.  But,

16     it's also going to be important to get somewhat of a sense, at

17     least, of the timeline that we're dealing with.  So why don't

18     you go ahead and give us an overview and then I'll see if

19     Mr. Wenstrup has anything he would like to say or if I have any

20     questions.

21          MS. MILLER:  Well, to answer the Court's question

22     completely frankly, it can't give the Court an exact timeline

23     right now and that's because there's too much that's currently

24     unknown.  As we reference -- and I think it sounds like the

25     Court has had an opportunity to review the filing that we made

1    last night, so I'm going to just assume that you have that

2    background, unless there's things that you would like me to

3    reiterate.  But, there is so much information that we still

4    have, are processing, and until we actually have an opportunity

5    to encounter it, determine what issues there are from a

6    technological perspective, process it, look at it in a

7    database, it's just hard to make an estimate.

8           So just as an example, I think I mentioned in the

9    filing that there are around 750,000 potential documents in the

10   FBI's holdings.  We have very good reasons to believe that any

11   number of those are duplicative, that the same, for example,

12   document could have been serialized to any number of different

13   files at the FBI.  So, if something seems relevant to defendant

14   A's case and defendant B and defendant C's, they may have had

15   it all placed into their individual case files with the FBI.

16   It might also exist in a more general sense, in like a main

17   file that's not associated with any particular defendant.

18          So, once we're able to ingest 750,000 documents, it

19   could become apparent that -- you know, and I'm just guessing

20   here, so I'm truly just guessing, which is my point -- but

21   maybe only 200,000 of those are actually relevant.  I'm making

22   that up by way of example to just illustrate for the Court that

23   right now we can't tell.  And it could be, though, that once we

24   get those in and we duplicate them, we can also do things,

25   leveraging Relativity tools, like keyword search them.  And it

1    may turn out that of that made-up number of 200,000 that I just

2    gave the Court, that another 100,000 are easily distinguished

3    as not discoverable; they're administrative documents or

4    something of that sort that have nothing to do with relevance

5    to anything to any case and would just be perceived as a

6    document dump as we put them on to the defendant and ask them

7    to go through them.

8         So, because of the time it takes to actually ingest

9    documents into Relativity and get us at a point where we can

10   review it -- which is what we are doing now -- that is the

11   biggest slog, essentially, that we need to get through right

12   now.  And we need some time to do that, which is why I've been

13   filing or having attorneys file these status reports to the

14   Court.  The first one was as of July 12th, this one is as of

15   August 23.  And it is completely my intention to keep doing

16   this.  My plan is that every time I do it, we will have more

17   information and be much closer to being able to give the Court

18   the answer that the Court is looking for.

19        What I can promise the Court is that it is not out of

20   any sense of a lack of diligence or commitment.  This is not

21   about lack of staffing, this is not about lack of commitment of

22   the people who are working the process.  Those people are

23   working incredibly hard, we are having constant meetings with

24   the federal public defender.  We are trying to actually do

25   something unprecedented together with the federal public

1    defender to pull this off, to make sure that this system can

2    work for every Capitol breach defendant, including this one.

3    But, there's just a few too many unknowns right now.  If I told

4    this Court a deadline based on the information that I have now,

5    it would -- it would be made up.

6              And, so, I'm not trying to be coy with the Court.  I

7    completely understand the Court's concerns.  And it's not out

8    of any lack of respect for the Court or the process or the

9    defendant or his rights, it just is an unprecedented amount of

10   information in varying formats, in varying natures that

11   requires expertise to process.  And even if this process seems

12   like it's taking a long time, the one thing I can assure this

13   Court is that it is still the shortest process there is.  It's

14   better than a document dump that's disorganized and

15   unsearchable.  There's just not really another alternative.

16             THE COURT:  Is the Relativity database solely

17   documents, or are there videos in there as well?

18             MS. MILLER:  So right now there is not that much in

19   the Relativity database.  It's the U.S. Capitol -- what we've

20   done is the discovery team has sent out letters to pretty much

21   every agency that we believe responded to or was involved in

22   January 6th and asked them to essentially give us everything

23   that could be discoverable.  What's in there right now is the

24   Capitol police's response.  What's not in there right this

25   minute is the FBI's response, and that is, in part, because it

1    is so huge and the way that we've chosen to approach it

2    technologically means that it will be coming, but it's not in

3    there quite yet.

4            We're also trying to make sure, with the FBI

5    response -- which is not the same issue we have with the

6    Capitol police -- that the materials are first culled to 6(e)

7    because a lot of grand jury materials do go to the FBI.  And so

8    we need to make sure, before we provide anything into our

9    vendor or Relativity, that those materials -- those constitute

10   a minority of the materials, they're not going to be ultimately

11   a thing that is delaying this case.

12           But, we just want to ensure that we have removed

13   anything that is or could be even construed as Rule 16

14   material, is removed before we turn the material over to our

15   vendors.  So we're working through that process, as well as

16   just, honestly, the technology of transmitting this volume of

17   material from the FBI to our vendor.  And as we work through

18   those two issues we will start to see a lot more of the FBI's

19   files populate our database.  And we will work through them on

20   a rolling basis.  It's not like we're going to wait to populate

21   everything, go through everything and then produce.  Our plan

22   is to ingest, review, produce, ingest, preview, produce.  And

23   we have teams of people ready, willing and able to help with

24   that.

25           THE COURT:  For a long time the sense was that

1   setting up the process, constructing the programs and so forth,

2   which was, as I understand it, largely a Deloitte exercise, was

3   what was taking place and delaying.  But what you're describing

4   now is more the system is in place, but what you've got to do

5   is get the data into the system, review it, produce.

6          MS. MILLER:  Yes.

7          THE COURT:  And that's more of a responsibility of

8   the relevant federal agencies than it is of an outside vendor,

9   I take it.

10          MS. MILLER:  The vendor is not -- so this is where

11   things get confusing.  This is not an automated process and

12   it's not something we leave to a vendor.  The vendor isn't

13   deciding what is discoverable.

14          THE COURT:  Right.

15          MS. MILLER:  The vendor works in tandem with us, with

16   the U.S. -- they work for us and at our direction and under our

17   supervision.  They manage the material from a technological

18   standpoint.  We make the decisions, we go through the

19   information.  They may have tools that can assist us with

20   getting the information down to a reasonable amount in the ways

21   that I described earlier, but they are certainly not going to

22   be making the types of decisions that the Court just alluded

23   to.

24          THE COURT:  I'm going to ask you to switch to the

25   Evidence.com database in a second.  But before I do, I'll make

1    an observation, and that is that while there seems to be a

2    little more information that is coming forth today than there

3    was in June or there was in May, in actuality there isn't all

4    that much more information that is coming, being provided.

5    What we're being told -- and it's somewhat frustrating to the

6    Court, and I'm sure to defense counsel -- what we're being told

7    is basically waiting for information from the FBI, in

8    particular, and then that data has to be processed.

9    Processed -- reviewing it and producing it, if you will.  And

10   you don't -- you're not able to tell me when those steps will

11   be completed, how long it's likely to take.  How long will it

12   take -- if the FBI gave you a data dump of 90 percent of the

13   material next week, how long would it take before this material

14   was, quote, unquote, produced to defense counsel?

15           MS. MILLER:  Well, we wouldn't wait to review 90

16   percent of it to produce it.  And I think that's part of the

17   confusion here.

18           THE COURT:  You do it on a rolling basis, I

19   understand.

20           MS. MILLER:  We would do it on a rolling basis.  So

21   just like we have to -- with this much information, it's not --

22   it can't be transmitted, 90,000 documents at a time.  It would

23   crash any computer -- it just wouldn't work.  So we will get it

24   in tranches and we will review it and produce it in tranches.

25   In fact, some of us are reviewing and producing, others will be

1    ingesting and tracking.  Everybody will be playing a role in

2    that.  I can ask my team, you know -- I'm not the technological

3    expert, Your Honor.  I'm not pretending to be.  I have people

4    on my team who are E-litigation experts, who are familiar with

5    huge discovery obligations.  We have people from the antitrust

6    division on our team, and I'm sure Court can imagine they are

7    used to dealing with enormous volume of documents.

8          You know, I can ask them for estimates about this

9    kind of thing, but the truth is, as I was trying to say

10   earlier, until we can just get a look at what everything is,

11   it's very hard to know.  Because if we get in 90 percent of the

12   documents and half of them, through some pretty quick machine

13   searches are determined to be irrelevant, that will certainly

14   dramatically expedite the speed at which materials are

15   produced.

16         THE COURT:  It seems to me that what -- you know, I'm

17   surmising -- Mr. Wenstrup may have a more specific complaint or

18   question that he might pose -- but seems to me that a defense

19   counsel would appreciate the answer to this kind of question:

20   Is it possible, if the client wants to wait for the production

21   of all the, quote, unquote, global discovery that we're talking

22   about, is it possible that this is still going to take more

23   than a year from today to complete the production of all the

24   global discovery to a defendant?  Is that possible?

25         MS. MILLER:  I suppose, Your Honor, in the realm of

1    possible, anything is possible, but I don't think that's

2    probable.  And I don't -- I don't think that's --

3                THE COURT:  What about six months?  Is six months

4    probable?

5                MS. MILLER:  I think that what we have been saying to

6    courts so far is that we would not imagine -- and I think it's

7    somewhat aggressive -- but I can't imagine setting a trial date

8    before January.  I think, when you start getting into early to

9    mid spring, trial dates become more realistic.

10               So, no, I don't think it's going to take a year.  I

11   think anywhere in the realm of four to eight months, or six

12   months, I don't know.  Because I understand the Court really

13   wants an answer, but the Court has me back to guessing again

14   and I don't want to guess for the Court.

15               But I can tell you that we want to scrupulously honor

16   the defendant's rights.  That includes the right to a speedy

17   trial and it includes the right to receive all of the

18   discoverable, including potentially exculpatory or material

19   information.  And we are doing everything in our power to honor

20   all of those rights.  And the reason that we're filing status

21   reports and having hearings is to let you know, let the Courts

22   know the kind of progress that we're making.

23               And I understand that the Court says progress isn't

24   the same thing as a deadline, but progress is very much a clue

25   as to when a reasonable deadline may be occurring.  And I

1   expect to be in a very different place in four to six weeks,

2   the next time I expect to be making these kinds of rounds of

3   hearings before various members of the bench and filing another

4   set of status, I expect to have made significant more progress

5   than we have today.

6          I will tell the Court that -- sort of turning to the

7   other topic that you raised about Evidence.com, I do expect a

8   considerable amount of video to be going forward sooner.

9   Ironically, video is, in a way, simpler to deal with, even

10   though it has to be produced technologically to make it easier

11   to ingest into Evidence.com, it can't go in in an

12   individualized player, all those other considerations that you

13   have to deal with with documents, like redacting and -- just --

14   they're not going to come into play, right?  The video can be

15   taken in and pushed out.

16          So, we could just put a sensitivity designation on it

17   and work out, you know, anything with the defense about what

18   defendants can and can't do with various footage.  And we do

19   plan to provide, as I said in the memo, the body-worn camera

20   footage within the next couple of weeks.  We just need to work

21   out a general protective order about it for the reasons that I

22   laid out in the memo.

23          And the CCTV is literally in transit.  I know that

24   sounds crazy, none of us are used to this.  But it takes a

25   couple of weeks to send 14,000 hours of video, you know, to

1   copy it.  It just -- to transmit it into another system.  It's

2   just -- that's how it is when you're dealing with this much

3   stuff.  But it's happening right now, and once we've ingested

4   it, I think that we'll be in a good place to produce it.  And

5   I'm told the estimate is around -- a total for that, for it

6   being ready, about four weeks.  And I really do think that that

7   video footage, the body-worn camera footage and the Capitol

8   CCTV footage is likely to be some of the most important and

9   relevant evidence to the defendants in this case.

10          Ironically, I believe, this is just -- I can't

11  promise this, I don't know, I haven't seen it, but my guess, my

12  guess, is that what's in the documents will probably be less

13  important to defendants than what's in the videos.

14          THE COURT:  Does the date of expert video,

15  Evidence.com or what's going into Evidence.com, include

16  non-government-produced video?  You've mentioned two sources,

17  body-worn camera and the Capitol security system.  Does it also

18  include private or media-produced video?

19          MS. MILLER:  Right now the only thing that's in our

20  system is body-worn camera, and we're working on the CCTV.

21  What we're focusing on first, getting in and getting out, are

22  the government, as the Court would refer to it, video because

23  it's the easiest to process and the most obvious.  So there's a

24  few other places, other types of cameras, et cetera, that we

25  have and will produce.

1          In terms of media video, I'm not exactly sure what

2     the Court is referring to.  If we got video footage by way of a

3     friendly subpoena or by consent from the media organization, we

4     might provide that video by Evidence.com.  But I don't know --

5     if there's a concern that the Court has about that, I'm of

6     course happy to hear the Court out and talk about a different

7     way that it can be produced.

8          THE COURT:  Is there any media that is not a

9     government source that is out in the public domain today?  In

10    other words --

11         MS. MILLER:  No.  And Evidence.com is not in the

12    public domain, to be clear.

13         THE COURT:  I understand that.  I understand that.

14    But what I'm asking is whether there is any media other than

15    government-sourced media, body-worn camera, Capitol security

16    system, or other government-produced media, is there any that

17    is out in the public domain?  In other words, is there video

18    that was taken on January 6th by any media outlets that it

19    has -- that those outlets have subsequently put out into the

20    public domain in news broadcasts and the like, or is there

21    private media, which exists, that is in the public domain.  And

22    if there is in either of those, is that going to be going into

23    Evidence.com, or is the government not worrying about those

24    materials because they're not necessarily in the government's

25    possession?

1          MS. MILLER:  Well, I think, Your Honor, determining

2     what's in our possession versus what's in the public domain is

3     generally hard to do, given the volume of the information.

4     And, so, taking the time to try and figure that out is probably

5     not a good use of time.  I think the better use of time is just

6     to take everything we have and make it available to the

7     defense.  That's the approach that we're taking with respect to

8     what's in our possession.

9          And some things may be in our possession and

10    technically be in that -- they are in the public domain, but

11    I'm still going to provide them because -- so, for example, I

12    think I said in the memo that one of the things that we're

13    planning to produce very soon are these OPR reports from the

14    U.S. Capitol police, because that's a hot -- a highly requested

15    item by defense counsel.  A number of the tips that came into

16    the U.S. Capitol police were actually based on things that

17    probably everybody on this call has seen a million times; News

18    articles, Instagram, something where somebody complained and

19    said, I see this police officer taking a selfie with a rioter

20    and it's unprofessional, blah, blah -- sorry for the blah,

21    blah -- and, you know, and so the Capitol police do an

22    investigation.

23         And, so, that's out there, but related to it is going

24    to be the interview of the police officer, what they said about

25    what was going on, about what their intentions are with respect

 1     to what was happening in that moment.  And, so, obviously,

 2     without the clip itself, none of that makes a lot of sense.  So

 3     we'll be providing the allegation which may have been a video

 4     that's in the public domain, along with the report that would

 5     happen when they investigated the incident that occurred there.

 6     And so, with -- because of things like that, because -- if it's

 7     in our possession, even if it's also in the public domain,

 8     we're just taking the very broad approach of let's just provide

 9     it, we don't know what the defense will consider material, it's

10     in our possession, and it's just easier to turn it over.

11            So, that's our plan for that.  Oh, and the Court

12     asked me if video can be in Relativity.  I never did answer

13     that.  Video can be in Relativity.  The plan I outlined is very

14     general because, as anything, there's always exceptions for

15     every rule.  Relativity is a platform that can be used to share

16     a video footage, ideal for the amount of footage that's in this

17     case.  So if we put there amount of footage into Relativity,

18     from what I understand, it will essentially reduce the speed

19     that anyone can use Relativity with to almost zero.  It will be

20     useless.

21            So that is why we're not -- it doesn't mean that

22     defense counsel won't receive video clips through Relativity,

23     it just means that they're not going to get bulk video through

24     Relativity.

25            THE COURT:  All right.  I think I've asked questions

1    and have you provide some confirmation for long enough without

2    turning to Mr. Wenstrup to see if he has any observations.

3    Basically what I have to do is keep this case on some kind of a

4    schedule moving forward.  I've been informed by the government

5    now that the defendant has rejected a recent plea -- a plea

6    offer recently, and has indicated that he would like to see all

7    the discovery before making a decision on a plea in this case.

8    Mr. Wenstrup, maybe the right thing to do now is to turn to you

9    and see what you would like to offer to the Court --

10              MR. WENSTRUP:  Thank you.

11              THE COURT:  -- dealing with this.

12              MR. WENSTRUP:  Thank you, Your Honor.  One thing I

13   just wanted to flag from a timeline standpoint is that

14   obviously once the materials are turned over, we're talking

15   about hundreds of thousands of documents and by my count, from

16   last night's notice, in the ballpark of 9300 hours video.  We

17   don't have hundreds of agents and discovery teams because we're

18   representing individual defendants.  You know, we have two --

19   we have two investigators at our office, so we are going to

20   have to come up with a strategy to sort of review the materials

21   to try to figure out what is relevant and where -- I mean,

22   exculpatory or other material evidence that is -- I mean, I

23   know that most of it --

24              THE COURT:  So is it your understanding,

25   Mr. Wenstrup, that with respect to videos, that you're

1  basically, as an individual counsel representing an individual,

2  Mr. Padilla in this instance, that the government is just going

3  to provide you with access to, as you put it, 9300 hours of

4  video and say, Go to it, look at it, determine what, if any of

5  it, has any bearing on your client?

6       MR. WENSTRUP:  No.  I did not get that sense.  I

7  think that there were allusions to geo locators and other data.

8  So I'm not -- that was the number of hours cited in the notice.

9  I didn't anticipate that Mr. -- there's no allegations that

10  Mr. Padilla was inside at any point.  So you know, there are

11  certainly going to be some parts of the videos and some part of

12  the documents that we don't have to look at.

13       THE COURT:  I thought that they were going to divide

14  the videos up into categories, if you will, both in terms of

15  time and location.

16       MR. WENSTRUP:  And that's my understanding as well.

17  I think even within the categories, these are going to be

18  significant amounts of discovery for our team to review.  So

19  again, I didn't want to represent that we were going to have to

20  watch all 9300 videos or review all 200 or 700,000 documents,

21  whatever the case may be.  Just that whatever subset of it that

22  it is, it's going to be significant.

23       I also think that with regard to some of the

24  timelines we've been talking about, we do plant to revisit

25  Mr. Padilla's detention status, but we're going to do that in a

1   written motion, rather than here today, and give the Court some

2   notice.

3           THE COURT:  I would appreciate that.

4           MR. WENSTRUP:  A couple other issues just to flag.

5   First, I think Mr. Padilla is not willing to continue waiving

6   his speedy trial rights.  However, he also doesn't want to

7   waive his *Brady* rights, and obviously that's our intention as

8   we go forward.  We understand that the Court might rule that,

9   you know, these are extenuating circumstances and the time is

10  excludable to go beyond the speedy trial.  But I do want to put

11  those things on the record.

12          The other thing is I'm going to be out on parental

13  leave for a chunk of the fall, so Ms. Mertz, who's barred in

14  D.C., is going to be entering an appearance in this case and

15  going to be working with me to help cover while I'm out.  So,

16  based on the government's representations, we wouldn't expect

17  the trial to happen while I would be out.  And it sounds like

18  the soonest would be early to mid spring at best, at which

19  point I think we could proceed.

20          It does seem to me like -- the notice talked about a

21  lot of the things that would start happening within the next

22  two weeks.  I'm not sure if it would make sense for the Court

23  to set another status conference for 60 days to see, you

24  know -- that will have been eight weeks, have we started seeing

25  the progress that the August 23rd notice indicates.

1          THE COURT:  Is there a time that you would suggest

2     for a status based on your own schedule, in terms of when

3     you --

4          MR. WENSTRUP:  I'm going to be -- I'll return after

5     Thanksgiving.  I understand that the Court may not want to wait

6     that long.

7          THE COURT:  That's too long.

8          MR. WENSTRUP:  And that's why Ms. Mertz is here and

9     has been, you know, kept abreast of the developments in the

10    case.  So I think she can handle any status conference in the

11    meantime.

12         THE COURT:  So what I take from some of the things

13    that you're saying, Mr. Padilla is not going to waive or

14    voluntarily agree to the exclusion of time under the Speedy

15    Trial Act, not any longer going to voluntarily agree.  So the

16    Court will have to make a determination.

17         You, of course, are aware of the fact that with

18    respect to a speedy trial, it's not just the complications of

19    this case that we face, but also the complications of the

20    COVID-19 pandemic because trials are proceeding, but proceeding

21    on a limited basis in our court; no more than three criminal

22    trials at any one time, and there's a fair backup.  So, there's

23    that to consider, and there is a standing order that excludes

24    time, by the Chief Judge, based on the COVID-19 circumstances.

25    But, I will, if the government makes that request, I will issue

1    a written order with respect to speedy trial, since we don't

2    have a voluntary agreement from the defendant.

3            I think that it makes sense to have another status in

4    60 days, or even a little less than 60 days because the

5    government is saying some things are going to happen.  And

6    maybe those things, if some of them do happen, will enable some

7    movement in the case, maybe not.  That's complicated, of

8    course, by your absence, Mr. Wenstrup.  But we'll deal with

9    events as they unfold.

10           Sixty days from now would be near the end of October.

11   Maybe mid October is a time that we should look at for another

12   status in the case.  How does that sound to you from the

13   defense perspective?  And then how does the government feel

14   about that?

15           MS. MERTZ:  Your Honor, that's fine for the defense.

16   I will be unavailable on the 15th, but available any other day

17   that week of October 11th.

18           THE COURT:  All right.  The 14th of October is a date

19   that I probably could do it.  Earlier in the week might be a

20   problem for me.  And then 15th you say is unavailable.  And

21   then giving October 18th I'm in trial, and it's a trial that's

22   likely to occur because it's a bench trial, not a jury trial.

23   I probably can hold it, notwithstanding the COVID-19

24   considerations.

25           So how does Thursday, October 14th sound to the

1    government?

2              MR. STRAIN:  That works for us, Your Honor.

3              THE COURT:  I have something at 10 and something at

4    10:30, is that right, Mr. Bradley?

5              THE COURTROOM DEPUTY:  That is correct.

6              THE COURT:  So maybe 11:30, to be safe, because that

7    10:30 matter I think is a pretrial and so maybe -- maybe we

8    even should put this at noon, just to be safe.  So how is noon

9    on October 14th for a status in this matter?  Is the calendar

10   free at the jail, Mr. Bradley?

11             THE COURTROOM DEPUTY:  Good question.  More likely it

12   has been so far, but give me one second and I'll check.

13             The noontime is normally designated for lunch.  So,

14   obviously, 12:30 is when -- it actually is open at 12:30.

15             THE COURT:  All right.  Let's do 12:30.

16             MS. MERTZ:  Your Honor, may I ask for 1 o'clock on

17   that day?

18             THE COURT:  I guess so.  That's such a burdensome

19   request to make, but I guess we can do that.  One o'clock.

20   Does that work for the government?

21             MR. STRAIN:  Yes.

22             MS. MILLER:  Your Honor, could I just take the

23   time -- I just want to, at least if the Court will indulge me,

24   just to reply to a couple of Mr. Wenstrup's comments and some

25   of the Court's responses.

1          THE COURT:  Okay.  If you want to respond to me, go

2     ahead.

3          MS. MILLER:  I do.  I know the Court said the Court

4     would issue a written ruling on the speedy trial.  I was going

5     to ask, if the Court needs anything from us in that regard,

6     we're happy to provide it.  I'm sure -- I know this Court is

7     well aware that the defendant's consent -- defendant can't

8     waive speedy trial, the public has an interest in it.  And

9     while his consent is interesting, it's really not anything that

10    truly matters.  The only thing that matters is whether the

11    ends-of-justice continuance is warranted.

12          This Court, I also know, is aware that the need for

13    reasonable time to address our discovery obligations is an ends

14    of justice -- is amongst multiple pretrial preparation grounds

15    that courts of appeals, including our circuit, have found

16    sufficient to grant continuances that toll the time under the

17    Speedy Trial Act.  And just most recently, I'll refer the Court

18    to the *Bikundi* case --

19          THE COURT:  Ms. Miller, I'm going to cut you off now.

20    If you're volunteering to provide something to the Court on the

21    speedy trial question, if you're volunteering yourself or

22    volunteering Mr. Strain to do so, then the Court will certainly

23    welcome it.  But it has to be done fairly quickly.

24          MS. MILLER:  I think we can get something in fairly

25    quickly, Your Honor.  So I'm happy to do that.

1          THE COURT:  All right.  What's your definition of

2     fairly quickly?

3          MS. MILLER:  The only reason I'm hesitating, Your

4     Honor, because I've spent all night doing it, is I've had a

5     death in the family and I'm going up to New York tomorrow.  But

6     I can focus on trying to get something at least into a draft

7     form for Mr. Strain and hope that someone else can take it over

8     for me tomorrow, if you can give us a couple of days to get it

9     in, just because I won't be the one who is here necessarily to

10    finish it off, I would appreciate it.

11         THE COURT:  All right.  So what's the -- what's the

12    "couple of days" mean?

13         MS. MILLER:  Monday would be wonderful.  If the Court

14    is not disposed to Monday, Friday would be acceptable.

15         THE COURT:  Um --

16         MS. MILLER:  I'm just trying to --

17         THE COURT:  If you can get it in on Friday, get it in

18    on Friday.  But I won't hold it against you if it's not in

19    until Monday.  But just do your best.

20         MS. MILLER:  Thank you.  And the only thing I wanted

21    to say, and I know that -- I think Mr. Wenstrup alluded to the

22    fact, and he knows this, I really want to reaffirm for the

23    Court and to Mr. Wenstrup, we intend to be very forward leaning

24    with what we can do to help the defense cull through the

25    voluminous materials here.  And that's why, as I indicated in

1      our motion, we're going to provide work product from our office

2      that, you know, 60 volunteers -- I call them volunteers, some

3      of them are paid, but none of them are asked to do it -- 60

4      people went through 3,000 hours of body-worn camera footage

5      using a zone map that they created of the Capitol to identify

6      camera locations, and we're going to provide that.  So, we're

7      going to turn over MPD radio and GPS information.

8              And just to let everyone understand a little better,

9      MPD radios emit GPS signals when they're transmitting, so this

10     is a tool that's helpful but not conclusively helpful because

11     an officer has to be talking over the radio for it to generate

12     a GPS location, and people doing the most talking were,

13     obviously, commanders.  But to some degree it has been, I know,

14     helpful to AUSAs in our office because they can identify who

15     might have had a camera in an area that they're interested in

16     looking at at a certain time.

17             And in addition, just so the Court is aware, we are

18     actually -- and I can't promise this is going to come to

19     fruition, maybe it's the stuff of dreams -- but we are actually

20     asking a private company to work with Axon, the owner of

21     Evidence.com, to help them get tools, like facial recognition,

22     into Evidence.com, so that would help, to a degree.  And we're

23     also having Axon develop a script, which is a set of computer

24     codes or commands that can extract GPS evidence from cameras,

25     which currently is not extractable, wasn't a thing that was

1    built into Axon software.  We asked them to create it.  As with

2    everything in this case, running it on 3,000 files is proving

3    to be a complicated task.  But if and when we can make that

4    work, I think that will be very helpful because finding footage

5    that may be in an area that's relevant to people will be

6    easier.

7              So every time that we find a tool or do something to

8    identify what might be relevant or pertinent, we can share

9    that.  We don't want the defense to start eight months behind

10   where we've gotten to.  So I just wanted to make everyone aware

11   of that.

12             THE COURT:  All right.  Well, I appreciate that, and

13   I imagine Mr. Wenstrup appreciates that as well.  We all know

14   that the -- whether it's in this case or other cases, that

15   there's going to be a time before these cases get to trial, in

16   situations where the defendant is detained, where there is

17   pressure exerted on the system because of the length of

18   detention that has already transpired and the sentence that is,

19   quote, unquote, likely to be rendered in the case, which it's

20   hard to speculate on.  But there are -- there's going to be

21   tension that is going to create motions like Mr. Wenstrup is

22   indicating he's going to file in this case, and I'm sure the

23   government knows that it's going to be facing a lot of those.

24   It's already facing some of them.

25             MS. MILLER:  And, Your Honor, part of the reason why

1  I asked for the opportunity to brief this to some degree was to

2  address the tension between speedy trial and detention in

3  somewhat -- I'm sure the Court is already familiar with all the

4  law, but I would at least like to set it down for the record.

5  And at least in this case, my understanding is forgetting

6  statutory maximums for a minute, just looking at what the

7  defendant roughly faces under the guidelines right now, my

8  understanding is it's around 57 to 71 months.

9         THE COURT:  We don't have to argue this case in

10  particular.  There are a lot of felony cases that will be on

11  one end of the continuum.  But I'm just speaking generally with

12  respect to the government's situation, it's going to be facing

13  those kinds of motions in a lot of situations.

14         MS. MILLER:  I know, which is why we are moving as

15  swiftly as we can, that's all I can assure the Court.

16         THE COURT:  All right.  So, we've set a status.  I've

17  indicated that I will rule on the speedy trial issue.  I

18  encourage the government to be as forthcoming and as prompt as

19  possible.

20         What more is there for us to deal with today?

21  Anything from the government's perspective, Mr. Strain?

22         MR. STRAIN:  Nothing else, Your Honor.  I would just

23  mention that the clock will start running today if the Court

24  doesn't order specific findings, since we were detained up

25  until today.  I can try to get -- work with Ms. Miller and get

1    something filed today, if that's possible, just so that the

2    time would be tolled as of today, or the Court can do be a oral

3    ruling, however the Court wants to handle it.  But that's it.

4              THE COURT:  All right.  Mr. Wenstrup, anything?

5              MR. WENSTRUP:  Nothing further, no.  Thank you.

6              THE COURT:  All right.  I'm not going to do an oral

7    ruling, but I may issue an interim ruling as early as tomorrow,

8    based on my assessment of the situation.  And so you should

9    look for that.  But I would welcome the government's

10   submission, which it has indicated it's going to make,

11   hopefully by Friday, but certainly by Monday.

12             With that, I think we're done for today.  And I thank

13   everybody for their participation, their patience in listening

14   to Ms. Miller explain what she's able to explain, and

15   Ms. Miller for her patience and conscientious effort to give us

16   the information that she is able to give us at this time.

17             And we'll move forward to a status that is now set

18   for October 14th at 1 p.m.

19             And we'll anticipate that that will be by Zoom.  Is

20   that agreeable to the defense?

21             MS. MERTZ:  Yes, Your Honor.

22             THE COURT:  All right.  And the government is in

23   agreement with that as well, Mr. Strain and Ms. Miller?

24             MR. STRAIN:  Yes.

25             THE COURT:  Fine.  So this will be another Zoom

1   status conference on October the 14th at 1 p.m.   Thank you all.

2          MS. MILLER:   Thank you.

3          MR. STRAIN:   Thank you.

4                          *   *   *

5

6

7          CERTIFICATE OF OFFICIAL COURT REPORTER

8

9      I, JANICE DICKMAN, do hereby certify that the above and

10   foregoing constitutes a true and accurate transcript of my

11   stenographic notes and is a full, true and complete transcript

12   of the proceedings to the best of my ability.

13                  Dated this 10th day of September, 2021

14

15

16          _____

17          Janice E. Dickman, CRR, CMR, CCR
            Official Court Reporter
18          Room 6523
            333 Constitution Avenue, N.W.
19          Washington, D.C.  20001

20

21   This hearing was held by video conference in compliance with
     the COVID-19 pandemic stay-at-home orders and is, therefore,
     subject to the limitations associated with the use of current
22   technology, including but not limited to telephone signal
     interference, static, signal interruptions, and other
23   restrictions and limitations associated with remote court
     reporting via telephone, speakerphone, and/or
24   videoconferencing.

25