UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 1:21-cr-214 (JDB) |
| Plaintiff | Hon. John D. Bates |
| v. | |
| JOSEPH LINO PADILLA | |
| also known as "Jose Padilla," | |
| Defendant. | |

## DEFENDANT JOSEPH LINO PADILLA'S MOTION TO REVOKE THE CURRENT DETENTION ORDER AND REOPEN THE DETENTION HEARING

NOW COMES Defendant Joseph Lino Padilla, by and through his attorney, Michael J. Cronkright, and Cronkright Law, PLLC, and moves this Honorable Court to revoke the current detention order and reopen the Detention Hearing.

Contents

I.    INTRODUCTION ........................................................................................................... 3

II.   JOSEPH "JOSE" LINO PADILLA BACKGROUND ............................................. 3

III.  FACTUAL HISTORY & PROCEDURAL HISTORY .............................................. 3

IV.   MEMORANDUM OF LAW ....................................................................................... 5

V.    ARGUMENT ................................................................................................................ 8

  A.  WEIGHT OF EVIDENCE AGAINST THE DEFENDANT ................................. 8

  B.  HISTORY AND CHARACTERISTICS OF THE DEFENDANT ......................... 9

    1.   The Defendant's Character .......................................................................... 9

    2.   The Defendant's mental and physical condition. ..................................... 10

    3.   The Defendant's family ties. ...................................................................... 11

    4.   The Defendant's employment situation. ................................................... 15

    5.   The Defendant's financial resources. ........................................................ 16

    6.   The Defendant's length of residence in the community and his community ties. .................. 16

    7.   The Defendant's past conduct. .................................................................. 17

    8.   The Defendant's history, if any, relating to drug or alcohol abuse. ........ 17

    9.   The Defendant's criminal history. ............................................................ 18

    10.  The Defendant's record concerning appearance at court proceedings. ............... 18

**C.   DANGER TO THE COMMUNITY** ...................................................................... 18

**D.   NATURE AND CIRCUMSTANCES OF THE OFFENSES CHARGED** .......................... 19

CHRESTMAN GUIDEPOST 1: Whether Defendant has been charged with felony or misdemeanor offenses. ..................................................................................... 20

CHRESTMAN GUIDEPOST 2: The extent of the Defendant's prior planning. .......................... 20

CHRESTMAN GUIDEPOST 3: Whether Defendant used or carried a dangerous weapon. ......... 21

CHRESTMAN GUIDEPOST 4: Evidence of coordination with other protestors before, during, or after January 6th ............................................................................................... 22

CHRESTMAN GUIDEPOST 5: Whether Defendant played a leadership role in the events of January 6th, 2021. ..................................................................................................... 22

CHRESTMAN GUIDEPOST 6: The Defendant's words and movements during the riot—e.g., whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, or attempted to injure, or threatened to injure others ........................................................................................................... 23

**VI.   PROPOSED CONDITIONS OF RELEASE** .......................................................... 23

**VII.   CONCLUSION** .......................................................................................... 24

## I.     INTRODUCTION

Joseph "Jose" Lino Padilla by and through his counsel, Michael J. Cronkright, respectfully moves this Court to revoke the prior detention order. Defendant requests an evidentiary hearing to explore the facts and issues raised herein. Defendant asserts that he is neither a flight risk nor danger to the community, and that there are suitable conditions of release which would assure his appearance in court and further assure that the interests of the community are safeguarded. Joseph "Jose" Lino Padilla respectfully requests that he be released on personal recognizance or, in the alternative, to commit him to the supervision of a High Intensity Supervision Program (HISP) or consider other conditions of release as discussed *infra.*

## II.     JOSEPH "JOSE" LINO PADILLA BACKGROUND

Joseph "Jose" Lino Padilla is a natural born American Citizen. He has resided in Tennessee for the entirety of his adult life, where he now resides with his wife and three children. Mr. Padilla is a veteran of the Iraq War and is fully disabled as a result of combat related tours.

## III.     FACTUAL HISTORY & PROCEDURAL HISTORY

On February 22nd, 2021, a criminal complaint was brought against Defendant Joseph Padilla, charging him with five felony counts and one misdemeanor. On February 23rd, 2021, Mr. Padilla was arrested in his home, which is located in the Eastern District of Tennessee.

Mr. Padilla completed an interview with Kimberly Williams, pretrial services office, before appearing in front of Magistrate Judge Susan K. Lee on February 23rd, 2021 – the same day as his arrest. Mr. Padilla waived a detention hearing and preliminary hearing and asked that his hearings and further proceedings be held in the United States District Court in the District of Columbia. Magistrate Judge Susan K. Lee issued a temporary order of detention while the United States Marshals transported Mr. Padilla from Tennessee to the District of Columbia.

A Memorandum in Support of Pretrial Detention was filed by Assistant United States Attorneys (AUSA) Jacob J. Strain and Puja Bhatia on March 9th, 2021. In short, the memorandum argued in support of the pretrial detention of Mr. Padilla pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) [Crime of Violence] and 18 U.S.C. § 3142(f)(2)(A) [Risk of Flight]. The AUSAs further argued that there are no conditions or combinations of conditions which can effectively ensure the safety of any other person and the community, pursuant to 18 U.S.C. §§ 3142(e)

On March 31st, 2021, an oral motion by the AUSA to commit Mr. Padilla to the Custody of the Attorney General by the Government was heard followed by an oral motion for release from custody by Mr. Padilla. On the same date, Magistrate Judge Zia M. Faruqui granted the government's oral motion for pretrial detention and denied Mr. Padilla's oral motion for pretrial release. Magistrate Judge Zia M. Faruqui held that Mr. Padilla is *not* a flight risk, but that he posed a significant danger to the community and should be detained pending trial.

Mr. Padilla's counsel filed a Motion to Revoke the Detention order on April 15th, 2021. The Government submitted a Memorandum in Opposition to Motion to Revoke Detention Order on April 20th, 2021, and Defense counsel filed a reply memorandum the next day. This Court issued an Order denying Defendant's motion and its Memorandum Opinion on May 05, 2021.

Defendant has been detained since the date of his arrest.  The pre-trial detention is now fast approaching two years and will exceed that amount by the time this matter comes to trial.  The delay in prosecution and the Defendant's speedy trial rights have been ruled on previously by this Court, with some of the delays being with the waiver of Defendant.  It is not the intent of Defendant to re-litigate that issue.  Nonetheless, the amount of time that Mr. Padilla has spent in confinement pre-trial is concerning (but perhaps not unusual for a large number of January 6 Defendants.)  Since the entry of the last detention Order, Mr. Padilla has had an excellent and peaceful history in confinement.  He has spent his time in detention quietly, researching legal issues to the best of his abilities, contributing to his

defense as much as possible and trying to support his family from afar.  Upon information and belief, he has no disciplinary history at the detention facility.

Defendant has observed the deleterious effect of his confinement on his family.  He is keenly aware that his wife and children have struggled immensely to cope with the loss of his daily support and guidance and has observed the negative effects.  Although painful, he accepts the responsibility for that decline, being keenly aware that his decisions have brought his family to this place.  At the outset of this case, he could not have anticipated that his family would suffer a two-year loss of his support pre-trial.

There is no dispute that the case against Mr. Padilla involves serious allegations. However, the Memorandum in Support of Pretrial Detention inflates and misrepresents Mr. Padilla's participation in the January 6th, 2021 events. Mr. Padilla is presented as a vocal leader seeking to overthrow the government, which is far from accurate.

## IV.     MEMORANDUM OF LAW

18 USC 3142(f) provides in pertinent part:

> The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. § 3145(b). The district court reviews a magistrate judge's detention order de novo to determine whether there are conditions of release that will reasonably assure the safety of any other person and the community. E.g., United States v. Sheffield, 799 F. Supp. 2d 18, 20 (D.D.C. 2011). The district court may hear additional evidence not presented at the initial detention hearing. Id.

Pursuant to the Bail Reform Act, 18 U.S.C. § 3141, a defendant must be released pending trial unless it is determined that no condition or combination of conditions exist which will reasonably assure his appearance as required or the safety of the community. 18 U.S.C. § 3142(c). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" United States v. Munchel, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (quoting United States v. Vasquez-Benitez, 919 F.3d 546, 550 (D.C. Cir. 2019)).

If the rebuttable presumption under 18 U.S.C. § 3142(e)(2) does not apply, then with regard to the risk of flight analysis as a basis for detention, the government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's presence during future court proceedings.[1] When the basis for pretrial detention is the defendant's danger to the community, the government is required to demonstrate the appropriateness of detention pursuant to subsection (e) by clear and convincing evidence. 18 U.S.C. § 3142(f). Short of that, the Court is generally required to release the defendant "subject to the least restrictive condition or combination of conditions" to achieve these goals. Id. The factors that must be considered in assessing the defendant's future dangerousness are laid out in § 3142(g) of the Bail Reform Act as: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.[2]

In United States v. Chrestman, Chief Judge Howell outlined six factors to be considered in assessing the nature and circumstances of January 6, 2021, related offenses, including whether a defendant: (1) has been charged with misdemeanors or felonies; (2) engaged in prior planning before arriving at the

---

[1] See United States v. Xulam, 318 U.S. App. D.C. 1, 84 F.3d 441, 442 (1996) (citing United States v. Simpkins, 826 F.2d 94, 96 (D.C. Cir. 1987)) (explaining that a finding must be based on clear and convincing evidence that the defendant poses a danger to the community or a preponderance of the evidence to support the defendant's likelihood to flee).

[2] 18 U.S.C. § 3142(g); see also Munchel, 991 F.3d at 1279–80; United States v. Smith, 79 F.3d 1208, 1209 (D.C. Cir. 1996).

Capitol, for example by obtaining weapons or tactical gear; (3) carried or used a dangerous weapon, be it a firearm, large pipe, wooden club, or other offensive use instrument; (4) coordinate with participants before, during, or after the riot; (5) assumed either a formal or de facto leadership role by encouraging other rioters misconduct; (6) the nature of the defendant's words and movements during the riot.[3]

Regarding whether a defendant presents a clearly identifiable and articulable future threat to the community the Court must consider, in light of all evidence, whether a defendant charged with felonies involving the possession of dangerous weapons at the U.S. Capitol on January 6, 2021, presents a clearly identifiable and articulable future threat to the community. Thus, a defendant's detention based on dangerousness accords with due process only to the extent that the Court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety. United States v. Munchel, 991 F.3d 1273 (DC Cir. 2021).

Additionally, in making an individualized assessment of dangerousness, the court must consider whether the defendant has prior felony convictions, ties to extremist organizations, and whether his post January 6th related behavior presents an articulable threat to the community, in light of evidence that a defendant did not commit illegal acts of violence or did not participate in planning / coordinating a January 6th related attack on the U.S. Capitol. United States v. Tanios, 856 Fed. Appx. 325 (D.C. Cir. 2021).

"To justify detention on the basis of dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'" United States v. Munchel, 991 F.3d 1273, 1280 (D.C. Cir. 2021) (citing § 3142(f)). The government must show that the arrestee presents "an identified and articulable threat." Id. (internal citation omitted). The assessment is not a "backward-looking assessment of the rioters or the riot" but a "forward-looking assessment" of whether the defendant will make good

---

[3] United States v. Chrestman, No. 21-mj-218, 2021 (D.D.C. 2021).

on the "articulable threat" in the future. Id. at 1285. In addition, after a person has been detained, "The judicial officer may, by subsequent order, permit the temporary release of the person . . . to the extent that the judicial officer determines such release to be necessary for the preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).

## V.     ARGUMENT

## A.  WEIGHT OF EVIDENCE AGAINST THE DEFENDANT

The Bail Reform Act […] instituted dangerousness as a basis for detention. *United States v. LaFontaine,* 210 F.3d 125, 134 (2d Cir.2000); *see also United States v. Dono,* 275 Fed.Appx. 35, 38 (2d Cir.2008) (unpublished opinion) ("[P]retrial detention was the means chosen by Congress in the Bail Reform Act to protect the community from dangerous defendants."); *United States v. Jimenez,* 104 F.3d 354 (2d Cir.1996). When detention is based wholly or in part on a determination of dangerousness, such finding must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B); *see also United States v. Ferranti,* 66 F.3d 540, 542 (2d Cir.1995); *United States v. Rodriguez,* 950 F.2d 85, 88 (2d Cir.1991). *United States v. Karper,* 847 F. Supp. 2d 350, 355 (N.D.N.Y. 2011).The weight-of-the-evidence factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *United States v. Marcrum*, 953 F. Supp. 2d 877, 883 (W.D. Tenn. 2013), *aff'd* (Nov. 1, 2013)(Internal citation omitted).

While the evidence against Mr. Padilla is substantial, with ample video footage demonstrating his activity,  it is not compelling enough to conclude that he is a danger to the community going forward. Unless the Government shows the defendant to be a flight risk by a preponderance of the evidence, or that he poses a continuing danger to a particularized person or community by clear and convincing evidence, and that no conditions can mitigate the alleged risks, the Act requires pretrial release. 18 U.S.C. 3141.

It is often stated that the best predictor of future behavior is past behavior. In this case, it is instructive to look at Mr. Padilla's extensive history *before* and *after* the events of January 6th. As

demonstrated herein, Mr. Padilla's life has been and will be a life of compliance and non-violence. Mr. Padilla is a United States Military veteran who suffers from PTSD as a result of multiple combat tours overseas. Mr. Padilla was unarmed upon his arrival at the U.S. Capitol. Officers along the barricade were unprovoked by Mr. Padilla and yet he was attacked in an apparent response to having his hands on the barricade while talking to an officer who had a military patch that Mr. Padilla recognized.

The Government has and will continue to argue that Mr. Padilla's actions constitute his dangerousness, however they fail to consider the totality of the circumstances provided in the video footage. In the video entitled _Axon_Body_3_Video_2021-01-06_1319, Mr. Padilla is shown attempting to erect the large Trump sign, a bystander within a few feet of Mr. Padilla can be heard saying "Put it up there, put it up there," which led Mr. Padilla to believe the sign was being placed upright in front of the barricade. He was forcefully shoved on the ground by police after having his hands on the sign for a matter of seconds. Within short order, he was pepper sprayed, hit with fists and batons, and struck with sufficient force to be delirious.  Even if not constituting a defense, it can be seen as mitigation for purposes of this motion that Mr. Padilla is a fully disabled veteran with a diagnosis of PTSD.

## B.  HISTORY AND CHARACTERISTICS OF THE DEFENDANT

In considering [Padilla]'s history and characteristics, the Court must "take into account the available information concerning" [Padilla]'s "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). *United States v. Klein*, 539 F. Supp. 3d 145, 154 (D.D.C. 2021) "[T]he ten specific sub-factors reviewed immediately [below] relate to the general history and characteristics of the particular defendant. *United States v. Chrestman*, 521 F. Supp. 3d 1107, 1116 (D. Kan.), *review granted, judgment rev'd,* 525 F. Supp. 3d 14 (D.D.C. 2021)

### 1.  The Defendant's Character

Joseph "Jose" Lino Padilla is an American citizen who was born in this country and has never had any contact with the criminal justice system prior to January 6th, 2021. He has no prior arrests because he does not have a criminal disposition. The alleged offenses are an anomaly in Mr. Padilla's otherwise law-abiding life, unlike other individuals associated with the January 6th, 2021 events.

Mr. Padilla is a veteran of the United States Army National Guard, honorably discharged and currently suffering from combat related PTSD. Mr. Padilla is not, nor does he ever plan to be, part of any organization that promotes and engages in political violence. Mr. Padilla has maintained his position that he is against political violence. Other than the present allegations against Mr. Padilla, he has never participated in any acts of political violence because violence and aggression are not an inherent characteristic of Mr. Padilla. Mr. Padilla is a family oriented, military veteran; not a danger to society as he has been portrayed to be.

During his confinement, Mr. Padilla has been appropriate and compliant.  Mr. Padilla has had no disciplinary reports filed during his incarceration nor has he had any disciplinary reason to have been placed in segregation. Mr. Padilla is always polite and respectful towards the corrections officers and other inmates.

The extensive time Mr. Padilla has spent incarcerated has provided him ample opportunity to consider his behavior on January 6 and he has expressed an understanding of the triggers and actions that influenced his actions. With the benefit of hindsight and reflection, Mr. Padilla is confident that he would make better decisions today.

This factor weighs in favor of pretrial release.

> **2. The Defendant's mental and physical condition.**

Mr. Padilla suffers from PTSD[4], degenerative joint disease in his lower back[5], and burn pit induced chronic sinusitis[6] resulting from his service in the Army National Guard. Further, Mr. Padilla is hypertensive[7] (high blood pressure) due to being overweight.

These conditions are known to bring increased risk of hospitalization and/or death if coupled with a COVID-19 infection. Mr. Padilla has already endured one COVID-19 infection despite the DC Jail's efforts to mitigate the risk of infection. The outbreak of COVID-19 in the DC Jail could be attributed to population density. If Mr. Padilla were to be released to his home in Tennessee, the likelihood that he would be in contact with COVID-19 would decrease.

Mr. Padilla has been prescribed 120mg of Duloxetine (Cymbalta) and 100mg of Trazadone, both to be taken daily. He did not begin receiving his prescriptions prescribed by his Mental Health Care provider within the Veteran's Administration Healthcare system until roughly December 2021. That is approximately 10 months without his prescribed mental health medications. Based on his self-assessment, Mr. Padilla's mental health has deteriorated substantially, especially due to the lack of basic care being provided in the DC Jail.

During Mr. Padilla's time in the DC Jail, he has experienced multiple months of 23hr/1hr and 22hr/2hr lockdowns and has regularly been kept in his cell for more than 24 hours at a time without release for recreation or basic hygiene.

This factor weighs in favor of pretrial release.

### 3. The Defendant's family ties.

Mr. Padilla has been married to his wife since 2005. They have maintained a residence in Dayton, Tennessee since March 23rd, 2021. Previously, they lived in Cleveland, Tennessee for 3 years. Mr.

---

[4] PTSD in Military Veterans - HelpGuide.org
[5] Degenerative Joint Disease (Osteoarthritis) of the Low Back (learnmuscles.com)
[6] Asthma, Rhinitis, Sinusitis- Burn Pit Exposure Conditions (bevetstrong.com)
[7] High blood pressure (hypertension) - Symptoms and causes - Mayo Clinic

Padilla and his wife have a loving marriage. Mr. Padilla's wife has stated that she wants her husband "home every minute of every day."

## MR. PADILLA'S WIFE

Mrs. Padilla's mental health records from Centerstone Mental Health Clinic in Cleveland, Tennessee, show a continuous decline in her mental health largely due to stressors associated with Mr. Padilla's incarceration. The mental health records state that Mrs. Padilla has been diagnosed with Bipolar II Disorder[8], Post Traumatic Stress Disorder due to war, terrorism, or hostility[9], Attention Deficit/Hyperactivity Disorder[10], and Generalized Anxiety Disorder with panic attacks[11]. The effects of Mr. Padilla's incarceration are manifesting in a physical way, which is hindering Mrs. Padilla's ability to function as she would have prior to Mr. Padilla's incarceration.

On August 9th, 2022, Mrs. Padilla had complaints of continued anxiety and flashbacks due to Mr. Padilla's impending court date. July 26th, 2022, Mrs. Padilla presented with continued flashbacks and anxiety over Mr. Padilla's situation. June 28th, 2022, Mrs. Padilla presented with "lots of anxiety." She reported complaints of increased night terrors, anxiety, panic, and outbursts. She also reported that sleep had become difficult as she is easily "triggered." June 6th, 2022, Mrs. Padilla had complaints of persistent anxiety that she believes surrounds the situation with Mr. Padilla.

There were several "problems" listed for Mrs. Padilla in which the best remedy would be for Mr. Padilla to return home. The "problems" included: (1) need for emotional support, (2) inadequate social support, (3) Needs assistance with community resources, (4) problems influencing health status, (5) Bipolar type II disorder currently in full remission, (6) posttraumatic stress disorder, (7) generalized anxiety disorder, and (8) Bipolar II disorder, current episode depressed.

---

[8] https://www.webmd.com/bipolar-disorder/guide/bipolar-2-disorder
[9] https://www.psychiatry.org/patients-families/ptsd/what-is-ptsd
[10] https://www.nimh.nih.gov/health/topics/attention-deficit-hyperactivity-disorder-adhd
[11] https://www.aafp.org/dam/brand/aafp/pubs/afp/issues/2015/0501/p617.pdf

The supplemental information for multiple visits stated that Mrs. Padilla is "severely ill" which could result in "disruptive pathology, behavior and function frequently influenced by symptoms may require assistance from other intrusive symptoms that distinctly impair social/occupational function or cause intrusive levels of distress." The most recent records show that Mrs. Padilla's mental health status has "minimally improved" meaning it has gotten "slightly better with little or no clinically meaningful reduction of symptoms." It is clear that the longer Mr. Padilla is incarcerated, the more Mrs. Padilla's mental health will decline. It is uncertain and highly concerning what may happen to Mr. Padilla's family if he remains incarcerated pending trial. Mr. Padilla understands that any pre-trial release could be temporary based upon the outcomes at trial. Nonetheless, he believes that he can assist his wife in the interim and help her with arrangements that would make the potential incarceration less burdensome on her and their children.

## MR. PADILLA'S CHILREN

Since being declared 100% unemployable, Mr. Padilla has dedicated all of his time to his family and becoming a stay-at-home father managing the house while his wife is at work, including but not limited to picking their three sons up from school and caring for them throughout the afternoon and early evening and regularly assisting them with their schoolwork. Since Mr. Padilla's detention, Mrs. Padilla struggles to assist the children with their schoolwork as Mr. Padilla has a better understanding of the concepts that the children are learning.

Mrs. Padilla has described the relationship between Mr. Padilla and their oldest child as "a hinge; they are screwed together at the hip." Their oldest son has lost his role model and has lost sight of how to act because he looks to his father as the authoritative figure in his life. Mrs. Padilla admittedly struggles with the authoritative role she has taken on and the three boys do not make it easier on her in their father's absence.

Mr. Padilla's youngest son was officially diagnosed with an anxiety disorder and autism on April 4th, 2021, at Siskins Center for Developmental Pediatrics in Chattanooga, Tennessee. Due to his autism,

the youngest child is extremely routine oriented and does not cope well with change. Consistent, predictable routines and structure are very important for autistic people and a change to routine—such as the parent providing the primary care being detained—can be very distressing.  Since Mr. Padilla's detainment, his youngest son has had more frequent meltdowns. "A meltdown is an intense response to overwhelming circumstances—a complete loss of behavioral control. People with autism often have difficulty expressing when they are feeling overly anxious or overwhelmed, which leads to an involuntary coping mechanism—a meltdown."[12] These meltdowns have led to behavioral issues at school resulting in disciplinary action.

Mr. Padilla's youngest son fears going to school because he is worried his mom will not be there when he returns home. He has become stressed at school, stressed at home, and requests to sleep with Mrs. Padilla for fear of separation. He has expressed his fear of losing his mom as he has his dad.

Per Mrs. Padilla, since Mr. Padilla's confinement, all of the children's grades have suffered. Mr. Padilla, being the primary care giver, usually helped his children with their homework. Due to working two jobs to make ends meet, Mr. Padilla's wife is not able to dedicate the same time Mr. Padilla spent helping the children with their schoolwork nor does she have the adequate understanding of how to help the children with their schoolwork. When Mr. Padilla's wife is working, the children are cared for by their maternal grandmother. The dynamic between the children and their maternal grandmother is not ideal as she is not equipped to handle three adolescent boys. The boys often play rough or play soldiers, which the grandmother does not approve of and in one instance resulted in her calling the police because she felt the boys were playing too rough.

---

[12] https://www.rdiconnect.com/what-is-an-autism-meltdown/#:~:text=A%20meltdown%20is%20an%20intense,involuntary%20coping%20mechanism%E2%80%94a%20meltdown.

The children's behavior has become an issue in the classroom as well. The boys have been having incidents in school leading to disciplinary actions and have been associating with other students that teachers feel are not "the right crowd."

Mr. Padilla's three boys are at a stage in their life where having their father around to guide them to manhood is pivotal. The efforts of the children's mother and grandmother should not be diminished, however, the role of a father in a son's life is important for their development. Mr. Padilla is the primary example to his sons of what it means to be a man. "Young men learn from their dads about what it means to be responsible, ethical, caring, and appropriate. More specifically, a teenage boy watches how his dad treats women, uses his physical strength, values his work, relates to kids, and expresses friendship with his mates. These observations will form the default option for teenage boys as they become men." [13] It is evident that Mr. Padilla and his boys have a close relationship. In the Report of Examination from Special Agent Terrilynn James, several texts between Mr. Padilla and his boys were exchanged while he was in Washington, D.C. His boys requested that he send them pictures of D.C. and when the protest escalated, his boys were quick to ask that their father check-in with them so they would know he was safe.

There is a concern that without their father's presence, they will continue to have behavioral problems at home and school. This family dynamic has been strained and will continue to worsen until Mr. Padilla is released.

Mr. Padilla's parents are both deceased.  Though their parents have passed, Mr. Padilla and his sister maintain a close relationship with one another. Before he was arrested, Mr. Padilla and his sister would speak to each other at least once a week.

This factor weighs highly in favor of pretrial release.

### 4.  The Defendant's employment situation.

---

[13] https://www.understandingboys.com.au/the-father-factor-what-teenage-boys-learn-from-their-dads/

Mr. Padilla joined the Army National Guard in July 2002. He participated in two deployments, the first in support of Operation Iraqi Freedom in 2006 which lasted 18 months, and the second in 2010 for 13 months. During both deployments Mr. Padilla was responsible for maintaining systems that kept radio controlled improvised explosive devices from detonating, as well as communications and other duties as assigned. During the two deployments, Mr. Padilla faced combat. In 2012, Mr. Padilla was honorably discharged from the Army National Guard.

Mr. Padilla began treatment for his Post Traumatic Stress Disorder (PTSD) at the Psychiatric Ambulatory Clinic in the Alvin C. York Veterans' Administration Medical Center in Murfreesboro, Tennessee in 2006. Although Mr. Padilla was diagnosed and being treated for PTSD, he never sought disability compensation as he did not want PTSD to hinder his service in the Army National Guard. In 2016 Mr. Padilla filed for compensation due to his PTSD. He maintained treatment at the Psychiatric Ambulatory Clinic in the Alvin C. York Veterans' Administration Medical Center in Murfreesboro, Tennessee until 2018 when he decided to attend the Chattanooga, Tennessee VA Clinic. Mr. Padilla lost his job in 2018 due to PTSD related issues so he sought an increase in his compensation to which his VA Disability Rating for PTSD was increased to 100%.

This factor is neutral and does not weigh against or in favor of pretrial release.

**5.   The Defendant's financial resources.**

Mr. Padilla lost his job in 2018 due to PTSD related issues so he sought an increase in his compensation to which his VA Disability Rating for PTSD was increased to 100%. Mr. Padilla receives financial support from a military pension and from social security. Currently, Mr. Padilla's wife is working two jobs to support their family while Mr. Padilla is detained, but her mental health problems make it difficult for her to leave the home.

This factor is neutral and does not weigh against or in favor of pretrial release.

**6.   The Defendant's length of residence in the community and his community ties.**

Mr. Padilla has resided in Tennessee for many years. His family currently maintains a home in Dayton, Tennessee. They have lived in this home since March 23rd, 2021.

Prior to Mr. Padilla's detainment, the family lived in Cleveland, Tennessee until they were evicted due to his arrest. While living there, Mr. Padilla had close friends in the neighborhood. They had regular contact with their neighbors and were always getting together for parties. They were hardly without someone over at their home.

Mr. Padilla is a member of Cedar Ridge Seventh Day Adventist church. His wife Rebekah is also a member of this church and attends every Saturday with her boys. Mrs. Padilla has reported that the church is supportive of and praying for Mr. Padilla's release. In the event Mr. Padilla is released, he plans to attend this church.

This factor weighs in favor of pretrial release.

### 7. The Defendant's past conduct.

Mr. Padilla participated and was fully compliant with the FBI investigation and arrest. He did not destroy evidence pertaining to his January 6th involvement nor did he attempt to flee at any point. In fact, for the five weeks leading up to his arrest, he carried on his normal life caring for his children and maintaining the family home. From January 6 to his arrest on February 23, 2021, Mr. Padilla made no threats or suggestions of any civil disobedience or resisting authority.

Mr. Padilla has been detained for nearly two years in the DC Jail. Since being detained, Mr. Padilla has maintained a polite and compliant demeanor towards the DC Jail staff despite the solitary-like conditions he has endured. Mr. Padilla has exhibited model inmate behavior that has resulted in no disciplinary reports. His good attitude coupled with his exemplary behavior, despite being in a high stress environment, exemplifies Mr. Padilla's good character.

This factor weighs in favor of pretrial release.

### 8. The Defendant's history, if any, relating to drug or alcohol abuse.

Mr. Padilla has no history of substance (drug or alcohol) abuse and he does not own any firearms.

This factor weighs in favor of pretrial release.

### 9. The Defendant's criminal history.

Mr. Padilla has no criminal history prior to or after the January 6th events.

This factor weighs in favor of pretrial release.

### 10. The Defendant's record concerning appearance at court proceedings.

It follows from the defendant's lack of significant criminal history that there is no demonstrated record of failing to appear as required for criminal cases.

This factor weighs in favor of pretrial release.

### C. DANGER TO THE COMMUNITY

"The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release." 18 U.S.C. § 3142(g). To assess a defendant's dangerousness, the court must "take into account the available information" concerning four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4). *United States v. Klein*, 533 F. Supp. 3d 1, 8 (D.D.C. 2021)

"Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," requiring an "open-ended assessment of the 'seriousness' of the risk to public safety." *Taylor*, 289 F. Supp. 3d at 70. In making that assessment, the Court may consider all relevant indicia of risk to the community, including evidence that would not be admissible at trial. *Id.* Because this factor substantially overlaps with the ultimate question whether any conditions of release "will reasonably assure ... the safety of any other person and the community," 18 U.S.C. § 3142(e), it bears heavily on the Court's analysis." *United States v. Klein*, 539 F. Supp. 3d 145, 155 (D.D.C. 2021).

"To justify detention on the basis of dangerousness, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *Id.* § 3142(f). Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety. *United States v. Munchel*, 991 F.3d 1273, 1279–80 (D.C. Cir.), *judgment entered*, 844 F. App'x 373 (D.C. Cir. 2021). Further, in the absence of a concrete, prospective threat to public safety that cannot be mitigated by strict conditions, this Court must apply "the default rule favoring liberty." See Cua, 2021 WL 918255, at *8; *see also Salerno*, 481 U.S. at 755, 107 S.Ct. 2095 ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."). *United States v. Klein*, 533 F. Supp. 3d 1, 20 (D.D.C. 2021)

The circumstances of January 6th were unprecedented at the time and are unlikely to occur again. If Mr. Padilla were to be released, the Court has the ability to fashion restrictions that would prevent Mr. Padilla from participating in any reoccurrence of January 6th-like events. The District of Columbia Pretrial Services Report assesses him as a low risk of re-arrest as well as a low risk of flight.  An Order of Detention Pending Trial filed on April 4th, 2021, stated that Mr. Padilla is not a flight risk, but that "Defendant's release poses a danger to the community that cannot be mitigated by release conditions."

**D.  NATURE AND CIRCUMSTANCES OF THE OFFENSES CHARGED**

Mr. Padilla argues that he is not a danger based upon the six advisory "guideposts" articulated in *United States v. Chrestman*, No. 21-mj-218 (ZMF), 2021 WL 765662 (D.D.C. Feb 26, 2021), for assessing the comparative culpability of a given defendant in relation to others on January 6, 2021. The guideposts are as follows: (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot;

(5) whether the defendant played a leadership role in the events of January 6, 2021; and (6) the defendant's words and movements during the riot"—e.g., whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, or attempted to injure, or threatened to injure others." Id. at 7-8.

Before discussing the Chrestman Guidepost factors, it should be noted that these factors are designed only to display a person's dangerousness based on January 6th, 2021, completely disregarding a person's character on a regular calendar day. The Chrestman factors unfairly reward the Government by requiring defendants to argue issues that should be argued at trial. Instead, defendants are forced to argue factors for pretrial release that ultimately may not weigh in their favor and that are designed to keep individuals detained irrespective of the Bail Reform Act. Defendant objects to the use of the Chrestman factors. Nonetheless, they are assessed as follows:

**CHRESTMAN GUIDEPOST 1: Whether Defendant has been charged with felony or misdemeanor offenses.**

Mr. Padilla has been indicted on several felony charges. Mr. Padilla has no criminal history; therefore, this is the first time he has ever been charged with a felony or a crime of violence and he is presumed innocent of all charges. Using the *Chrestman* analysis, the very charges against Mr. Padilla weigh against him. Nonetheless the Bail Reform Acts states that nothing in the act "shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. 3142(j).

This factor should not be weighed in favor of pretrial detention but should instead be eliminated as the charges against Mr. Padilla should not limit his presumption of innocence. Mr. Padilla has substantial defenses to the most significant charges against him which are more appropriately considered at trial.

In context, it is respectfully submitted that this factor should not be weighed in favor of either party.

**CHRESTMAN GUIDEPOST 2: The extent of the Defendant's prior planning.**

The memorandum opinion dated May 5th, 2021, states that "Padilla ultimately dressed in ordinary clothing, except for his scuba mask, and did not bring any weapons with him." Mr. Padilla carried bottled water, an M95 mask, and a scuba mask. Mr. Padilla contends that he brought the scuba mask with him in case anti-Trump protesters became violent. A footnote of the above referenced memorandum opinion states that there is a dispute as to the relevance of Padilla's scuba mask. "[T]he government says it shows "clear premeditation of anticipated clashing with police," Gov't's Opp'n at 6, whereas Padilla contends that "masks [and] goggles have become commonplace" at protests in the last year and are even recommended by mainstream online media[.]" see Def.'s Reply to Gov't's Opp'n ("Def.'s Reply") [ECF No. 22] at 2.

Mr. Padilla did not go to the Capitol on January 6th, 2021, with the intention of disrupting the certification of the election and did not anticipate that he might commit violent acts. Mr. Padilla attended the rally in support of his Presidential Nominee with the understanding that, given the current political climate and its recent uprise in violence, he may be faced with outside backlash from non-Trump supporters. Mr. Padilla came prepared with a scuba mask to protect himself in anticipation for what he had seen online prior to January 6th, 2021.  This factor should be weighed in favor of Defendant.

### CHRESTMAN GUIDEPOST 3: Whether Defendant used or carried a dangerous weapon.

For purposes of this motion, it is undisputed that Mr. Padilla briefly had his hands on the large metal Trump sign and temporarily possessed a flagpole. Clearly there are trial issues related to the large metal Trump sign and the flagpole which remain unresolved. Nonetheless, Mr. Padilla can be seen in video footage placing his hands on a large Donald Trump sign for a matter of seconds before he was shoved down a flight of stairs by police officers.  There is a clear indication that the other protestors were attempting to place the sign just before the barricade to taunt police officers. It is unclear whether other people that were actually carrying the sign had some other intent. Mr. Padilla did not formulate an intent to use the sign to push or assault the police. Mr. Padilla heard someone on a megaphone say, "put it up

there." Mr. Padilla inferred that that person was referring to the sign. Mr. Padilla was forcefully shoved by police officers off of the sign and again down the flight of stairs. The assertion of the Trump sign as a "dangerous weapon" may prove to be a better metaphor than a weapon.  Regardless of what any others may have intended, a reasonable interpretation of the evidence would allow the conclusion that Mr. Padilla did not intend to use the sign as a weapon.

The Government further alleges that Mr. Padilla used a silver flagpole to assault officers in the tunnel. Both the intent of the Defendant and the relative danger posed by Mr. Padilla throwing the object are matters to be assessed at trial or perhaps in a sentencing hearing. While it is beyond dispute that video evidence demonstrates Mr. Padilla threw the pole, the defense has not been presented with any evidence to suggest that any officers were injured. It is clear that the pole was thrown such that it first hit a wall after sailing over the heads of protestors.  Any contact with officers could be viewed by the trier of fact as incidental. Upon information and belief, no officer has endorsed being struck or injured by the pole. Mr. Padilla maintains that he did not intend to throw the flagpole at police in the tunnel.

### CHRESTMAN GUIDEPOST 4: Evidence of coordination with other protestors before, during, or after January 6th

Essentially, there was no coordination before, during, or even after January 6th to incite violence or participate in criminal activity. Mr. Padilla went to the rally with two family members, but they were quickly separated, and Mr. Padilla can be seen alone throughout the video footage from January 6th.

This factor weighs in favor of pretrial release.

### CHRESTMAN GUIDEPOST 5: Whether Defendant played a leadership role in the events of January 6th, 2021.

Mr. Padilla simply planned to attend a protest. Mr. Padilla did not have a leadership role in the January 6th, 2021, events, nor is he a member of any extremist organizations, any group that supports violence against the government, or any other hate group. Mr. Padilla did not make any statements

before, during, or after January 6th, which would suggest he had any leadership role in the protest nor is there any evidence to support that Mr. Padilla played a leading role.

In context, this factor weighs in favor of pretrial release.

> **CHRESTMAN GUIDEPOST 6: The Defendant's words and movements during the riot—e.g., whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, or attempted to injure, or threatened to injure others"**

Mr. Padilla never entered the Capitol. He arrived in Washington, D.C., weaponless and without any symbols of violent protest. He did not initiate physical contact with any officers. Mr. Padilla is shown in body camera footage to be conversing with police officers, at which point he is shoved down and helped back up by fellow bystanders. Mr. Padilla then moved back to the railing where he was sprayed with repellant by police officers. Although he was standing with his hands on the railing, he did not touch any of the police officers on the other side of the railing.

Due to his PTSD, Mr. Padilla believed that he was under attack by the police officers. He is then shown pushing against the railing and yelling "push." This does not demonstrate  a leadership role or an intent to injure — it is a moment of passion and anxiety, during a once in a lifetime event that will never take place again. No one around Mr. Padilla pushed on the railing with him. The officers proceeded to seriously beat Mr. Padilla with a baton and their fists. Mr. Padilla is visibly disoriented after being beaten by police officers.

## VI.     PROPOSED CONDITIONS OF RELEASE

If released, Mr. Padilla would return to his wife and children in Tennessee, where he has never faced criminal allegations. He would obey any Court orders regarding home detention, computer monitoring, and avoidance of political activities or gatherings. These conditions would eliminate any potential concerns that this Court or the government might have. Further, nothing about Mr. Padilla's history suggests an unwillingness or inability to follow orders of the court or conditions of release. His time would largely be occupied by raising his three boys.

Counsel has regularly been in touch with Mr. Padilla's wife since Mr. Padilla's arrival in Washington, D.C. Before Mr. Padilla's initial detention hearing Mrs. Padilla proposed options for his return to Cleveland, Tennessee if released – her driving to pick up Mr. Padilla in Washington, D.C., or buying him a plane ticket. These options, as well as a one-way rental car or bus ticket, remain options both for his return upon release and for all future court dates.  The Court also has the options of electronic monitoring and home confinement.

## VII.    CONCLUSION

WHEREFORE, for the foregoing reasons, and any others which may appear in our reply brief at a full hearing on this matter, and any others this Court deems just and proper, defendant through counsel, respectfully requests that he be released on personal recognizance. If that request is denied, defendant requests as an alternative, that he be released and placed into Highly Intensive Supervision Program of the Pretrial Services Agency conditioned on reasonable conditions including, but not limited to, electronic monitoring, home confinement, and intensive supervision.

Respectfully submitted:

/s/ *Michael J Cronkright*
_____
Michael J Cronkright (P52671)
Cronkright Law, PLLC
420 W. Saginaw, Ste. J2A
Lansing, MI 48917
Phone (517) 881-4643
Michael@Cronkrightlaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a copy of the foregoing Defendant Joseph Joseph Padilla's

<u>**DEFENDANT JOSEPH LINO PADILLA'S MOTION TO REVOKE THE CURRENT**</u>
<u>**DETENTION ORDER AND REOPEN THE DETENTION HEARING**</u>

is being filed via the Electronic Court Filing System (ECF), causing a copy to be served upon government counsel of record, this 2nd  day of January, 2023.

Respectfully submitted:

/s/ *Michael J Cronkright*

_____
Michael J Cronkright (P52671)
Cronkright Law, PLLC
420 W. Saginaw, Ste. J2A
Lansing, MI 48917
Phone (517) 881-4643
Michael@Cronkrightlaw.com