UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSEPH LINO PADILLA,<br>also known as "Jose Padilla,"<br><br>Defendant. | Criminal Action No. 21-214 (JDB) |

## MEMORANDUM OPINION

Defendant Joseph Lino Padilla is charged via indictment with 12 offenses related to the breach of the United States Capitol on January 6, 2021. Padilla has filed three motions seeking (1) dismissal of one count of the indictment, (2) an evidentiary hearing and discovery in support of a selective prosecution claim, and (3) revocation of his detention order and reopening of his detention hearing. For the reasons explained below, the Court will deny each motion.

### Background[1]

Padilla participated in the breach of the U.S. Capitol on January 6, 2021 in protest of the 2020 presidential election results. See Statement of Facts [ECF No. 1-1] ("SOF") at 1–2, 9. On January 6, the U.S. Congress was convened in the Capitol for a joint session to certify the electoral vote count. Id. at 1. The joint session began at approximately 1:00 p.m. and was supposed to continue throughout the afternoon. See id. However, in the early afternoon, a large crowd gathered outside the Capitol. Id. Despite the presence of barricades and U.S. Capitol Police ("USCP") attempting to keep the protesters out of the Capitol and away from the building, the crowd overwhelmed the USCP and forced their way into the Capitol around 2:00 p.m. Id. Shortly after,

---

[1] For a more fulsome description of the facts of this case, see United States v. Padilla, 538 F. Supp. 3d 32, 35–38 (D.D.C. 2021).

1

at around 2:20 p.m., members of the House of Representatives and Senate, as well as then-Vice President Michael Pence, were forced to evacuate and effectively suspend the joint session. Id.

Video footage shows Padilla participating in the riot at the Capitol on January 6. See SOF at 2–8. The footage starts around 1:31 p.m. and shows Padilla, wearing a scuba mask, approaching a metal barricade in front of a line of Metropolitan Police Department ("MPD") officers protecting a restricted area of the Capitol grounds. Id. at 3. After being forced back by an MPD officer, Padilla proceeded to push the barricade and yelled, "Push! Push! F***ing push!" Id. At 1:38 p.m., MPD officers removed Padilla's scuba mask and struck him with batons to prevent him from breaching the barricade. Id. at 4. Padilla then receded from the barricade and began helping other rioters move a large metal sign on wheels toward the barricade by grabbing onto it. Id. at 5. Approximately three hours later, video shows Padilla holding a flagpole in front of the archway of the Lower West Terrace Doors. Id. at 6. He launched the flagpole toward officers who were simultaneously being attacked by other rioters. Id. at 6–8.

Shortly after January 6, Padilla made several social media posts referencing his participation in the Capitol riot. See SOF at 9. Specifically, Padilla said he and others "push[ed]" officers in addition to pushing "the rails," "the stairs," and "the doorway." Id. He "th[a]nk[ed] God the guys on the left of the [Capitol] building were able to push up the stairs . . . and start knocking on the Capitol Building doors." Id. He described the "guy[s] breaking the windows" as "Patriots trying to find a new way in so we could flank the cops who were holding the doorway." Id. He noted that

> [i]f we could have occupied the Capitol, we could have invoked the right given to us in the 2nd paragraph of the Declaration of Independence . . . . We would have been in the Seat of Power. All we would need to do is declare our grievances with the government and dissolve the legislature, and replace it with Patriots who were there. Then simply re-adopt the Constitution with amendments added to secure future Federal elections.

Id.

A grand jury returned a 12-count indictment against Padilla. See Indictment [ECF No. 48]. The indictment charges him with three counts of civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Counts Two, Four, and Six); two counts of assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Counts Three and Five); assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1) (Count One); obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Seven); entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count Eight); disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count Nine); engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count Ten); disorderly conduct in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Eleven); and an act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Twelve). See id.

On March 31, 2021, following a detention hearing, Magistrate Judge Zia Faruqui ordered that Padilla be detained pending trial based on his finding that Padilla is a danger to the community. See Mar. 31, 2021 Min. Entry; Order of Detention Pending Trial [ECF No. 23]. Two weeks later, Padilla filed a motion to revoke his detention order, see Def.'s Mot. to Revoke Detention Order [ECF No. 15] ("2021 Mot. for Release"), and this Court held an evidentiary hearing on May 3, 2021, see May 3, 2021 Min. Entry.  The Court denied Padilla's motion, finding by clear and convincing evidence that "he poses a concrete, prospective threat to the safety of the community

that cannot be mitigated by any combination of release conditions." Padilla, 538 F. Supp. 3d at 49.

On December 27, 2022, Padilla filed a motion to dismiss Count Seven, which charges him with obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2. See Def.'s Mot. to Dismiss Count Seven of the Superseding Indictment [ECF No. 60] ("Mot. to Dismiss"). On January 3, 2023, he filed a motion for discovery and an evidentiary hearing in support of a selective prosecution claim, see Def.'s Mot. for Disc. & for Evidentiary Hr'g in Supp. of Claim of Selective Prosecution [ECF No. 62] ("Disc. Mot."), and a motion to revoke his detention order and reopen the detention hearing, see Def.'s Mot. to Revoke Current Detention Order & Reopen Detention Hr'g [ECF No. 63] ("Mot. for Release"). On January 17, 2023, the government responded in opposition to all three motions. See Gov't's Opp'n to Mot. to Dismiss [ECF No. 63]; Opp'n to Disc. Mot. [ECF No. 65]; Opp'n to Mot. for Release [ECF No. 64]. Padilla filed a reply in support of his motion for release on January 31, 2023, see Def.'s Reply to Opp'n to Mot. for Release [ECF No. 66] ("Reply"), but did not file a reply in support of his other two motions. The motions are now ripe for decision.

## Motion to Dismiss Count Seven

Padilla has moved to dismiss Count Seven of the indictment, which charges him with obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2, for "failure to state an offense."[2] Mot. to Dismiss at 1.

A criminal defendant may move pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) to dismiss the indictment against him for "failure to state an offense." If the

---

[2] Padilla also briefly mentions the indictment's alleged "lack of specificity" as a basis for dismissal under Federal Rule of Criminal Procedure Rule 12(b)(3)(B)(iii), Mot. to Dismiss at 2, but he never explains the argument further or even discusses it again in his brief. Accordingly, the Court will not address that argument.

statutory provision at issue does not cover the charged conduct, the indictment fails to state an offense.  See United States v. McHugh (McHugh I), 583 F. Supp. 3d 1, 10 (D.D.C. 2022).  In assessing whether to grant a motion to dismiss under Rule 12(b)(3)(B)(v), courts consider whether the allegations in the indictment, assumed to be true, "would be sufficient to permit a jury to find that the crimes charged were committed."  United States v. Bozell, Case No. 21-CR-216 (JDB), 2022 WL 474144, at *2 (D.D.C. Feb. 16, 2022) (quoting United States v. Bowdoin, 770 F. Supp. 2d 142, 146 (D.D.C. 2011)).

Padilla argues—in nearly identical fashion to the other January 6 defendants in this Court whose motions the Court has already denied—that his alleged conduct is not covered by § 1512(c)(2) because that section's reach is limited by § 1512(c)(1).  See Mot. to Dismiss at 2–7.  Section 1512(c) reads:

> (c) Whoever corruptly—
>
> > (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
> >
> > (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

Padilla contends that "[u]nder the statute's plain language and structure, the most natural and plausible reading of 18 U.S.C. §1512(c)(2) is that it covers acts that have the same kind of obstructive impact as the listed forms of obstruction in § 1512(c)(1)." Mot. to Dismiss at 3.  Thus, because the government "has not alleged in the indictment or statement of facts that Mr. Padilla took any action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence Congress's certification of the electoral college vote," his charged conduct cannot support a conviction under § 1512(c)(2).  Id.

5

Padilla then briefly analyzes the statutory history of § 1512(c), noting that the purpose of the statute was to "criminalize any tampering with potential witnesses in official proceedings" in the wake of the Enron scandal, and arguing that a memorandum authored by former Attorney General William Barr in June 2018 supports that this was the intended purpose of the statute. See Mot. to Dismiss at 3–6. Finally, Padilla cites United States v. Miller, a case from this District in which the court held that "§ 1512(c)(2) must be interpreted as limited by subsection (c)(1), and thus requires that the defendant have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding," 589 F. Supp. 3d 60, 78 (D.D.C. 2022), in support of his argument. Mot. to Dismiss at 6.

As Padilla acknowledges, this Court "has not granted any motion for dismissal of 18 U.S.C. § 1512(c)(2) charges." Mot. to Dismiss at 2. Instead, the Court has, on numerous occasions, considered and declined to adopt the statutory construction argument Padilla advances here. See United States v. McHugh (McHugh II), Crim. A. No. 21-453 (JDB), 2022 WL 1302880, at *2–12 (D.D.C. May 2, 2022); Bozell, 2022 WL 474144, at *5; United States v. Brock, Crim. A. No. 21-140 (JDB), 2022 WL 3910549, at *2 (D.D.C. Aug. 31, 2022); United States v. Sheppard, Crim. A. No. 21-203 (JDB), 2022 WL 17978837, at *4 (D.D.C. Dec. 28, 2022); see also United States v. Grider, Crim. A. No. 21-022 (CKK), 2022 WL 3016775, at *3 & n.3 (D.D.C. July 29, 2022) (collecting cases from other judges in this District concluding the same). This Court has already spilled much ink on this issue and so will only briefly reiterate its reasoning here.

First, the broad interpretation of § 1512(c) is the most natural reading of the text. The word "otherwise," which links § 1512(c)(1) and (2), ordinarily means "in a different way." McHugh II, 2022 WL 1302880, at *3 (citing Otherwise, Oxford English Dictionary (3d ed. 2004)). Applying this ordinary meaning of "otherwise" yields a reading of § 1512(c)(2) that "prohibits

6

acts which obstruct an official proceeding 'in a different way' from those obstructive acts covered by paragraph (c)(1)." Id. at *7. Thus, the acts proscribed by § 1512(c)(2) need not have the same "obstructive impact" as those proscribed in § 1512(c)(1).

Second, although the plain meaning of the statute is clear, which ends the inquiry, the context and purpose of § 1512(c) also support a broader reading than that urged by Padilla. See McHugh II, 2022 WL 1302880, at *7. Despite some overlap with conduct proscribed in other parts of the statute, a broader reading of § 1512(c)(2) does not render those subsections duplicative: "[b]y adding a new prohibition on direct obstruction to § 1512, Congress did not duplicate pre-existing provisions, but instead expanded the statute to include additional forms of obstructive conduct, necessarily creating overlap with the section's other, narrower prohibitions." Id. at *8 (emphases in original) (citation omitted). Such overlap is common in criminal law. Id. at *9. Further, the legislative intent supports a broad reading of the statute—"§ 1512(c)(2)'s language was likely adapted from the similar language of 18 U.S.C. §§ 1503(a) and 1505. And those two statutes are expansive prohibitions on obstruction." Id. at *10. Moreover, the narrower reading of § 1512(c)(2) is implausible because there were several more straightforward ways for Congress to craft its language to accomplish the meaning Padilla advances. See id. at *11. And the legislative history does not strongly favor one reading over the other. See id. at *11–12.

Padilla does not raise any novel arguments that would warrant the Court's deviation from its reasoning in other January 6 cases. Thus, the Court will deny Padilla's motion to dismiss Count Seven.

### Motion for Evidentiary Hearing and Discovery for Selective Prosecution Claim

Padilla requests discovery and an evidentiary hearing in support of a selective prosecution claim he intends to raise. See Disc. Mot. Padilla argues that he "is being subjected to disparate

7

prosecutorial treatment due to his political views and activism," id. at 10, and "requests appropriate and reasonable discovery in order to discover facts necessary to the litigation of the issue," id. at 16. At the outset, he notes that "no selective prosecution claims by January 6th Defendants have been granted to date, even in the request for discovery" and that "controlling law presents a high hurdle for him to clear." Id. at 1.

A defendant may bring a selective prosecution claim under the equal protection component of the Fifth Amendment. Despite its broad grant of prosecutorial discretion, the government may not base the decision to prosecute on "an unjustifiable standard such as race, religion, or other arbitrary classification." United States v. Armstrong, 517 U.S. 456, 464 (1996) (internal quotation marks omitted). There is a "presumption that a prosecutor has not violated equal protection," id. at 465, and a defendant must present "clear evidence to the contrary" to succeed on such a claim, id. (internal quotation marks omitted). To make out a selective prosecution claim, a defendant must show that the challenged prosecution policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." Id. at 465 (internal quotation marks omitted).

To demonstrate a discriminatory effect in prosecution decisions, "a defendant must show that the Government afforded 'different treatment' to persons 'similarly situated' to him." United States v. Judd, 579 F. Supp. 3d 1, 4 (D.D.C. 2021) (quoting Armstrong, 517 U.S. at 470). "When a person's circumstances 'present no distinguishable legitimate prosecutorial factors that might justify' different prosecutorial decisions between him and the defendant, that person is similarly situated to the defendant." Id. at 4 (quoting Branch Ministries v. Rossotti, 211 F.3d 137, 145 (D.C. Cir. 2000)). Courts "'narrowly' interpret the phrase 'similarly situated.'" Id. (quoting United States v. Stone, 394 F. Supp. 3d. 1, 31 (D.D.C. 2019)).

Courts impose a "correspondingly rigorous standard" for discovery in support of a claim of selective prosecution. Armstrong, 517 U.S. at 468. A defendant must present "'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent." Id. (quoting United States v. Berrios, 501 F.2d 1207, 1211 (2d Cir. 1974)).

The thrust of Padilla's selective prosecution argument is that "others of different class and political persuasion fare better when their demonstration[s] of grievances are pressed in [a] similar manner as were his." Disc. Mot. at 2. He lists various protests in which he claims the protestors were treated more favorably than he and other January 6 protestors were despite being similarly situated. First, he cites climate protests that took place in 2021 in D.C., which were attended predominantly by Native Americans, arguing that despite the "glaring" similarities between those protests and the events of January 6—including assaults on officers and disruption of government business—"the majority of persons arrested were either not charged at all or were ticketed and released. None seem to have been charged with federal crimes." Id. at 2–5. Next, he points to the 2020 protests in Portland, noting that despite also featuring assaults on officers and damage to government property, nearly all the charges against those protestors have been dismissed. Id. at 5–6. Padilla then raises the 2018 protest of Justice Brett Kavanaugh's Supreme Court confirmation, wherein a crowd of protestors breached police barricades outside the Capitol while then-Vice President Pence was inside presiding over the confirmation hearing; despite over 200 arrests, only one protestor was prosecuted in federal court. Id. at 7. Finally, Padilla notes that Ray Epps and James Knowles, other protestors at the Capitol on January 6, have to date not been arrested or charged in connection with their participation in the events of that day. Id. at 7–9.

As Padilla acknowledges, this Court and others in this District have already denied similar requests for discovery in support of selective prosecution claims in January 6 cases. See Brock,

9

2022 WL 3910549, at *11–12; Judd, 579 F. Supp. 3d at 3–9; see also United States v. Rhodes, Crim. No. 22-cr-15 (APM), 2022 WL 3042200, at *4–5 (D.D.C. Aug. 2, 2022) (denying a motion to dismiss based on selective prosecution). The defendants in those cases also drew comparisons to the Portland protests, and the courts held that the Portland protestors were not similarly situated to January 6 defendants. See Brock, 2022 WL 3910549, at *12; Judd, 579 F. Supp. 3d at 7–8; Rhodes, 2022 WL 3042200, at *5. The courts differentiated the Portland protestors in part because "the mob on January 6th . . . 'endangered hundreds of federal officials in the Capitol complex,' including Members of Congress and their staffs, Vice President Pence, and the United States Capitol Police." Brock, 2022 WL 3910549, at *12 (quoting Judd, 579 F. Supp. 3d at 8). "In contrast, the Portland protests happened at night, when no federal employees were in the buildings to be endangered." Id.; accord Rhodes, 2022 WL 3042200, at *5 (noting that "the Portland attacks occurred primarily at night and therefore put fewer people in danger" and that defendant failed to identify any Portland protestor who was "involve[d] in a concerted plan to use force to oppose the authority of the United States government and to obstruct an official proceeding" as was the case for January 6).

This Court and the Rhodes court also rejected comparisons between the January 6 Capitol riots and the 2018 protests of Justice Kavanaugh's confirmation: "although those who interfered with recent Supreme Court confirmation hearings could be viewed as having sought to obstruct, influence, or impede an official proceeding, their actions far more closely resemble genuine protest than the actions of which [defendant] stands accused." Rhodes, 2022 WL 3042200, at *5; accord Brock, 2022 WL 3910549, at *12 (noting "the difference in violence, threat to citizen safety, and scope" of the confirmation protests).

10

Padilla's other comparisons are similarly unavailing. He fails to assemble credible proof of disparate treatment, instead drawing unwarranted conclusions based on anecdotal evidence. Regarding the 2021 D.C. climate protests, Padilla merely states that "even a casual observer of the American political scene could surmise that President Biden's administration may be more favorably disposed to climate protestors [and] Native American citizens . . . than to 'stop the steal' protestors and supporters of former president Trump," Disc. Mot. at 2–3, without explaining why or citing any specific evidence in support. And, as the government notes, "Padilla does not identify any particular person that he claims is similarly situated, and fails to show that his comparators' 'circumstances present no distinguishable legitimate prosecutorial factors that might justify different prosecutorial decisions.'" Opp'n to Disc. Mot. at 6 (quoting Branch Ministries, 211 F.3d at 145). As with the Portland protests and the Kavanaugh confirmation protests, those distinguishable prosecutorial factors include the scope and magnitude of violence and destruction.

Padilla's final comparisons to two other January 6 protestors, who have to date not been charged in connection with their conduct on that day, fail for the simple reason that, by virtue of their attendance at the Capitol that day, those protestors likely share the same political ideology as Padilla. Although Padilla notes that "he has no knowledge of the political persuasion of these individuals," Disc. Mot. at 9, his argument is premised on the notion that everyone at the Capitol on January 6 shared the same political beliefs that the government disfavors, and that the government's animosity towards those who hold those beliefs explains the harsher prosecution decisions. Padilla has given the Court no reason to believe that Epps and Knowles hold a different political ideology than Padilla such that the government chose to prosecute Padilla but not them. Even if these were persuasive comparisons (and they are not), the government astutely notes that "[m]any individuals have not yet been charged because the government has had to marshal an

11

unprecedented level of investigatory resources to identify and charge each defendant who participated in the U.S. Capitol attack." Opp'n to Disc. Mot. at 7.

Padilla also fails to show evidence of discriminatory intent in the government's charging decisions. He mainly relies on "the national trends of political protest" and the commentary of others who have "surmised a discriminatory purpose" from purportedly disparate treatment to argue that "there is a systemic partisan political motivation within the FBI and the Justice Department as a whole which is focused on Donald Trump and his January 6 supporters." See Disc. Mot. at 11–15. But this Court has already rejected similarly anecdotal evidence as insufficient to prove discriminatory purpose in a selective prosecution claim. In Brock, the Court held that the defendant's argument—that "the motive behind the claimed discrepancies in charging is a bias in DOJ leadership in favor of liberal causes"—was too "conclusory" to be "evidence of anything." 2022 WL 3910549, at *12 (internal quotation marks omitted). As Armstrong counsels, "personal conclusions based on anecdotal evidence" are not sufficient to prove discriminatory intent in a selective prosecution claim. 517 U.S. at 470.

In any event, Padilla's assertion "runs counter to the facts." Brock, 2022 WL 3910549, at *12. As this Court observed in Brock, "[i]nitial prosecution decisions in both the Portland cases and the January 6th cases, including charging January 6th protestors and dismissing cases against Portland protestors, were made under Republican leadership," undermining Padilla's theory that he and others at the Capitol on January 6 were selected for prosecution based on political bias. Id. (emphasis added) (citing Judd, 579 F. Supp. 3d at 8 n.9); accord Opp'n to Disc. Mot. at 7–8.

The Court therefore will deny Padilla's motion for an evidentiary hearing and discovery in support of a selective prosecution claim because he has failed to present "some evidence tending

to show the existence of the essential elements of" such a claim. Armstrong, 517 U.S. at 470 (quoting Berrios, 501 F.2d at 1211).

### Motion to Revoke Detention Order and Reopen Detention Hearing

Finally, Padilla has moved to revoke his current detention order and reopen the detention hearing. See Mot. for Release. On March 31, 2021, Magistrate Judge Faruqui denied Padilla's oral motion for release from custody, finding that "he posed a significant danger to the community and should be detained pending trial." Id. at 4. Padilla then petitioned this Court to revoke his detention order on April 15, 2021, see 2021 Mot. for Release, which the Court denied following an evidentiary hearing, see Padilla, 538 F. Supp. 3d at 49. Padilla has now been detained for almost two years. Mot. for Release at 4.

In denying Padilla's initial motion for release, the Court found that Padilla, although not a flight risk, Padilla, 538 F. Supp. 3d at 48–49, posed a danger to the community based on his violent conduct at the Capitol on January 6 and his troubling rhetoric after the fact, id. at 40–48. In reaching this conclusion, the Court considered the nature and characteristics of the offense, the weight of the evidence against Padilla, Padilla's history and characteristics, and the nature and seriousness of the danger posed by Padilla. See id. After considering all the evidence presented at the hearing through the lens of these factors, the Court determined that "Padilla presents a concrete, prospective threat to public safety that cannot be mitigated by any combination of release conditions." Id. at 48.

Padilla now asks the Court to revisit that determination by reopening his detention hearing and revoking his detention order. 18 U.S.C. § 3142(f) provides that

> [t]he hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably

13

    assure the appearance of such person as required and the safety of any other person and the community.

Another judge in this District—denying the same motion by another January 6 defendant—interpreted "material bearing" to "refer to information that actually affects the Court's decision whether to detain the defendant pending trial." United States v. Chansley, Case No. 21-cr-3 (RCL), 2021 WL 2809436, at *3 (D.D.C. July 6, 2021); accord United States v. Krol, Crim. A. No. 22-110 (RC), 2022 WL 16948611, at *3 (D.D.C. Nov. 15, 2022) (applying the same definition). But bare materiality is not sufficient—the new information must "relate in some significant or essential way to the decision whether to detain." United States v. Worrell, Case No. 1:21-cr-00292-RCL, 2021 WL 2366934, at *9 (D.D.C. June 9, 2021), appeal dismissed, No. 21-3040, 2021 WL 4765445 (D.C. Cir. Sept. 15, 2021); accord Krol, 2022 WL 16948611, at *3 (adopting the same standard). Further, "[n]ew and material information . . . consists of something other than a defendant's own evaluation of his character or the strength of the case against him; instead, it must consist of truly changed circumstances, something unexpected, or a significant event." United States v. Caldwell, Crim. A. No. 21-181 (CKK), 2022 WL 168343, at *6 (D.D.C. Jan. 19, 2022) (quoting United States v. Lee, 451 F. Supp. 3d 1, 5 (D.D.C. 2020)).

    The only new circumstances Padilla raises in support of his renewed motion for release are "the hardship experienced by his family as a result of his continued detention" and "his lack of disciplinary infractions while in pretrial custody." Opp'n to Mot. for Release at 6; accord Mot. for Release at 4–5, 10–15.[3] Padilla relitigates issues already raised at the previous detention hearing and decided by the Court in an attempt to manufacture "new information relative to the detention issue," see Reply at 3–6, and dedicates a significant portion of his briefing to analyzing the same

---

[3] Padilla also raises for the first time that he is a member of the Cedar Ridge Seventh Day Adventist Church in his community, Mot. for Release at 17, but since that fact was known to Padilla at the time of the previous detention hearing, it cannot serve as a basis to reopen the hearing, see 18 U.S.C. § 3142(f).

factors the Court already weighed in its initial decision rather than explaining why the two new circumstances should alter the Court's prior determination, see Reply at 6–7; Mot. for Release at 8–23.

The Court finds that the two new developments since the previous detention determination—that Padilla's family has suffered while he has been detained and that Padilla has had no disciplinary infractions while in pretrial custody[4]—do not warrant disturbing the Court's previous decision to detain him. While these considerations are relevant in the decision to detain, as they pertain to Padilla's personal history and characteristics, they do not "relate in some significant or essential way to the decision." Worrell, 2021 WL 2366934, at *9.

Ultimately, although the developments relating to Padilla's family are unfortunate and saddening, and while it is commendable that Padilla has stayed out of trouble while in custody, these factors do not alter the fact that Padilla exhibited very violent behavior on January 6. As the Court noted in its previous decision,

> this Court is hard-pressed to believe that its orders would deter future acts of violence by Padilla when he was undeterred—and seemingly invigorated by—what he says transpired on January 6. In his own words, Padilla alleges that he was "beaten unconscious twice, sprayed more times than [he] care[s] to count, received strikes from batons that should have been lethal," and yet he continued for hours to try to stop the certification of the election and emerged steadfast in his belief that "what happened" at the Capitol "is what needs to be done again and again."

Padilla, 538 F. Supp. 3d at 47 (citation omitted). And as was the case the last time the Court weighed these considerations, "[t]he Court recognizes Padilla's commitment to his family and the effect that his detention has had on them. But the Court is not reasonably assured that Padilla can

---

[4] It is also worth noting that this circumstance is true for every defendant who exhibits good behavior in custody. Every defendant's family suffers in some way or another due to that defendant's incarceration. But the Court certainly cannot grant every such defendant pretrial release from custody.

be trusted to abide by any conditions of release that might be imposed instead of pretrial detention." Id. (internal quotation marks omitted).

The Court will accordingly deny Padilla's motion to reopen his detention hearing and revoke his detention order.

## Conclusion

For the foregoing reasons, each of Padilla's pretrial motions is denied. A separate Order consistent with this decision accompanies this Memorandum Opinion.

/s/
JOHN D. BATES
United States District Judge

Dated: February 13, 2023