**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | \| | |
| | \| | Crim. No. 21-214 (JDB) |
| Plaintiff | \| | Hon. John D. Bates |
| v. | \| | |
| | \| | |
| JOSEPH LINO PADILLA | \| | |
| also known as "Jose Padilla," | \| | |
| | \| | |
| Defendant. | \| | |

# DEFENDANT JOSEPH LINO PADILLA'S SENTENCING MEMOMORANDUM

_____

Michael J Cronkright (P52671)
Cronkright Law, PLLC
Attorney for Joseph Lino Padilla
4601 W. Saginaw, Ste J2A
Lansing, MI 48917

## Contents

TABLE OF AUTHORITIES...................................................................................................3

    United States Code...................................................................................................3

    United States Sentencing Commission Guidelines Manual.................................................3

    Case Law...................................................................................................3

REMORSE...................................................................................................4

JOSEPH LINO PADILLA'S PERSONAL HISTORY...................................................................4

    Mr. Padilla's Childhood History...................................................................4

    Mr. Padilla's Wife And Children...................................................................7

    Mr. Padilla's Military History...................................................................12

    Mr. Padilla's Current Mental Status...................................................................13

CONVICTION BACKGROUND...................................................................14

SENTENCING GUIDELINES...................................................................15

    U.S.S.G. §2A2.2 is not applicable to Count 1...................................................15

    U.S.S.G. §2A2.2(b)(1) Enhancement for "more than minimal planning" is not applicable ...................16

    U.S.S.G. §3C1.1 Enhancement for "obstructing or impeding the administration of justice" is not applicable...................................................................18

    U.S.S.G. §2J1.2(b)(1)(B) Enhancement for "substantial interference with the administration of justice" is not applicable as the Certification of the Electoral College Vote does not involve the administration of justice...................................................................19

    U.S.S.G. §3A1.2(c)(1)&(2) Enhancement for Official Victim is not applicable...................................20

SIMILARLY SITUATED DEFENDANTS...................................................................21

    *United States v. Thomas Robertson – 1:21:CR-00034-CRC*...................................................21

    *United States v. Patrick Edward McCaughey III – 1:21-CR-00040-TNM* ...................................23

    *United States v. Thomas Webster – 1:21-CR-00208-APM* ...................................................24

DOWNWARD DEPARTURES/ VARIANCES...................................................................25

    §5H1.6 – Loss of Caretaker Support...................................................................25

    Mr. Padilla's "Youthful Lack of Guidance"...................................................................27

    Mr. Padilla's Conduct was Aberrant...................................................................27

CONCLUSION...................................................................................................28

## TABLE OF AUTHORITIES

**United States Code**

Title 18 United States Code §111(a)(1)

Title 18 United States Code §111(b)

Title 18 United States Code §231(a)(3)

Title 18 United States Code §1512(c)(2)

Title 18 United States Code §1515(a)(1)

Title 18 United States Code §1752(a)(1) and (b)(1)(A)

Title 18 United States Code §1752(a)(2) and (b)(1)(A)

Title 18 United States Code §1752(a)(4) and (b)(1)(A)

Title 18 United States Code §3553(a)

Title 18 United States Code § 3553(a)(6)

Title 40 United States Code §5104(e)(2)(D)

Title 40 United States Code §5104(e)(2)(F)

**United States Sentencing Commission Guidelines Manual**

§2A2.2(b)(1) – More than Minimal Planning

§2J1.2(b)(1)(B) – Substantial Interference with the Administration of Justice

§3A1.2(c)(1)&(2) – Official Victim

§3C1.1 – Obstructing or Impeding the Administration of Justice

§5H1.6 – Family Ties and Responsibilities

**Case Law**

*Pepper v. United States*, 562 U.S. 476, 477 (2011)

*United States v. Dunnigan*, 507 U.S. 87, 94 (1993)

*United States v. Floyd*, 945 F. 2d 1096 (9th Cir. 1991)

*United States v. Gage*, 183 F.3d 711, 716 (7th Cir.1999)

*United States v. Hamner*, Case No. 21-cr-689

*United States V. Henry*, 557 F.3d 642, 645 (D.C. Cir. 2009)

*United States v. Howe*, 543 D.3d 128, 132 (3rd Cir. 2008)

**DEFENDANT JOSEPH LINO PADILLA'S SENTENCING MEMORANDUM**

NOW COMES Defendant Joseph Lino Padilla, by and through his attorney, Michael J. Cronkright, and Cronkright Law, PLLC, and provides the court with the following information to be considered at sentencing in this matter. As the Court is well aware, its obligation is to impose a sentence "sufficient, but not greater than necessary to comply" with the factors found in Title 18 United States Code §3553(a). Mr. Padilla's crimes are serious and will result in punishment; however, the punishment imposed must account for his individualized circumstances, in accord with the principle announced by the Supreme Court that "the punishment should fit the offender and not merely the crime," Pepper v. United States, 562 U.S. 476, 477 (2011).

**REMORSE**

Mr. Padilla has now had over two years to consider his actions. Remorse comes from different directions and settles upon the person over time. Mr. Padilla is remorseful for his actions directed at others, specifically at the people called upon to defend the Capitol on January 6, 2021. At the same time, he recognizes that his actions have had a major impact on his wife and children, and to a lesser extent on other family members. All of this is a source of deep regret, pain, and remorse. Mr. Padilla is eager to explain this to the Court in his own words at sentencing.

**JOSEPH LINO PADILLA'S PERSONAL HISTORY**

**Mr. Padilla's Childhood History**

Mr. Padilla was born, in Vicksburg, Mississippi. Mr. Padilla is the youngest of five children born to Robin and Ramona Padilla. In this blended family, Joseph's brothers were offspring of his father, and his sisters were offspring of his mother. Mr. Padilla's connections with his siblings are

somewhat distant, in that he only communicates with his sister Kathy. Mr. Padilla's family history is impacted by the fact that he was raised in a dysfunctional and abusive environment.

Robin Padilla died in prison, having passed away in April 2019 due to post surgical complications from a hip replacement. At that time, he was incarcerated for offenses related to pedophilia and was serving a sentence for sexually abusing Mr. Padilla's nieces. The pattern of abuse began early in Mr. Padilla's life and involved the sexual molestation of his half-sisters. Mr. Padilla's eldest sister eventually moved out of the household and stayed with her biological father due to the sexual assault she experienced from Robin Padilla. She eventually returned home, ensured by Ramona Padilla that Robin Padilla had "turned a new leaf."  It did not take long for the sexual abuse to resume. The continued sexual abuse of Mr. Padilla's sisters led to Robin and Ramona Padilla divorcing when Mr. Padilla was 10 years old. Following their divorce, Mr. Padilla resided with his father and had visitation with his mother. Mr. Padilla states that he and his father moved often, rarely living in one place for more than a year. When Mr. Padilla turned 18, he moved out of his father's home to live by himself. He reports that, as a youth, he did not understand much of what was happening in his family and that he has difficulty remembering much about the trauma in his family. As a young adult, much of it came to light as the details about the molestation of his nieces were revealed.

As noted in the PSR, prior to his incarceration and death, Robin Padilla was employed as an electrical engineer. Although Robin Padilla made an acceptable living, he managed his money poorly, resulting in a lower socioeconomic status for the family. Mr. Padilla recalls his father picking him up after work from the babysitter's house and going directly to his father's favorite

bar where he was left to sit in the corner in the back of the bar. There, he would fall asleep while his father drank.

Following his parents' divorce, Robin Padilla married Ada Brown. This marriage was short lived lasting only 7 years. Ada Brown was physically and mentally abusive to Mr. Padilla. She often persuaded Robin to hit Mr. Padilla with a belt for minor things such as not drying the sink of the bubbles after doing the dishes. Ada Brown forced Joseph to live in an unfinished basement and only allowed him to leave the basement for dinner or showering. Mr. Padilla was forced to relieve himself in the woods next to the home rather than using the family bathroom. Around the age of 16, Mr. Padilla was allowed to move out of the basement and into a bedroom. Robin Padilla and Ada Brown's marriage ended when Mr. Padilla provided proof to his father that Ada had been unfaithful during their marriage.

At the age of 25, Mr. Padilla lost his mother, Ramona Padilla, to a heart attack. She was 55 years old at the time of her death. During her life, Ramona Padilla was an addict who abused cocaine, crack, and marijuana during Mr. Padilla's childhood. He was in kindergarten when he witnessed his mother's overdose, after which she spent three months in the hospital. Following the overdose, the family became homeless and spent several months living in a tent at Dinosaur Valley State Park in Glenn Rose, Texas. He describes this stint of homelessness as being largely due in part to his parents' drug and alcohol abuse. Mr. Padilla explained that by the summer of his 12th birthday his mom had returned to hard drug use. When she was picking him up for summer visitation, she was high on illicit drugs. At that time, she abandoned him on the side of the road not far from his father's house. Mr. Padilla stated he was still close enough to walk home

but was too distraught to do so; and so, his father picked him up. This was the last time he had

contact with his mother until a week before her death in June of 2005.

One of his life passions has been to provide a better environment for his children. He

contemplates daily how his actions have thwarted that goal.

### Mr. Padilla's Wife And Children

Mr. Padilla and his wife Rebekah Padilla (aka Becky Padilla) have been romantically

involved since 2003 but have known one another since they were children. Mr. Padilla and Becky

were married on June 18th, 2005, in Chattanooga Tennessee. Becky is employed as a librarian at

Cleveland-Bradley County Library. Mr. and Mrs. Padilla have three sons: EP (age 17), MP (age 14),

and GP (age 13) who is autistic.

Since Mr. Padilla's arrest on February 23rd, 2021, his wife and sons have been dealing with

severe mental health issues. Mrs. Padilla's records from Centerstone Mental Health Clinic in

Cleveland, Tennessee, show a continuous decline in her mental health largely due to stressors

associated with Mr. Padilla's incarceration. The records reveal that Mrs. Padilla has been

diagnosed with Bipolar II Disorder, Post Traumatic Stress Disorder due to war, terrorism, or

hostility, Attention Deficit/Hyperactivity Disorder, and Generalized Anxiety Disorder with panic

attacks. It is difficult to hold a conversation with Mrs. Padilla regarding her husband as she

instantly becomes emotional. Mr. Padilla has been the source of stability in her life,  and she has

declined with his absence.

On August 9th, 2022, Mrs. Padilla had complaints of continued anxiety and flashbacks due

to Mr. Padilla's impending court date. July 26th, 2022, Mrs. Padilla presented with continued

flashbacks and anxiety over Mr. Padilla's situation. June 28th, 2022, Mrs. Padilla presented with

"lots of anxiety." She reported complaints of increased night terrors, anxiety, panic, and outbursts. She also reported that sleep had become difficult as she is easily "triggered." June 6th, 2022, Mrs. Padilla had complaints of persistent anxiety that she believes surrounds the situation with Mr. Padilla.[1] Mrs. Padilla reported that she finds it difficult to be in public since her husband's arrest and attributes this to the anxiety she feels when she sees police or even hears emergency sirens. Mrs. Padilla's mental health problems have made it difficult for her to maintain full-time employment. Mrs. Padilla will often leave her job at the library after only a couple of hours due to panic attacks and regularly misses work due to anxiety.

Mrs. Padilla also faces great stress due to her unstable housing. Mrs. Padilla and her three sons are currently living in her mother's home paying rent monthly, however, once Mr. Padilla's disability benefits discontinue, Mrs. Padilla will no longer be able to make her monthly rental payment to her mother and will be forced to move out. Since Mrs. Padilla works part-time and rarely has a steady week of employment due to mental health issues, she will be unable to find alternative housing and fears she and her sons will be homeless; falling into the same cycle that their father experienced.

Her mental health records reveal that Mrs. Padilla is "severely ill" which could result in "disruptive pathology, behavior and function frequently influenced by symptoms may require assistance from other intrusive symptoms that distinctly impair social/occupational function or cause intrusive levels of distress." The most recent records made available to counsel show that

---

[1] Defendant's Motion to Revoke Detention Order & Reopen detention Hearing Pg. 12

her mental health status has "minimally improved" meaning it has gotten "slightly better with little or no clinically meaningful reduction of symptoms."[2]

Mr. Padilla's youngest child, GP, was officially diagnosed with autism on April 4th, 2021, at Siskins Center for Developmental Pediatrics in Chattanooga, Tennessee. Mr. Padilla's traumatic and challenging childhood is the driving force behind his desire to raise his boys in a home with an abundance of love and guidance.

When Mr. Padilla was declared 100% disabled, he dedicated his life to his boys. He accepted the role of being a stay-at-home father managing the children and home while his wife worked at the library. The focused paternal involvement proved beneficial to the boys, which is evidenced in their letters of support.

Mr. Padilla's three boys are at a stage in their life where having their father around to guide them to manhood is pivotal. Becky's efforts should not be diminished, however, both parents recognize that Mr. Padilla's role in their sons' lives are important for their development. Mr. Padilla is the primary example to his sons of what it means to be a man. "Young men learn from their dads about what it means to be responsible, ethical, caring, and appropriate. More specifically, a teenage boy watches how his dad treats women, uses his physical strength, values his work, relates to kids, and expresses friendship with his mates. These observations will form the default option for teenage boys as they become men."[3]

Mr. Padilla's eldest son describes his father as "the main beat of our family's machine." EP recalls his earliest memories of his father being when Mr. Padilla returned from his first

---

[2] Defendant's Motion to Revoke Detention Order & Reopen Detention Hearing Pg. 13
[3] The father factor: what teenage boys learn from their dads | UB (understandingboys.com.au)

deployment in 2007. EP states that his father would take him to boy scouts and to the park and would frequently play with him. EP's greatest fear as he approaches his 18th birthday on September 7th is that his father will continue to miss more of his life. For a young boy approaching manhood, 15-minute phone calls with his father and the inability to visit his father have proven to be a great burden to their once strong relationship. EP wants nothing more than for his father to witness him grow and to experience life together. Mrs. Padilla has described the relationship between Mr. Padilla and their oldest child as "a hinge; they are screwed together at the hip." When Mr. Padilla was incarcerated, EP lost his authoritative figure, role model, and best friend. Without his father's guidance over the last 920 days since his incarceration, EP's teachers feel that he has fallen into a group which is "not the right crowd."

MP is Mr. Padilla's middle child and explains in great detail in his letter of support the impact his father has had on his life pre-incarceration. MP states that his father was teaching him and his brothers how to be men. MP recalls fond memories of his father in his letter stating that Mr. Padilla engaged in the boys' boy scouts and participated in troop camping trips where the boys learned fire safety, camped, hiked, and earned badges. Mr. Padilla's willingness to protect his family and boys is evidenced by the story MP told of his father lunging into action to save MP's life during a hiking trip when MP fell into the water. MP recounts that his dad was always there for him and specifically helped MP with his homework and projects. MP states he is lost without his father. MP pleads in his letter for his father to come home to help him become a better man, to guide him through JROTC, and to help him with school as he used to do.

Due to his autism, the youngest child, GP, is extremely routine oriented and does not cope well with change. Consistent, predictable routines, and structure are very important for autistic

people and a change to routine—such as a parent being detained—can be very distressing. Since Mr. Padilla's detainment, his youngest son has had more frequent meltdowns. "A meltdown is an intense response to overwhelming circumstances—a complete loss of behavioral control. People with autism often have difficulty expressing themselves when they are feeling overly anxious or overwhelmed, which leads to an involuntary coping mechanism—a meltdown."[4] These meltdowns have led to behavioral issues at school resulting in disciplinary action. These meltdowns can be attributed to the great stress GP has endured watching his father be arrested and incarcerated for 920 days with limited contact. GP has expressed fears about going to school because he is worried his mom will not be there when he returns home. GP's stress is not limited to school, however. He has great stress at home and often requests to sleep with his mother for fear of separation. GP states in his letter of support that he has nightmares when his dad is not home and that he misses his father greatly. He has expressed his fear of losing his mom as he has his dad.

Mrs. Padilla admits that she struggles with the authoritative role she has taken on and asserts that the boys don't make it easy on her in their father's absence. Since Mr. Padilla's detention, Becky Padilla struggles to assist the children with their schoolwork as Mr. Padilla has a better understanding of the concepts that the children are learning. Per Mrs. Padilla, since Mr. Padilla's confinement, all of the children's grades have suffered. Mr. Padilla, being the primary care giver, usually helped his children with their homework. Mr. Padilla's wife is not able to dedicate the same time Mr. Padilla spent helping the children with their schoolwork due to her employment at the library nor does she have an adequate understanding of how to help the

---

[4] What is an Autism Meltdown? | RDIconnect

children with their schoolwork. The children's behavior has become an issue in the classroom as well. The boys have been having behavioral incidents in school leading to disciplinary actions, something which ordinarily wouldn't have happened prior to Mr. Padilla's incarceration.

When Mr. Padilla's wife is working, the children are cared for by their maternal grandmother. The dynamic between the children and their maternal grandmother is not ideal as she is not equipped to manage three adolescent boys. The boys often play rough or play soldiers, which the grandmother does not approve of and in one instance resulted in her calling the police because she felt the boys were playing too rough.[5]

In the Report of Examination from Special Agent Terrilynn James, several texts between Mr. Padilla and his boys were exchanged while he was in Washington, D.C. His boys requested that he send them pictures of D.C. and, when the protest escalated, his boys were quick to ask that their father check-in with them so they would know he was safe. [6]

It is evident that Mr. Padilla and his boys have a profoundly close relationship. Mr. Padilla's adolescent sons are at a pivotal point in their lives where their father's guidance is crucial to their development.

### Mr. Padilla's Military History

Mr. Padilla is a United States Army veteran. He began his first combat tour in support of Operation Iraqi Freedom on June 26th, 2006, and was honorably released after 477 days of service on October 16th, 2007. Mr. Padilla's second combat tour began on December 5th, 2009, and he was honorably discharged after 263 days of service on August 25th, 2010. During these

---

[5] Defendant's Motion to Revoke Detention Order & Reopen Detention Hearing Pg. 14, ECF 15
[6] Defendant's Motion to Revoke Detention Order & Reopen Detention Hearing Pg. 15, ECF 15

deployments Mr. Padilla was responsible for maintaining systems that kept radio controlled improvised explosive devices from detonating, as well as communications and other duties as assigned.

Subsequent to these two combat tours, the Department of Veterans Affairs determined that Mr. Padilla's service-connected evaluation is 100% and he is therefore considered to be totally and permanently disabled due solely to his service-connected disabilities.[7] Mr. Padilla's service-connected disabilities include Post Traumatic Stress Disorder, degenerative joint disease in his lower back, and burn pit induced chronic sinusitis.

In 2006, Mr. Padilla began treatment for his Post Traumatic Stress Disorder (PTSD) at the Psychiatric Ambulatory Clinic in the Alvin C. York Veterans' Administration Medical Center in Murfreesboro, Tennessee. Although Mr. Padilla was diagnosed and treated for PTSD, he never sought disability compensation as he did not want the PTSD diagnosis to hinder his service in the Army National Guard. In 2016, Mr. Padilla filed for compensation due to his PTSD. He maintained treatment at the Psychiatric Ambulatory Clinic in the Alvin C. York Veterans' Administration Medical Center in Murfreesboro, Tennessee, until 2018 when he decided to attend the Chattanooga, Tennessee VA Clinic. Mr. Padilla lost his job in 2018 due to PTSD related issues and his disability rating was increased to 100% disabled.

**Mr. Padilla's Current Mental Status**

---

[7] See attached Department of Veterans Affairs Personal Claim Information Letter dated March 31st, 2020.

Mr. Padilla reports that his upbringing combined with his combat experience in the Army has made him an introvert who struggles with loud noise, chaos, and large groups; all of which are largely unavoidable in prison. He further states that he is constantly on the verge of tears and looks forward to receiving his evening medications in the hopes he will fall into a deep sleep just to gain some peace.

Mr. Padilla's mental health is further strained by the continued separation from the only stable environment he has ever lived in; the one with his wife and children. Mr. Padilla deeply regrets ever having gone to the Capitol on January 6th, 2021. He states that every day is torture having to live with the fact that his actions are the direct reason for his family's separation and hardship. He understands that his actions on January 6th caused himself and his family the pain and suffering they now deal with daily. Mr. Padilla reports that his only desire post-incarceration is to find some land and build a farmstead for his family.

### CONVICTION BACKGROUND

On May 3rd, 2023, this Honorable Court found Joseph "Jose" Lino Padilla guilty of the following:

| | |
|---|---|
| **COUNT 1:** | 18 U.S.C. §111(a)(1) – Assaulting, Resisting, or Impeding Certain Officers |
| **COUNT 3:** | 18 U.S.C. §231(a)(3) – Civil Disorder |
| **COUNT 4:** | 18 U.S.C. §111(a)(1) and (b) – Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon |
| **COUNT 5:** | 18 U.S.C. §231(a)(3) – Civil Disorder |
| **COUNT 6:** | 18 U.S.C. §1512(c)(2) and 2 – Obstruction of an Official Proceeding and Aiding and Abetting |
| **COUNT 7:** | 18 U.S.C. §1752(a)(1) and (b)(1)(A) – Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon |
| **COUNT 8:** | 18 U.S.C. §1752(a)(2) and (b)(1)(A) – Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon |

| **COUNT 9:** | 18 U.S.C. §1752(a)(4) and (b)(1)(A) – Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon |
| **COUNT 10:** | 40 U.S.C. §5104(e)(2)(D) – Disorderly Conduct in a Capitol Building |
| **COUNT 11:** | 40 U.S.C. §5104(e)(2)(F) – Act of Physical Violence in the Capitol Grounds or Buildings |

## SENTENCING GUIDELINES

### U.S.S.G. §2A2.2 is not applicable to Count 1

Count 1 derives from Mr. Padilla's behavior on the lower terrace. His conduct on the Lower West Terrace did not amount to aggravated assault and therefore does not warrant the application of U.S.S.G §2A2.2 Aggravated Assault. U.S.S.G. §2A2.4(c)(1) states that if the conduct constituted aggravated assault, apply U.S.S.G. §2A2.2 Aggravated Assault. Application note 1 defines "aggravated assault" as a felonious assault that involved:

(A)  a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon;

(B)  serious bodily injury;

(C)  strangling, suffocating, or attempting to strangle or suffocate; or

(D)  an intent to commit another felony.

Subsections (A), (B), and (C) do not apply factually. The government alleges that Mr. Padilla had the intent to commit another felony, therefore the application of U.S.S.G 2A2.2 Aggravated Assault should apply. Mr. Padilla disagrees.

At closing arguments, the Government asserted that the other felony was Count 3, stating: "Your Honor, there's the intent to commit another felony. And that would be the civil disorder; that is Count 3.[8]"

---

[8] Day 3 Trial Transcript, pg. 516, Lines 18-19.

With regards to Count 3 being the "other felony," the Court should note that the conduct charged in Counts 1 and 3 are almost identical conduct[9]. In United States v. Thomas Hamner, Case No. 21-cr-689, The Court addressed the issue of a section 231 count being the other felony:

> It strikes me that if the Commission is asking: Did you commit the assault with the intent to commit some other offense? ***it didn't mean with the intent to commit that exact same assault, just charged differently.*** They could have easily defined "another offense" as any offense with any different elements that's a different offense, but they didn't. ***It's also important to note that the cross reference says you go to aggravated assault if the assault on the police officer involved the intent to commit another felony, not the same intent needed to satisfy the elements of another felony, not that it was committed during the commission of another felony.*** This suggests that the guideline is meant to cover just the situation in the cases that you cited, where the assault on the police officer is intended to facilitate or further or advance or succeed in the commission of or evasion of apprehension for a second, different crime." (USA v. Hamner, Sentencing Transcript pg. 20-21, emphasis added)[10].

Taking the government at its word (that count 3 was the other felony) the Court should not score Count 1 using 2A2.2.

### U.S.S.G. §2A2.2(b)(1) Enhancement for "more than minimal planning" is not applicable

U.S.S.G. §2A2.2(b)(1) states: "If the assault involved more than minimal planning, increase by 2 levels." Application Note 2 reads: "For purposes of subsection (b)(1), "more than minimal planning" means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense, other than conduct to which §3C1.1 (Obstructing or Impeding the Administration of Justice) applies."

---

[9] See attached Exhibit A which shows the comparison of Counts 1 and 3.
[10] It is acknowledged that other courts have ruled otherwise.

The government asserted in their letter to probation that Mr. Padilla wore an N95 mask and scuba goggles "to protect himself from law enforcement's crowd control measures[11]." It is common knowledge that the COVID-19 virus caused a global pandemic. The related public health emergency declaration lasted until May 11th, 2023.[12] The assertion that Mr. Padilla's bringing a required facemask to a protest is more than minimal planning is absurd.

An article published by the Reader's Digest on November 10th, 2022, entitled, *10 Things to Bring to a Political Protest*, states that a facemask is essential to a protestor in order to protect themselves from the COVID-19 disease.[13] The article further states that protestors should come equipped with shatter-resistant goggles or safety glasses, in an effort to protect their eyes from violent police countermeasures. Mr. Padilla, however, wore goggles in anticipation of Antifa counter protestors. Police forcibly removed Mr. Padilla's goggles and facemask, placing him at risk of contracting the COVID-19 virus.

U.S.S.G. §2A2.2(b)(1) 2 level enhancement should not apply simply because Mr. Padilla brought goggles and a facemask. Numerous protestors planned and coordinated with others, brought communication equipment, helmets, body armor, bear spray, pepper spray, knives, guns, etc. Mr. Padilla bringing goggles and a mask cannot fairly be construed as more than minimal planning and therefore the 2-level enhancement should not apply.

---

[11] Presentence Investigation Report ¶ 51
[12] End of the Federal COVID-19 Public Health Emergency (PHE) Declaration | CDC
[13] Things You Should Wear (and Bring) to a Protest | Reader's Digest (rd.com)

## **U.S.S.G. §3C1.1 Enhancement for "obstructing or impeding the administration of justice" is not applicable**

U.S.S.G. §3C1.1 states, "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels."

The requisite intent element of this guideline was discussed in United States V. Henry, 557 F.3d 642, 645 (D.C. Cir. 2009):

> . . . our precedent holds that a § 3C1.1 enhancement is only appropriate where the defendant acts with the intent to obstruct justice, a requirement that "flow[s] logically from the definition of the word `willful,' which, this court has suggested, `requires that the defendant consciously act with the purpose of obstructing justice.'" Monroe, 990 F.2d at 1376 (quoting United States v. Thompson, 962 F.2d 1069, 1071 (D.C.Cir.1992)). Other circuits have come to the same conclusion. See, e.g., United States v. Gage, 183 F.3d 711, 716 (7th Cir.1999); see id. at 717-18 (Posner, J., concurring) (collecting cases in the 2d, 5th, 7th, 9th, and 10th Circuits).

The Government states that the obstructive conduct which warrants this enhancement is Mr. Padilla's trial testimony as to intent. The assessment of this testimony calls upon the court to consider his subjective intent. It is true that the court "did not credit" Mr. Padilla's testimony regarding his use of the flagpole. Mr. Padilla is not challenging the Court's findings here. Nonetheless, the Court stopped short of finding that Mr. Padilla committed perjury. There are many reasons why testimony is rejected by a trier of fact. Most of those reasons don't involve committing perjury. To assess this enhancement based on a perjured testimony analysis,  the Court must find all three elements of perjury: 1) a false statement under oath, 2) concerning a

material matter, 3) with the willful intent to provide false testimony. United States v. Dunnigan, 507 U.S. 87, 94 (1993). Mr. Padilla asserts that he testified consistent with his memory of events. The Court did not find Mr. Padilla's testimony regarding his memory of events credible. Mr. Padilla will live with that assessment.

It should be noted that Mr. Padilla likewise testified to his memory of events (as to his intent) with the identical charge relating to the Trump sign. In that instance the Court apparently found his testimony credible. This is a demonstration of the Court performing its function as trier of fact. In each instance, the Court accepted some evidence and rejected other evidence. Arguably, neither involves perjury or obstruction of the administration of justice.

### U.S.S.G. §2J1.2(b)(1)(B) Enhancement for "substantial interference with the administration of justice" is not applicable as the Certification of the Electoral College Vote does not involve the administration of justice

It has been widely held and acknowledged that the Certification of the Electoral College Vote is a proceeding before the Congress and therefore is an "official proceeding" as defined in 18 U.S.C. §1515(a)(1)(B):

> 18 U.S.C §1515(a)(1)(B):
>
> (a) As used in sections 1512 and 1513 of this title and in this section—
> (1) the term "official proceeding" means—
> (B) a proceeding before the Congress

The government asserts that the official proceeding – the certification of the Electoral College Vote – is synonymous with the administration of justice, however this logic is flawed.

U.S.S.G. §2J1.1(b)(1)(B) reads: "If the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by 8 levels." Under U.S.S.G §2J1.2, Application Note #1 states: ***"Substantial interference with the administration of justice"*** includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false

testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources. The Certification of the Electoral College vote is none of the above and therefore should not be considered synonymous with the administration of justice as described in U.S.S.G. §2J1.2.

In USA v. Hunter Seefried, the Court stated in its memorandum opinion: "In the Court's view, the answer is no. Text, context, and precedent show that the 'administration of justice' most naturally refers to a judicial or related proceeding that determines rights or obligations. The electoral certification was not such a proceeding." The court further found "that the enhancements in §§ 2J1.2(b)(1)(B) and (b)(2) do not apply because the electoral certification does not involve the 'administration of justice.'"

### U.S.S.G. §3A1.2(c)(1)&(2) Enhancement for Official Victim is not applicable

Victim Related Adjustment: The victims of the defendant's assaultive conduct in the Tunnel were the USCP officers, including Officer O.C., who were wearing full police uniforms. Further, based on the defendant's statements and interactions with officers, he was aware they were law enforcement officers. Because the defendant knew or had reasonable cause to believe the individuals were law enforcement and he acted in a manner that created substantial risk of serious bodily injury, for which the defendant is accountable, six levels are added. USSG §3A1.2(c)(1) and (2).[14]

First, it should be noted that §3A1.2(c)(2) does not apply to the facts at hand since that provision involves prison officials and correctional facilities. Second, the prerequisite that must

---

[14] Presentence Investigation Report ¶ 59

be met is that the manner in which the relevant conduct occurred must have presented a *"substantial risk of serious bodily injury."* Arguably, the most egregious facts in this entire case involve the throwing of a plastic flagpole at fully equipped officers wearing body armor, helmets, face masks and gloves. In this situation, it is theoretically possible that an injury could occur; but there is certainly not a substantial risk of a serious injury. Third, to the extent that the victim is Congress, the enhancement does not apply at all pursuant to Application Note 1 (requiring a specific victim).

## SIMILARLY SITUATED DEFENDANTS

Section 3553(a) requires courts to shape a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." §3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range. See Gall, 552 U.S. at 55 ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); United States v. Ovid, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two Defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the Defendants), and unwarranted differences among defendants whose conduct and characteristics are similar. See United States v. Parris, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

It is appropriate for this court to consider other sentences imposed on similarly situated January 6th defendants:

### *United States v. Thomas Robertson – 1:21:CR-00034-CRC*

Mr. Robertson's charges include:

[1] 18 U.S.C. § 1512(c)(2)
[2] 18 U.S.C. § 231(a)(3)
[3] 18 U.S.C. § 1752(a)(1) and (b)(1)(A)
[4] 18 U.S.C. § 1752(a)(2) and (b)(1)(A)
[5] 40 U.S.C. § 5104(e)(2)(D)
[6] 18 U.S.C. § 1512(c)(2)

Like Mr. Padilla, Mr. Robertson is a United States Military Veteran, however, one key factor separates these veterans: Mr. Robertson lied about his military history. Mr. Robertson outwardly held himself as an Army Ranger and a graduate of sniper school. Mr. Robertson boasted to a reporter that he achieved the rank of Sergeant First Class (E-7) and provided a photo he claimed to be himself adorned with a Purple Heart. All of which is utterly false as Mr. Robertson was discharged from the Army as a Specialist (E-4) and was never awarded the Purple Heart.

Mr. Robertson brought a gas mask and a large wooden stick to the protest on January 6th and held the stick in "port arms" (a tactical position used by the military and law enforcement to push others away) and blocked the path of officers attempting to hold back the mob. He advocated on social media for the use of violence to overturn the election results, including by starting a "counterinsurgency" and through "open armed rebellion."

In the days following the protest, Mr. Robertson bragged about his conduct on social media. Mr. Robertson actually breached the capitol building and photographed himself in the Crypt shortly after the crowd overwhelmed police in the Crypt. Mr. Robertson posted to Facebook, "Here's the picture in question and I am fucking PROUD of it. It shows 2 men willing to actually put skin in the game and stand up for their rights. If you are too much of a coward to risk arrest, being fired, and actual gunfire to secure your rights, you have no words to speak I value.

Enjoy your feel-good protests and fame. I'll simply accept a 'Thank you' for the very blanket of freedom that you live and sleep under."

Prior to his arrest, Mr. Robertson obstructed the administration of justice when he destroyed his and his friends' cell phones by throwing them into the lake. Despite this, he was granted pretrial release. Following a lawfully authorized search of the defendant's residence, law enforcement discovered that the defendant violated his release conditions by possessing a loaded M4 rifle and a partially assembled pipe bomb at his home, and by purchasing an arsenal of 34 firearms online and transporting them in interstate commerce while under felony indictment, in violation of 18 U.S.C. § 922(n).

The Government recommended a sentence of 96 months incarceration, 36 months supervised release, $2,000 restitution, and $100 special assessment for each count of conviction. The court sentenced Mr. Robertson to 87 months incarceration, 36 months supervised release, and $2,000 restitution.

<u>United States v. Patrick Edward McCaughey III – 1:21-CR-00040-TNM</u>

Mr. McCaughey was convicted after trial of several charges including:

[1] 18 U.S.C.§ 111(a)(1) and 2;
[2] 18 U.S.C.§ 111(a)(1) and (b);
[3] 18 U.S.C.§ 111(a)(1);
[4] 18 U.S.C.§ 1512(c)(2) and 2;
[5] 18 U.S.C.§ 231(a)(3);
[6] 18 U.S.C.§ 1752(a)(2) and (b)(1)(A);
[7] 18 U.S.C.§ 1752(a)(4) and (b)(1)(A);
[8] 40 U.S.C.§ 5104(e)(2)(D), 2; and
[9] 40 U.S.C.§ 5104(e)(2)(F)

Mr. McCaughey assisted in overwhelming a police line and taunting and assaulting police officers. Mr. McCaughey used a stolen police issue riot shield to push against officers in an effort

to trap them against a door frame. As Mr. McCaughey pinned officers to the door frame, a co-defendant used a stolen police issue baton to hit officers in the face. Not only did Mr. McCaughey use the shield to trap officers, he also used it to assault them; landing at least one confirmed blow to an officer's arm. The Government recommended 188 Months Incarceration, 36 months supervised release, and $2,000 restitution. The court sentenced him to 90 months incarceration – slightly more than half the amount of time the government recommended – 36 months supervised release, and $2,000 restitution.

### *United States v. Thomas Webster – 1:21-CR-00208-APM*

Mr. Webster was convicted after trial of:

[1] 18 U.S.C. § 111(a)(1), (b)
[2] 18 U.S.C. § 231(a)(3)
[3] 18 U.S.C. § 1752(a)(1), (b)(1)(A)
[4] 18 U.S.C. § 1752(a)(2), (b)(1)(A)
[5] 18 U.S.C. § 1752(a)(4), (b)(1)(A)
[6] 40 U.S.C. § 5104(e)(2)(f)

Mr. Webster is a former Marine and a 22-year veteran of the New York City Police Department. Mr. Webster is the prime example of someone who exhibited more than minimal planning because he traveled to D.C. with an NYPD bulletproof vest and a Smith and Wesson Model 640 revolver, small enough to conceal inside a jacket pocket. Additionally, Mr. Webster brought with him his military-issued rucksack containing Meals Ready-to-Eat, water bottles, and Gatorade. Unlike Mr. Padilla who brought only an N95 facemask and scuba goggles.

Mr. Webster forcefully pushed against a bike rack. An officer reached across the bike rack to shove Mr. Webster away but, in doing so, struck Mr. Webster on his face. Mr. Webster then swung the flagpole he was carrying against the bike rack with enough force to break the metal

pole in half. Following this, Mr. Webster charged at the officer and tackled the officer to the ground after the officer wrestled the flagpole out of his grip. He then dragged the officer by his helmet, pinned him to the ground, and tried to rip the officer's gas mask off. This caused tear gas to become trapped inside the officer's mask, and his throat and nose began to burn. While he restrained the officer on the ground, other protestors began kicking the officer. He left the officer on the ground and continued toward the Capitol.

Mr. Webster never accepted responsibility for his actions on January 6th and villainized the officers he assaulted and injured when he testified at trial. The Government recommended that Mr. Webster be incarcerated for 210 months with 36 months of supervised release and $2,060 restitution. The Court imposed a sentence of 120 months incarceration, 36 months supervised release, and $2,060 restitution.

## DOWNWARD DEPARTURES/ VARIANCES
### §5H1.6 – Loss of Caretaker Support

Defendant requests the Court consider a downward departure based on the extraordinary financial hardship that his family will suffer otherwise. Defendant's family is substantially dependent on Defendant's disability payments. Defendant is a military veteran who is 100% disabled with a diagnosis that includes PTSD. Defendant receives both SSI and VA disability payments. Those payments constitute the vast majority of the family income. Defendant's wife has significant mental health issues and is in ongoing treatment. She is not expected to be able to replace her husband's income. Mr. Padilla is not qualified to receive either of his disability checks while serving a prison sentence.

The test suggested in the Sentencing Guidelines is as follows:

(B) Departures Based on Loss of Caretaking or Financial Support.—A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-exhaustive list of circum-stances in subdivision (A), the presence of the following circumstances:

**(i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.**

The combined anticipated income loss in this instance is substantial. The family is already struggling financially and struggling with the loss of family support brought on by Mr. Padilla's inability to obtain pre-trial release.

**(ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.**

It is true that families commonly suffer from loss of income when an adult in the home is incarcerated. In this instance, there is the combined effect of the substantial loss of disability payments and the mental health issues present. As a result, there is no realistic way for the family to avoid being plunged into poverty and homelessness without the assistance of Mr. Padilla's disability income.

**(iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.**

It is difficult to imagine how this Court, or the Department of Correction, can reach a solution that would ameliorate the pending financial disturbance and hardship brought upon by a sentence within guidelines. Defendant is at a loss to suggest a program that would prevent or even mitigate the financial and emotional collapse of his family.

**(iv) The departure effectively will address the loss of caretaking or financial support.**

Defendant respectfully suggests that home confinement and probation would effectively address the loss of caretaker and financial support.

U.S. v. Floyd, 945 F. 2d 1096 (9th Cir. 1991)

### Mr. Padilla's "Youthful Lack of Guidance"

Mr. Padilla's upbringing is disturbingly dysfunctional. It is impossible to quantify the degree of impact of the criminal and sexually deviant activity that defined his environment as a child. The fact that much of the deviant behavior was directed at the females in his family does not negate the deleterious impact. He endured the separation of his parents, the inappropriate reunification, the resumption of the "secret sin" lifestyle, the abandonment by his mother to his abusive father, homelessness, and the witnessing of the overdose by his drug-addicted mother. It is impossible to imagine a normative upbringing with those components defining the daily life of a child.

Arguably, that dysfunctional environment did not come to an end with the death of his parents. It is appropriate for this Court to consider the lack of adequate guidance and upbringing when deciding whether to grant a downward departure or variance. *U.S. v. Floyd*, 945 F. 2d 1096 (9th Cir. 1991).

### Mr. Padilla's Conduct was Aberrant

This Court must consider the aberrant nature of Mr. Padilla's conduct. See, e.g., United States v. Howe, 543 D.3d 128, 132 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); see also United States v. Hadash, 408 F.3d 1080, 1084 (8th Cir. 2005) (Defendant was a "law abiding citizen, who [did] an incredibly dumb thing");

United States v. Davis, 2008 WL 232920 (S.D.N.Y. 2008) (Defendant was a first offender who had worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).

As explained above, Mr. Padilla has lived an exemplary life despite his troubled upbringing. His conduct on January 6 was not typical of his life pattern. His own family bears witness to this fact. They have struggled to make sense of his actions.

Further, Mr. Padilla has an incredibly low risk of recidivism. - For all male offenders in Criminal History Category I, the recidivism rate is 15.2.[15] For those who have been employed, the rate is 12.7%. Offenders like Mr. Padilla with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point.[16]

<u>**CONCLUSION**</u>

Mr. Padilla presents for sentencing without criminal history. His family life and military service combine with the anticipated extraordinary loss of support to his wife and children, the horrific lack of appropriate upbringing, the significant remorse that he carries, and the minimal risk of recidivism combine to suggest the appropriateness of a downward departure and/ or variance.

September 6, 2023                                     Respectfully submitted:

                                                     /s

                                                     _____
                                                     Michael Cronkright (P52671)
                                                     Attorney for Joseph Padilla

---

[15] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf
[16] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf