```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


  UNITED STATES OF AMERICA,      .
                                 .
            Plaintiff,           .   CR No. 21-0214 (JDB)
                                 .
       v.                        .
                                 .
  JOSEPH LINO PADILLA,           .   Washington, D.C.
                                 .   Wednesday, September 13, 2023
            Defendant.           .   2:30 p.m.
  . . . . . . . . . . . . . . . .


                      TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE JOHN D. BATES
                 UNITED STATES DISTRICT JUDGE


     APPEARANCES:

  For the Government:        DOUGLAS B. BRASHER, AUSA
                             U.S. Attorney's Office
                             1100 Commerce Street
                             Third Floor
                             Dallas, TX 75242

                             ANDREW HAAG, AUSA
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530

  For Defendant:            MICHAEL J. CRONKRIGHT, ESQ.
                             Cronkright Law, PLLC
                             4601 West Saginaw
                             Suite J2a
                             Lansing, MI 48917

  Court Reporter:           BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001



  Proceedings reported by stenotype shorthand.
  Transcript produced by computer-aided transcription.
```

```
 1                    P R O C E E D I N G S

 2           THE DEPUTY CLERK:  Good afternoon, Your Honor.

 3    We're on the record in criminal case 21-214, United States

 4    of America versus Joseph Lino Padilla.

 5      Starting with government counsel, may you please approach

 6    the podium and state your appearance for the record.

 7           MR. BRASHER:  Good afternoon, Your Honor.  Doug Brasher

 8    and Andrew Haag on behalf of the United States of America.

 9           THE COURT:  Good afternoon.

10           MR. CRONKRIGHT:  Good afternoon, Your Honor.  Michael

11    Cronkright appearing with and on behalf of Joseph Padilla.

12           THE COURT:  Mr. Cronkright.  And Mr. Padilla is here as

13    well.  Good afternoon to both of you.

14      We're here today for sentencing in this matter, and I will

15    start by asking first you, Mr. Cronkright, on behalf of

16    yourself and Mr. Padilla, whether you've received and had a

17    chance to review the presentence report and whether there are

18    any remaining issues in dispute.

19      And I note that there are some issues that have been raised

20    with respect to the guideline calculation.  And of course

21    there's an opposition to the government's request for

22    application of an enhancement -- the terrorism enhancement.

23      But Mr. Cronkright, issues that remain in dispute?

24           MR. CRONKRIGHT:  Your Honor, do you want me to address

25    the guidelines issues now?
```

1          THE COURT:  No.  I'm going to ask you to address them

2     in a few minutes.  But anything other than the guidelines

3     issues.  You're going to get a chance to speak twice, first on

4     the guideline calculation and then on your general sentencing

5     argument and recommendation.  Right now I'm just asking you if

6     there's anything else with respect to the presentence report

7     that is in dispute that I need to focus on.

8          MR. CRONKRIGHT:  So in regards, Your Honor, to the

9     presentence investigation report, first I've had a chance to

10    review it with my client and I've had a chance to review the

11    revised version with my client.  I raised a number of

12    objections as to factual issues.  All of those seem to have

13    been adequately addressed.  All of the substantive corrections

14    that we asked for have been made and we're satisfied with

15    that.

16      There remains unresolved objections which I'm prepared

17    to address, although everything I had to say about that in

18    substance is in my submission already.  So the Court knows

19    what my positions are.  So given the opportunity, I'll

20    probably hit the highlights but I'm going to rely

21    substantially on the written documents.

22          THE COURT:  All right.  And I appreciate that,

23    Mr. Cronkright, and I will give you that opportunity to hit

24    the highlights.

25      The same set of questions to the government:  Received,

1    reviewed, and are there remaining issues in dispute from your

2    perspective?

3         MR. BRASHER:  We have received, reviewed those

4    documents, and just the open issues on the guidelines that are

5    in dispute that Mr. Haag will handle, and then our general

6    sentencing that I will handle.

7         THE COURT:  All right.  Then with respect to findings

8    of fact on issues that are not in dispute, I will accept the

9    presentence report as findings of fact on those issues

10   pursuant to Federal Rule of Criminal Procedure 32(i)(3)(A).

11        So the case does fall within the Sentencing Reform Act of

12   1984 by which Congress created the United States Sentencing

13   Commission.  And that commission has issued detailed

14   guidelines for courts to consider in determining the sentence

15   in a criminal case.  There are sentencing ranges set for

16   specific offenses, and the ranges are all contained in a

17   guidelines manual.  But those guidelines are not mandatory,

18   instead they are advisory, although they must be consulted by

19   the Court in determining the appropriate sentence in a case.

20        And I will do that here.  I will assess and determine the

21   proper sentence in this case by referring to and considering

22   the sentencing guidelines along with all other relevant

23   factors under Title 18 of the U.S. Code § 3553(a).

24        The guidelines, however, will be treated as advisory, not

25   mandatory, and there's no presumption that a guidelines

1        sentence is the correct sentence.

2            Defendant has been found guilty following a bench trial on

3        10 of the 11 counts that were brought against him.  And I

4        guess I'll quickly review what those counts are.

5            Count 1 is Assaulting, Resisting, or Impeding Certain

6        Officers in violation of Section 111(a)(1) of Title 18.

7            On Count 2, the defendant was acquitted by the Court.

8            Counts 3 and 5 are Civil Disorder in violation of Title 18

9        of the U.S. Code § 231(a)(3).

10           Count 4 is Assaulting, Resisting, or Impeding Certain

11       Officers Using a Dangerous Weapon, Section 111(a)(1) and (b)

12       of Title 18.

13           Count 6 is Obstruction of an Official Proceeding and Aiding

14       and Abetting.  That's a violation of Title 18 of the U.S. Code

15       § 1512(a)(2), and the aiding and abetting provision at Section 2.

16           Count 7, Entering and Remaining in a Restricted Building or

17       Grounds with a Deadly or Dangerous Weapon in violation of 18

18       U.S.C. § 1752(a)(1) and (b)(1)(A).

19           Count 8, Disorderly and Disruptive Conduct in a Restricted

20       Building or Grounds with a Deadly or Dangerous Weapon in

21       violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A).

22           Count 9, Engaging in Physical Violence in a Restricted

23       Building or Grounds with a Deadly or Dangerous Weapon in

24       violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A).

25           Count 10 and 11 are violations of 40 U.S.C. §§

5104(e)(2)(D) and (e)(2)(F), Disorderly Conduct in a Capitol Building and an Act of Physical Violence in the Capitol Grounds or Buildings.

So those are the counts, and as I said, Count 2 resulted in an acquittal.

So my first obligation is to make this guideline calculation. And it is fairly complicated and lengthy here. And so to begin with, before I embark upon that, I would like to hear any argument that counsel wish to provide to the Court. As Mr. Cronkright has said, I do have the sentencing memoranda and they contain some lengthy addressing of the sentencing guideline calculation.

But, Mr. Cronkright, I'll start with you since yours is the objection to some of the guideline calculation. And anything you wish to communicate at this time, I will be happy to hear.

MR. CRONKRIGHT: Thank you, Your Honor. Thank you also for acknowledging the submissions that the Court has already read. And I'm going to try to not belabor the points that we are raising and then yield the podium.

You know, the objections that we made we thought for the most part I suppose were reasoned objections based on the submission of the presentence report. Some of those things have changed somewhat. So as I'm looking for my place in my notebook, I'll address that as well.

The first thing that I would suggest to the Court is that

1   there are several places in which the administration of

2   justice issue sort of rears its ugly head, and this is things

3   that many judges and to some extent perhaps even Your Honor

4   has ruled on this.  Nonetheless, we raise the issue as to

5   whether, when my -- the assertion is that there's going to be

6   some additional scoring because my client intended to

7   interfere with the administration of justice.  It comes up in

8   two ways in the scoring here.

9       And so the first way is that the testimony of my client is

10   being raised as an issue as far as with an intent to interfere

11   with the administration of justice.  The issue here is whether

12   according to case law we essentially -- the Court is called

13   upon to essentially assess the elements of perjury.

14          THE COURT:  That's the obstruction of justice --

15          MR. CRONKRIGHT:  Oh, oh, you are right, Your Honor.

16          THE COURT:  -- provision as opposed to the interference

17   with the administration of justice.

18          MR. CRONKRIGHT:  You are right absolutely, of course.

19   In regards to that obstruction of justice count, which I think

20   was my first objection, but I'm not sure -- I'm not looking at

21   them.  Nonetheless, I'm there in my mind so I'm going to

22   address that issue.

23       The simple assertion is that there are -- and it's

24   throughout the case law -- and I cited some of that in my

25   brief to the Court -- but there are different reasons why a

1    finder of fact would not believe testimony, and there's even

2    different reasons why a defendant may give testimony that is

3    factually inaccurate without committing perjury.

4        My client's assertion throughout is that he is testifying

5    about the events the way that he remembered the events.  And

6    having not been in that situation, it's difficult for me to

7    say that I can relate to that, but the bottom line is there

8    were thousands of people doing various things in the Capitol

9    that day.  It was a very emotionally charged event.  And we

10   know just from history that people are not always accurate

11   reporters of fact in emotionally charged events.

12       So when he takes the stand and testifies as to the facts

13   the way he remembers them, even if the Court, as I think they

14   used -- the words the Court used was that you did not credit

15   that testimony as to his intent -- and here I'm specifically

16   talking about the throwing of the flagpole.  I mentioned in my

17   brief that the defense that my client put up was principally

18   in regards to the two 111(a) and (b) charges where he disputed

19   the assertions of the government that he had committed those

20   offenses, and the Court apparently did credit his testimony in

21   regards to one of the counts which the Court found him not

22   guilty of.

23       THE COURT:  That didn't involve a flagpole.  It

24   involved the large sign being carried over the heads of many

25   of the rioters.

1          MR. CRONKRIGHT:  It involved the Trump sign.

2          THE COURT:  Yes.

3          MR. CRONKRIGHT:  Yeah, okay.

4      So here's a case where my client took the stand and

5   testified to his intent as he remembered it, one of which

6   obviously resulted in a not guilty verdict, and the other one

7   didn't because the Court didn't credit that testimony.  And

8   the Court looked at the other evidence surrounding that,

9   especially the video evidence.  The Court questioned the

10   intent testimony my client provided.

11      Now, I'm not here -- this is not an appeal, I'm not here to

12   relitigate that issue.  I'm not here to question the Court's

13   finding.  I'm simply here to say that my client was testifying

14   in a manner consistent with his memory of events.

15          THE COURT:  But the two situations are different in

16   that with respect to the Trump sign being passed overhead, the

17   video evidence was what convinced me, and that video evidence

18   happened to be consistent with what Mr. Padilla's testimony

19   was.  But it was the video evidence that was actually

20   fundamental to my acquittal on that count.

21      With respect to the flagpole, the video evidence and

22   Mr. Padilla's testimony in my judgment were not consistent.

23          MR. CRONKRIGHT:  Well, I understand that.  The question

24   here, though, is whether my client operated with an intent to

25   deceive the Court in some way, to actually interfere with

1    the -- to obstruct justice by giving knowingly false

2    testimony.  And again, as I've indicated, we're not here on

3    appeal, I'm not disputing the Court's finding when it said

4    that it didn't credit his testimony.

5        What I'm presenting to the Court is the Court did not at

6    that time make a ruling that my client had committed perjury,

7    or the Court did not make a ruling that my client intended to

8    obstruct anything.  The ruling was that the other evidence

9    conflicted with it and therefore you did not accept what he

10   said.

11       And I accept that we are here on sentencing on that

12   particular count for the reason that you were not swayed by my

13   client's testimony.  And I'm not meaning to reargue that.  I'm

14   merely raising a fundamental assertion that my client was not

15   intending to deceive; my client was intending to give accurate

16   testimony as to the way that he remembered the events at that

17   time.

18               THE COURT:  So noted.

19               MR. CRONKRIGHT:  So his testimony in the courtroom was

20   entirely consistent with what I've heard since the day I met

21   him.  And so whether the Court accepted it or not, and clearly

22   the Court did not accept it, the reality is that's not the

23   same as perjury.  The Court has not made any findings like

24   that, and the elements of perjury are what control this

25   particular enhancement applied in this particular way.

1    So as to that enhancement, Your Honor, I think that that

2    scoring is not appropriate for the reasons that I've stated.

3    So the reason -- back to the issue of the administration of

4    justice.  The simple assertion here -- and I'm not going to

5    belabor it because I've briefed it and the Court's read those

6    arguments, and I think for other reasons, even in other cases,

7    the Court is also familiar with those arguments.  But the

8    assertion made I think in *Hammer*, if I'm recalling correctly,

9    was that the certification of the electoral count is not the

10   administration of justice, that that language is language that

11   is uniquely adapted to court proceedings and things that lead

12   up to court proceedings, and so it certainly applies to

13   federal officers and interviews and indictments and so forth.

14   It involves to bringing people into the justice system and

15   getting resolutions to disputed matters in court and so forth.

16   Congress wasn't doing anything like that.  Congress wasn't

17   administering justice.  Congress was here to decide who the

18   next president was going to be.  And that is the argument,

19   Your Honor.  And again, I don't want to belabor it because the

20   Court is familiar with the arguments.  And I would say that

21   any of the scoring that relies on the notion of the

22   administration of justice, to the extent that the assertion is

23   that we're scoring points because of the 1512 issue, because

24   of the interference with the certification of the electoral

25   count -- Electoral College vote, I would say that because

1    that's not the administration of justice, that there should

2    not be a scoring based on that.

3        I wanted to address the objection that I made in regards to

4    the "more than minimal planning" aspect.  The assertion here

5    is that my client engaged in more than minimal planning

6    because he brought an N95 mask and a ski mask.  And as I

7    pointed out in my brief, and it's not disputed even in the

8    response from the probation agent, that we were in the middle

9    of a pandemic at the time of January 6 and there were

10   requirements that in mass gatherings you wear a mask.  It

11   would be normal planning for any kind of event, even if there

12   was no intent to break any laws, to bring a mask with you.

13       THE COURT:  Indeed, I've seen the videos time and time

14   again with respect to January 6 and there were a fair number,

15   I wouldn't say a majority by any means, but a fair number of

16   the rioters who had masks on.

17       MR. CRONKRIGHT:  Yeah.  I would say too that there is

18   perhaps a nuanced argument, Your Honor, that this particular

19   guideline, more than minimal planning, is clearly aimed at

20   pre-offense conduct.  So what you did when you arrived on the

21   Capitol grounds on January 6 is probably less important to

22   this guideline than what you did in planning for it because

23   we're talking about planning for the event, more than minimal

24   planning, so that's something that happens in advance of an

25   event.

1          Now, I don't want to get into how long do you have to plan.

2     It's sort of like how long do you have to have premeditation

3     in a murder case, and I suppose it could be conceivably a very

4     short period of time --

5          THE COURT:  I wouldn't take much more time on this.  My

6     inclination is not to apply that special offense

7     characteristic.  The government can argue to the contrary and

8     I'll listen to them.  But in any event, given the guideline

9     calculation, it doesn't matter, because that's only applied

10    with respect to count group 1, which doesn't result in the

11    highest adjusted offense level.  It's count group 2 that

12    results in the highest offense -- adjusted offense level.

13         MR. CRONKRIGHT:  Yeah.  I'm not here to --

14         THE COURT:  So it's not going to --

15         MR. CRONKRIGHT:  At this point to address the issue --

16         THE COURT:  Looking at the probation office's guideline

17    calculation, if I eliminate that particular special offense

18    characteristic that's set out at paragraph 51, I believe, it

19    doesn't affect the ultimate guideline calculation because the

20    ultimate guideline calculation is driven by group 2, count

21    group 2.

22         MR. CRONKRIGHT:  So I think that I -- let me look.  I

23    think I've now addressed the objections that I made to the

24    guidelines calculations.  And I think that that's all the

25    Court's asking me at this point.  Am I right on that?

1          THE COURT:  I'm sorry?

2          MR. CRONKRIGHT:  The Court is only asking me to address

3     my objections at this point?

4          THE COURT:  Yes.  Just the sentencing guidelines.

5          MR. CRONKRIGHT:  Yeah.  So I think I have now addressed

6     the objections that I raised.  Anything beyond that I rely on

7     my submission in writing, Your Honor.

8          THE COURT:  Okay.  I'll give you a moment, if you need

9     it, to address the terrorism issue once the government

10    addresses that.

11         MR. CRONKRIGHT:  Okay.  Obviously, that wasn't an

12    objection per se.  So I raised the issue of *Winstead* in the

13    assertion that if the statute, or in this case the guideline,

14    is clear then there's no reason to go to the commentary as my

15    first objection.  And again, I would stand -- I think I raised

16    three objections -- or three objections to that, if you can

17    use the word "objections" appropriately there.

18       But I find it disturbing, in regards to the government's

19    assertion that there should be an enhancement, that the

20    principal use of the terrorism enhancement seems to be for

21    people who have gone to trial and lost and are standing in

22    front of the Court for sentencing.  So --

23         THE COURT:  You're talking about in the context of

24    January 6 cases.

25         MR. CRONKRIGHT:  Yes.  Yes.  On January 6 cases.  I

1    mean, I looked at their support for that and the cases that

2    they cited, and I think, if I'm recalling correctly, all but

3    one, they were people who had gone to trial and the government

4    had sought the enhancement.  The one exception that I remember

5    is where it was a requirement of the plea agreement.

6        So obviously plea agreements are interesting animals, if

7    you will, in that people sometimes live with things that they

8    wish weren't in there but they want the protection of the plea

9    agreement so that they acquiesce to it.  And I do remember one

10   instance in the government's submissions where it was the case

11   that it was a requirement of the plea agreement that they

12   agree to a two-point departure.

13       So I find it disturbing that it apparently is being used as

14   a trial -- sort of a trial penalty.  And obviously, defendants

15   who have gone to trial and lost, they're going to lose in

16   almost all instances their acceptance of responsibility

17   potential downward departures.  And so the guidelines

18   themselves sort of incorporate that into there.

19       But I think if you look at my client's conduct and you look

20   at the guidelines, you have to say, well, first place, the

21   guideline itself doesn't apply and there's no reason for us to

22   be going into a footnote saying that there's a possible

23   departure.  But even if there was a departure, the conduct

24   that my client is found guilty based on -- and from my

25   client's perspective, I mean, he's found guilty because of

1    acts that he committed which violated the statute, and that
2    conduct doesn't seem to be in any way outside of the scope of
3    the guidelines because the guidelines seem to be incorporating
4    every aspect of the conduct which they've already argued.  And
5    therefore I'm not sure why, if you look at the policy
6    statement, which is the third argument that I raised, why we
7    would go there at all if it doesn't seem to be anything that's
8    beyond the scope of anything that the guidelines commission
9    anticipated.  In fact, there's proposed scoring for all of
10   that conduct already.
11      So thank you for the opportunity to address that.  I just
12   don't think that on these facts the terrorism enhancement or
13   the footnote enhancement is appropriate for the reasons that
14   I've stated.
15            THE COURT:  All right.  Thank you, Mr. Cronkright.
16      Mr. Haag, will it be?
17            MR. HAAG:  Yes.
18            THE COURT:  So let's start with more than minimal
19   planning.  Why is wearing an N95 mask, which at that time many
20   people were wearing, including many -- not most but many of
21   the January 6 rioters -- plus wearing ski goggles, why does
22   that amount to more than minimal planning here?
23            MR. HAAG:  So, Your Honor, first I want to start --
24            THE COURT:  It seems to me to be quite a stretch.  And
25   I guess I should be looking at Probation as well as you on

1       that.

2               MR. HAAG:  Your Honor, first I'd like to draw the

3       Court's attention to footnote 16 of our sentencing memo.

4       There we have a quotation from the defendant on one of his

5       accounts where he had said "I don't even wear masks in

6       public."  So the reason why I'm drawing attention there is why

7       did Mr. Padilla, the defendant, wear the mask on January 6,

8       and it's the intent behind --

9               THE COURT:  Wait a minute.  This is footnote 16 of

10      your...

11              MR. HAAG:  Of the memorandum.  Yes, Your Honor.

12              THE COURT:  I'm going to find 16.  Unless you give me a

13      page, I have to leaf through to find out where it is.

14              MR. HAAG:  Page 7, Your Honor.

15              THE COURT:  Okay.  Thank you.

16         Okay.

17              MR. HAAG:  So the focus with this is exactly what was

18      the intent for what he brought to January 6, the face mask and

19      the ski goggles.  I also note in the Court's findings the

20      defendant had stated, "I full expect if it goes the way I

21      think it will go there will be pepper spray deployed en

22      masse."  That was in December 2020, so shortly before the

23      riots.  And then after that he had talked about how he wanted

24      to dissolve the legislature and take over the Capitol.

25              THE COURT:  That's why he wore the ski goggles,

1    apparently, too.

2             MR. HAAG:  Yes.

3             THE COURT:  So it's not much different --

4             MR. HAAG:  It's -- [overspeaking] --

5             THE COURT:  -- in that regard.

6             MR. HAAG:  Exactly, Your Honor.  In his mind, the idea

7    of putting those objects on was to protect himself from --

8             THE COURT:  But why does that amount to more than

9    minimal planning?  And does that addition to the offense level

10   then apply for this little in regard to planning, no actual

11   planning but just the fact that someone wore some protective

12   gear?

13            MR. HAAG:  I wasn't able to find it for specifically

14   the masks and goggles, but there are cases with respect to

15   objects that look like body armor and helmets and those types

16   of objects.  The purpose again of those is self-defense in

17   order to achieve the goal of taking over the Capitol, and

18   that's exactly what the defendant was doing here.  He wanted

19   to make sure he wasn't incapacitated, that once he got to the

20   Capitol he would actually be able to execute his plans.

21       As we kind of saw over the course of the day, the defendant

22   was hit with pepper spray.  The only time he had actually put

23   on the mask was after he had been hit with pepper spray.  And

24   by the time he'd made it up to the tunnel he was sluggish, he

25   was slower, wasn't able to actively participate in the riot.

1   So the assertion here with the more than minimal planning

2   was that him going into January 6 is that he wanted to protect

3   himself from that kind of incapacitation that would hinder his

4   ability to take over the Capitol.

5            THE COURT:  All right.

6            MR. HAAG:  Turning next, there was a brief objection

7   raised by the defense with respect to aggravated assault in

8   Count 1 and why that applied.  During the closing argument

9   there was a point that was made that § 231 was the other

10  felony.  Additionally, there is § 1512 being the other felony,

11  the reason why he assaulted the police officers was not just

12  civil disorder, obstructing police officers but it was also to

13  get into the Capitol and --

14           THE COURT:  Yeah.  At one point there was a reference

15  to the other civil disorder count, but you're contending now,

16  and you think the record supports, the fact that we can look

17  to the other felony aspect as well.

18           MR. HAAG:  Certainly.  And I would say that would apply

19  both to --

20           THE COURT:  And is not limited to the 231 -- the second

21  231 charge but instead we can look to the 1512 charge.

22           MR. HAAG:  Yes, Your Honor.  And I would say that also

23  applies to Count 3 where the government asserted that 2A2.2

24  should apply based on the basis of the 1512 and the 111.

25   With respect to 3C1.1, the obstruction of justice, I think

1    the Court's findings in this case make very clear that the

2    defendant was not testifying truthfully with respect to what

3    was happening outside of the tunnel.

4        THE COURT:  In particular with respect to the flagpole

5    javelin.

6        MR. HAAG:  Exactly, Your Honor, and the fact that when

7    the defendant was trying to throw the flagpole, he was trying

8    to hit the rioter that hadn't actually moved yet, and that

9    when the rioter had turned to bend down to pick up the object

10   the defendant was turned away.  This whole idea that he was

11   trying to protect the officers when he had just watched

12   officers be hit by all manner of weapons for 30 seconds, a

13   minute, before he had thrown the flagpole.  And then finally

14   when the officer got brought into the crowd, was standing just

15   a few feet behind the defendant, the defendant did nothing.

16     So his focus there, where he had asserted it was to protect

17   the police officers, was clearly -- the evidence bore out was

18   not the case and was in fact untruthful.  So I do believe that

19   3C1.1 applies to the defendant's testimony there.

20     The question raised by the defense with respect to the

21   administration of justice, we'll agree that the guidelines

22   here are not the picture of clarity with respect to 2J1.2.  It

23   doesn't exactly define what the administration of justice is,

24   but it does define what substantial interference of an

25   administration of justice.  And I think the Court can use that

1    definition as a tool to determine what exactly is the

2    administration of justice.

3         THE COURT:  How so?

4         MR. HAAG:  With respect -- the definition first states

5    that it's premature -- the commentary defines substantial

6    interference as being the premature termination of a felony

7    investigation as well as essentially inducing a judicial

8    finding based on false testimony or perjury.

9     But then the final one indicates the unnecessary

10   expenditure of substantial government or court resources.

11   And that there, that phrase there, is not a catch-all phrase.

12   This isn't as used in a -- let's use some generic situation

13   where it is similar to the other two.  It's its own freestanding

14   phrase.  And you know that because it doesn't say "the other" or

15   "otherwise" or some other connection that would hook it to the

16   earlier two phrases.  This in and of itself is a freestanding

17   phrase.

18    So looking a little bit further into what exactly is the

19   expenditure of government or court resources, it's just the

20   application or execution of laws.  It's exactly what Congress

21   was doing on January 6.  It was complying with its obligations

22   under the Electoral College Act as well as the Constitution to

23   count the Electoral College vote.

24    So for that reason I would say that the administration of

25   justice, both the plus eight for the defendant's physical

1    conduct as well as the actual substantial interference that

2    happened on January 6, the plus three, would apply here.

3         THE COURT:  All right.  What else?

4         MR. HAAG:  The defense did raise an objection under

5    3A1.2(c)(1) with respect to the official victim and whether or

6    not there is substantial risk of serious bodily injury to the

7    officers that the defendant had assaulted.  With respect to

8    the flagpole and Officer Corado, I would just note a few

9    points of the Court's findings that thoroughly indicate that

10   there was going to be potential harm to Officer Corado.

11        First, the defendant carried a plastic flagpole, aimed it

12   towards the mouth of the tunnel and launched it like a javelin

13   into the tunnel where the line of police officers were

14   standing.  Next, "given the flagpole's shape and size, it

15   could cause serious damage if it hit someone in the head,

16   particularly if it struck someone in the eye."

17        And then finally, the flagpole could still cause injury

18   even to an officer wearing a helmet due to the fact that there

19   had been a gap between the helmet and the body armor, and that

20   would expose the officer's neck.

21        So taking those three facts together, there is a real risk

22   that, based on how the defendant threw the flagpole, where he

23   threw it, and what the officer was wearing, that there was a

24   substantial risk of serious bodily injury to Officer Corado.

25        And then finally, with respect to Count 1, which was the

1    bike-rack push there, at that point there was a large crowd of

2    rioters that were trying to get through the police line.  If

3    the defendant had been successful in actually pushing the bike

4    rack over, an officer could have fallen down, bike rack would

5    have been on top of him, and the rioters could have just run

6    directly over him.  That is another instance of substantial

7    risk of serious bodily injury.

8        So for those reasons, I believe both for the assault on the

9    West Front as well as in the tunnel, this guideline should

10   apply as to substantial risk.  However, if the Court does not

11   find that, I would still ask the Court to find that 3C -- or

12   3A1.2(a)(1)(A) and (a)(2) do apply, which is just the fact

13   that they were officers and that the defendant's conduct was

14   motivated by the fact that they were officers.

15       And then finally, turning towards the government's request

16   for the terrorism departure, I understand the defense cites

17   *Winstead*, which I do not think is applicable, it's not

18   comparable to how the guidelines here are working.  In

19   *Winstead* what the Court was dealing with was the career

20   offender enhancement, and that works very similar to the

21   enhancement of 3A1.4 where the defendant in *Winstead* was given

22   an enhancement because he had committed two prior felonies and

23   the Court found that those felonies had qualified under the

24   guidelines for the enhancement.

25           THE COURT:  Some courts have adopted this view.  The

1    statutory language, the definition of federal crime of

2    terrorism is conjunctive, not disjunctive, requiring an

3    offense that is both calculated to influence or affect the

4    conduct of government by intimidation or coercion, or to

5    retaliate against government conduct, and that it's a

6    violation of one of the enumerated list of statutes, which

7    this is not.

8         So how does the application note -- how do we justify the

9    application note that says nonetheless, an upward departure

10   can be applied even in cases where only the first part of that

11   definition is satisfied?  That seems to be inconsistent with

12   the normal rules of statutory construction.

13        MR. HAAG:  I can appreciate the tension that's there

14   between the two.  But what note 4 is really doing is treating

15   the adjustment as an analogy.  I think it's more akin to a

16   policy statement like § 5K2 and the various --

17        THE COURT:  Even a policy statement can't be

18   inconsistent with what the statutory definition says.

19        MR. HAAG:  Certainly, Your Honor, but --

20        THE COURT:  The statutory definition requires a

21   violation of one of the enumerated statutes, and we don't have

22   that.  Isn't that the end of the inquiry?

23        MR. HAAG:  It is not, Your Honor, because what the note

24   4 is saying is there might be cases, as is the case here,

25   where a defendant had committed a crime with a terrorist

1          intent but it did not fall under that definitional language,

2          therefore the adjustment doesn't apply, they don't get the

3          automatic 12, they don't get the criminal history score of 6,

4          but because the terrorist intent was similar to what the

5          intent is behind those federal crimes of terrorism, a

6          departure akin to a policy statement departure is warranted.

7          And that's why --

8                  THE COURT:  You mean outside of the actual application

9          of 3A1.4.

10                 MR. HAAG:  Exactly, Your Honor.  So it's a completely

11         separate application.  It's just using the adjustment as kind

12         of a -- not to use the term, as a guideline.  It's using the

13         adjustment as the cap.  And as we saw with what Judge Mehta

14         had done in the Stewart Rhodes case and the codefendants

15         there, the judge had -- Judge Mehta had treated the adjustment

16         as the cap, but then departed upwards based on the severity of

17         the conduct that the individual defendants --

18                 THE COURT:  Only one of those cases involves an

19         individual as opposed to a conspiracy context, and Judge Mehta

20         is the only judge that has done that.  All the other judges, I

21         think it's six or seven of them, have declined to apply this

22         enhancement.

23                 MR. HAAG:  I understand, Your Honor, and that's the

24         discretionary aspect of it.  I just say as a matter of law I

25         believe this note 4 does apply to the defendant's conduct.

1          Looking at his statements, his statements were absolutely
2     replete, both before, during and after January 6, that he was
3     trying to overthrow the government.  That was his intent.
4          Personally, Your Honor, I think this is one of the most
5     egregious cases in terms of intent evidence for what the
6     defendant was trying to do on January 6.
7          THE COURT:  Well, there's a lot of cases that involve
8     social media and comments on the scene on January 6 that would
9     indicate an intent, as you put it, I think, to overthrow the
10    government, or to -- or at least to prevent the government
11    from smoothly transitioning from one presidential
12    administration to the other in terms of political power.
13         So I fear that the rationale you're offering with respect
14    to Mr. Padilla would actually apply to a large number of
15    January 6 defendants, and it has not been applied to a large
16    number of January 6 defendants.  It's only been applied twice.
17    Once in a clear conspiracy context among the most serious of
18    the cases brought with respect to January 6, and the other
19    time is the only time it's been applied to an individual who
20    had no collective or joint planning.
21         MR. HAAG:  So, Your Honor, I do believe Mr. Padilla is
22    quite unique in terms of the connection between his statements
23    made online as well as his conduct on January 6.  I would note
24    the fact that Mr. Padilla was standing on the line in front of
25    Sergeant Cropper as well as another Metropolitan Police

1   officer, quoting the Declaration of Independence, exactly as

2   he had done online.  There's the connection there --

3        THE COURT:  I've had much worse cases than

4   Mr. Padilla's in terms of the statements made prior to

5   January 6 by the defendant and the planning, if you will, and

6   what the defendant wanted to have happen in terms of

7   overthrowing the government.  Much worse than Mr. Padilla's.

8   Not to say that Mr. Padilla's wasn't very troublesome, but I

9   don't think he's unique.

10       MR. HAAG:  And, Your Honor, I think what you're getting

11  to there is exactly the discretionary aspect I mentioned

12  earlier where the government believes this does meet the

13  guidelines and that this guideline, specifically note 4, is a

14  legally sound note and commentary, but I would assert, based

15  on the facts I have shown, I do believe that note 4 is

16  applicable.  But I do understand the Court's position.

17       THE COURT:  All right.  I think that covers it, doesn't

18  it?

19       MR. HAAG:  I believe it does, Your Honor.  Thank you.

20       THE COURT:  All right.  Thank you.

21    All right.  Now I have to do my work by going through the

22  guideline calculation.  As I said, it is a little complicated

23  and therefore a little lengthy.  And that's in part because of

24  the number of counts that we're dealing with, but also in part

25  just because the guidelines are a bit cumbersome at times,

1    particularly when we're grouping counts.

2        I find the guideline applicable in most of these instances

3    is 2A2.2.  That applies to Count 1, it applies to Counts 3 and

4    5 by a circuitous route, but nonetheless, as the probation

5    office has indicated in paragraph 41 of the presentence

6    investigation report, it is 2A2.2 that applies.

7        The same is true for Count 4.  Count 6 is different; that

8    is the 2J1.2 guideline application.  Back to -- that's true of

9    Count 7 as well.  Back to 2A2.2 with respect to Count 8 and

10   Count 9.  And then of course Counts 10 and 11 are not subject

11   to the guidelines because they're Class B misdemeanors.

12       So Counts 1 and 3 wind up grouping under 3D1.2(b) of the

13   guidelines.  They involve the same victim, MPD officers

14   located in the West Plaza of the U.S. Capitol, and acts that

15   are connected by a common criminal objective and constitute --

16   or constitute part of a common scheme or plan.  And therefore,

17   it's the guideline at 2A2.2 that produces the highest offense

18   level and we get there pursuant to 3D1.3 of the guidelines.

19       Counts 6, 7, and 8, are grouped under 3D1.2(b).  Again,

20   they involve the same victim, Congress, and two or more acts

21   or transactions connected by a common criminal objective or

22   constituting part of a common plan.

23       In addition, Counts 4, 5, and 9 group with those counts

24   pursuant to 3D1.2(c) because Counts 4, 5, and 9 embody conduct

25   that is treated as a specific offense characteristic in the

1    guideline that applies to Counts 6, 7, and 8.  And here the

2    guideline at 2J1.2 produces the highest offense level.

3        So, for this first grouping, Count Group 1 we call it, the

4    guideline for violation of 111(a)(1), which is found at 2A2.2

5    of the guidelines, is, under 2A2.2(a), a level 14 because the

6    offense I find involved aggravated assault.

7        The contention that the conduct at the barricade does not

8    amount to aggravated assault does not seem correct to me.

9    111(a) physical contact enhancement provision was cited by the

10   Court rather than the intent to commit another felony

11   provision when I found Mr. Padilla guilty.  But I think it's

12   pretty clear from the Court's verdict that Mr. Padilla formed

13   an intent to obstruct the certification in the lead-up to

14   January 6, and his actions on that day were animated by that

15   intent.  And that involves 1512.

16       And in any event, I would note that this doesn't affect the

17   ultimate guideline calculation because the offense level of 33

18   for the second grouping is the highest offense level.

19       Sticking with the first grouping, I've already observed

20   that I do not believe that the special offense characteristic

21   for more than minimal planning should be applied.  Yes,

22   Mr. Padilla wore goggles and an N95-style respirator, the

23   latter being worn by many, although the government correctly

24   points out that Mr. Padilla has indicated elsewhere that he

25   doesn't usually wear a mask.  These were protective measures.

1   But I will not apply this enhancement under 2A2.2(b)(1)

2   because I don't think that just wearing an N95 mask, which was

3   deployed when a chemical irritant was sprayed by the police --

4   I don't believe that just wearing that mask and ski goggles is

5   enough to qualify as more than minimal planning.  So that will

6   not be applied.  Again, it's not going to affect the ultimate

7   guideline calculation.

8       On Count 1 -- on the first grouping, group 1, the

9   victim-related adjustment of six levels under 3A1.2(b) is

10  applied because the victims of the defendant's assaultive

11  conduct were law enforcement officers located at the barriers

12  that he came into conflict with.  He assaulted those officers

13  because of their status as law enforcement officers who were

14  attempting to hold the line and protect rioters from advancing

15  to the Capitol.

16      The 3C1.1 adjustment for obstruction of justice, willfully

17  obstructing or impeding or attempting to obstruct or impede

18  the administration of justice, I find that that does apply

19  here.  I don't think this provision is limited to court

20  proceedings of any kind, and I find that the false testimony

21  that the defendant gave is sufficient to warrant application

22  of this adjustment.

23      And I will say that the most telling false testimony

24  related in my view to the throwing of the flagpole and

25  Defendant Padilla's explanation for that.  I found then and I

find now that his explanation is altogether not credible.  So
that two-level adjustment under 3C1.1 will be applied.

That means that for Count Group 1 the adjusted offense
level is 22, not the 24 that the probation office had, because
I've eliminated one two-level adjustment.

But the more important calculation is for Count Group 2.
And there the guideline for a violation of § 1512(c)(2) is
found at 2J1.2, and that's a 14-level -- base offense level
under 2J1.2(a).

There are eight levels added because the offense involved
causing or threatening to cause physical injury to a person or
property damage in order to obstruct the administration of
justice.  And that would be relating to the interference with
the democratic process involving the Electoral College count.
And this eight-level increase is applied under 2J1.2(b)(1)(B).

And I will note in passing that it does seem to me a little
bit inconsistent to apply the terrorism increase that the
government argues for in addition to something like this
eight-level increase that is being applied, and then a
six-level increase for a victim-related adjustment as well.
It just seems to me that that is not warranted to the extent
that this is my discretionary decision, and I note that at
this time as well.

We also have the 2J1.2(b)(2) special offense
characteristic, which is the substantial interference with the

1      administration of justice, that is the Electoral College vote

2      before Congress, and three levels are added under that

3      provision.

4          The victim-related adjustment under 3A1.2(c)(1) and (2), I

5      believe that applies.  The victims of the defendant's

6      assaultive conduct, particularly in the tunnel, were law

7      enforcement officers, fully displayed with police uniforms and

8      he was aware that they were law enforcement officers and he

9      was certainly taking action that would interfere with their

10     conduct.  Because the defendant knew or had reasonable cause

11     to believe that they were law enforcement and he acted in a

12     manner that created substantial risk of serious bodily injury

13     for which he ultimately is accountable, the six-level increase

14     or adjustment under 3A1.2(c)(1) and (2) is applicable here.

15         I think that hurling that flagpole does create a

16     substantial risk of bodily injury.  Perhaps that's a debatable

17     point, but as I have already found in the trial in this case

18     in rendering my judgment, a flagpole is certainly capable of

19     causing serious bodily injury, and the throw of the flagpole

20     by Mr. Padilla, what's been referred to as a javelin-like

21     throw, was capable of causing serious bodily injury to the

22     officer.

23         There was at least one officer who didn't have a helmet on,

24     and besides which, there is a space between any body

25     protective gear, body armor, and the face shield, exposing the

1    neck of all the officers to a projectile such as the flagpole

2    when it was launched by Mr. Padilla.

3        The adjustment for obstruction of justice applies here as

4    well for the reasons I have described, and that's a two-level

5    adjustment under 3C1.1.  And therefore the adjusted offense

6    level on this Count Group 2 is 33.

7        The multiple-count adjustment is described in the

8    presentence investigation report at paragraphs 63 through 65

9    and it results in no increase above that level 33, as

10   explained in paragraph 66, because the units employed do not

11   result in any increase in the offense level under 3D1.4 of the

12   guidelines.

13       That means, because there's no acceptance of responsibility

14   here, and I apply no downward adjustment for acceptance of

15   responsibility, that the total offense level is in fact a 33,

16   a very high offense level, no question that that's the case.

17       And with respect to acceptance of responsibility, the

18   defendant went to trial, he challenged factual issues

19   regarding his intent, and that means that except in a very

20   rare case there's no acceptance of responsibility, and I find

21   that this is not such a rare case.  And in any event, I found

22   and confirm the finding that Mr. Padilla did not testify

23   truthfully, and that is a further reason not to apply the

24   acceptance of responsibility.

25       Criminal history.  No criminal history here.  No past

1     convictions, no criminal history points, and Mr. Padilla is in

2     the lowest criminal history category, a category I.

3         I will say -- I'm not sure that I said this fully -- I

4     think I did.  I think I said most of this.  Let me just add on

5     the terrorism increase that the government is seeking, in

6     addition to the consistency in terms of the statute and the

7     application note, I do have some concern, if it were applied,

8     about sentencing disparities that it could lead to, given the

9     fact that it hadn't been applied by most judges.

10        I think this case is factually distinguishable from the

11    rare case in which it was applied, Judge Mehta's cases.  And

12    this case does not involve any collective planning.  Instead,

13    it's only individual planning, if you will, by the things that

14    Mr. Padilla did in advance of January 6, and when he attended

15    the Capitol riot on January 6.

16        All right.  So the guideline range for imprisonment with an

17    offense level 33 and a criminal history category I is very

18    high.  It's 135 to 168 months.  That's not true for all counts

19    that Mr. Padilla was convicted on.  Some of those counts,

20    indeed all the counts other than 4 and 6, I believe, have

21    lower statutory maximums.  So while the guideline range in

22    total is this high 135 to 168, there are some counts that have

23    statutory maximums that are below that, and some well below

24    that.

25        So any objection to those conclusions other than the

1    objections and arguments that have been made already, those

2    conclusions as to appropriate offense level, criminal history

3    category, and advisory guideline range?  Mr. Cronkright?

4            MR. CRONKRIGHT:  None other than those already made.

5            THE COURT:  And Mr. Brasher, or Mr. Haag.

6            MR. HAAG:  Nothing further, Your Honor.

7            THE COURT:  All right.  As I said, the guidelines are

8    advisory in any event but they will be considered fully by the

9    Court along with all other relevant factors.

10       So now let me hear from first the government, then the

11   defense, and then if Mr. Padilla wishes to address the Court,

12   I will be pleased to hear from him as well.  Mr. Brasher.

13           MR. BRASHER:  Thank you, Your Honor.

14       I just want to address the 3553(a) factors.  We discuss

15   them in our sentencing memorandum but I want to hit, as the

16   Court has said earlier, the highlights hopefully.

17       First, the nature and circumstances of the offense.  This

18   is one of the most serious crimes, the most serious events

19   that has faced this country since the Civil War.  Due to the

20   number of January 6 cases this court has seen and this

21   district has seen, I worry that we might start to become numb

22   to the reality of how serious this crime is.  So I would just

23   urge the Court to remember just a few key points.

24       This was a direct assault on the Capitol.  The storming of

25   the Capitol building was an unparalleled attack on one of the

most iconic symbols of America and American democracy, a
building that had not been breached since the War of 1812.

It undermined the democratic process.  The attack occurred
during the certification of the Electoral College vote, which
is a fundamental step in the peaceful transfer of power.  And
by attempting to overturn that, the results of a free and fair
election, it directly challenged the core principles of our
democracy.

It resulted in the loss of life and many injuries, on both
sides, on protesters' side and on law enforcement.  And of
course, the defendant is not charged with participating in
those deaths, but he was part of the mob that led to those
unfortunate circumstances.  And those -- the violence that
occurred that day is reminiscent of the darkest chapters of
American history.

It eroded the trust in American institutions.  The attack
exacerbated already a polarized society and made the situation
in our country even worse.  It's had global implications.  In
addition to being a United States Attorney, I do teach an
undergraduate criminal justice class at Texas Christian
University.  We cover hot topics in criminal law, and we spent
some time talking about January 6, reading news reports,
following the news about that.  And I had a student,
unprompted, send me an email that I would just like to share
with the Court.

1    He's from Nicaragua, doesn't speak English very well, and

2    so he told me he was hesitant to raise his hand and make the

3    comment in class.  This is what he wrote.

4    He said:  "I'm from Nicaragua, which currently is under an

5    authoritarian regime, where the government has thrown to jail

6    all of their opposition and those who talk against them,

7    including businessmen who don't favor the dictator.  One year

8    ago my family did not go back to Nicaragua.  My father is on

9    the board of a company that prints the newspaper, and one of

10   his colleagues from work was sent to prison and he was advised

11   not to go back since we were fortunately out of the country

12   for summer vacation.

13   "I say this not for you to feel sorry for me but for you to

14   get more familiar with the case.  I am talking about this in

15   relation to the U.S. Capitol case.  Since for a long time

16   United States government has accused Nicaragua of violations

17   of human rights, censorship, lack of democracy, and many more

18   abuses."

19   And this is the most important part that he said.

20   "I would say that the U.S. Capitol riot case damages

21   dramatically U.S. foreign policy and international respect,

22   since authoritarian countries like mine and other

23   authoritarian regimes like Venezuela, Cuba, etc., can now

24   claim that the U.S. is not a legitimate government but rather

25   a country in chaos."

1    These are the remarks of a freshman at TCU who sees clearly
2    the impact that January 6 has had on this country.  And
3    although the defendant just was one of thousands, he played an
4    important role on that day.

5        I just want to turn briefly to the history and
6    characteristics of the defendant.  It's true that a difficult
7    upbringing can cast a long shadow on an individual's life, but
8    we have to remember that personal responsibility is a key
9    cornerstone of a just society.  And the defendant faced
10   regrettable events in his childhood and adolescence, but he
11   overcame those.

12       By all accounts, he served successfully and honorably in
13   the military.  And although he received a full disabled
14   rating, he was able to raise his children and manage the home.
15   And I know my wife would say that's more than a full-time job.

16       This is also not a case where there's a clear tie between
17   being victimized as a child and then becoming a perpetrator
18   later in life.  It's not a case where someone is born amidst
19   constant drug use who then becomes addicted and ends up
20   selling drugs later as an adult, or a case of child sexual
21   abuse where that impact on one's psyche ends up a person
22   becoming a perpetrator later on.

23       Nothing about the defendant's childhood and adolescence
24   gave any reason for the defendant to commit the acts that he
25   did on January 6.  So while his early childhood experiences

1   are regrettable, it is not an excuse for leniency in this

2   case.

3       The Court also needs to fashion a sentence that reflects

4   the seriousness of the offense and promotes respect for the

5   law.  There is nothing more disrespectful towards law

6   enforcement than the things that Mr. Padilla said on the West

7   Plaza that day, calling the officers oath breakers, traitors.

8       As to deterrence, I want to focus just on specific

9   deterrence.  Based on the defendant's online rhetoric, he

10  would not only view January 6 as necessary but as a beginning.

11  "What happened Wednesday is what needs to be done again and

12  again."

13      The defendant claims that he was set off that day.  He was

14  there initially just to protest peacefully but that once his

15  hands had been hit by a police officer's baton, that's what

16  changed everything.  And if that's all it takes, whether that

17  hit on the hand was justified or not, but if that's all it

18  takes to set someone off on a course to assault multiple

19  officers in a violent attempt to overtake American government,

20  then the Court needs to fashion a significant sentence to

21  deter him.

22      And it seems that the defendant's -- the only deterrent

23  effect has been the consequences that are now going to be

24  suffered by defendant's family, and that have been suffered by

25  his family during his period of incarceration.  Again, that's

1    not a reason for leniency; that's a reason for the Court to

2    see that specific deterrence works and should impose a

3    significant sentence.

4       Your Honor, again, January 6, 2021, was one of the most

5    serious attacks on America since the Civil War.  The defendant

6    played a key part in that event.  He was relentless, from the

7    time he arrived at the West Plaza just after 1 p.m. until

8    rioters were finally cleared from the inaugural stage after 4

9    p.m.  Attack after attack.  Excited while it was happening,

10   sending messages to his spouse that it's working and that he

11   just needs to rest before he goes back in for more.

12      All of these reasons, Your Honor, are reasons -- our ask in

13   this case is a sentence of 171 months.  Given the Court's

14   findings of the guidelines, that's only a slight variance

15   above the high end of the guidelines.  And if the Court were

16   determined to stay within the guidelines, a sentence of 168

17   months would be appropriate.  And it's regrettable that that

18   would have significant implications for the defendant's

19   family, but that's not a reason to discount the defendant's

20   actions and his intent that day.  So we would ask Your Honor

21   for a sentence of 171 months.

22           THE COURT:  Thank you, Mr. Brasher.

23      Mr. Cronkright.

24           MR. CRONKRIGHT:  Thank you, Your Honor.

25      The Court is aware that one of the things that I'm prepared

1    to argue about today is the loss of caretaker support because

2    I mentioned it in my brief.  And we have in the --

3         THE COURT:  By the way, you've asked to file under seal

4    certain material?

5         MR. CRONKRIGHT:  I did.

6         THE COURT:  I'll allow that to be filed under seal.

7    Looking at it, I'm not sure that all of it needs to be filed

8    under seal, but we'll go ahead and grant that motion to file

9    certain letters under seal.

10        MR. CRONKRIGHT:  Thank you for that, Your Honor.

11      Based on that, I'm operating under the assumption as I

12   mentioned before that the Court's reviewed those materials

13   and --

14        THE COURT:  I've reviewed everything.

15        MR. CRONKRIGHT:  Okay.

16      Your Honor, in regards to -- I'm just looking for some

17   guidance from the Court.  In regards to the loss of caretaker

18   support issue, I'm prepared to offer some brief testimony from

19   my client's wife about the impact aspect of that.  If the

20   Court would entertain that I would call her as a witness, and

21   I don't know if the Court wants to do that now.

22        THE COURT:  If you wish to, you may.  I will take a

23   proffer on that if you wish to do it that way.

24        MR. CRONKRIGHT:  By way of proffer, Your Honor, I, as

25   indicated in the brief, indicated that my client's wife offers

1    some support to the family, but it's certainly not adequate in

2    any way.  But I'm looking at the Cleveland Public Library

3    payroll report dated 8/1 of 2023 which indicates that my

4    client's wife's take-home pay year to date at that point,

5    that's 8/1, was $3,987.

6       I've also reviewed correspondence from her boss that

7    indicates that she has part-time work available to her but

8    she's continuously missing work because of her personal issues

9    and that she has some pretty severe psychological issues for

10   which she's under treatment.  And those psychological issues

11   make it so that she's essentially severely disabled and is

12   often unable just to get out of bed and go to work.

13      She's in treatment for that.  It's not responding well to

14   treatment.  And my client's income through his disability is

15   in jeopardy.  From this point on I'm assuming that he will not

16   be able to collect his disability.  He has both SSI --

17         THE COURT:  And it's your view and your representation

18   that both of the annuities or payments that he receives, both

19   the veterans and the disability, will be suspended?  Or what

20   exactly happens with respect to them?

21         MR. CRONKRIGHT:  Right.  I looked into that by looking

22   at the government's websites on those issues.  And my belief

23   is, based on what I have been able to determine, that he will

24   lose -- "suspended" is a good word -- that he will lose both

25   of those government payments as a result of his conviction

1    here if he's incarcerated.  Incarcerated seems to be the

2    pivotal issue according to the government website --

3            THE COURT:  And he loses it for the period of

4    incarceration?

5            MR. CRONKRIGHT:  Yes.

6            THE COURT:  Or is it -- he doesn't lose it permanently?

7            MR. CRONKRIGHT:  I believe he can apply to have both of

8    those reinstated at the point where he's no longer

9    incarcerated.  So I think "suspended" is the appropriate word.

10   He loses the full benefit for the period of incarceration,

11   after which he can try to get it back.  There's an application

12   process to get it back.

13           THE COURT:  All right.  If either the government or

14   probation has any different understanding at the conclusion of

15   Mr. Cronkright's presentation, I would like to hear it.

16       Go ahead.

17           MR. CRONKRIGHT:  All right.

18       So the rest of that story is that without the financial

19   support and without the normal household support that my

20   client is able to provide, Mrs. Padilla is essentially

21   dysfunctional.  And she is currently staying with a relative

22   who does demand rent, appropriately so, and has already made

23   the threat to evict her because of nonpayment of rent because

24   Mrs. Padilla is having a hard time paying the bills.

25       She has three children at home, as the Court knows from

1    reading the materials, and I think that a case can be made

2    that this is more than ordinary.  I think it's fair to say

3    that in every case where someone is a breadwinner that there's

4    going to be a loss of income if somebody goes to prison and

5    that's to be anticipated.

6        But I think we're looking at a fairly severe situation

7    where my client's looking forward in the very near future of

8    having a loss of her home.  Also, it's been pointed out to me

9    that there is a -- she lives in a remote area where she

10   requires transportation and she has a payment to make on her

11   car every month and if she loses that car she's going to be

12   without the ability even to get to work on the days where she

13   is functional.

14       So that is essentially my offer of proof, Your Honor, on

15   that standpoint.  I will say, in regards to this case, that,

16   as is often the case when we stand in front of the Court at

17   sentencing, that perspective is an important issue.  I note

18   with interest that the government makes arguments based on the

19   loss of reputation of the government internationally and so

20   forth.

21       And so I think that to the extent at least that the

22   argument is that somehow my client is responsible for the

23   actions of the mob that was there on January 6 in total, if

24   you will, even to the point where it's interfered with our

25   international relations and that other governments don't

1    respect us and so forth, I think that the Court should also,
2    if it's going to consider that type of input, the Court should
3    also consider that a departure based on the fact that my
4    client's contribution to that was probably pretty minimal in
5    terms of the extent of loss of reputation internationally and
6    so forth.

7        The Court's well aware of the fact that my client was a --
8    somewhat of a loner, that his social life seemed to be mostly
9    on the internet, that his planning of participating in the
10   January 6 events did not involve in any extensive way agreeing
11   or conspiring with others, that he came with very little
12   advance thought other than just to get in the car and come and
13   so forth.

14       And so he's participated in a large mob activity, which is
15   horrific, but he certainly is not operating on the level of
16   some of the cases we've seen where there were mass
17   conspiracies and group activities.  My client's not a part of
18   any organization like the Proud Boys or Oath Keepers or
19   anything like that.

20       So what we have is somebody that up until the point where
21   he foolishly picked up that flagpole and threw it in the
22   direction of the officers, had proportionally, in comparison
23   to some of the things that the Court is aware of that happened
24   that day, had engaged in relatively modest illegal activity if
25   I can say it that way.

1          THE COURT:  There's danger in saying it that way.

2          MR. CRONKRIGHT:  Well, I understand.  I would not

3    minimize anything that he did.  I think the pushing of the

4    barricades is serious, I think the throwing of the flagpole is

5    serious.  I think we have to acknowledge that.  And the Court

6    has clearly acknowledged that and my client will acknowledge

7    that.

8          But the Court witnessed what I witnessed during this trial,

9    which is the horrific scene at the tunnel and the horrible way

10   that the officers were treated and all of that.  And all I'm

11   saying is that taking my client's life in perspective is a

12   really good thing to do at this point.  The fact that he is a

13   veteran, the fact that he is a hundred percent disabled with

14   PTSD, the fact that he was a lone person in the mob and caught

15   up in the emotion of the events, the fact that he is the --

16   both the caretaker and the breadwinner, if you will, if you

17   can say that about somebody who is disabled, for his family, I

18   think all of those things are important to take into

19   consideration.

20         The incident with the flagpole is a horrible thing to do.

21   I fully acknowledge that, and I don't know any other way to

22   say it other than that.  But at the same time, I am even more

23   horrified by some of the things that were going on at the

24   tunnel at the same time.  And I have a lot of compassion for

25   the officers and I think the Court should as well, and I think

the Court will see that my client actually does too.  And when
he stands up to allocute I think he's going to address that.
I don't want to steal his thunder on that.

    I do want to say that another way of putting this
particular case and this particular sentencing into context is
to look at where did my client come from on the journey that
led him to January 6.  And when I delved into his
background -- which he doesn't like to talk about -- and the
abusive situation that he had as a child, I find that that's
very disturbing and very compelling and maybe speaks to the
issue of the PTSD, although I've previously thought that that
was mostly because of his military experiences.

    If you haven't been there, I think it's difficult to
understand the journey that my client had through life when he
grew up in a household where father was molesting
stepdaughters and so forth.  And all of that impacts your
world view, and it impacts your personality in ways that is
very difficult to quantify or even difficult for me to
articulate.

    Nonetheless, I think that it's pretty significant if you
look at just some of the basic facts that we put into the
sentencing memorandum, with his dad remarrying and him being
abused by his stepmom and confined to the basement and being
required to use the woods rather than the bathroom facilities
and so forth.  The fact that his mother was a drug addict who

1   basically at times just dropped him off and left him

2   uncared-for.  The background -- and I won't belabor it because

3   it's in writing and I put it there for the Court to consider,

4   the background itself makes this a difficult situation.

5       Mr. Padilla, the irony of the situation is that Mr. Padilla

6   looked at his own upbringing, and one of his life goals was to

7   do better with his children.  And look where that has led him

8   to now, where one would have to objectively say that he's

9   failed in that effort because he's been in jail waiting for

10  this moment for the last two years while his kids suffered as

11  a result of his own conduct.

12      That makes this a very sad story indeed.  And I'm not

13  saying that if you had a bad background you get to commit

14  crimes and not be held accountable.  I don't think that way.

15  I'm just saying this is a very difficult, compelling story,

16  and if we look at the fact that he didn't have good guidance

17  growing up, at least it is fair to say that the Court can

18  consider that when deciding whether that guidelines section --

19  or sentence is really appropriate in this case.

20      I have submitted in my brief essentially three arguments

21  for downward departures.  And one is what I've just mentioned,

22  that my client just didn't have the guidance that he needed as

23  a child, and that has impacted him in adverse ways, including

24  probably contributing to his PTSD.

25      The other is that this is going to be actually probably

1      more of a hardship on his family than it is on him.  And

2      that's a pretty compelling issue, that as long as he is

3      incarcerated, his family is going to be suffering severely.

4          And the last thing that I have suggested to the Court is

5      that the recidivism is a significant issue and the Court

6      should consider the fact that Mr. Padilla has gone this far

7      without committing crimes, and that's obviously reflected in

8      the guidelines already, that he has no criminal history.  But

9      the Court should have confidence that my client is not going

10     to commit crimes in the future.  There's no reason based on

11     his life to think that that is where the story goes.

12         It's difficult when you're at a sentencing and the

13     assertion is that the only reason that the defendant has taken

14     the positions that he's taken or is saying the things that

15     he's saying is because he doesn't want to face the

16     consequences.  That's kind of common to criminal defense, that

17     we hear those kind of assertions.  Certainly, when you have

18     somebody that's a drug addict and they get treatment and help,

19     then the assertion is you're only doing that because you don't

20     want to get a harsh sentence and so forth.

21         And I understand that that assertion can be levelled in a

22     case like this.  I would encourage the Court to listen to the

23     things that Mr. Padilla wants to say.  And we've already

24     submitted a letter, but my client still wants to address the

25     Court, and I know that you're going to give him the

1    opportunity to do that.  But I can at least say, as someone

2    who has spent a lot of time in the last two years with this

3    particular client, that I don't see it that way, that he is --

4    he's demonstrating remorse in order to avoid consequences and

5    so forth.  That's not the way that this looks from my

6    perspective.  And I certainly have seen that, where people's

7    only motivation is to avoid consequences.

8        My client has expressed that he is aware that the things

9    that he did were inappropriate, were wrong, were illegal and

10   were criminal and that he needs to be held accountable for

11   those things.  He has always been a supporter of law

12   enforcement and he freely acknowledges that his behavior on

13   January 6 doesn't reflect that.  And that troubles him.  And I

14   think you'll probably hear some of that coming out sort of

15   indirectly in the things he has to say to Your Honor.

16       I don't see avoidance of consequences as being the

17   significant driving factor for anything that my client is

18   asking of this court.  And I would just ask the Court to

19   consider that he is genuinely remorseful.  He's expressed that

20   to Probation, but I think more important the Court will see

21   that when it hears what he has to say today.

22       So with that, Your Honor, I would suggest to the Court that

23   even though I didn't in my written submission make a specific

24   request for a sentence, I would suggest to the Court that what

25   I'm arguing for is first a downward departure for the reasons

1    stated.  I would also say that my client has obviously been in

2    jail, like have many in January 6 defendants, for a very long

3    time now, well over two years at this point, and that he is

4    requesting, and I think it's an appropriate request, a period

5    of -- even if it's a substantial period of home confinement.

6    With that he could continue to support his family.

7        And I think the Court should also look at one other thing,

8    and that is the fact that he has an exemplary record.  By his

9    report to me, he has no misconducts of any kind while he's in

10   jail.  I haven't heard anything adversely said about his

11   behavior while he's been incarcerated.  I think he'll be a

12   model citizen while serving his sentence regardless of what

13   the sentence is, as he has been so far.

14       So a substantial period of home confinement would make it

15   so that the family doesn't suffer and I think it would meet

16   all the goals of sentencing including the 3553(a)

17   requirements.  Thank you, Your Honor.

18           THE COURT:  All right.  Thank you, Mr. Cronkright.  And

19   if Mr. Padilla would like to say something, I will be very

20   pleased to hear from him.

21       And I have read all the materials that have been submitted,

22   which include, Mr. Padilla, the handwritten letter.  It's a

23   two-and-a-half-page letter that was submitted.

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  Good afternoon.

1        THE DEFENDANT:  I just -- I want to thank you for the

2   time -- for giving me the time to make -- to speak like this.

3   First I want to apologize to Officers Beaver and Corado,

4   Sergeant Cropper, Sergeant Riley -- I believe that's his name.

5   It's been a while, but -- and also Detective Sergeant Akhtar.

6   And all the other law enforcement officers that responded to

7   the Capitol on January 6, 2021.  My actions that day were not

8   in keeping with my character.  And I deeply regret any harm

9   that I caused.

10      I let my anger at an election I felt was stolen override

11   the fact that these were just people trying to do a job, a

12   thankless job.  And they were trying to support their

13   families, a pressure that I'm well acquainted with.  I can

14   only ask for your forgiveness as nothing I can say or do will

15   take back the words, the actions, and anything else that

16   happened on that day.

17      I would also like to apologize to my wife, my children, and

18   all my family.  I've always strove to provide them with an

19   upright and honorable example, and my failure of character on

20   Jan 6 has inflicted grievous harm upon them and has placed

21   their safety and security in dire jeopardy.

22      I also tender my apologies to you, sir, and the court for

23   the necessity of my prosecution.  With the exception of a few

24   traffic violations, I have always been a law-abiding citizen

25   and I regret that I let a moment in the crowd encourage me to

1    act in such an abnormal manner.  I accept my responsibility in

2    this prosecution and know that I must be punished.

3        Now I'd like to address a few points that Mr. Brasher

4    highlighted in his sentencing request.  Mr. Brasher claims I

5    showed no remorse for my actions after January 6.  And I would

6    agree with him, but with qualifications.  In the immediate

7    aftermath of the events at the Capitol, I did not show any

8    remorse.  I was still emotionally charged from being in such a

9    historically momentous event.

10       And it doesn't matter if you look at that as a negative

11   event, like when Puerto Rican nationalists assaulted the House

12   floor in 1954 and killed several elected representatives, or

13   maybe in a more positive light such as in May 30, 2020, when

14   the White House was stormed and then-President Trump had to,

15   you know, retreat to the nuclear bunker.  It was still a

16   historically momentous event, and I had no reason to let

17   myself get caught up in that.

18       It wasn't until January 13, 2021, when a pair of FBI agents

19   knocked on my door, that cold water was dashed upon me.  When

20   they left, I realized the monstrous immensities of my actions.

21   Remorse is rarely immediate, sir.  When the emotions and

22   adrenaline waned after the FBI agents departed, I understood

23   the stress and fear my anger and violence placed upon the law

24   enforcement officers that responded to the Capitol.  I felt

25   remorse.

1    I know from my own experience what it's like to be

2    surrounded by hundreds of howling, agitated men who only need

3    the slimmest of excuses to resort to violence.  It made me

4    feel remorse.  Nobody deserved to experience what I forced

5    them to experience.  When I realized the terrible physical and

6    emotional stress the consequences of my actions on the 6th

7    would cause my family, I felt remorse.

8    When I learned my actions would place my family on the edge

9    of homelessness and poverty, I felt remorse and torturous

10   self-hate.  I felt remorse then, and I continue to feel it.

11   The only way I can prove to you that these are not just words

12   written on paper but are truth is my actions over 920 days of

13   confinement.

14   As my PSR noted, I have a GiveSendGo set up in my name.

15   Some January 6 defendants have received hundreds of thousands

16   of dollars in donations by portraying themselves as political

17   martyrs being persecuted by establishment politicians, or as a

18   righteous patriot pressing forward against nefarious forces.

19   I don't do any of that.  I rarely give interviews.  I've

20   given one, and it was more for the conditions that we were

21   living in, which I gave to refute some of the stories that

22   were coming around about us being tortured.  They -- there's

23   people that -- they're grifters, Your Honor.

24   But I can't -- my remorse at my actions that night, I can't

25   raise money off of my actions that day, knowing that I caused

the harms I caused, even if it will mean financial security
for my family.

Regarding the need for deterrence and to promote the safety
of the public, Mr. Brasher points to many of the statements I
made online, such as my belief that a horrible civil war is
near, my desire for more mass protests similar to Jan 6, and
even my rhetoric of resorting to the cartridge box, as threats
of continued violence.

While I understand why Mr. Brasher limited his search to
posts made after November 3, 2020, if he had looked at all my
entire post history across my adult life on the internet, he
would have found many posts echoing similar rhetoric as far
back as the year 2000 when the election was stolen from Al
Gore by George W. Bush.  Yet where is the action that makes
these true threats?

I will not deny I interrupted the electoral certification
on Jan 6, yet in all my years of revolutionary rhetoric, I've
never even owned a gun.  Even though I repeatedly posted that
Jan 6 was our only chance to make a political change, I didn't
bring any weapons or even a gas mask.  I didn't own, carry, or
attempt to purchase a firearm, ammunition, or any other
accoutrements of war.  I didn't join any militias or extremist
groups.

I did interrupt the electoral certification, but to
intimate that I intend to carry out a continuing armed

1   rebellion against the government if I don't receive a lengthy

2   term of imprisonment is a gross exaggeration, especially as

3   there's never been any attempt on my part to make myself

4   remotely capable of carrying out those threats.

5        Now, I know it's been mentioned I had a very terrible

6   upbringing.  The driving force in my life, sir, is my family.

7   I never should have done what I did on Jan 6.  My family is in

8   extreme jeopardy now.  If I have to be punished, I expect to

9   be punished.  However, transferring the punishment from myself

10  to my family, it's not fair, it's not just.  They -- my family

11  is my only reason for living.  I live for them.  They're my

12  reason to wake up every day.  They're my reason that I love

13  them because I want them to experience the joy and the love,

14  the warmth that I never got.

15       My actions have placed my family on the verge of

16  homelessness, mental and emotional breakdown, and insecurity.

17  My desire to never inflict such harm on my family again will

18  deter me from future lawlessness, sir.

19       As for engendering respect for law and law enforcement, I

20  can only point to my life both before and after January 6.

21  Before January 6 I spent every day of my 40 years as a

22  law-abiding citizen, minus a couple of traffic violations.  I

23  don't think there's anybody that goes through life without

24  running a stop sign or speeding.

25       After Jan 6, I continued as a law-abiding citizen.  When I

became aware that I was under investigation, I was respectful
to the FBI agents.  I did not attempt to flee, destroy
evidence, delete my social media or anything else.  When I was
arrested, I was respectful and courteous despite the
militaristic raid and the fact that I was in the freezing cold
in my underwear.  When I was brought down to the city police
station to be interrogated, I was polite and respectful.

Since my detention I've been respectful and compliant with
every correctional officer I've encountered, despite some who
blatantly engaged in racial provocation.  In my 920 days of
detention I've received no disciplinary actions.

My detention has also given me time to consider many things
about my religious beliefs and made me realize that I had been
ignoring my God's admonishment that we should tolerate the
leaders placed above us because they've been placed there for
a reason.

I'd like to speak directly to Mr. Brasher here and his
co-counsel.  I know and understand that it's your job to paint
me in an extremely unfavorable light, and I've given you
wonderful, wonderful material to work with.  But I forgive you
for it.  It's your job and it's what needs to be done.

Finally, Your Honor, I'd like to address you personally.
While I won't deny that I've been disappointed by some of your
decisions, I feel you've been very fair and you've rendered a
just verdict.  I ask you to hear me with a merciful heart,

sir.  I stand before you now penitent, remorseful, and with my family facing a chasm they're incapable of leaving.

My family faces homelessness, the loss of my VA and Social Security benefits that have provided my family with the kind of stability that I never had.  They face bearing the full burden of my punishment.  I don't say this in an attempt to avoid punishment.  I've been found guilty of crimes, and I deserve to be punished, and I must be punished.

However, confining me in prison will deprive my family of the benefits I've received through honorable service to this nation in a time of war.  Without these benefits, my wife will not be able to provide for our children the safe and stable housing that they've known, even with government assistance.

My wife's mental health is in tatters, sir.  And her serious mental illness has impaired her ability to work a job in a schedule that will allow her to provide for my family.  She's also at the risk of losing our sole source of reliable transportation.  Here in the DMV, not having a vehicle isn't a large obstacle of life.  My family, however, resides in the ridges of the Appalachian mountains in East Tennessee. Government services are poor and few, and the waiting list for public housing is measured in years, not months.

My family resides more than 40 miles from the nearest large city and more than 30 miles from my wife's place of employment.  If she were to lose her only reliable source of

1    transportation, it would leave her literally stranded in the

2    mountains, and that would ensure a swift descent into

3    homelessness and the kind of bone-grinding poverty that exists

4    only in Appalachia, sir.  It's hard to describe if you've

5    never seen it.

6        This transfer of punishment is contrary to justice.  I ask

7    you, sir, to consider a lengthy term of home confinement as my

8    sentence.  Imposition of home confinement will allow me to

9    keep my benefits and keep my family from extreme financial

10   distress that is much more than the pain ordinarily

11   accompanying confinement.

12       The home my wife lives in now only has slightly better

13   amenities than I enjoy at the wonderful DC CTF.  However, I'm

14   sure the company and the food will be much better.  I ask this

15   mercy on you, sir:  Reunite me with my family.  I assure you

16   that if you grant me this chance, I'll focus only on carrying

17   for my family.

18       I've got plans, Your Honor.  I plan on building a small

19   farm.  And, you know, the inflation of the last few years, I

20   know I didn't experience it personally, being here in

21   confinement, but it's made me realize the importance of food

22   and how much it means to know that you're never going to have

23   to worry about opening the fridge and wondering what you're

24   going to eat.

25       And I want to provide my family with that life, with food

1    always in the fridge.  All my family, not just my immediate

2    family, my friends, my community.  I just want to build a

3    small farm and forget about politics, forget about the rest of

4    the world, honestly.  It's -- the pain I've inflicted on

5    others, my family and myself, it's not worth it to get caught

6    up in politics like I was.

7        I apologize for my actions once again, and I beg for your

8    mercy, sir.  Thank you.

9        THE COURT:  All right.  Thank you, Mr. Padilla.

10       All right.  We've been going on for a while, but we need to

11   go on for a little while longer as I perform my responsibility

12   of imposing sentence.  Let me make a few preliminary comments

13   and then I'm going to ask Mr. Padilla and Mr. Cronkright to

14   come back up to the lectern.  But first I'll say these things.

15       I've received much material, the presentence investigation

16   report, memoranda from each side, including supplemental

17   memoranda, exhibits, attachments, and of course the exhibits

18   relating to the trial as well.  And I've reviewed all of that

19   relevant material.

20       There is an issue of restitution here.  There is authority

21   for restitution.  It's found in §§ 3663 and 3663A of Title 18.

22   Mr. Padilla was part of the mob that caused upwards of $3

23   million of damages now, as calculated, to the Capitol and the

24   grounds, and costs and losses associated with the events of

25   January 6.  And as other judges and I have done in other

1    cases, I will find that the defendant's criminal conduct was a

2    cause of that loss.  And that's a loss to an identified

3    victim, the Architect of the Capitol responsible for the

4    maintenance and care of the Capitol.  And I will therefore

5    apportion restitution with respect to the defendant and impose

6    an award of $2,000 of restitution for these offenses and his

7    conduct on January 6.

8        With respect to a fine, I find that there is an inability

9    to pay a fine in addition to that restitution.  I will not

10   impose a fine in this case, particularly given the defendant's

11   family circumstances and conditions.

12       So I'm now going to impose the sentence.  I'm going to

13   indicate the sentence to be imposed and the rationale for it,

14   and in doing so I would ask Mr. Padilla and Mr. Cronkright to

15   come back up to the lectern, which is where I like you to be

16   while I'm imposing sentence, as this is a very serious matter

17   that needs to be taken seriously and we will do so here.

18       MR. BRASHER:  Your Honor, if I may, the Court had

19   indicated it might want to hear additional information about

20   the VA benefits and --

21       THE COURT:  Oh, did you have something that you wanted

22   to add?

23       MR. BRASHER:  We did find some information --

24       THE COURT:  Why don't you step aside for a moment,

25   Mr. Padilla, and let Mr. Brasher have the lectern for that

1    purpose.

2         MR. BRASHER:  We did find some information from a VA

3    website, VAbenefits.gov, and then I believe the probation

4    officer sent us similar information that basically indicates

5    that if a sentence is more than 60 days, that the payments

6    will be suspended but that they can -- the dependents can file

7    a request to have those payments be made to them instead.  And

8    then once the period of incarceration is over, there's some

9    process to have them go back to the name of the individual.

10        Similarly, as to Social Security, I'm not sure exactly how

11   the process works but at least my understanding is, based on

12   this, that the benefits can be paid to -- at least the VA

13   benefits can be paid to the spouse and family.

14        THE COURT:  The VA but you don't know about --

15        MR. BRASHER:  I'm not certain about the Social

16   Security, and probation might be the best person to ask on

17   that.  I'm sure they face it more often than I do.

18        But I would say that in any event at sentencing the burden

19   is on the defendant to meet this requirement by a

20   preponderance of the evidence, and that has not been met, is

21   our position.  So I'll leave it with that.

22        THE COURT:  I appreciate that, Mr. Brasher.  Does

23   probation have any additional or different information?

24        PROBATION OFFICER:  Thank you, Your Honor.  No.  With

25   regards to the Veterans Affairs benefits, I found the similar

1    information that the government just presented, and I don't

2    have additional information regarding Social Security

3    benefits, Your Honor.   Thank you.

4        THE COURT:   All right.   What I would ask -- I

5    appreciate that.   What I would ask is that you talk to

6    Mr. Cronkright after this and make sure you've passed on to

7    him whatever information you have so that he can make sure

8    that Mr. Padilla's family is aware of whatever information.

9        MR. CRONKRIGHT:   Your Honor, Ms. Padilla is trying

10   desperately to get my attention.   Can I just have a quick

11   conference with her?

12       THE COURT:   Sure.   Sure.

13     (Defense conferring.)

14       MR. CRONKRIGHT:   If I may, Your Honor, just sort of

15   reopen my offer of proof, Ms. Padilla is informing me that she

16   has inquired and that it takes -- for the family to apply for

17   those benefits, the process itself is difficult and that it

18   takes about a year to get that reinstated.   So she would be

19   anticipating at a minimum a year without the benefit of those

20   two benefits that we talked about, if she made family

21   applications instead of receiving the direct benefit.

22       THE COURT:   All right.   Well, it is what it is, I

23   guess.   It sounds a little harsh to say that, but I don't

24   control those processes, obviously.

25     All right.   Mr. Padilla, back up to the lectern, if you

1    would, please.

2        (Defendant complies.)

3        So I'm going to indicate the sentence and the rationale for

4    it.  I'll only go through it once but I'll give counsel an

5    opportunity to make any final legal objections before I

6    formally impose the sentence.

7        We have to start at the same place that I and the other

8    judges of this court start, and that is with the conduct that

9    is at issue here.  It's extremely serious.  It's an assault on

10   precious democratic values and institutions, including, as

11   Mr. Brasher I believe said, an iconic symbol of our democracy,

12   the United States Capitol.

13       And it was an attempt to prevent the peaceful, smooth

14   transition of political power from one presidential

15   administration to another, and that is a hallmark of our

16   democracy and something the United States has long been

17   admired for.  And, of course, that's consistent with the

18   observations Mr. Brasher made from an email received from one

19   of his students.

20       It does represent, the events of January 6, a real and

21   perhaps indelible stain on our country.  And, in addition to

22   that, it caused scores of injuries, deaths, and millions of

23   dollars of damages.

24       The defendant was a major player.  I don't think there's

25   any other way to describe it.  He was among the most

1    aggressive rioters at the barricades.  It doesn't mean that he

2    did some of the most aggressive things that some others did,

3    or that he had the most sophisticated planning.  I'm not

4    saying that.  But at the barricades, he was one of the most

5    aggressive rioters that law enforcement had to deal with.

6        And he has some troublesome social media that you can't

7    ignore.

8        On the other hand, he certainly has a difficult upbringing

9    that he experienced, although as Mr. Brasher pointed out,

10   unlike some other settings, it's an upbringing that is in

11   large part unrelated to the type of conduct we're dealing with

12   here.  But he had no prior contact with the criminal justice

13   system.

14       He's a man with significant family responsibilities that he

15   has historically fulfilled.  He has community and family

16   support, some of it indicated by those who are here today.

17   And he is an honorably discharged veteran.  And all of that is

18   important for the Court to be mindful of as it decides on the

19   appropriate sentence here.

20       But I have to be mindful of the conduct as well.  And in

21   advance of January 6 Mr. Padilla posted comments about his

22   desire to participate in a violent revolution, which would

23   include occupying the Capitol building.  He said things such

24   as "My final line is Biden holding up his hand at his

25   inauguration.  After that it's the cartridge box for me."  And

1    that sounds pretty serious.  He also said a similar thing a

2    few days later, saying that he would have to resort to the

3    cartridge box.

4        In November, again, he posted a plan about abducting

5    President Biden and Vice President Harris on inauguration day,

6    taking them to the Capitol building for an emergency joint

7    session of Congress.

8        All of this is very concerning rhetoric and communication.

9    And he said, "I fully expect if it goes the way I think it

10   will go, there will be pepper spray deployed en masse.  We're

11   going there to surround the Capitol and let the politicians

12   there know what exactly will happen to them if they vote to

13   allow fraudulently assigned electors to vote.  Make sure you

14   bring rope."

15       That's an ambiguous statement that can be taken one of two

16   ways, neither of which is particularly good, one of which is

17   particularly bad.

18       He posted plans to take over the Capitol building on

19   January 6, saying "We've gotta do it on the 6th or never at

20   all.  We have to take over the Capitol building, immediately

21   pass acts dissolving the current legislative body and fill the

22   places with uncompromising patriots from among those of us

23   there."

24       A few days later said "Take the seat of power, the Capitol

25   building, and dissolve the currently seated legislative body.

1    Dissolve our government and appoint new members to the

2    legislature made up of patriots present on the 6th.  We have

3    to take over the seat of power of the Capitol building."  This

4    is all in the weeks immediately preceding January 6.

5        In the two days preceding January 6 he posts, "I fully plan

6    to incite people to storm the Capitol building, and we need to

7    take and occupy the Capitol building."  So there's no real

8    doubt about why he was there.

9        When there, as Mr. Padilla got closer to the barricade, he

10   called the officers traitors and oath breakers.  The officers

11   pushed him backwards to stop him from grabbing onto a bicycle

12   rack and trying to breach the police line.  He threatened

13   officers, he told them that the rioters were going to trample

14   them.  He stood in the officers' way as they attempted to move

15   a barricade.  He grabbed the barricade, he violently pushed it

16   against the officers.

17       And while there, he of course wore the N95 style mask.  At

18   least he started to wear it when chemical irritants were

19   deployed.  And he had a set of scuba goggles or ski goggles on

20   as well.

21       That's not the end of it.  He continued to push against the

22   officers at the barricade.  They rebuffed him.  They pushed

23   him to the ground.  When he stood back up, they had to deploy

24   chemical spray against him.

25       And while he said that the violent rhetoric isn't what he's

1    really like, one has to view it in context with the things

2    that he said.  And he cited the Declaration of Independence in

3    an angry tirade on the West Plaza, as he had done before

4    January 6, and as he would do in the days immediately after

5    January 6.

6        He was clear in telling the officers he wasn't going to

7    stop.  He screamed for his fellow rioters to "push, push,

8    fucking push," and push the barricade into Sergeant Cropper

9    and into other officers, turned towards the crowd,

10   disappointed that more of them were not helping him and

11   telling them that they were "fucking cowards."

12       He indicated that he believed the true patriots like

13   himself were those who were pushing through the rails and

14   stairs and into the doors of the Capitol building.

15       Later, a few minutes later, he draped his arms over the

16   barricade as an officer attempted to push him away and he

17   would not move.  He resisted and resisted and resisted.  He

18   pushed into the barricade, assisted ultimately by other

19   rioters, and officers had to spend more than a minute fighting

20   back against him and others at the barricades.  And eventually

21   they broke through the line of officers at the barricades

22   where Mr. Padilla was engaging.

23       He went down, pursuing the officers basically into the

24   tunnel, with a crowd of other rioters, describing in a message

25   to his wife that this is not a rally anymore, it's a

revolution.  When he stood at the tunnel with maybe a dozen
other rioters, they began to attack the officers with several
different objects, throwing objects at the officers.  And that
was where he lined himself up, held a flagpole, cocked back in
his right hand, and threw it at the police officers.  It
struck one of the officers in the head.  The officer had a
helmet on.  So there was no real injury to the officer, which
for the officer and now for Mr. Padilla is fortunate.

He later bragged about this conduct and admitted that his
goal had been to interfere with the certification of the
election, saying "We would have occupied the Capitol if some
asshole hadn't stalled our momentum after we pushed the cops
into the main hallway."

He even went beyond the certification and admitted that he
intended to destroy the existing government:  "We were
attempting," he said, "to destroy the republic by dissolving
the legislature and convening a constitutional convention of
the people."

There's been some discussion here today about Mr. Padilla's
trial testimony.  And I'm not saying that it was all
untruthful.  I don't think that or believe that.  But he did
testify untruthfully in my view.  And particularly we're
talking about the throwing of the flagpole.

He testified that he wasn't trying to strike an officer,
said he was aiming for a rioter who had bent down to pick up

1    something.  I found at the trial that this version of events

2    was simply not credible, and I noted that Mr. Padilla watched

3    for minutes as other rioters violently attacked the police

4    line and stood nearby as an officer was swarmed by a group of

5    rioters, but he did nothing.

6        And even though he says that he saw the particular rioter

7    bend down to pick up something, the video really showed him

8    turned away from the other rioter when that happened, and it

9    also showed Mr. Padilla cocking back that flagpole in a

10   throwing position before the rioter even began to walk.

11       So I did not credit his testimony that he had intended to

12   only follow legal process, and I did not credit his testimony

13   with respect to why he and at whom he threw the flagpole.

14   That was against the video evidence at trial.

15       Extremely serious conduct.  I think that goes without

16   saying, but I have said it more than once now.  Aggressive,

17   persistent, dangerous.  He was convicted on 10 counts,

18   acquitted on one but convicted on 10.  Several very serious

19   felonies.  And he in my judgment testified untruthfully on

20   some subjects, at least.

21       I simply can't erase the magnitude of his involvement in

22   the riot on January 6 and his professed willingness to engage

23   in violent conduct at the Capitol, specifically at the

24   Capitol, as he then wound up doing, and particularly the

25   launching of a flagpole at police officers doing their lawful

duty.

So we wind up with a sentencing guideline range that is very high.  It's 135 to 168 months in the Court's calculation.  The government is asking for a sentence at the top of that guideline.  They've asked for slightly above, but with my calculation of the guideline, I think it's fair to say that they're asking for a sentence at the top of the guideline of 168 months.

The probation office has recommended a sentence at the low end of the guidelines, 135 months.  And the defendant is seeking a very significant variance from that guideline range, down to -- the request as I read it is a sentence of time served with a period of home confinement as a condition of supervision.

Now, the defendant was raised in a dysfunctional family.  He's experienced a fair amount of trauma related to his upbringing, and I take account of that.  He has a supportive family that is very dependent on him, and I take account of that.  And that is consistent with the caretaking responsibility that is recognized as one of the provisions of the guidelines.

He has a distinguished military career with a disability rating of 100 percent.  I will note that his military career was distinguished.  I give him full credit for that.  But there's always another side to the military history issue, and

that is that as a member of our military, you took an oath to
the Constitution, to uphold the Constitution, and in my
assessment the conduct that you engaged in on January 6 was
not consistent with that oath that you had taken as a member
of the military.  So it cuts both ways.

Acceptance of responsibility and remorse.  This is a
difficult issue for this case because I think that there is
some genuine expression of remorse that I'm hearing from you,
Mr. Padilla.  But it's awfully late in the game, and it's hard
to accept it as a full expression of remorse and hard to
accept your perspective and view as a full acceptance of
responsibility.

Certainly, on January 6 and thereafter, or shortly
thereafter, you did not accept responsibility, you did not
show remorse, you expressed yourself inconsistent with either
of those concepts.  But I do think that you're coming around,
and therefore I do give you a little bit of credit there, not
full credit but a little bit of credit for seemingly starting
to see the error of your ways.  And I think there's some
sincerity to how you're feeling and how you're expressing it
even here today and even to the officers who were so unjustly
and criminally treated by you and others on January 6.

So, taking account of all those things, some of which cut
one way, some of which cut another way, I've concluded -- and
I do want to say that your wife's situation is of great

1    concern.  It's obviously of concern to you.  It's of concern
2    to me.  It should be of concern to the community generally
3    because we don't want to see someone put in the difficult
4    situation that she obviously will be put in, has been already
5    with your incarceration, and will be from any further
6    incarceration.

7        And the issue of benefits is an important one.  I hope that
8    that can be resolved at whatever time appropriately and to her
9    benefit.  But I don't have any control over that, and we don't
10   have -- as Mr. Brasher has indicated, we don't have a clear
11   picture on that right now.

12       I have to say that the point that you made, Mr. Padilla,
13   which I've heard in other contexts, not just January 6 cases,
14   a plea in effect not to transfer punishment from you to your
15   family members.  I understand that, and I feel for you and
16   your family in that situation.  But it is not the criminal
17   justice system that is responsible for that.  It is not the
18   Court that is responsible for that.

19           THE DEFENDANT:  I understand, sir.  Yeah.

20           THE COURT:  It is you that is responsible for that.
21   And I know that's a hard thing to say, but that is the truth.
22   And that is what happens in criminal cases with regularity.
23   It is not just the defendant and the victims, but also the
24   immediate family of the defendant that suffer from the conduct
25   that a defendant engages in that is found to be criminal and

1    results in a sentence.  And while we can all have genuine

2    feelings about that, I can't say that it's the criminal

3    justice system that caused that.  I have to look at the person

4    standing before me primarily.

5        So, in any event, I've concluded that a sentence well below

6    the guideline range is the appropriate sentence.  I've looked

7    at other cases.  Your conduct is very serious, but it does not

8    warrant a sentence of 14 years, which is what the government

9    is requesting, or a sentence of almost 12 years, which is what

10   the guidelines at the low end would call for.

11       Instead, I believe that a sentence of about half of the

12   middle of the guidelines is sufficient but not greater than

13   necessary to advance all of the purposes that are set out in

14   § 3553(a) of Title 18.  And that will be a sentence of six and

15   a half years, 78 months, with credit for time served.

16       That sentence is in my judgment one that takes fully and

17   fairly into account the nature and circumstances of your

18   offense, and the history and characteristics that you have

19   shown.  It is a sentence that is significant and will keep you

20   incarcerated for many, many months yet to come, and it will

21   promote respect for the law, which I think is important here,

22   as well as deterring any future conduct by you in violation of

23   the law, as well as deterring future conduct by others in the

24   future in violation of the law, particularly conduct of this

25   sort.

1       It will, in my judgment, also avoid any unwarranted

2  sentence disparities.  And I've looked at the cases.  Cases --

3  you can find cases above and below that sentence for

4  circumstances that are similar to what we have here.  You

5  don't find exact parallels.  But looking at them in total, I

6  believe that a sentence as I have imposed is one that will

7  avoid any unwarranted sentence disparities.

8       And a sentence of time served with a period of home

9  confinement would not do so.  I believe that would be a

10  disparate sentence and it is not a sentence that I am prepared

11  to impose in this case.

12       So now I'm going to read the sentence to be imposed:

13       Pursuant to the Sentencing Reform Act of 1984, and in

14  consideration of the provisions of 18 U.S.C. § 3553 as well as

15  the advisory sentencing guidelines, it is the judgment of the

16  Court that you, Joseph Lino Padilla, are hereby committed to

17  the custody of the Bureau of Prisons for an aggregate term of

18  imprisonment of 78 months -- that is six and a half years --

19  which consists of concurrent terms of 78 months as to each of

20  Counts 4 and 6, 78 months on Count 1, 60 months on Counts 3

21  and 5, 78 months on Counts 7, 8, and 9, and six months on

22  Counts 10 and 11.

23       And again, those sentences are all to be served

24  concurrently, so there's an aggregate total sentence of 78

25  months.

1   You are further sentenced to serve a 24-month, that is

2   two-year term of supervised release as to each of Counts 1, 3,

3   4, 5, 6, 7, 8 and 9, with such terms to run concurrently.

4   In addition you are ordered to pay a special assessment of

5   $820, in accordance with 18 U.S.C. § 3013.  While on

6   supervision, you shall abide by the following mandatory

7   conditions, as well as all discretionary conditions

8   recommended by the probation office in Part D, sentencing

9   options, of the presentence report, which are imposed to

10   establish the basic expectations for your conduct while on

11   supervision.

12   The mandatory conditions include that you must not commit

13   another federal, state or local crime, you must not unlawfully

14   possess a controlled substance, you must refrain from any

15   unlawful use of a controlled substance.  You must submit to

16   one drug test within 15 days of placement on supervision and

17   at least two periodic drug tests thereafter as determined by

18   the Court.  You must cooperate in the collection of DNA as

19   directed by the probation officer.  And you must make

20   restitution in accordance with Title 18 of the U.S. Code §§

21   3663 and 3663A or any other statute authorizing a sentence of

22   restitution.

23   You shall comply with the following special conditions:

24   You must participate in a mental health treatment program and

25   follow the rules and regulations of that program.  The

1    probation officer, in consultation with the treatment

2    provider, will supervise your participation in the program.

3    You must provide the probation officer access to any requested

4    financial information and authorize the release of any

5    financial information.  The probation officer may share

6    financial information with the United States Attorney's

7    Office.

8        You must not incur new credit charges or open additional

9    lines of credit without the approval of the probation office.

10        Within 45 days of release from incarceration you will

11    appear before the Court for a reentry progress hearing.  The

12    United States Probation Office in the district in which you

13    are supervised will submit a progress report to the Court

14    within 30 days of the commencement of supervision.  Upon

15    release of the progress report, the Court will determine if

16    your appearance here is actually required.

17        The Court finds that you do not have the ability to pay a

18    fine and therefore waives imposition of a fine in this case.

19    Restitution payments shall be made to the Clerk of the Court

20    for the United States District Court, District of Columbia,

21    for disbursement to the Architect of the Capitol at the

22    address here in Washington, D.C., and the restitution amount

23    imposed is $2,000.

24        Financial obligations are immediately payable to the Clerk

25    of the Court for the U.S. District Court, at the address here

1    in Washington.  Within 30 days of any change of address you

2    shall notify the Clerk of the Court of the change until such

3    time as the financial obligation is paid in full.

4        The probation office shall release the presentence

5    investigation report to all appropriate agencies.  That

6    includes the United States Probation Office in the approved

7    district of residence, in order to execute the sentence of the

8    Court.  Treatment agencies shall return the presentence report

9    to the probation office upon the defendant's completion or

10   termination from treatment.

11       Now, Mr. Padilla, you do have a right to appeal.  You were

12   convicted after a bench trial by this court and you have the

13   right to appeal your conviction, and you also have the right

14   to appeal the sentence that I have imposed.  You have the

15   right to apply for leave to appeal in forma pauperis, which

16   basically means free of cost, and if you were to so request

17   and qualify, the Clerk of the Court would prepare and file a

18   notice of appeal on your behalf.  Although I note that you

19   have very able counsel who is representing you here today and

20   he would presumably assist you in that process if you wished

21   to follow it.

22       With few exceptions, any notice of appeal must be filed

23   within 14 days of the entry of judgment.  I expect that

24   judgment will be entered perhaps tomorrow or perhaps not until

25   Friday.

1          With that, let me ask counsel whether they have -- or know

2     of any reason other than reasons that have already been argued

3     here today and stated here in court today why the sentence

4     should not be imposed as I have just indicated.

5     Mr. Cronkright.

6              MR. CRONKRIGHT:  Not at this time, Your Honor.

7              THE COURT:  Mr. Brasher.

8              MR. BRASHER:  Not from the government.  Thank you.

9              THE COURT:  Is there anything else we need to cover

10    before I impose the sentence?  There are no counts to be

11    dismissed.  Was this an original indictment or were there

12    earlier indictments?

13             MR. BRASHER:  There were earlier indictments.  I

14    believe this was the second superseding indictment.

15             THE COURT:  So all the earlier indictment counts will

16    be dismissed and the conviction has been on this final

17    indictment.

18         And Mr. Cronkright, is there any request that you wish to

19    make with respect to a place of incarceration, programs, etc.

20             MR. CRONKRIGHT:  Not at this time.

21             THE COURT:  All right.  I order that the sentence is

22    imposed as I have stated it.  That is the sentence of the

23    Court and the defendant will be remanded to the custody of the

24    marshal for the completion of the sentence that has been

25    imposed.

1    And of course I will repeat that you will receive -- it's

2    up to the Bureau of Prisons to do this, but my recommendation

3    as included in the judgment -- and I have no doubt that it

4    will be followed -- is that you will receive full credit for

5    the time that you have been incarcerated already, which runs

6    from I believe February 23, 2021, when you were arrested.

7    So with that, I will say simply in closing that all

8    sentencings are difficult, and this one is no exception.  And

9    many sentencings wind up with some dissatisfaction on both

10   sides.  For the government perhaps in this case, given what it

11   has requested, for law enforcement officers who were affected

12   by the events on January 6, given the significant impact on

13   them that that day had, and conversely, for you and your

14   family.  But this is the sentence of the Court, and I believe

15   it is a just sentence that reflects the egregious conduct you

16   engaged in on January 6.

17   With that, these proceedings are completed.

18   THE DEFENDANT:  Sir, may I hug my wife and my kids

19   before I step out?  I've seen them for one hour in two and a

20   half years.

21   THE COURT:  That judgment is up to the United States

22   marshals.  If they will permit you to do that, I will allow

23   it.  But it is a judgment that is up to them, not up to me.

24   All right.  That completes these proceedings.  And I will

25   say to Mr. Padilla's family and supporters, that he will need

1    your support in the future, and you will need to be there for

2    him in the coming months and years as you've been there for

3    him today.  And I welcome your attendance here today, and I

4    urge you to continue your support of him in the difficult days

5    ahead.  Thank you all.

6        That completes this proceeding.  I'm going to take a brief

7    break for the court reporter and staff, and then we have a

8    short, I think, sentencing to complete when we return.  So

9    I'll give everybody 10 minutes and we'll be back.  Thank you.

10       (Proceedings adjourned at 4:47 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne