<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
      UNITED STATES OF AMERICA,        )  Criminal Action
 3                                      )  No. 1:21-CR-214
                        Plaintiff,      )
 4                                      )  **BENCH TRIAL**
      vs.                               )
 5                                      )  Washington, D.C.
      JOSEPH LINO PADILLA,              )  **May 3, 2023**
 6                                      )  **Time:  10:08 A.M.**
                        Defendant.      )
 7    _____

 8             **TRANSCRIPT OF BENCH TRIAL - DAY 3**
              BEFORE THE HONORABLE JUDGE JOHN D. BATES
 9                 UNITED STATES DISTRICT JUDGE
      _____
10

11                    A P P E A R A N C E S

12    For Plaintiff:          DOUGLAS BURTON BRASHER
                              U.S. ATTORNEY'S OFFICE FOR
13                            THE NORTHERN DISTRICT OF TEXAS
                              1100 Commerce Street, Third Floor
14                            Dallas, TX 75242

15                            ANDREW HAAG
                              U.S. ATTORNEY'S OFFICE FOR D.C.
16                            601 D Street NW
                              Washington, DC 20530
17

18    For Defendant:          MICHAEL J. CRONKRIGHT
                              CRONKRIGHT LAW, PLLC
19                            4601 West Saginaw Highway, Suite J2A
                              Lansing, MI 48917
20

21

22    Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
                              Official Court Reporter
23                            United States Courthouse, Room 6714
                              333 Constitution Avenue, NW
24                            Washington, DC  20001
                              202-354-3246
25
</pre>

1                               I N D E X

2    **CLOSING ARGUMENT**                                      **PAGE**

3         By Mr. Brasher                                        464

4         By Mr. Cronkright                                     484

5         By Mr. Haag                                           510

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S
 2           THE COURTROOM DEPUTY:  Your Honor, we have Criminal
 3    Action 21-214, United States of America v. Joseph Padilla, and
 4    all counsel are present.
 5           THE COURT:  All right.  We're here for closing
 6    arguments, and I'll hear from the government first, and then
 7    from Mr. Cronkright for the defendant, and then a brief
 8    rebuttal by the government, time warranted.
 9           So, Mr. Brasher.
10           MR. BRASHER:  Thank you, Your Honor.
11           Jose Padilla would like you to believe that he's a
12    patriot, that he loves America and loves democracy.  He might
13    even believe that still himself, after everything, after all
14    the damage that he and other January 6th rioters caused.
15           But there's nothing patriotic about the defendant's
16    actions that day.  There's nothing patriotic about violently
17    attacking police officers, officers like Sergeant Jayson
18    Cropper, Detective Sergeant Owais Akhtar, Sergeant Paul Riley,
19    and Officer Oscar Corado; officers who devote their lives to
20    upholding the rule of law, laws that the defendant broke
21    repeatedly, over and over again.
22           These are people who have dedicated their lives to
23    protecting the highest ranking Members of Congress and average
24    ordinary citizens.  On January 6th, 2021, those officers and
25    many, many others had a vital job.  They needed to protect the
```

1    Capitol and secure -- secure it so that Congress could meet

2    inside and certify the Electoral College vote.

3        On January 6th, 2021, Jose Padilla didn't back the

4    blue.  He ignored the physical barriers they set up; he ignored

5    their warnings and ignored their commands to get back.

6    Instead, he attacked them.  He pushed bike racks against them;

7    he pushed a large metal sign into their chests like a battering

8    ram; and he threw a flagpole like a spear at their heads.

9        But most of all, he tried to get past them.  He tried

10   to get past these officers into the Capitol so that he could

11   achieve by force what he could not do by voting -- block the

12   certification, abolish the legislature, and keep the former

13   President in power.

14       Your Honor, the very core of America, the central

15   tenet of democracy is that we settle our differences at the

16   ballot box.  True American patriots are those who choose

17   country over party and go along with a peaceful transfer of

18   power to someone they didn't vote for.  They don't storm the

19   Capitol; they don't join a mob; and they don't attack the

20   police; and they don't threaten to resort to the cartridge box.

21       The defendant tried to achieve his political goals by

22   brute force and by taking otherwise peaceful objects and

23   converting them into dangerous weapons that he used against the

24   police.  That's not patriotic.  It's criminal.  And the

25   testimony and evidence presented in this trial leaves no doubt

1  that the defendant is guilty of all 11 counts charged against

2  him.

3         I'm going to review starting with Count 6,

4  obstruction of an official proceeding.  Mr. Padilla was part of

5  a large crowd of demonstrators who breached the restricted

6  perimeter during the election certification proceedings.  As

7  you heard from Captain Mendoza, the breach of the restricted

8  perimeter caused Congress to adjourn its session because it was

9  no longer safe for Members of Congress to be in the Capitol.

10         Although Mr. Padilla never entered the Capitol

11  building, he was part of a mob in the Lower West Terrace that

12  was fighting to get inside.  That crowd was just as much of a

13  security concern for the Capitol Police as the people who did

14  make it inside.

15         In fact, you heard the panic and distress in the

16  radio traffic as rioters breached the outer perimeter in

17  Government's Exhibit 200.

18         (Video played.)

19         MR. BRASHER:  Mr. Padilla remained part of that

20  crowd, trying to get inside, for at least the next three hours.

21  So the evidence has showed also that the congressional

22  proceedings could not be restarted until the Capitol Building

23  and the restricted grounds around it were cleared of the last

24  rioter, and even the presence of one authorized person in that

25  area was cause enough to disrupt the proceedings.

1          Although many rioters collectively disrupted the

2    proceedings, each individual rioter, including Mr. Padilla,

3    contributed to that disruption.

4          At 2:09 p.m., the defendant is seen on the Lower West

5    Terrace pushing against the bike racks into the police

6    officers.  Less than three minutes later, Vice President Pence

7    was evacuated from the Senate Chamber.

8          And as seen in Government's Exhibit 214, by

9    2:48 p.m., Mr. Padilla was at the Capitol doors.  His words,

10   knocking at the doors, pushing to get inside.  Thankfully,

11   officers, like Sergeant Riley seen here at the bottom of the

12   frame, were there to resist his efforts.

13         So there can be no doubt that Mr. Padilla's actions

14   impeded and disrupted the official proceeding.

15         Second, the defendant intended to obstruct or impede

16   the official proceeding.  The defendant's own words, as posted

17   on Facebook, leave no doubt.  We are actually trying to take

18   back our republic, attacking the seat of power.  We pushed all

19   the way to the Capitol doors and after that started knocking.

20   We would have occupied the Capitol.  Also want to say that the

21   riot was never about Trump.  We were attempting to restore the

22   republic by dissolving the legislature.

23         Attack the seat of power, occupy the Capitol,

24   dissolve the legislature; attack, occupy, dissolve.  Citing, as

25   inspiration, a document, the Declaration of Independence, a

1   document which helped secure the founding of this nation, but

2   which made the Founding Fathers criminals in the eyes of their

3   government.

4           So, yes, the evidence shows that the defendant

5   intended to obstruct the official proceeding.

6           Third, the defendant acted knowingly, with awareness

7   that the natural and probable effect of his conduct would be to

8   obstruct or impede the official proceeding.

9           Mr. Padilla admitted that he knew that the Electoral

10  College vote was happening on January 6th inside the Capitol

11  Building.  And he admitted knowing that politicians can only

12  vote on the floor and, if they're not present, they can't vote.

13  And he also admitted to posting to social media that he planned

14  to incite people to storm the Capitol Building and run the

15  politicians out of it.

16          And there's more.  We have real-time evidence of what

17  the defendant was -- what he knew and what he was thinking.  At

18  2:47 p.m., he messages his wife on Facebook:  It's working,

19  babe.  He's then given information that they're hiding in the

20  basement, leaving no doubt in the defendant's mind that the

21  politicians had suspended the proceedings and had been

22  evacuated.

23          And he continues.  By 4:19, messaging:  We're pushing

24  at the door.

25          So, yes, the defendant knew and acted knowingly that

1    his actions would cause a disruption in the official

2    proceeding.

3              And, finally, fourth, the defendant acted corruptly.

4    The story the defendant told in court was that he was so

5    concerned about election fraud that he wanted Congress to

6    object to the certification and send the votes back to the

7    states.  But the story he told online under a pseudonym was

8    much different.

9              Question:  If elected officials won't stop the

10   election fraud, who will?  Answer by Mr. Padilla:  Only we can.

11   Violently.

12             Indeed, what crime did Mr. Padilla say was one of the

13   most serious crimes that one could commit?  Subverting the will

14   of the voters.  A crime so serious that, according to him, they

15   should lead immediately to the noose, no appeal, or a short

16   trial, short walk to the gallows.  But yet, that is exactly

17   what he intended.  He wanted to abolish the legislature, even

18   if Trump was voted winner of the election.

19             And the defendant's own words, that at some point his

20   intent -- even if you credit his testimony that it was about

21   protesting and demonstrating, at some point it changed from a

22   rally to a revolution as reflected in his comments he posted

23   online as well.

24             Additionally, the Court can glean corrupt intent from

25   his lies.  There's no evidence that his hands were crushed

1    because he was simply laying it on a railing.  There's no

2    evidence that the cops started it.  There's no evidence that he

3    was speaking calmly to the police officers along that police

4    line.  And there's evidence that he started it, that he was

5    hitting the police; he threw a flagpole at their heads.

6         But he knew that admitting these truths to his

7    friends online would cause embarrassment to him.  So that's why

8    he concealed his true actions, because he knew what he had done

9    was wrong.

10        So the evidence also satisfies the fourth element.

11   And the defendant is, therefore, guilty of Count 6, obstruction

12   of an official proceeding.

13        THE COURT:  And your position is that it satisfies it

14   corruptly no matter what the definition of corruptly is since

15   you haven't offered one?

16        MR. BRASHER:  Absolutely, yes.  Our position is that

17   it hasn't changed in light of *Fischer*.  But even if the Court

18   were to adopt the other definition, the defendant was trying to

19   secure a benefit for himself and for others, and that was

20   installing politicians of his preference.  It's a benefit to

21   him personally.

22        Turning back to Count 1 -- this is the assault

23   involving pushing the bike racks that the defendant admits

24   guilt on.  But beyond his admission, there's more than enough

25   factual basis in the record for the Court to conclude that he

1    is guilty of this count as well.

2            Count 2, this was the assault involving the large

3    metal sign.  The defense the defendant gave in court was that

4    he was trying to erect the sign as part of a First Amendment

5    expression and protest.

6            THE COURT:  On that count, do I need to make a

7    determination based on the evidence of what he was doing or

8    intending with the sign?

9            MR. BRASHER:  Well, I will address that.  But, one, I

10   don't think it matters; but, two, I think the evidence is clear

11   that he was not trying to erect it.  But even if he was, I

12   think the Court can still find him and should still find him

13   guilty, and I'll explain why.

14           THE COURT:  Okay.  I thought you were finishing with

15   that count.

16           MR. BRASHER:  Just getting into it.

17           THE COURT:  All right.  Go ahead.  You're showing me

18   the evidence.

19           MR. BRASHER:  Going to show you the video first.

20           THE COURT:  I got you.

21           (Video played.)

22           MR. BRASHER:  So the evidence is clear; the video

23   leaves no doubt that the defendant assaulted, resisted,

24   imposed, impeded, or intimidated, or interfered with an officer

25   from the Metropolitan Police Department or United States

1    Capitol Police.  He acted forcibly by pushing on that sign, and

2    he acted intentionally.  This was not an accident.  He didn't

3    trip and fall over backwards and his body weight caused the

4    sign to move forward.  It was an intentional act that he did.

5         That's what matters is the intent of pushing on the

6    sign, not what he was trying to accomplish by pushing on the

7    sign that matters.  I don't think there's any doubt here about

8    whether or not those officers were engaged in the performance

9    of their duties, whether they're MPD, assisting the United

10   States Capitol Police, or the United States Capitol Police;

11   this element is satisfied.

12        Addressing the Court's questions:  Pushing the sign

13   into the officers, this brief moment captured on video from

14   multiple angles leaves no doubt, but that's not all.  Prior to

15   this moment, the defendant was pushing against the police line,

16   and minutes earlier he admits he committed an assault against

17   the police, and he had warned them that they were going to be

18   trampled when this happens.

19        And by this, he meant some organic movement from the

20   crowd pushing forward to break the police line.  But he just

21   happened to luck out when a weapon came crowd-surfing along,

22   and he joined in the crowd in ramming it against the police.

23   So there is --

24        THE COURT:  If the evidence was that he said to

25   Mr. -- I think it was Mr. McHugh with the megaphone.  After

1    McHugh said, push it up, put it up; if he had turned to him and

2    said, yes, let's erect this, let's push this up here right now,

3    and then had taken the same actions as exhibited on the video,

4    that still would be sufficient for a conviction in Count 2?

5            MR. BRASHER:  Yes.

6            THE COURT:  And why?

7            MR. BRASHER:  Yes.  First, before the Court can even

8    consider that, it has to look at the evidence.  The only

9    evidence of that is the testimony given by Mr. Padilla.

10           And the reason why that evidence is not credible is

11   because, on direct examination, he went painstakingly frame by

12   frame to explain about where his hands were, how he was

13   pushing, and about the need to dislodge that wheel that was

14   tangled up in the fence as part of his efforts to get the sign

15   upright.

16           But on cross-examination, he admitted that he didn't

17   even know that the sign had wheels until he saw it later on the

18   video.

19           He had also said that the rally was never about Trump

20   and that it had stopped being about Trump after the first time

21   that he was sprayed and beaten by the police, which, according

22   to him, was 20 to 40 minutes earlier.  So by his own timeline,

23   at that point he was not there to support Trump or protest in

24   support of Trump by raising a large Trump banner.

25           And the reality is that, even if he was trying to

1    erect it, at some point the police officers realized this was a

2    danger, and they wanted to get it away from the crowd.  So they

3    maybe started pushing --

4          THE COURT:  But he only touched it for eight seconds.

5          MR. BRASHER:  Yes.  But a lot happened in that eight

6    seconds.  And the police officer started pulling it back across

7    the line.

8          And by trying to erect it, he was impeding or

9    imposing -- opposing or interfering with their efforts to take

10   that sign away from him using force.  So even if he was trying

11   to erect it, he was interfering with the officers' efforts to

12   protect themselves and protect the line.

13         So it doesn't matter which theory the Court uses;

14   he's still guilty of this assault.  The only question that is

15   potentially at issue is whether the sign is a dangerous or

16   deadly weapon for the fifth element.

17         Now, the Court is familiar with the definition.  The

18   sign is not inherently dangerous, but the way it was used, it

19   was dangerous.  And the evidence of that is from Sergeant

20   Cropper.  The sign, after it made its way across the line, was

21   laying on its side, and he tripped over it.  It was not moving,

22   was not being pushed --

23         THE COURT:  That doesn't register with me.  Let's say

24   you have a pillow and it's at the barrier.  Someone is carrying

25   a pillow because they are an idiot; maybe it's the pillow man.

1    And then that is seized by the police, and they put it in the

2    back.

3         And then later on, Sergeant Cropper comes walking

4    along, doesn't see it there, and he trips and falls and injures

5    himself.  That makes the pillow a dangerous or deadly weapon?

6         MR. BRASHER:  The point is that the mere -- the

7    amount of force of falling on it caused him a serious enough

8    injury that required a hospital visit and stitches.  That if --

9         THE COURT:  Therefore, anything that's solid is a

10   dangerous or deadly weapon?

11        MR. BRASHER:  Well, this large -- it was a large

12   object made out of metal with square corners, and that caused

13   an injury by -- with a force of a person falling on it, but the

14   way it was used was much more than that.  It was used by a

15   crowd of multiple people, 20 to 30 people, pushing it against

16   the officers.  And the defendant was one of those persons.

17        THE COURT:  I understand that theory.  But I don't

18   understand the theory of it's sitting later on on the ground

19   behind where the barricade had been, and Sergeant Cropper trips

20   on it, and that turns it into -- or that's evidence that it is

21   a dangerous or deadly weapon.  That doesn't make much sense to

22   me because there's no limiting factor.

23        You can think of 8, 10, 15, 20 things that all of a

24   sudden become dangerous or deadly weapons simply because

25   someone can hurt themselves, maybe even by connection with it

1    from falling on it.

2         MR. BRASHER:  Yes.  Again, it's not because that's

3    what happened with Sergeant Cropper, that's what makes it a

4    weapon.

5         THE COURT:  It makes a computer a dangerous or deadly

6    weapon because someone could trip over a computer and hit their

7    head on the corner.

8         MR. BRASHER:  Equally so, if a group of 40 people

9    were to shove a computer against the police line, then that

10    would also make it a dangerous weapon.

11         THE COURT:  Those are two different theories.  I just

12    don't understand how the fact that it's sitting on the ground

13    and Sergeant Cropper trips on it is evidence that it's a deadly

14    or dangerous weapon.  I've said my piece.  Go ahead.

15         MR. BRASHER:  I understand.  I would just draw the

16    Court's attention, then, to the testimony of Sergeant Riley and

17    Sergeant Cropper.  I think Sergeant Riley specifically said

18    that he viewed that sign -- his words were a battering ram.  A

19    battering ram is a weapon; there's no question about that.

20         THE COURT:  If it's used in that way, that is

21    correct.  And it does appear from the evidence that it was by

22    some individuals being used in that way.  The question is where

23    Mr. Padilla fits in that analysis.

24         MR. BRASHER:  Yes.  Again, I think the video evidence

25    is clear.  I think the self-serving testimony that was

1    contradicted by the fact that he didn't even know that it had a

2    wheel until he saw it on video just undermines any credibility

3    that this was an effort to demonstrate.

4         There was no effort -- there was no effort to put the

5    sign upright.  And even if that's what he was trying, the

6    police did not want that, and he was trying to oppose their

7    efforts to prevent that from happening.  So that also is enough

8    for the assault.

9         THE COURT:  So if he and 20 other individuals -- if

10   the sign had been brought up, but they stopped five feet short

11   of the barrier, and he and 20 other individuals started to put

12   it up, and one of the police officers yelled to them, don't put

13   that up there, it will interfere with our line of sight, but

14   they put it up anyway, is that enough to make a conviction of

15   Count 2?

16        MR. BRASHER:  If there was physical contact, then

17   yes, that would be enough to qualify as an assault.

18        THE COURT:  There has to be physical contact with the

19   officers?

20        MR. BRASHER:  There doesn't have to be, but there has

21   to be a use of force that interferes with their efforts.

22   That's, I think, in this hypothetical.  It may not, in that

23   instance, qualify as a deadly weapon unless the way that the

24   struggle to get it up and not get it up caused -- was capable

25   of causing an injury.

1   I don't know, from this hypothetical, whether that

2   happened.  But we do know that's not the way it was used; it

3   was used as a battering ram.

4        So our position is, of course, that the -- that it

5   was used in a way that was capable of causing serious bodily

6   injury and, therefore, qualifies as a deadly or dangerous

7   weapon.

8        Turning to Count 5 -- this is the flagpole assault.

9   This is the moment of impact from Government's Exhibit 227.

10  The video clearly shows that Officer Corado's head moves

11  backwards and to his right or to our left as the pole hits his

12  helmet, which the Court held and hefted and is a heavy-duty

13  helmet.

14       And I want to just play a brief clip from

15  Government's Exhibit 227 of the seconds of what was happening

16  in the crowd before Mr. Padilla threw the pole.

17       (Video played.)

18       MR. BRASHER:  So what was it?  Mr. Padilla's story is

19  that he threw that flagpole because he saw an officer being --

20  an officer in jeopardy, and that was so concerning to him that

21  he needed to act; that it was worth the risk of potentially

22  hitting an officer to protect officers who are under attack.

23       So what was that threat?  Well, it wasn't this rioter

24  using this crutch against the officers.  It wasn't this rioter

25  who is putting his hands on the face mask and gas mask of this

1    officer.  It wasn't this rioter with a large wooden stick, much

2    larger than an axe handle.

3         It wasn't this rioter throwing this canister at the

4    officers.  It wasn't this rioter swinging a hockey stick

5    violently at the officers.  It wasn't this rioter shoving this

6    riot shield at the officers.  It wasn't this rioter throwing

7    this wooden stick at the officers, or this rioter who is

8    continuing to attack them with the crutch, and this rioter

9    continuing to attack them with the hockey stick.

10        It wasn't the rioter off screen here who threw this

11   flag at the officers.  It wasn't this rioter swinging this pole

12   at the -- swinging a pole at the officers' legs, or this rioter

13   climbing the fence with a crutch in his hand to attack them;

14   this rioter with a baton; it wasn't this rioter now over the

15   fence with his hands under the face shield of this officer.

16        It wasn't this officer whose helmet has now come off

17   and this rioter stomping on that officer.

18        What was the threat?  It was this man bending over to

19   pick up something on the ground.  Your Honor, that's not

20   credible.  But that's not all.

21        What happened after, after he was so alarmed he

22   needed to distract, tangle up, slow down this rioter who bent

23   over to pick up something; what did he do because he was so

24   alarmed and so concerned?

25             (Video played.)

1      MR. BRASHER:  He does nothing.  This rioter that he

2  was so concerned about has his hands on the officers, pulls one

3  of them out into the crowd as the defendant looks on; as other

4  members of the crowd attack that officer and surround him and

5  mob him, just mere feet from the defendant; and as they

6  continue to carry him away from the crowd where -- from the

7  tunnel where his fellow officers were there, the defendant

8  stands holding a flag in the air.

9      The idea that he was so concerned about this

10  officer's safety and this man with the red hat, that he needed

11  to throw a pole at him, it's beyond the pale.

12      For the same reasons that the sign is a deadly

13  weapon, the flagpole is a dangerous and deadly weapon as well.

14  It doesn't matter that the officers were protected by

15  protective gear.  He used it as a spear, aimed at their heads

16  and just, by sheer luck, happened to hit the broadside of the

17  helmet rather than hit with the pointy end that could have

18  caused much more damage.

19      Officer Corado testified that he had no protection at

20  the bottom of his face shield to his vest, the very vulnerable

21  area of his neck that could have been hit by a flagpole thrown,

22  when he was not aware of what was happening and not ready to

23  resist and block the throw as it came in and hit him.

24      Turning to Counts 3 and 5, the civil disorder counts,

25  I'm not going to spend too much time on these.  The defendant

 1    acted knowingly and committed an act or attempted to commit an

 2    act with the intended purpose of obstructing, impeding, or

 3    interfering with one or more law enforcement officers.  That's

 4    satisfied with the evidence the Court has seen.

 5         The evidence is that this happened during a civil

 6    disorder, which is a gathering of two or three people causing

 7    disorderly and disruptive conduct.  There were much more than

 8    that at the times of these assaults.  Here's the overhead view

 9    showing thousands of rioters.  And, again, multiple people,

10    part of a civil disorder when he threw the flagpole.

11         Third, that this civil disorder impacted commerce.

12    We have the Safeway stipulation, Stipulation No. 3, coupled

13    with the testimony of Special Agent Montana and her

14    interpretation of the Safeway records showing that on

15    January 6th Safeway's actual revenue versus its projected was

16    much lower than anticipated.

17         Counts 7 through 11, again, I'm not going to spend

18    much time on these, but I do want to point out a few things.

19    First, there's no contention that -- there can be no contention

20    that the restricted area or grounds are as laid out in

21    Government's Exhibit 601.

22         The only dispute is whether Mr. Padilla saw signs on

23    the sidewalk when he entered.  He claims that they were -- had

24    been at that point at least moved off to the side, and he

25    thought they were protecting the lawn from getting muddy.

1            But even if the Court were to credit that testimony,

2    he's still guilty of these counts because the defendant entered

3    or remained.  And by the time he made it to the first barriers,

4    he knew that the police did not want him to go further.  But he

5    continued to press on up through, into the Capitol doors at the

6    tunnel and remained for several hours.

7            The same evidence that the Court can find for a

8    dangerous weapon on the assault counts, the Court can find for

9    these counts as well.  And, again, to the extent these counts

10   require --

11           THE COURT:  What's the dangerous weapon he carried;

12   just the flagpole?

13           MR. BRASHER:  It could be the flagpole or the sign

14   for these counts.

15           THE COURT:  Eight seconds of hand on the handle of

16   the sign?

17           MR. BRASHER:  And the flagpole, yes.

18           THE COURT:  The flagpole I understand.

19           MR. BRASHER:  And, finally, to the extent these

20   counts require evidence of impeding, disrupting, disturbing,

21   acting disorderly, again, it's all the evidence the Court has

22   seen and the evidence that we've pointed to for Count 6, the

23   obstruction count.

24           Your Honor, around the world, the United States

25   Capitol Building -- iconic dome -- is a powerful symbol of

1    democracy, a peaceful self-government illustrated by the smooth

2    transfer of power every four years.  But not on January 6th,

3    2021.

4          On that day chaos reigned on the grounds of the

5    United States Capitol for hours.  And for hours, law

6    enforcement officers fought a hand-to-hand medieval battle from

7    Peace Circle to the Lower West Terrace to the now infamous

8    tunnel.  The peaceful transfer of power that is America's pride

9    was interrupted and placed in jeopardy, just like the defendant

10   wanted, just like he had hoped, and just like he had planned.

11         For many people, these events marked a dark day in

12   American history, but not for this defendant.  Even though he

13   ultimately failed and would need more force next time, he was

14   proud of what he did.  Yeah, I'm proud of what I did yesterday.

15   It's guns next.  That's the only way.

16         The defendant was part of a mob.  But that is no

17   excuse.  A raging whitewater river is composed of individual

18   water droplets, an avalanche of individual snowflakes.  The

19   mob's strength was its numbers.  The Capitol Police and the

20   Metropolitan Police Department could have handled the defendant

21   alone, but not when confronted by thousands.

22         The defendant fought violently to enter the Capitol

23   Building so that he could overthrow American democracy.  That

24   is not an exaggeration.  By his own words, he wanted to occupy

25   the Capitol, dissolve the legislature, and replace it with a

 1    slate of politicians of his own choosing who could then invite

 2    the former President to remain in office despite the will of

 3    the voters.  There's nothing patriotic about that.

 4         What Jose Padilla did on January 6th was criminal.

 5    And the testimony and evidence admitted in this trial shows

 6    that he is guilty on all counts.  Thank you.

 7         THE COURT:  Thank you, Mr. Brasher.  Mr. Cronkright?

 8         MR. CRONKRIGHT:  Thank you.  And good morning, Your

 9    Honor.

10         Your Honor, I don't know if I've ever had a situation

11    quite like this, in that my client has taken the stand and made

12    a number of concessions which, obviously, are appropriate for

13    the Court to consider.

14         But I informed the Court in my opening -- and I think

15    the Court could have gleaned from my trial brief -- that we are

16    here in this posture of being focused primarily on two counts,

17    although in the trial brief I mentioned a third, and I'll deal

18    with that briefly in my arguments here.  But that's the 111(a)

19    and (b) counts, and that's our principal focus.

20         I have a number of things to say about those counts.

21    But just so that I don't forget in a wrap-up, I will tell the

22    Court that I think that how the Court assesses those two counts

23    affect other counts, and I think that it's fair for the Court

24    to think about some of what it heard in thinking about those

25    other counts.

1          I'm going to just summarize some of the things that I

2    think are reasonable issues where, even with my client's

3    concessions, the Court should consider the implications on

4    counts other than Counts 2 and 4.

5          In the first place, I understand that my client has

6    made concessions where he specifically said that he thought

7    that he was guilty of certain offenses.  And, obviously, Your

8    Honor has been on the bench a number of years, and it's clear

9    that it's the facts in the case and not the opinions that lead

10   us to convictions, which is why factual bases are important

11   when we enter a plea.  We're looking for facts which support

12   the plea.

13         So the naked assertions that my client made that he

14   was guilty of a 231 or a 111(a) are not enough to convict him.

15   Although, when it comes to this case, especially with Count 1,

16   we're well beyond those bare assertions, and we're into facts

17   where, if the Court were to take the facts as my client

18   presented them, those facts would at least hit all of the

19   elements, I think, on the 111(a) Count 1.

20         And the Court could convict based on the facts

21   asserted.  So I agree in that sense with what the U.S. Attorney

22   has said is that the facts -- both the facts the government

23   presented and facts that my client testified to support a -- if

24   believed -- and that's, obviously, where Your Honor comes in --

25   would support a conviction on Count 1, and my client testified

 1    consistent with that.  I'm not here to argue against that now.

 2             But I think it's important when -- in analyzing that,

 3    just to go back and sort of divorce ourselves from some of the

 4    heated rhetoric both that my client put forth and some of the

 5    rhetoric that we heard this morning.

 6             My client, for example, is not on trial for not being

 7    a patriot.  My client is not on trial for not being American or

 8    not being a patriotic American, I think, was the term that was

 9    used by Mr. Brasher.  He's actually here, obviously, for some

10    specific allegations of specific crimes.  That's not one of

11    them.

12             So my client, even if he was an unpatriotic American,

13    wouldn't necessarily have been guilty.  And I understand that

14    that's not really the argument that the government is

15    presenting.  But, nonetheless, we heard that this morning, and

16    I think it's fair for me to point out that we come here

17    presenting the issues of fact to the Court, and we disagree on

18    some very specific issues of fact.

19             And whether we had a jury or a bench trial, as we did

20    here, we're relying on the trier of fact to fairly hear what

21    those issues of facts are and make those decisions.

22             So if we go to the statute itself, the 111 statute

23    itself, obviously -- it's what I call a laundry list statute.

24    There are a number of acts which would -- the prescribed

25    conduct, there's a number of those, prescribed conducts that

1    could support a conviction.  So it's not just assault.  I know

2    that Your Honor is aware of this.  But it's assault, resist,

3    oppose, impede, intimidate, and interfere.

4           So when you look at the case law, obviously, the case

5    law stands for the proposition that those prescribed acts are

6    to be read in context with the other descriptive terms in the

7    statute.  So we add forcibly to the front end of that, and I

8    would argue that we add the fact that that conduct is directed

9    towards an officer, as indicated in the statute under 1114,

10   where they're described as any federal officer and that the

11   officer is in the performance of his duties.  Those things are

12   all within the statute.

13          So my argument today is that this is the -- the

14   analytical approach the Court has to take.  Did my client

15   forcibly assault an officer performing his duties; did my

16   client forcibly resist an officer performing his duties.  So we

17   have to take the statute in context of what is the prescribed

18   act.

19          Obviously, this is general intent crime; that's what

20   the case law indicates.  But my client needs to have formed the

21   intent to commit one of the prescribed acts that's repeated

22   throughout numerous cases.

23          My argument this morning is the prescribed act is, as

24   I've just described, forcibly assault of an officer, a federal

25   officer, in the performance of his duties.  I'm not here

1    arguing that officers were not acting in the performance of

2    their duties.  And with at least -- except for perhaps one

3    exception, I'm not arguing on any of the counts that they

4    weren't -- that the police officers weren't federal officers.

5               I will just say, parenthetically, that there's at

6    least a question as to whether a Metro PD or city officials are

7    federal officers or both.  And I think that that at least is

8    something that we have to look at the evidence on, and I think

9    the evidence was that Metro PD were assisting the Capitol

10   Police.

11              Does that make them federal officers, or were they

12   all along?  I think that the proofs are probably a little bit

13   short on that.  I think that when we get to some of the other

14   counts, that's something that the Court is going to have to

15   decide.

16              In any event, we look at the -- we looked at the

17   concept that I've just described, forcibly resist -- I'm

18   sorry -- forcibly assaults an officer, and I agree that there's

19   substantial amount of proofs in regards to Count 1.

20              Where we disagree in the first instance with the

21   government's presentation of evidence, and ultimately their

22   conclusions, is whether the Trump sign is, wherever it was, a

23   dangerous weapon.  I think that that is a significant issue to

24   be resolved.

25              Parenthetically, on the idea that somehow the

1    tripping could somehow come to bear in this, in discussing that

2    with my staff last night, I used the pillow example.  So I was

3    at least interested when the Court brought up that same

4    example; if somebody trips on a pillow that somebody else left

5    there, does that make that pillow a dangerous weapon?  Even if

6    it was, what would that have to do with anything?

7           So in this case I think that we can sort of dismiss

8    out of hand the idea that, after the police got control of it

9    and set it in a place where it could be tripped over, it was

10   tripped over.  And somehow that action has something to do with

11   my client and the fact that he touched it perhaps hours earlier

12   and for eight seconds that -- I mean, it seems almost

13   nonsensical.

14          THE COURT:  Would you concede that the sign at

15   issue could be a dangerous weapon?

16          MR. CRONKRIGHT:  Ask again.  I didn't hear.

17          THE COURT:  Would you concede that the sign at issue

18   could be a dangerous weapon?  One might argue that a pillow

19   can't be.

20          MR. CRONKRIGHT:  Right.

21          THE COURT:  But would you concede that the sign could

22   be?  For example, on January 6th --

23          MR. CRONKRIGHT:  So are you asking --

24          THE COURT:  Let me finish.

25          MR. CRONKRIGHT:  I'm sorry.

1          THE COURT:  On January 6th, 20 protestors had carried

2     that sign and had continued all the way up to the barriers with

3     the police and had physically pushed it and the police hadn't

4     seen it coming and had hit ten police officers in the head,

5     would the sign qualify as a dangerous or deadly weapon?

6          MR. CRONKRIGHT:  Well, first, let me apologize for

7     interrupting the Court.

8          And in the second instance, my answer is, if we're

9     asking the conceptual question, I would actually go back and

10    say that -- just so that the Court understands my read of the

11    law and the historical context of case law, I think that pillow

12    that we were talking about could be a dangerous weapon.  I

13    think any -- just about anything could be a dangerous weapon.

14         So if you're asking a theoretical question as to

15    whether that sign could have been a dangerous weapon, I think

16    the answer is yes.  I think that the government, in their

17    slide, presented the very consistent view of case law that we

18    look at any dangerous weapon in -- we have two categories.

19         Obviously, the things that are inherently weapons, so

20    that's the gun and the knife and so forth; and then we have

21    things that are ordinary objects which would not normally be

22    considered a weapon.  But, nonetheless, based on their use,

23    could be a dangerous weapon.

24         So if you can manage to pick up a 20-foot-long sign

25    and use it as a battering ram, then I suppose it would be a

1    dangerous weapon.  But I think there's two questions in

2    analyzing the facts of this case that the Court needs to ask.

3          And as a way of describing this, I would say, in the

4    first place, you have to look at the concept that when you have

5    a crowd mentality like this, not everybody necessarily is going

6    to have the same idea.  Officer Cropper, for example, testified

7    in support of the idea that, even the police on the line who he

8    was unable to communicate with, may well have had a different

9    idea.  Some of them may have been pushing; some of them may

10   have been pulling.  He had a tactical approach to it.

11         The people in the crowd -- and there were numerous

12   people with hands on that sign -- may well have all had

13   different ideas about what they were doing.  So you have to

14   look at how did Mr. Padilla use the sign.

15         And because in the context of this case, we really

16   don't care if somebody else had a mindset and was attempting to

17   use that sign in a way that was a dangerous weapon.  So you

18   could have both -- you could have multiple things going on at

19   the same time, but we need to focus on the facts that are

20   directly pertinent to Mr. Padilla.

21         So then the other thing that you have to look at, I

22   think, in every case where we're in the second category, is did

23   it, in fact -- on the facts of this case, did it, in fact, get

24   used as a dangerous weapon, because it's the use, obviously,

25   that converts a nonweapon into a weapon.  So we have to look at

1        the use.

2                But if the assertion is something -- that an object

3        became a dangerous weapon, I think we also have to ask, when

4        did it become a dangerous weapon?  Because I think that that

5        is, at least in some cases -- and specifically in this case --

6        that it is a critical consideration.

7                So if you look at the evidence in this case -- and,

8        obviously, we're talking about a very short period of time.  I

9        have asserted that it was eight seconds.  But the evidence --

10       the video, obviously, speaks for itself on that point.  It

11       could be nine seconds, but not more than that, certainly.

12               So did it become a dangerous weapon in the -- in the

13       nine seconds that Mr. Padilla had his hand on the pole handle?

14       And if it did become a dangerous weapon, did it become a

15       dangerous weapon because of the way in which Mr. Padilla used

16       it?  So you could have all of these things going on, and I

17       suggest that you do have all these things going on.

18               There was one person who was closer to the action, if

19       you will -- meaning my client -- than anybody else.  He was the

20       closest person.  He testified -- Sergeant Cropper, he testified

21       that Mr. Padilla held the sign -- I'm sorry.  He testified that

22       his perception was that the sign was being -- was being used in

23       a manner that it was going to be erected, and that that was a

24       tactical problem for him, and he was making tactical decisions

25       when he decided the police needed to take control of it.

1          So that's how he assessed the situation.  He did not

2     think that it was being used as a weapon.  I raise that because

3     it supports my client's assertion, and he is the closest

4     officer of those who testified, and factually.  If we just look

5     at the video, he's right next to my client.

6          When you look at Mr. Padilla at the moment just

7     before he broke contact with the sign, he's standing with his

8     back to the line of officers.  So the idea that he is using

9     that as a battering ram, I mean, you would think that you would

10    get behind it and push at that point.

11         He's doing something different.  He's got his hands

12    spread.  As soon as he made contact with the sign, his hands

13    spread, and the position where he was in a leverage position

14    where he could push down on one side and up on another side.

15         So in that position, then, in that context the

16    evidence seems abundantly clear that Mr. Padilla was trying to

17    erect the sign.  The fact that there's -- the Court has

18    referred to him by name.  I refer to him as megaphone man,

19    affectionately, perhaps.  The fact that the man with the

20    megaphone is standing there saying, put it up -- which is the

21    same thing, by the way, that the officer would have heard when

22    he made his conclusion that it was a tactical issue, not a

23    weapon.

24         So in the context you have two people in very close

25    proximity whose visual and auditory cues are telling them that

1    there is an attempt to erect this, I would suggest to the Court

2    that if there's an attempt to erect the sign going on, that's

3    what -- even if other people have different ideas.  If there's

4    an attempt to erect a sign and that is the attempt that

5    Mr. Padilla is participating in, which is what the officer

6    closest to him thought, then that takes us out of the category

7    of having a weapon.  I mean, it's not a weapon.  It's not being

8    used in that manner.

9         So for those eight seconds and as to -- as far as

10    Mr. Padilla's involvement, my assertion is that it clearly is

11    not a weapon and that the Court can exclude consideration of

12    111(b) from the equation.

13         And that leaves us with going through the laundry

14    list and asking whether this is an 111(a) violation standing

15    alone without ever reaching the idea that it's a dangerous

16    weapon.  And I think that's where the conversation in regards

17    to this incident becomes most interesting is whether the Court

18    could convict my client of sort of the lesser included offense

19    of a 111(a) violation here based on the theory which the

20    government is alternatively advancing; that somehow erecting

21    this sign was an impediment, an obstruction, or impeding the

22    actions of the officers.

23         In the first place, of course, it's interesting to

24    note that the sign wasn't erected.  And I don't think under the

25    indictment my client is accused of attempting to erect the sign

1    under the second superseding indictment, but I would have to

2    pull that up and look at that specifically.

3            THE COURT:  So on Count 1, the assaulting, resisting,

4    or impeding certain officers without the dangerous weapon

5    relating to the events at the barricade, not the events up at

6    the tunnel, can't he be convicted of Count 1 without the sign

7    being considered at all?

8            MR. CRONKRIGHT:  Well, the information presented is

9    specific to that 1:37 to 1:41 time frame, if I'm recalling

10   correctly.  You're looking at the indictment and I'm not.

11   So he could be convicted of that without reference to a

12   dangerous weapon and without reference to the sign.  I think

13   that's what the Court is asking me.

14           THE COURT:  Well, dangerous weapon is Count 2, and

15   that's referred to by the government as the dangerous weapon,

16   the sign; Count 2 being between 1:39 and 1:41; Count 1 is

17   actually 1:37 to 1:39.

18           MR. CRONKRIGHT:  Okay.  So without reference, then,

19   to the sign, I think you're asking whether he could be

20   convicted of --

21           THE COURT:  Can he be convicted on Count 1 without

22   reference to the sign at all from his actions that he's

23   conceded he says were assault, his actions pushing against the

24   barricade, against the police?

25           MR. CRONKRIGHT:  So I think, clearly, he can be

1    convicted of that count if the Court believes that evidence.

2    Then that at least hits on all --

3            THE COURT:  It's not believing the evidence.  The

4    evidence is a video.  What would I be believing?

5            MR. CRONKRIGHT:  I'm not suggesting that the Court

6    shouldn't believe it.  I'm suggesting the process, the Court

7    hears the evidence, believes the evidence.  The evidence itself

8    is sufficient for a conviction of Count 1, and we are not

9    contesting that.  That's why my client took the stand and said,

10   yeah, he even thinks he's guilty of that.

11           But that is based on -- as the Court has correctly

12   stated, that's based on the pushing against the officers at the

13   barricade.  And whether you're going on an assault theory or an

14   obstruct or impede, you kind of get there anyway; you analyze

15   that on those facts.  That's our position.

16           So that's why I have moved on from that because I

17   think we've conceded that both now in argument and also when my

18   client testified, that that is a violation of 111(a).

19           THE COURT:  Okay.

20           MR. CRONKRIGHT:  I think I have now laid out why I

21   believe that there is no violation of 111(b) on the sign

22   incident, and I was --

23           THE COURT:  You would ask me to consider three things

24   in that regard, I take it?  One, the video evidence of his

25   movements with respect to the sign, holding the handle and what

1    he was doing with it; his testimony with respect to what he was

2    intending; and I suppose a third thing would be another

3    demonstrator saying, put it up?

4         MR. CRONKRIGHT:   Yeah.   And I think that that very

5    nicely summarizes the context in which these eight seconds

6    should be analyzed.

7         So my suggestion is, if you put all of those

8    together, that what you have is an -- that my client has

9    formulated an intent to use the sign as a symbol of protest.

10   So it's not in that context as to any action of his and the way

11   he's using that sign, it is not a deadly weapon under the

12   second way of analyzing weapons.   So that is my argument, Your

13   Honor.

14        I would just say a couple other things in terms of

15   the idea that there is a violation of 111(a) as sort of a

16   standalone or a lesser included on Count 2.

17        Their assertion is that if the sign were erected, it

18   would block their view of the crowd, and the tactical need to

19   control the crowd would have been interfered with.   It's just

20   that borders on the absurd if we consider the fact that any

21   protestor waving a flag in front of an officer is going to do

22   the same thing, even if only for a period of time.   But if you

23   took eight seconds to wave the flag in front of the officer,

24   you would, essentially, be in the same place.

25        And so the assertion is that in a protest, where the

1    officers have a need for crowd control, that any obstruction of

2    their vision would get in the way of the tactical needs of the

3    officers and, therefore, be a violation of this statute.

4          It seems like an absurd way to look at the statute to

5    me, and it's going way beyond the pale to say that obstructing

6    the vision of an officer by putting a Trump sign up --

7    notwithstanding the wonderful metaphor of a Trump sign being a

8    weapon, the reality here is that there's always sort of going

9    to be a contest between the right of protestors to make their

10   voice be heard and to make their expression be heard and the

11   tactical needs of the officers.

12         So I'm suggesting that it's a bit of an overreach to

13   say that, as to the sign, that my client could be found guilty

14   of a 111(a) without the (b).  And so my position is that

15   there's no crime stated.

16         THE COURT:  Wouldn't -- isn't the government's

17   response -- I think Mr. Brasher made this response -- that if

18   you're just waving a flag, you don't meet the forcibly

19   requirement in the statute.

20         MR. CRONKRIGHT:  Okay.  Though the reality --

21         THE COURT:  You're not forcibly assaulting, you're

22   not forcibly resisting, opposing, impeding if you're just

23   waving a flag.

24         MR. CRONKRIGHT:  And I didn't hear from Mr. Brasher

25   how that is -- that application of force is somehow different

1    in this instance where you're -- the force you're using is

2    designed to put the sign up.

3            I mean, you can't -- presumably, you can't put a sign

4    up or wave it without using some force.  I mean --

5            THE COURT:  Now we're getting into the ridiculous.

6    If you're walking, you're using some force.

7            MR. CRONKRIGHT:  Exactly.  Well, walking is force.  I

8    understand.  It's a matter of physics.

9            If we're going there, then anything you do to hold

10   the sign up is force.  It's not different than erecting the

11   sign.

12           So where do you draw those lines?  Force is an

13   application of -- I don't know the physics definition.  But

14   it's an application of energy in a certain direction, which all

15   of these things require that, which is how we get movement in

16   physics.

17           So at what point does the Court draw the line in

18   that?  I'm just suggesting that, even though I think the Court

19   can find a violation of 111(a) without (b), it doesn't seem to

20   be called for in these facts.  That's the position that I'm

21   expressing to the Court.

22           So then I move on -- unless the Court has further

23   questions about that, I'm prepared to move on and talk about

24   the incident of the flagpole --

25           THE COURT:  Please.

1        MR. CRONKRIGHT:  -- later on.  In the first place, I

2   actually don't know how to argue that a flagpole can't be a

3   dangerous weapon.  I mean, we're back to the any object and how

4   it was used scenario.  And so I do --

5        THE COURT:  If you don't know how to argue that, then

6   don't argue it.

7        MR. CRONKRIGHT:  I'm telling you that it seems to me

8   that the flagpole -- you know, if I take a flagpole and strike

9   somebody, then I've used it as a dangerous weapon.  It's kind

10  of almost elementary.

11       So I think that we go back and analyze the elements

12  in regards to the flagpole.  I think there's two interesting

13  arguments that we put together with the flagpole, and they sort

14  of lead us to the same analysis.

15       The first is just going back and looking at the

16  elements, and looking at the way that I argued the elements --

17  and I'm going to be consistent here -- that you say, was

18  Mr. Padilla guilty of forcibly assaulting an officer performing

19  their duties, and we kind of can break that down.  You can do

20  that with resist, oppose, impede, intimidate, and interfere,

21  and see where that conversation takes you.

22       I say it that way because the case law is clear that

23  we look at whether the -- whether the defendant formed the

24  general intent of committing one of those prescribed acts, and

25  the prescribed act is not just an assault or resistance or

1    whatever during -- and the laundry list.  But it is, in fact,

2    paired with both forcibly on the front end and the officer on

3    the back end.

4          The reality here is that, if you accept my client's

5    testimony, then he never formed the intent to commit a

6    prescribed act when he picked that flagpole up because his

7    focus and his direction and his thought process had nothing to

8    do with an officer other than the officer who he was not trying

9    to hit, who was the officer that was on the ground and in

10   trouble.

11         So I'm thinking -- I'm arguing and I'm thinking that

12   on these facts, that even using a general intent standard, that

13   my client never formulated the intent that was necessary

14   because he was never focused on committing one of these

15   prescribed acts in regards to an officer.

16         THE COURT:  That's if I accept and believe his

17   testimony with respect to why he threw the flag.

18         MR. CRONKRIGHT:  And I apologize because of the echo,

19   but can you repeat that?

20         THE COURT:  That's if I accept his testimony and

21   believe it with respect to why he threw the flagpole.  And I

22   have to assess the -- not only what he said, but also what the

23   video evidence shows to conclude, as the finder of fact, what I

24   believe was the intent in throwing that flagpole.

25         MR. CRONKRIGHT:  I think that the next question, of

1    course, is whether we're back to me arguing that it's a

2    specific intent crime.  But I think that your assessment is

3    that the defense that I'm arguing now is that you have to look

4    at was he intending to throw a flagpole at an officer.  I think

5    that that's correct.

6         I do think that you need to look at all the evidence

7    to make that determination, including the government's

8    evidence.

9         THE COURT:  Why doesn't the evidence show the

10   following, Mr. Cronkright.  Why doesn't the evidence show a

11   number of protestors throwing objects at the officers in the

12   tunnel, whether they're directed at a particular officer or

13   just at the group of officers in the mouth of the tunnel?  The

14   evidence shows that without any doubt.

15        MR. CRONKRIGHT:  I agree; it does.

16        THE COURT:  Six, eight dangerous objects being

17   thrown.

18        MR. CRONKRIGHT:  It does.

19        THE COURT:  We then see Mr. Padilla in his javelin

20   stance start to wind up with the flagpole to throw it.  Only

21   after he's already winding up to throw it do we see the person

22   who he identifies as being his target start to move towards

23   what he is saying he's concerned about, which is an officer

24   down on the ground.

25        And it's only -- he continues that motion and throws

1    it, but it's only after he starts cocking to throw that that

2    person starts to move.  Why doesn't that say to me, wait a

3    minute, he wasn't really trying to throw at that other

4    demonstrator; he was throwing into the mouth of the tunnel.  It

5    happens that that other demonstrator did come into his line of

6    fire, but he began the process before that person did so.

7          Why isn't that -- I've looked at the evidence several

8    times.  Why isn't that what the evidence shows?

9          MR. CRONKRIGHT:  Well, I think that in the first

10   place, the obligation of the Court in regards to the second

11   theory, which is he was offering -- or doing what he was doing

12   in defense of that other downed officer, the first obligation

13   of the Court is to look at it through the eyes of Mr. Padilla.

14   So you have to factor in -- and, by the way, under common

15   assessment of defense of others or self-defense, even if the

16   defendant was wrong in his assertion --

17         THE COURT:  It's not self-defense.  It's defense of

18   others.

19         MR. CRONKRIGHT:  I understand.

20         THE COURT:  He doesn't have a self-defense claim with

21   respect to throwing the flagpole.

22         MR. CRONKRIGHT:  No.  I understand.  The analysis is,

23   essentially, similar, which is why I said that.

24         The analysis is first that the Court looks at it

25   through the eyes of Mr. Padilla.  And if he -- even if he was

1    wrong on his assertion -- I mean, let's say, for example, that

2    he thought that Mr. McAbee was attacking when he was trying to

3    render aid or something like that.  I'm not asserting that

4    those are the facts.  I'm just saying that, as a matter of

5    argument, even if that -- if he was wrong in his assertion, if

6    it was something that he believed and was reasonable based on

7    the belief that he had formed at the time, it's still a valid

8    defense.

9          So here we have testimony from my client which -- you

10   know, video is really helpful in a lot of ways.  But the

11   reality is that my client observed earlier in the day,

12   according to his testimony, somebody that he thought was the

13   person standing in front of him that was carrying an axe

14   handle.  So he's thinking that this is somebody who previously

15   in the day was carrying a dangerous weapon, and he's instantly

16   concerned.

17         The government looks at all the other people around

18   there.  This is a horrific violent scene; I mean, it is.  It's

19   the worst thing --

20         THE COURT:  I think there's no doubt about that.

21         MR. CRONKRIGHT:  So nobody could look at this and not

22   be shocked by these facts.  I would not want to be the officer

23   or any officer that was involved in that.  It's horrible.

24         But Mr. Padilla is looking at this in the context of

25   thinking that this man is an aggressive man because he saw him

1   carrying a deadly weapon earlier in the day.  He bends down; he

2   picks up a weapon.

3          And if you look at -- my assertion is different than

4   the way the Court has described it.  My assertion is that -- in

5   the first place, you can't look at the video and tell what he

6   was seeing.  You have to have some additional input.  There's

7   so much going on.

8          But in the second instance, he starts raising the

9   flagpole as soon as he -- as soon as the movement goes down

10  from McAbee.  That's what I believe to be the facts.  And he

11  doesn't -- later in time, he comes up with the weapon, but he

12  sees the movement to bend down to pick something up.

13         Now, his testimony was he saw these things all day.

14  They were scattered; they were everywhere.  There were weapons

15  available everywhere.  So there's a natural assumption on his

16  part that McAbee is going to pick up a weapon.  And, in fact,

17  he does; he proves to be right.

18         THE COURT:  But why does it make sense that he's all

19  of a sudden concerned about McAbee potentially picking up a

20  weapon off the ground and potentially going to assault an

21  officer when he's standing there watching another protestor

22  clubbing officers with a hockey stick?  Why didn't he throw the

23  flag then?

24         That man with the hockey stick took six or eight

25  swings hitting the officers.  Why didn't he throw the flag to

1    try to distract or stop that man?

2         MR. CRONKRIGHT:  So Mr. Padilla himself testified

3    that he wished that he would have done more in response to a

4    very similar question as the Court is posing here.  So even

5    though -- I mean, there's more of an argument here that

6    demonstrates the reasonableness of the actions that he did

7    take, but the reality is that he is acting in response to

8    something.

9         I mean, if he's standing there and watching this

10   horrible scene and thinking I have to do something, I have to

11   do something, at some point it doesn't really matter what

12   triggers him to ultimately act.  Any reasonable person in that

13   situation watching this level of violence would be disturbed

14   and increasingly disturbed.

15        So at what point did he reach the tipping point?  He

16   reached the tipping point, according to his testimony, when

17   there's one more person entering the fray, and that's what

18   pushed him over.  He said, I have to act.  It's not divorced

19   from what happened.  It's an accumulative effect.

20        The other thing to point out, you have to look at

21   what was he actually seeing?  We have a video that's from

22   above.  But if you look at the video, you'll see that

23   Mr. Padilla is moving into position, he's looking, he's

24   watching, he's moving around trying to get a better view of

25   things.

1    So what you see when you look at the video may well

2    not have been what he saw before he decided to act in regards

3    to Mr. McAbee.  So we can't assume by looking at the video that

4    all of those horrible things that we're seeing is what he was

5    seeing.

6    What he claims to have been seeing was -- he sees the

7    yellow that's down there, and he sees this raucous thing, and

8    he sees all sorts of things being thrown, and here comes a man

9    who bends down to pick up a weapon.  He's thinking this

10   officer, this officer is in imminent danger.

11   And the fact that some -- other people are -- I mean,

12   there's a standoff and other people are whacking at the

13   officers, as horrible as that is, it's not the same.  There's

14   something different going on in his mind at the point where he

15   sees an officer down.

16   Army experience and life experience would teach you

17   that an officer down is an inherently dangerous thing, and

18   officers on the stand in this case conceded that.  There's

19   something inherently different when you are aware there's an

20   officer down.

21   By the way, in terms of the observations of what went

22   on around there, I would remind the Court that not but a few

23   feet away there was an officer who testified -- the officer

24   that was ultimately struck by the flagpole -- that he didn't

25   know there was an officer down, and he's right there.  He's

1    right there.

2         So at the point where my client becomes aware that

3    there's an officer down, he understood -- as per his testimony,

4    he understood the gravity of that situation.  That there is

5    somebody down on the ground, and his testimony was that, even

6    if I could just provide a --

7         THE COURT:  I understand your theory, which is part

8    his testimony and part your elaborations of his testimony,

9    about what he may have thought.

10        MR. CRONKRIGHT:  I understand.  So in any event,

11   that's my -- that's my assertion based on what I heard him

12   testify to that -- that the trigger comes when he sees the

13   combination of a man reaching down for a weapon and an officer

14   on the ground, and the man appeared to be advancing towards

15   that officer on the ground.  Notwithstanding everything else, I

16   think we all agree that this situation was absolutely horrific.

17        If this looks the way that my client testified that

18   it looks, then it's a lawfully justified action; namely, we

19   have to ask, is it reasonable?  But, of course, it's a pretty

20   minor -- this is a pretty minor response.  I mean, much more

21   would be done.

22        But the idea that -- the fact that my client didn't

23   go charging, pushing his way through the crowd, up the stairs

24   and physically attack the attackers, it's interesting to have

25   that discussion, but it really doesn't speak to any of the

1      issues that are meritorious in this case, other than, perhaps,

2      the issue of whether my client was really trying to help this

3      officer.

4              But for him to be not guilty of the crime, he doesn't

5      have to follow it up.  He doesn't have to find another weapon

6      and attack the attackers or something like that.  The reality

7      is that he took that one act and --

8              THE COURT:  The only arguments of what he did or

9      didn't do is relevant to assessing the believability of what he

10     says was his motivation.

11             MR. CRONKRIGHT:  And I would concede that point.  I

12     do think that it's relevant.  I don't think it's dispositive in

13     any way because he took an action.

14             And then the next question is, was that reasonable?

15     Was his action reasonable?  I suppose, you know, if the

16     assertion is, no, it wasn't reasonable, he should have done

17     more, that doesn't seem to have any merit.

18             But I do understand that the Court can look at that

19     and try to say, do I believe the evidence as he's presented it

20     that he was coming to the aid of an officer?  So that is the

21     pivotal question, and I think the Court needs to look at that.

22     Our assertion is that in this case no crime was committed

23     because it is a lawfully justifiable action.

24             We're not conceding that the -- ultimately, that the

25     flagpole struck an officer.  In fact, if you look at the video,

1    I think it's reasonable to think that maybe it struck more than

2    one officer because it seemed to be bouncing around amongst the

3    crowd.

4            None of that changes the fact that the Court is

5    presented with an argument that, based on the elements and also

6    an argument based on defense of others, my client is not guilty

7    of that crime.  Thank you for your time, Your Honor.

8            THE COURT:  Thank you, Mr. Cronkright.  It will be

9    Mr. Haag.

10           MR. HAAG:  Thank you, Your Honor.  I want to start

11   briefly with a hypothetical weapon with respect to the

12   dangerous weapon.  Imagine --

13           THE COURT:  Which dangerous weapon?

14           MR. HAAG:  The banner, Your Honor.  I'm imagining a

15   scenario where someone is swinging a metal pole at a victim,

16   and the victim is able to stop the assailant, grab their hands

17   and is struck by the metal pole.  However, you would still say

18   that the metal pole, the metal pipe is a dangerous weapon.

19           And the reason why you would reach that conclusion is

20   he needs to look at the nature of the object, analyze the

21   object itself.  How long is it?  What type of metal is it made

22   out of?  The thickness of the pipe, all those kind of things

23   inform the analysis about whether or not something is a

24   dangerous weapon.

25           And similarly here, the reason why the tripping was

1    brought up with Sergeant Cropper was to indicate that the metal

2    banner was not just metal, but that there were corners on it,

3    and the corners on it were capable of causing injury, as can be

4    seen by just tripping over the thing.  So that is the reason

5    why that fact about the sign informs the analysis of whether or

6    not something is a dangerous weapon.

7            THE COURT:  Let me ask one or two questions.  It

8    seems to me that Mr. Cronkright is arguing that Metropolitan

9    Police are not covered under the language of 111.

10           MR. HAAG:  Your Honor, that was a point I was going

11   to address here.  I want to point out that pretty much -- or I

12   think every witness in this case testified that the

13   Metropolitan Police and other law enforcement agencies were

14   there to assist Capitol Police officers.

15           THE COURT:  Therefore?

16           MR. HAAG:  And at the beginning of Captain Mendoza's

17   testimony, she indicated that the Capitol Police is something

18   that is set forth by federal law; that the objectives of the

19   Capitol Police are protected by federal law.

20           THE COURT:  Therefore?

21           MR. HAAG:  They are federal agents; therefore,

22   Metropolitan Police officers coming to assist the Capitol

23   Police --

24           THE COURT:  Wait a minute, wait a minute.  If I

25   assisted a Capitol Police officer, would I be covered, and it

1    would give rise to a 111 charge against someone who assaulted

2    or interfered with me?

3              MR. HAAG:  It's persons assisting a federal officer.

4              THE COURT:  It's what?

5              MR. HAAG:  Persons assisting a federal officer.

6              THE COURT:  So if I were a person assisting a federal

7    officer, would that mean that 111 could apply to an assault or

8    interference with me?

9              MR. HAAG:  I would have to pull up the specific

10   language of the statute, which I believe my colleague is

11   pulling up right now.

12             THE COURT:  The statute, 111, doesn't really answer

13   it because you have to refer to what --

14             MR. HAAG:  A federal officer is defined as.

15             THE COURT:  -- a federal officer would be, which is,

16   what, 1114?

17             And that provision says -- I'm not even sure that

18   that's the right provision.  What is the provision that gives

19   the definition of -- well, it is.  Person designated in

20   Section 1114 of this title.  And 1114 says, "Or attempts to

21   kill any officer or employee of the United States or of any

22   agency in any branch of the United States Government, including

23   any member of the uniformed services, while such officer or

24   employee is engaged in or on account of the performance of

25   official duties."

1          It doesn't say -- "Or any person assisting such an

2    officer or employee in the performance of such duties or on

3    account of that assistance."  So that's the language.

4          MR. HAAG:  That's the language I was looking for,

5    Your Honor.

6          THE COURT:  So it would cover any person.  It would,

7    arguably, cover me.

8          MR. HAAG:  Arguably, yes.  But here's a situation

9    where you have a law enforcement agency assisting another law

10   enforcement agency.  I think we're covered there.

11         We're turning back to the assault question.  The

12   defendant is raising this argument that he was trying to torque

13   the sign up, that he was trying to put the sign up.  If we

14   could pull up 218A.

15         Your Honor, circling the top of the screen right

16   here, the defendant here is not trying to torque it up; he's

17   not trying to push it up.  He's trying to push it forward.

18   This is an individual, who he himself said he was 250 pounds at

19   this point.  He was trying to use his entire body weight to

20   push this thing forward into the officers.

21         And the reason why his body weight and what's going

22   on here is important, again, informs the dangerous weapon

23   analysis.  Is the sign used in a manner that would potentially

24   cause injury?

25         I think if these officers here are not pushing back,

1    if they're not fighting back, this sign going into them, again,

2    the face gap between the helmet and their neck, the sign going

3    in there, the edges of the sign going into their necks is

4    definitely capable of causing injury; again, going back to the

5    tripping idea with Agent Cropper -- Sergeant Cropper.  Thank

6    you.

7          But even assuming, for sake of argument, the

8    defendant's story of trying to put up the sign is correct, a

9    few frames after this during direct testimony with the

10    defendant, the defendant pointed out, as Sergeant Cropper was

11    in the crowd, he had moved past the bike racks at this point,

12    basically, in the face of the defendant, trying to push the

13    defendant off of the sign.  If the defendant at that point is

14    trying to push the sign down into the ground to get the sign to

15    go up, that would have to go through Sergeant Cropper.  It's

16    making contact with Sergeant Cropper.

17          THE COURT:  You think the video evidence shows that?

18          MR. HAAG:  Yes, Your Honor.  Because there's the

19    portion of the video that Sergeant Cropper is pushing the

20    defendant away from the sign, and the defendant specifically

21    said at that frame, if -- he's trying to push the sign down.

22    If he's trying to push the sign down, he has to make contact

23    with Sergeant Cropper.  Sergeant Cropper said that the sign

24    was interfering; Sergeant Riley, similarly, was saying that the

25    sign was interfering with police officers' ability to --

1          THE COURT:  Well, for two different reasons.

2    Sergeant Riley was thinking that it was being used or would be

3    used as a battering ram.  Sergeant Cropper was not thinking

4    that.

5          MR. HAAG:  Certainly different reasons.  But the

6    video here shows that if the sign were to have gone down as

7    Sergeant Cropper was standing there, that would have interfered

8    with him.

9          THE COURT:  That was during the eight seconds that

10    Mr. Padilla was touching the handle of the sign?

11          MR. HAAG:  Yes, Your Honor.  I believe it's the

12    period where his hands are -- the sign is kind of stretched

13    apart, towards the end of the sequence.

14          THE COURT:  With that, I'll look at it again.

15          MR. HAAG:  With respect to 111(a), as a subsidiary of

16    the 111(b), even if Your Honor does not find that the banner

17    here is a dangerous weapon, you can still find the defendant

18    guilty of 111(a) as we've discussed with the interference,

19    impeding, and here I think this is --

20          THE COURT:  You don't even need that for Count 1,

21    right, because it actually -- does Count 1, as asserted by the

22    government, include his conduct at the barrier without the

23    large sign?

24          MR. HAAG:  So there are three separate assaults that

25    are charged in this case.  The first is the bike rack push the

1    defendant admitted that he was guilty of.

2            THE COURT:  Is that Count 1?

3            MR. HAAG:  That's Count 1.  And then Count 2 is what

4    we see here.  So it's two distinct assaults.  I do want to make

5    the record clear with that.

6            And you can find him guilty of the 111(a) with

7    respect to the banner here; one, based on physical contact;

8    and, two, based on intent to commit another felony.  Either one

9    would suffice.

10            THE COURT:  And on Count 1, which is at the barrier,

11    is it -- I mean, I can say this as to whether it's 20, 8, or 1.

12    What is the government asserting that the Court should conclude

13    in terms of the offense?  That it is the simple assault that is

14    a one-year offense, or that it is -- involves acts -- that the

15    acts involved physical contact with the victim of the assault

16    and, therefore, it's an eight-year penalty provision?

17            MR. HAAG:  So in addition to the physical contact,

18    Your Honor, there's the intent to commit another felony.  And

19    that would be the civil disorder; that is Count 3.

20            So in addition to the defendant pushing the bike rack

21    into the officers -- that's the physical contact -- the

22    alternative would be the intent to commit another felony, which

23    is the civil disorder.  That civil disorder rationale also

24    applies to Count 2 as the alternative to 111(b).

25            THE COURT:  Right.

 1          MR. HAAG:  Turning briefly to the flagpole, Your

 2     Honor, I brought up the neck gap with respect to the banner,

 3     but I also want to bring it up here.  If Your Honor watches

 4     closely with the hockey sticks, those being swung, there's an

 5     individual to the right jabbing the crutch at one of the

 6     officers, and you can distinctly see the officer's neck skin.

 7          Fortunately, the rioter there just barely misses the

 8     officer's neck, but the officer still recoils being struck and

 9     jabbed near the neck area and kind of collapses to the ground.

10          THE COURT:  It would be a pretty astounding finding,

11     I think, to say that throwing -- let's make it simpler.  Have

12     one officer standing there in the gear, including helmet, and

13     someone throwing a flagpole and striking their helmet.  That

14     somehow, because the officer has sufficient body protection on,

15     that's not a dangerous weapon.  That seems to me to be a

16     stretch.

17          MR. HAAG:  Certainly, Your Honor.  And I would agree

18     with that there.

19          One last point that I wanted to make about

20     Mr. Padilla and what his thinking was.  Counsel a moment ago

21     was bringing up this idea that Officer Corado was not able to

22     see the officer down on the ground in front of him, and somehow

23     Mr. Padilla could see that.

24          But the fact of the matter is, at the time that the

25     officer was on the ground, Officer Corado was being assaulted

1    by multiple rioters from multiple different angles, as were his

2    fellow officers.  He was wearing a gas mask that was

3    obstructing his vision that covered his entire face, in

4    addition to another plastic shield on top of him.  His vision

5    was clearly impaired at the time.

6           So I don't think there should be placed too much

7    credence on the fact that Officer Corado, who was standing

8    directly in front of this downed officer, could not see the

9    downed officer.

10           THE COURT:  So assuming that the defense of others is

11    properly raised here, do you think -- well, what do you think

12    defeats that?  Does the defendant meet the initial production

13    burden that the defendant has?

14           MR. HAAG:  With his own testimony, I think there

15    might be some burden met there.  It's depending on whether or

16    not Your Honor believes that testimony.  I think there's a lot

17    to doubt there.

18           But looking at the video evidence, the defendant is

19    clearly not trying to defend the downed officer as Your Honor

20    was pointing out with --

21           THE COURT:  Well, if I assume that they've at least

22    met that burden of production by the theory and testimony that

23    is provided by Mr. Padilla, then how do I assess it?  Then it's

24    the government's burden beyond a reasonable doubt to defeat the

25    defense.

1          MR. HAAG:  Certainly, Your Honor.

2          THE COURT:  You've said in your papers that the

3     defense has five elements.  So how is it defeated?  Tell me how

4     you defeat that defense.  I mean -- sort of simplistically,

5     it's defeated if I don't believe Mr. Padilla.

6          MR. HAAG:  Certainly.

7          THE COURT:  But how does that fit into the framework

8     of the defense?

9          MR. HAAG:  So walking through those five elements,

10    whether or not the defendant actually believed someone was in

11    danger, I think, as Mr. Brasher pointed out in his closing

12    argument, walking through what happened after the flagpole

13    throw, he clearly had no care of whether or not the officer was

14    in danger.  That was not --

15         THE COURT:  He might believe that the officer was in

16    danger.  Doesn't -- that element doesn't say, and he cared

17    about it.  It just says he believed he was in danger.  We all

18    can see the video, and it looks like that officer was in

19    danger.

20         MR. HAAG:  I think -- I understand where you're

21    coming from, Your Honor.  But to me, the actions of the

22    defendant afterwards do inform whether or not he thought the

23    officer was in danger.

24         THE COURT:  But it informs more whether he cared that

25    the officer might be in danger.

1          MR. HAAG:  I will concede that, Your Honor.

2          Second, whether the belief was reasonable.  The video

3     clearly shows that the officer was in danger at that point;

4     that that is definitely the case.  Whether or not the defendant

5     believed that the use of force was necessary to defend the

6     person in danger, that's pretty much a stretch.  That wasn't

7     what the defendant was trying to do.  He was not trying to

8     defend the person that was in danger.  He was trying to strike

9     one of the officers.

10         Whether that would have reasonably stopped the

11    rioters, even if he was trying to target the one individual

12    stepping across, I think, is also a stretch as well.  And the

13    defendant used a reasonable amount of force.  He didn't -- I

14    have to think through that one a little bit more, Your Honor.

15    But for here, in this case the defendant was not trying to help

16    that officer.

17         THE COURT:  It seems to me that the government's

18    response is a little different than any of these five elements

19    because the government's response is, basically, that's not why

20    he threw the flag.  Do you need a second?

21         MR. HAAG:  No, Your Honor.  I think I would actually

22    revisit my initial conclusion.  The defendant has not met his

23    burden in this case.  This was not a defense of another.  This

24    is not something that would go to the jury.

25         THE COURT:  Because it's not believable that that's

```
1     why he threw the flag --

2               MR. HAAG:  Certainly.

3               THE COURT:  -- that it was in defense of others?

4               MR. HAAG:  Certainly.

5               THE COURT:  All right.  Anything else?

6               MR. HAAG:  That's all, Your Honor.

7               THE COURT:  All right.  Thank you.

8               Okay.  I will chew on this for a little bit, and

9     maybe we should get back together at 1:45, and I'll intend to

10    render a verdict on these 11 counts at that time.  All right.

11    See you then.

12              (Lunch recess taken at 11:45 a.m. until 1:45 p.m.)
```

1        AFTERNOON SESSION - MAY 3, 2023

2        USA V. PADILLA - CASE NO. 1:21-CR-214

3              2:10 P.M.

4        THE COURTROOM DEPUTY:  Recalling Criminal

5    Action 21-214, United States of America v. Joseph Padilla, and

6    all counsel are present, Your Honor.

7        THE COURT:  All right.  Good afternoon to everyone.

8    I've heard the evidence and the arguments of counsel, and I

9    appreciate that.  And I've reviewed the evidence, both in the

10   courtroom and outside the courtroom, and I'm ready to render a

11   verdict on all counts.

12        We're here because in early January 2021, Mr. Padilla

13   traveled to Washington where he participated in the riot at the

14   United States Capitol on January 6th.  The details of his

15   participation have been described by the witnesses and through

16   the video and other evidence presented during the trial over

17   the last two days.

18        Specifically, the government alleges that his conduct

19   on January 6th violated a number of federal statutes as set out

20   in the 11 counts in the superseding indictment.

21        Two counts of assaulting, resisting, or impeding

22   certain officers during a dangerous -- I'm sorry -- using a

23   dangerous weapon, in violation of 18 U.S.C. 111(a)1 and (b).

24   That's Counts 2 and 4.

25        Two counts of civil disorder, in violation of

 1    18 U.S.C., Section 231(a)(3).  That's Counts 3 and 5.

 2            Assaulting, resisting, or impeding certain officers,

 3    in violation of Title 18 of the U.S. Code, Section 111(a)1.

 4    That is Count 1.

 5            Obstruction of an official proceeding and aiding and

 6    abetting, in violation of Title 18 of the U.S. Code,

 7    Section 1512(c)(2) and Section 2.  That's Count 6.

 8            Entering and remaining in a restricted building or

 9    grounds with a deadly or dangerous weapons, in violation of

10    18 U.S.C. 1752(a)(1) and (b)(1)(A).  That's Count 7.

11            Count 8 is disorderly and disruptive conduct in a

12    restricted building or grounds with a deadly or dangerous

13    weapon, in violation of 18 U.S.C. 1752(a)(2) and (b)(1)(A).

14            Count 9, engaging in physical violence in a

15    restricted building or grounds with a deadly or dangerous

16    weapon, in violation of Title 18 of the U.S. Code, 1752(a)(4)

17    and (b)(1)(A).

18            Count 10, disorderly conduct in the Capitol Grounds

19    or Building -- Buildings, in violation of Title 40 of the U.S.

20    Code, Section 5104(e)(2)(D).  That's Count 10.

21            And the last count, Count 11, an act of physical

22    violence in the Capitol Grounds or Buildings, in violation of

23    40 U.S.C., Section 5104(e)(2)(F).

24            That's a lot of counts, so it will take a couple

25    minutes or more.

1          Over the last two days, the government called six

2   witnesses.  We all know who those witnesses are.  They are

3   Metropolitan Police officers, Capitol Police officers and

4   Special Agent Mac Montana of the FBI.  And the only defense

5   witness was Mr. Padilla.

6          Special Agent Montana testified about social media

7   posts, messages she recovered from Mr. Padilla's accounts

8   showing, among other things, his plans to travel to Washington,

9   D.C., on January 6th to engage in violent protests and occupy

10  the Capitol to disrupt the electoral certification and

11  overthrow the government.

12         The testimony from the other government witnesses and

13  video footage illustrated the breach of the Capitol and tracked

14  Mr. Padilla's movements and actions throughout the Capitol

15  Grounds on the afternoon of January 6th.  The video footage

16  showed several instances of Mr. Padilla resisting officers'

17  orders to back away from bike rack barricades by ramming or

18  pushing into them and encouraging others to do so as well.

19         Several instances of Mr. Padilla taunting police

20  officers and vocalizing his intent to breach the barricades and

21  enter the Capitol against the police officers' orders.  One

22  instance of Mr. Padilla briefly grabbing a large metal sign

23  being crowd-surfed by protestors toward the police barricade,

24  and an instance of Mr. Padilla launching a flagpole toward a

25  line of police officers guarding an entrance to the Capitol.

1      Mr. Padilla testified about his state of mind before

2   and during his actions on January 6th and his intent in making

3   the social media posts introduced through Special Agent

4   Montana's testimony.  After considering all of the evidence and

5   the arguments of counsel, for the reasons that I will explain,

6   I find Mr. Padilla guilty on almost all counts.

7      We'll start with Count 1, assaulting, resisting, or

8   impeding certain officers.  That's Section 111(a)1 of Title 18.

9   That count charges Mr. Padilla with assaulting, resisting, or

10  impeding certain officers through his actions at the police

11  barricade line.

12      To find Mr. Padilla guilty of this offense, I must

13  find the following four elements beyond a reasonable doubt:

14      First, that the defendant assaulted, resisted,

15  opposed, impeded, intimidated, or interfered with an officer or

16  an employee of the United States who was then engaged in the

17  performance of his official duties; or with any person

18  assisting officers of the United States who were then engaged

19  in the performance of their official duties.

20      Second, that the defendant did such acts forcibly.

21  Third, that the defendant did such acts voluntarily and

22  intentionally.  And, fourth, the defendant made physical

23  contact with a person who was an officer or an employee of the

24  United States who was then engaged in the performance of his

25  official duties or assisting officers of the United States, who

1    were then engaged in the performance of their official duties,

2    or acted with the intent to commit another felony.

3          First, I find that Mr. Padilla assaulted, resisted,

4    opposed, impeded, intimidated, or interfered with an officer of

5    the U.S. Capitol Police or the Metropolitan Police Department,

6    or were assisting the U.S. Capitol Police in the performance of

7    their official duties throughout -- through his actions with

8    respect to the police barricades.

9          For the Capitol Police and MPD on January 6, 2021,

10   the term official duties means policing the U.S. Capitol

11   Building and Grounds and enforcing federal law and D.C. law in

12   those areas.

13         Both officers who testified and were on the other

14   side of the police barricade that Mr. Padilla pushed into were

15   MPD officers deployed to the Capitol on January 6th to aid the

16   U.S. Capitol Police in securing the Capitol Building and

17   Grounds from rioters.  When Mr. Padilla pushed into the

18   barricades, the officers were performing their official duty of

19   trying to maintain the integrity of the barricades to keep

20   unauthorized members of the public out of the restricted area.

21         Testimony from MPD Sergeant Jayson Cropper, as well

22   as video footage, demonstrates that Mr. Padilla pushed his body

23   weight against the bike racks forming the police barricades

24   several times in an attempt to breach the barricade at the

25   Lower West Terrace.

1    Mr. Padilla is shown at approximately 1:38 p.m.

2    yelling -- and I quote -- "Push.  Fucking push," while using

3    his body weight to push into the police barricade with an

4    officer standing directly in front of him behind the barricade.

5    That's Government Exhibit 209 at 9:15.

6    Police officers proceeded to push him back, but he

7    keeps his hands on the barricade and keeps pushing until his

8    hands are forcibly removed and he is pushed back.  Mr. Padilla

9    admitted during his testimony that he committed an assault

10    during this episode.

11    And Detective Sergeant Owais Akhtar's testimony and

12    video footage from his body-worn camera demonstrates that

13    Mr. Padilla began pushing on the police bike rack barricade at

14    approximately 2:09 p.m. after he was directed to move back from

15    the barricade.  That's Government Exhibit 207.

16    He puts his hands on the barricade and uses his body

17    weight to push forward, all while officers are yelling at

18    rioters to move back.  Further, at this location, Mr. Padilla

19    was far and away the most aggressive of the rioters.  This

20    behavior undoubtedly constitutes resisting, opposing, and

21    impeding police officers.  His actions were resistant to the

22    officers' attempt to keep rioters off and away from the

23    barricades, and his actions in ramming into the barricades

24    interfered with the officers' job that day, which was to

25    protect the Capitol Grounds by keeping the barricades in place

1    to keep the rioters out.

2         Mr. Padilla admits as much in the social media post

3    after January 6th indicating that, "That railing was mine.  I

4    just held onto a railing and pushed.  I did this five times

5    until all the railings were gone."  Government Exhibit 301.

6         Second, I find Mr. Padilla did these acts forcibly.

7    The defendant acted forcibly if he used force, attempted to use

8    force, or threatened to use force against the officer.

9    Mr. Padilla used force when using his body weight to

10   continuously push the police barricades back into police

11   officers.

12        Third, I find Mr. Padilla performed these actions

13   knowingly and voluntarily.  He was captured on video yelling,

14   "Push, push.  Fucking push."  That's Exhibit 209.  He also

15   repeatedly tells officers he will not back down.  Again,

16   Government Exhibit 209 at various places.

17        And his social media posts from after January 6th

18   indicate that he was trying to push his way into the Capitol.

19   That's found at Government Exhibit 301.

20        Last, I find Mr. Padilla made physical contact with

21   those and other officers while he was pushing into the

22   barricade.  The video footage shows that he thrust himself into

23   the bike rack, which made physical contact with the police

24   officers standing directly on the other side; thus, making

25   indirect contact through his use of force against the bike

1    rack.

2    Hence, I find Mr. Padilla guilty on Count 1 beyond a

3    reasonable doubt.

4    Counts 2 and 4 are assaulting, resisting, or

5    impeding certain officers using a dangerous weapon.  The

6    statute there is 18 U.S.C., Section 111(a)(1) and (b).  Count 2

7    of the indictment charges Mr. Padilla with assaulting,

8    resisting, or impeding certain officers using a dangerous

9    weapon through his actions involving the large metal sign.

10    It's a metal frame of a sign.

11    Count 4 charges him with the same offense related to

12    his act of throwing a flagpole.  To find Mr. Padilla guilty of

13    these offenses, I must find the following four elements beyond

14    a reasonable doubt as to each count:

15    First, the defendant assaulted, resisted, opposed,

16    impeded, intimidated, or interfered with an officer or an

17    employee of the United States who was then engaged in the

18    performance of his official duties or with any person assisting

19    such an officer or employee in the performance of that

20    officer's duties.

21    Second, the defendant did such acts forcibly.  Third,

22    the defendant did such acts voluntarily and intentionally.

23    And, fourth, in doing such acts, the defendant intentionally

24    used a deadly or dangerous weapon.

25    I'll turn first to Count 2.  I find that the

1    government has not met its burden and, therefore, find

2    Mr. Padilla not guilty on this count.

3          Here I find that the evidence, specifically the video

4    footage depicting Mr. Padilla grabbing the moving large metal

5    sign, is ambiguous as to what Mr. Padilla intended to do with

6    the sign.  The government argues that the evidence shows that

7    Mr. Padilla was trying to use it as a battering ram to bash

8    into the police line behind the barricade, and others may have

9    been intending that.

10          Mr. Padilla claims he was trying to stand the sign

11    up.  The video footage is of little help resolving these

12    disputing narratives.  Mr. Padilla holds onto a handle and the

13    pole attached to the sign for only eight seconds and during

14    that time appears to move it up and down; at one point appears

15    to pull it back away from the officers; and from one angle

16    appears to push it forward into the barricade.  That can be

17    found at Government Exhibit 209 and Government Exhibit 218.

18          He also grabs onto the sign seconds after another

19    rioter next to him yelled into a bullhorn, "Put it up here.

20    Put it up here," which lends some credibility to Mr. Padilla's

21    claim that he was trying to stand the sign up.  When he grabs

22    onto the pole appended to the sign, he appears to push the pole

23    up, which undermines the government's argument that he was

24    pushing it into the line of police officers.  That can be found

25    at Government Exhibit 209 at 11:13.

1          From an aerial angle, video footage shows Mr. Padilla

2     seconds later pushing the pole forward and then pulling the

3     pole backwards away from the officers.  That can be found at

4     Government Exhibit 218 at 2:00.

5          The parties seem to dispute whether this is a general

6     intent or a specific intent crime, whether I need to find that

7     Mr. Padilla intentionally used the metal sign to assault,

8     impede, or interfere with an officer, or whether it is enough

9     that Mr. Padilla intentionally grabbed the sign, and the result

10    of his actions with respect to the sign impeded officers.

11         But I need not resolve that dispute here because I

12    find that the government has not met its burden showing that

13    Mr. Padilla used force against an officer.  The video footage

14    is ambiguous on this point because at different points during

15    the eight seconds -- and it's only eight seconds -- that he was

16    touching the sign, he moves the metal pole in different

17    directions, much of the time not toward the officers behind the

18    barricade.

19         This is not sufficient to conclude beyond a

20    reasonable doubt that Mr. Padilla's actions with respect to the

21    sign were forcible.  And, hence, I find Mr. Padilla not guilty

22    on Count 2.  I will, therefore, not reach the issue of whether

23    the metal sign was a deadly or dangerous weapon in this

24    context.

25         For the same reasons, I also find Mr. Padilla not

1   guilty as to the lesser included offense charged in Count 3.

2   That's not Count 3.  It's Count 2, I believe.  That would be

3   the lesser included offense charged in Count 2.

4          Turning next to Count 4, which charges Mr. Padilla

5   with assaulting, resisting, or impeding certain officers using

6   a dangerous weapon through his act of throwing a flagpole,

7   first, I find that Mr. Padilla assaulted, resisted, opposed,

8   impeded, intimidated, or interfered with officers when he threw

9   a flagpole at the police line guarding the entrance of the

10  lowest -- of the Lower West Terrace tunnel.

11         Video footage shows that, while Mr. Padilla was

12  outside the entrance of the tunnel, he carried a plastic

13  flagpole, aimed it toward the mouth of the tunnel, and launched

14  it like a javelin into the tunnel where the line of police

15  officers were standing trying to keep rioters out.  Government

16  Exhibit 229 shows that.

17         The flagpole hit the helmet of United States Capitol

18  Police Officer Oscar Corado and made contact with another

19  police officer as well.  Mr. Padilla acknowledges this in his

20  testimony.  Officer Corado testified that, having objects

21  thrown at him, including the flagpole that Mr. Padilla threw,

22  disrupted his ability to do his job that day, thus, impeding

23  and interfering with his official duties of protecting the

24  Capitol.

25         Officer Corado is a federal officer, a U.S. Capitol

1    Police officer.  And when he was struck, he was performing his

2    official duties of protecting the Capitol and maintaining the

3    police line.

4        Second, I find Mr. Padilla did so voluntarily and

5    intentionally.  "The law permits the fact finder to infer that

6    a person intends the natural and probable consequences of their

7    actions."  That's *United States vs. Mejia*, M-e-j-i-a,

8    597 F.3d 1329, jump cite 1341, D.C. Circuit 2010.

9        Here, the video footage shows Mr. Padilla watching

10   rioters overwhelm the line of officers standing at the mouth of

11   the tunnel by throwing all manner of objects at them.

12   Government Exhibit 229 again shows this.

13       Mr. Padilla acknowledged in his testimony that the

14   violence escalated dramatically and that some members of the

15   mob were beating police officers on the line with crutches and

16   hockey sticks, and that's shown clearly on the video.  He

17   observed the effect that those rioters' actions of throwing

18   objects had on the police line.  It was severely overwhelming

19   them and impeding their ability to hold the line.

20       He then chose to join those rioters by aiming the

21   flagpole at the police line and deliberately launching the

22   flagpole with his other hand directly into the police line.

23   Because the natural and probable causes of that action are to

24   strike and, thus, to impede and interfere with those officers,

25   the Court concludes that Mr. Padilla intended that result when

1    he launched the flagpole.

2            The Court does not credit Mr. Padilla's version of

3    the events.  He claimed in his testimony that he threw the

4    flagpole intending to strike another rioter who he believed was

5    about to assault an officer who was down, but this explanation

6    is belied by the video footage.

7            First, Mr. Padilla stands and watches for minutes as

8    other rioters violently attack the police line, but he does

9    nothing about it.  He just observes as rioters directly around

10   him launch objects at the officers.  There was an officer

11   swarmed by a group of rioters who were grabbing onto him while

12   he was clearly struggling, mere feet away from Mr. Padilla, and

13   he did nothing.

14           Thus, his claim that he suddenly became concerned and

15   wanted to help officers at the time that, for purposes of this

16   trial, it was convenient for him to claim concern is not

17   credible.

18           Second, his head is turned away from the other rioter

19   at the time that the rioter bends over to pick up the weapon

20   that Mr. Padilla claims he was worried that rioter would use to

21   beat the officer who was down.  So it's highly unlikely that

22   Mr. Padilla even saw that.

23           Third, he puts up and cocks back the flagpole in a

24   throwing position before the rioter even begins to walk across

25   the opening of the tunnel.  Thus, he could not have been aiming

1    at him because he had already made the decision to throw it

2    before the man approached the officer who was down.

3            Last, after Mr. Padilla threw the pole, he makes no

4    attempt to help the downed officer by approaching him and does

5    not attempt to stop other rioters around him causing chaos and

6    throwing objects at officers.  The video footage shows that he

7    stands there for several more minutes idly watching the chaos

8    unfold around him.

9            Hence, the Court will not credit Mr. Padilla's

10   testimony that he intended to launch the flagpole at another

11   rioter rather than at the police line and the officer he

12   ultimately struck.  His "defense of others" claim is simply not

13   credible based on a clear -- on the clear video evidence to the

14   contrary.

15           Third, I find that Mr. Padilla threw the flagpole

16   forcibly for much of the same reasons discussed above or

17   earlier.  I find that he threw the flagpole, which required the

18   use of force, against Officer Corado, who was struck with it.

19           Fourth, I find that the person assaulted, resisted,

20   opposed, impeded, intimidated, or interfered with was an

21   officer or an employee of the United States who was then

22   engaged in the performance of his official duties.  Officer

23   Corado is a U.S. Capitol Police officer, and when he was

24   struck, he was performing his official duties of protecting the

25   Capitol and maintaining the police line.

1          Last, I find that, in doing such act, Mr. Padilla

2    intentionally used a deadly or dangerous weapon.  Relevant

3    here, an object is a deadly or dangerous weapon if the object

4    is capable of causing serious bodily injury or death to another

5    person, and the defendant carried it with the intent that it be

6    used in a manner capable of causing serious bodily injury or

7    death.  A flagpole is certainly capable of causing serious

8    bodily injury.

9          Given its shape and size, it could cause serious

10   damage if it hits someone in the head, particularly if it

11   struck someone in the eye.  And as discussed earlier, I find

12   that Mr. Padilla used the flagpole with the intent to strike an

13   officer and impede or interfere with his duties by launching it

14   at him, and that action was capable of causing serious bodily

15   injury to the officer.

16         Mr. Padilla admitted in his testimony that the way in

17   which he used the flagpole could have been dangerous if the

18   officers were not wearing helmets.  But Mr. Padilla could not

19   have possibly known with certainty that all the officers in

20   that police line were wearing helmets.  In fact, video footage

21   shows that at least one officer lost his helmet.

22         In any event, the flagpole could still cause injury

23   even to an officer wearing a helmet due to the fact that there

24   was a gap between the end of the officer's face shield and the

25   body armor that would expose an individual's neck.

1          Hence, I find that the flagpole Mr. Padilla used

2   outside the Lower West Terrace tunnel is a deadly and

3   dangerous -- deadly or dangerous weapon.  I, therefore, find

4   Mr. Padilla guilty on Count 4 on evidence presented beyond a

5   reasonable doubt.

6          Counts 3 and 5 are civil disorder.  Mr. Padilla is

7   charged with civil disorder through his actions along the

8   police line.  In Count 3 that involves the bike racks and the

9   large metal sign.  And then Count 5 charges him with the same

10  offense related to his act of throwing a flagpole near the

11  tunnel at approximately 4:47 p.m.

12         To find Mr. Padilla guilty of these offenses, I must

13  find the following three elements beyond a reasonable doubt as

14  to each count:

15         First, the defendant knowingly committed an act with

16  the intended purpose of obstructing, impeding, or interfering

17  with one or more law enforcement officers.

18         Second, at the time of the defendant's actual act,

19  the law enforcement officer or officers were engaged in the

20  lawful performance of their official duties incident to and

21  during a civil disorder.

22         And, third, the civil disorder in any way or degree

23  obstructed, delayed, or adversely affected either commerce or

24  the movement of any article or commodity in commerce or the

25  conduct or performance of any federally protected function.

1          Looking first at Count 3, which charges civil

2     disorder with respect to Mr. Padilla's actions involving the

3     bike racks and the large metal sign, I find that he knowingly

4     committed an act with the intended purpose of obstructing,

5     impeding, or interfering with one or more law enforcement

6     officers when he repeatedly pushed into the police barricades.

7          A person acts knowingly if he realizes what he is

8     doing and is aware of the nature of his conduct and does not

9     act through ignorance, mistake, or accident.  As discussed with

10    respect to Count 1 already, Mr. Padilla knowingly pushed the

11    barricades into the police line on numerous occasions.  He

12    admitted to this conduct during his testimony, and his social

13    media posts after January 6th indicate that he did so with the

14    express purpose of pushing his way into the Capitol, which

15    impeded the officers' purpose that day of keeping the barriers

16    in place to prevent the rioters from breaking through as

17    discussed in the previous counts.

18          Second, I find that the law enforcement officers who

19    Mr. Padilla impeded by pushing the barricades were engaged in

20    the lawful performance of their official duties incident to and

21    during the civil disorder.

22          The term civil disorder means any public disturbance

23    involving acts of violence by groups of three or more persons

24    which:  A, causes an immediate danger of injury to another

25    individual; B, causes an immediate danger of damage to another

1    individual's property; C, results in injury to another

2    individual; or D, results in damage to another individual's

3    property.

4         The riot at the Capitol on January 6th was certainly

5    civil disorder.  As we heard from testimony and saw on video

6    footage, the actions of the rioters at the Capitol on

7    January 6th involved violence and resulted in personal injury

8    and property damage.

9         In addition to rioters, including Mr. Padilla pushing

10   barricades into police, video footage shows that several

11   rioters were violently beating police officers at the opening

12   of the Lower West Terrace tunnel.  During his testimony,

13   Mr. Padilla remarked how quickly the violence by rioters

14   against police officers was escalating and noted that rioters

15   were using all manner of objects to injure police officers,

16   including some rioters beating them with hockey sticks and

17   crutches.  And that is only one small snapshot of the violence

18   and mass destruction committed by the mob at the Capitol on

19   January 6th.

20        Officer Corado testified to injuries he saw officers

21   sustain that day from the violent actions of the mob, and video

22   footage showed one officer with a bleeding head and another

23   officer down on the ground.  Sergeant Paul Riley testified that

24   he was personally hit by flying objects thrown by the mob and

25   that he observed other officers sustain injuries as well.

1            Captain Mendoza testified to the chaos of the day,

2    including that officers were distressed and asking for

3    assistance as the mob started to swell, ultimately causing the

4    evacuation of the Vice President and delay of the certification

5    proceedings.

6            In total, I think it's 180 officers who were injured

7    on January 6th.  Hence, the events of January 6th were civil

8    disorder, and by pushing the police barricades into officers,

9    Mr. Padilla's actions impeded the lawful performance of those

10   officers' official duties incident to and during that civil

11   disorder.

12           Last, I find that the civil disorder that occurred at

13   the Capitol on January 6th adversely affected commerce.  The

14   term commerce means commerce or travel between one state,

15   including the District of Columbia, and any other state,

16   including the District of Columbia.  It also means commerce

17   wholly within the District of Columbia.

18           The government introduced business records from

19   Safeway grocery stores within the District that showed a

20   dramatic decrease in sales from the projected level on

21   January 6th due to store closures due to the Capitol riot.

22   That's Government Exhibit 407.

23           This constituted an adverse effect on commerce.

24   Hence, I find Mr. Padilla guilty on Count 3.

25           Count 5 charges Mr. Padilla with another count of

1    civil disorder related to his actions of throwing a flagpole in

2    front of the Lower West Terrace tunnel.  For the reasons

3    discussed in Count 4, I find that, by throwing the flagpole,

4    Mr. Padilla knowingly committed an act with the intended

5    purpose of obstructing, impeding, or interfering with one or

6    more law enforcement officers.

7         Second, for the same reasons discussed in Count 3, I

8    find that at the time of Mr. Padilla's acts, officers were

9    engaged in the lawful performance of their official duties

10   incident to and during a civil disorder.  When Mr. Padilla

11   launched the flagpole, Officer Corado and those around him were

12   performing their duties of protecting the Capitol from forced

13   entry by the rioters and maintaining the police line incident

14   to the civil disorder that was occurring.

15        And also for the same reasons as in Count 3, I find

16   that commerce was adversely affected by the civil disorder that

17   occurred at the Capitol on January 6th.  Hence, I find

18   Mr. Padilla guilty on Count 5.

19        Count 6 of the indictment charges Mr. Padilla with

20   corruptly obstructing an official proceeding.  That's in

21   violation of Title 18 of the U.S. Code, Section 1512(c)(2).  To

22   find Mr. Padilla guilty on this offense, I must find the

23   following four elements beyond a reasonable doubt:

24        First, the defendant did obstruct or impede an

25   official proceeding.  Second, the defendant acted with the

1    intent to obstruct or impede the official proceeding.  Third,

2    the defendant acted knowingly with awareness that the natural

3    and probable effect of his conduct would be to obstruct or

4    impede the official proceeding.  And, fourth, that the

5    defendant acted corruptly.

6         First, I find that Mr. Padilla did obstruct or impede

7    an official proceeding.  That term includes a proceeding before

8    the Congress, such as the electoral certification.  He was part

9    of a large crowd of demonstrators who breached the Capitol on

10   January 6th during the election certification proceedings.

11        As we heard from Captain Mendoza, this breach caused

12   the Vice President to be evacuated and Congress to adjourn its

13   session because it was no longer safe for Members of Congress

14   to be in the Capitol.  Mr. Padilla entered the restricted area

15   of the Capitol Grounds before the session was adjourned and the

16   Vice President was evacuated at approximately 1:59 p.m.

17        And Mr. Padilla remained in the restricted area of

18   the Capitol Grounds for over two hours.  His presence, along

19   with the presence of thousands of other rioters, further

20   delayed the proceedings because they were unable to resume

21   until the crowd had been dispersed and several safety sweeps

22   were conducted in the Capitol.

23        Other cases in this District have found that actions

24   like those of Mr. Padilla constituted obstruction of an

25   official proceeding, and I'll cite in particular to *United*

1    *States v. Reffitt*, R-e-f-f-i-t-t, which is Criminal Action

2    No. 21-CR-32, before Judge Friedrich, and that's found at 2022

3    Westlaw 1404247.

4            I'll also cite to *United States v. Rivera*, Criminal

5    Action No. 21-060, Judge Kollar-Kotelly, June 17, 2022.  And

6    that is found at 2022 Westlaw 218- -- I'm sorry -- 2187851.

7            Second, I find that Mr. Padilla acted with the intent

8    to obstruct or impede the official proceedings.  His social

9    media posts from both before and after January 6th, his actions

10    on January 6th, and his testimony illuminate that he knew that

11    the action -- I'm sorry -- the election certification was

12    happening inside the Capitol on January 6th, and that his

13    intent was to forcibly enter and occupy the Capitol to prevent

14    the certification from happening.

15            In the lead-up to January 6th, Mr. Padilla posted

16    messages such as -- and I quote -- "I fully plan to incite

17    people to storm the Capitol Building and run all the

18    politicians out of it."

19            And when asked on the stand what effect the

20    politicians running out of the Capitol would have, he said,

21    "That would obstruct the certification of the vote because they

22    would not be in there able to vote."

23            Mr. Padilla's intent is also demonstrated by his

24    messages and actions on January 6th.  He messaged his wife

25    while he was at the Capitol on January 6th saying, "It's

1    working, babe," presumably referring to his attempt to breach

2    the Capitol and obstruct the proceedings.  His wife responded,

3    "They're hiding in the basement," presumably referring to the

4    lawmakers.  That's Government Exhibit 301, by the way.

5         Mr. Padilla sent another message to his wife on

6    January 6th while at the Capitol stating, "It's not a rally

7    anymore.  It's a revolution."  That, too, is found at

8    Government Exhibit 301.

9         And his actions on January 6th are consistent with

10   this intent.  He tried over and over to get into the Capitol.

11   He stayed at the Capitol for hours attempting to get past the

12   police barricades and then joining the mob trying to force

13   their way in through the tunnel.

14        Following January 6th, Mr. Padilla posted messages

15   further confirming that he had the specific intent to obstruct

16   Congress's certification of the vote.  The day after

17   January 6th, he said on social media, "We would have made it

18   into the building if some dude hadn't stopped our momentum and

19   made it harder for us to push.  Just wish we made it into the

20   building.  And we would have occupied the Capitol if some

21   asshole hadn't slowed our momentum."

22        He also stated on social media the day after

23   January 6th that "We were attempting to restore the republic by

24   dissolving the legislature.  We were actually trying to take

25   back our republic and attack the seat of power, and we were

1    trying to push our way into the Capitol to restore our

2    republic."

3            He repeatedly quotes the Declaration of Independence

4    in describing January 6th.  For example, he says that he had

5    the right to do what happened Wednesday; that is, on

6    January 6th.  Because the Declaration of Independence says, "It

7    is the right of the people to alter or to abolish or institute

8    new government."

9            Notably, Mr. Padilla also expressed familiarity with

10   the certification process.  He testified that prior to

11   January 6th he had read a breakdown of the process of

12   certifying the votes and reviewing the text of the Electoral

13   Act.  Following January 6th, he posted his frustration with

14   senators who did not object to the certification saying, "It

15   really bothers me that Marsha Blackburn didn't object because

16   she's my senator."

17           Mr. Padilla testified that all his statements posted

18   on social media were really stupid stuff, things I probably

19   don't believe in, and that his intent was for lawmakers to use

20   the lawful process and do something like make a slate of

21   amendments.

22           But he repeated severely extreme rhetoric at the

23   Capitol on January 6th.  For example, he talked about what

24   would happen if this government stands.  First, he tries to

25   explain that away, claiming that he was referring to sending

1    the votes back to the states and regaining Republican control

2    in the House and Senate.  But that explanation and his

3    continued insistence that he had only lawful goals on

4    January 6th is contradicted by his own statements, testimony,

5    and actions.

6         I don't credit his self-serving claims that he had

7    intent only to follow legal processes in light of the

8    overwhelming evidence to the contrary.  I, thus, find that

9    Mr. Padilla had the specific intent to obstruct the

10   certification process.

11        Third, I find that Mr. Padilla acted knowingly with

12   awareness that the natural and probable effect of his conduct

13   would be to obstruct or impede the official proceedings.  A

14   person acts knowingly if he realizes what he is doing and is

15   aware of the nature of his conduct and does not act through

16   ignorance, mistake, or accident.

17        For the same reasons just discussed, Mr. Padilla was

18   aware that his actions on the Capitol Grounds and his attempt

19   to breach the Capitol would have the probable effect of

20   obstructing the election certification that day.

21        So now, last, I find that Mr. Padilla acted

22   corruptly.  To act corruptly, the defendant must use unlawful

23   means or act with an unlawful purpose, or both.  He must also

24   act with consciousness of wrongdoing, which means with an

25   understanding or awareness that what the person is doing is

1    wrong.

2    Mr. Padilla used unlawful means to achieve an

3    unlawful purpose.  He assaulted officers when pushing

4    barricades into them to try to breach the police line and enter

5    the Capitol.  He assaulted officers by launching a flagpole at

6    them in an attempt to interfere with their maintenance of the

7    police line, guarding against rioters trying to breach the

8    Capitol.

9    And, as discussed earlier, his purpose was unlawful

10   as well.  He wanted to dissolve the legislature, start a

11   revolution, and attack the seat of power.  That's all set out

12   in Government Exhibit 301.

13   He acted with consciousness of wrongdoing in that he

14   was prepared to break laws to achieve his goals.  In a social

15   media post in December 2020, Mr. Padilla stated that "If things

16   go how I think they will" -- on January 6th -- "there will be

17   pepper spray."  He stated that he "might just have to fight

18   Proud Boys style."  He stated that he "planned on buying a

19   rifle in advance of" -- let me state that over again.  He

20   stated that he "planned on buying a rifle in advance of

21   January 6th" and alluded to "upgrading his weapon if shit kicks

22   off at the riot."

23   The Court does not credit Mr. Padilla's testimony

24   that these statements were merely bravado, rhetoric, or

25   bombast, and that he just wanted to peacefully occupy the

1    Capitol to urge lawmakers to take their grievances seriously.

2    The violent actions he committed on January 6th belie that

3    claim.

4           Even under Mr. Padilla's proposed definition of

5    corruptly, which draws from Judge Walker's concurrence in

6    *United States v. Fischer*, I would still find that he acted

7    corruptly.  Mr. Padilla's proposed definition of corruptly is

8    to act with an intent to procure an unlawful benefit either for

9    himself or for some other person.

10           The evidence shows that Mr. Padilla acted with an

11    intent to prevent President Biden from becoming President by

12    seizing Congress, occupying it, dissolving it, and then

13    installing Mr. Trump as President.  A social media message from

14    December 18, 2020, demonstrates as much.  Mr. Padilla alludes

15    to a scenario in which the rioters on January 6th would seize

16    power and invite Trump back to the presidency of a restored and

17    election-secure USA.

18           Using unlawful force to seat someone as President who

19    is not lawfully elected constitutes an unlawful benefit for the

20    person who ultimately takes the presidency, whether it's

21    Mr. Trump or anyone else other than President Biden, the lawful

22    winner of the 2020 election.

23           That is sufficient to find Mr. Padilla acted

24    corruptly under his own proposed definition.  Hence, I find

25    Mr. Padilla guilty on Count 6 beyond a reasonable doubt.

1      Count 7 of the indictment charges Mr. Padilla with

2  entering and remaining in a restricted building and grounds

3  with a deadly or dangerous weapon.  To find him guilty of this

4  offense, I must find that the government proved each of the

5  following three elements beyond a reasonable doubt:

6      First, the defendant entered or remained in a

7  restricted building or grounds without lawful authority to do

8  so.

9      Second, the defendant did so knowingly, meaning he

10  knew that the building or grounds was restricted, and he knew

11  he lacked lawful authority to enter or remain there.

12      And, third, the defendant carried a deadly or

13  dangerous weapon during and in relation to the offense.

14      First, I find that Mr. Padilla entered or remained in

15  a restricted building or grounds without lawful authority to do

16  so.  The term restricted building or grounds means any posted,

17  cordoned off, or otherwise restricted area of a building or

18  grounds where a person protected by the Secret Service is

19  temporarily visiting.  The term person protected by the Secret

20  Service includes the Vice President and the immediate family of

21  the Vice President.

22      Captain Mendoza testified that parts of the Capitol

23  Grounds were restricted from the public on January 6th and that

24  Vice President Pence was visiting the Capitol that day for the

25  electoral certification.  Video footage shows that Mr. Padilla

1    entered that restricted area by pushing past barricades and the

2    police line and continued to attempt to probe further into the

3    restricted area closer to the Capitol Building.

4          He ultimately made it as far inside of the Lower West

5    Terrace tunnel and reached the doors to the Capitol, and he

6    remained in this restricted area for at least three hours.

7          Second, I find that Mr. Padilla did so knowingly,

8    meaning he knew that the building or grounds was restricted,

9    and he knew he lacked lawful authority to enter or remain

10   there.

11         Captain Mendoza testified that the restricted

12   perimeter was designated by bike racks and snow fencing with

13   signs on them stating that the area was closed.  Mr. Padilla

14   acknowledged in his testimony that he saw the signs indicating

15   that the area was restricted, but decided to enter anyways.

16   Even if he had not seen the signs, he surely learned that the

17   area was restricted when police repeatedly ordered him and

18   others to get back, deployed pepper spray, and pushed back on

19   him when he tried to compromise the barricades on multiple

20   occasions.

21         Video footage shows that Mr. Padilla acknowledged

22   that he was not allowed to enter and was going to keep fighting

23   to cross the barricades.

24         Last, I find that Mr. Padilla carried a deadly or

25   dangerous weapon during and in relation to the offense as

1    discussed in Count 4.  The flagpole, as used by Mr. Padilla,

2    was a deadly or dangerous weapon, and he used the flagpole

3    during his commission of this offense when he launched it at

4    the police line standing in the front of the tunnel.

5           He had no other reason for the flagpole.  He was not

6    carrying a flag on that flagpole that day, and he had simply

7    picked the flagpole up off the ground.

8           Hence, I find Mr. Padilla guilty on Count 7 beyond a

9    reasonable doubt.

10          Count 8 of the indictment charges Mr. Padilla with

11   disorderly and disruptive conduct in a restricted building and

12   grounds with a deadly or dangerous weapon.  To find him guilty

13   of this offense, I must find that the government proved each of

14   the following five elements beyond a reasonable doubt:

15          First, the defendant engaged in disorderly or

16   disruptive conduct in or in proximity to any restricted

17   building or grounds.

18          Second, that the defendant did so knowingly, meaning

19   he knew that the building and grounds was restricted, and he

20   knew he lacked lawful authority to enter or remain there.

21          Third, the defendant did so with the intent to impede

22   or disrupt the orderly conduct of government business or

23   official functions.

24          Fourth, the defendant's conduct, in fact, impeded or

25   disrupted the orderly conduct of government business or

1    official functions.  And, fifth, the defendant used or carried

2    a deadly or dangerous weapon during and in relation to the

3    offense.

4           First, I find that Mr. Padilla engaged in disorderly

5    or disruptive conduct in or in proximity to any restricted

6    building or grounds.  Disorderly conduct occurs when a person

7    uses words or takes action likely to produce violence on the

8    part of others, is unreasonably loud and disruptive under the

9    circumstances, or interferes with another person by jostling

10   against or unnecessarily crowding that person.

11          Disruptive conduct is a disturbance that interrupts

12   an event, activity, or the normal course of a process.

13   Mr. Padilla's actions on the Capitol Grounds of repeatedly

14   pushing the barricades into the police line, encouraging others

15   to push as well, and launching a flagpole into a line of

16   officers easily meets both these definitions.

17          Second, I find that he did so knowingly, meaning he

18   knew that the building or grounds was restricted, and he knew

19   he lacked lawful authority to enter or remain there, for the

20   same reasons as discussed in Count 7.

21          Third, I find that Mr. Padilla did so with the intent

22   to impede or disrupt the orderly conduct of government business

23   or official functions.  As discussed with respect to Count 6,

24   Mr. Padilla intended to enter the Capitol to stop the

25   certification proceeding, which is, of course, a government

1    business and an official function.

2          Fourth, I find that Mr. Padilla's conduct did, in

3    fact, impede or disrupt the orderly conduct of government

4    business or official functions, for the same reasons as

5    discussed earlier in Count 6, as his actions and the actions of

6    the mob together caused the certification proceedings to

7    adjourn and remain adjourned while the riot was ongoing.

8          Last, for the same reasons discussed in relation to

9    other counts, I find Mr. Padilla used or carried a deadly or

10   dangerous weapon, namely, the flagpole, during and in relation

11   to the offense.

12         Hence, I find Mr. Padilla guilty on Count 8 beyond a

13   reasonable doubt.

14         Count 9 of the indictment charges Mr. Padilla with

15   engaging in physical violence in a restricted building or

16   grounds with a deadly or dangerous weapon.  To find Mr. Padilla

17   guilty of this offense, I must find that the government proved

18   each of the following three elements beyond a reasonable doubt:

19         First, the defendant engaged in an act of physical

20   violence against a person or property in or in proximity to a

21   restricted building or grounds.  Second, the defendant did so

22   knowingly.  And, third, the defendant used or carried a deadly

23   or dangerous weapon during and in relation to the offense.

24         First, I find that Mr. Padilla engaged in an act of

25   physical violence against officers on the Capitol Grounds

1    through his actions of pushing the barricades and throwing the

2    flagpole.  The term act of physical violence means any act

3    involving an assault or other infliction of death or bodily

4    injury on an individual, or damage to or destruction of real or

5    personal property.

6            Because I find that Mr. Padilla's actions with

7    respect to the barricades and the flagpole constituted assaults

8    on police officers, I believe that this element is met here.

9            Second, I find that Mr. Padilla did so knowingly for

10    the same reasons discussed in previous counts.  And, last, I

11    find that Mr. Padilla used or carried a dangerous or -- a

12    deadly or dangerous weapon, namely, the flagpole, during and in

13    relation to the offense for the same reasons discussed in

14    relation to previous counts earlier.

15            Hence, I find Mr. Padilla guilty on Count 9 beyond a

16    reasonable doubt.

17            Count 10 of the indictment charges Mr. Padilla with

18    disorderly conduct in a Capitol Building or grounds.  To find

19    Mr. Padilla guilty of this offense, the government must prove

20    each of the following elements beyond a reasonable doubt:

21            First, the defendant engaged in disorderly or

22    disruptive conduct in any of the United States Capitol

23    Buildings or Grounds.

24            Second, the defendant did so with the intent to

25    impede, disrupt, or disturb the orderly conduct of a session of

1    Congress or either House of Congress.

2         And, third, the defendant acted willfully and

3    knowingly.

4         I find, first, that Mr. Padilla engaged in disorderly

5    or disruptive conduct on the Capitol Grounds for the same

6    reasons that I discussed in Count 8.

7         Second, I find Mr. Padilla did so with the intent to

8    impede, disrupt, or disturb the orderly conduct of a session of

9    Congress or either House of Congress for the same reasons as

10   discussed in Counts 6 and 8.

11        And, last, I find Mr. Padilla acted willfully and

12   knowingly.  A person acts willfully if he acts with the intent

13   to do something that the law forbids, that is, to disobey or

14   disregard the law.  As discussed in relation to Count 6,

15   Mr. Padilla knew the actions he took on the Capitol Grounds on

16   January 6th were unlawful.  He acknowledged that in his

17   testimony, as well as on the video footage from the day that

18   the police told him.

19        I will note -- let me say that again.  He

20   acknowledged both in his testimony and on video footage from

21   the day that the police told him time and time again not to

22   cross the barricade, but that he tried to do so anyway.  From

23   his words and actions, it is clear that his intent was to

24   disobey officers and disregard the law by breaching the police

25   lines and entering the Capitol Building.

1          Hence, I find Mr. Padilla guilty of Count 10 beyond a

2  reasonable doubt.

3          Count 11 of the indictment charges Mr. Padilla with

4  engaging in an act of physical violence in the Capitol Grounds

5  or Building.  To find Mr. Padilla guilty of this offense, the

6  government must prove the following two elements beyond a

7  reasonable doubt:

8          First, the defendant engaged in an act of physical

9  violence in the United States Capitol Grounds or any of the

10  Capitol Buildings.  And, second, the defendant acted willfully

11  and knowingly.

12          I find that Mr. Padilla did engage in an act of

13  physical violence on the Capitol Grounds for the same reasons

14  that I have discussed in relation to earlier counts,

15  particularly Count 9.

16          And, second, I find that Mr. Padilla acted willfully

17  and knowingly for the same reasons discussed in relation to

18  Count 10.

19          And, accordingly, I find Mr. Padilla guilty of

20  Count 11 beyond a reasonable doubt.

21          So those are the findings and verdicts of the Court

22  on all 11 counts, verdicts of guilty on 10 of those 11 counts,

23  a verdict of not guilty on Count 2, and that completes the

24  Court's rendering of a verdict in the case.

25          Anything that either of you wants to raise or note at

1    this time before we proceed to schedule sentencing and to deal

2    with the question of release pending sentencing?

3             MR. BRASHER:  Nothing from the government, Your

4    Honor.

5             MR. CRONKRIGHT:  Nothing from the defense, Your

6    Honor.

7             THE COURT:  All right.  So we need a sentencing date

8    three months from now, which is the normal time period we're

9    looking at.  It would be August.  I think it will be tough to

10   do it in August, particularly early August.  So why don't we

11   look after Labor Day.  It will be easier to find a date, I

12   believe, after Labor Day.  I have a trial -- maybe two trials

13   in the first two weeks of September.  Tell me, Mr. Bradley.

14            THE COURTROOM DEPUTY:  Your Honor, I was trying to

15   figure out when was Labor Day.  I've now learned that it's

16   September 4th.  So you can do a sentencing on -- you can do

17   it -- you have a trial that week.

18            THE COURT:  That week or the next week?

19            THE COURTROOM DEPUTY:  The same week.

20            THE COURT:  It starts on Wednesday or Tuesday?

21            THE COURTROOM DEPUTY:  I think it's Wednesday, the

22   6th, if I remember correctly.

23            THE COURT:  All right.

24            THE COURTROOM DEPUTY:  You're free the 11th all day,

25   not the 12th.  You have the conference.  You can do it on the

1    13th.

2              THE COURT:  So the 11th is what day of the week?

3              THE COURTROOM DEPUTY:  The Monday, following Monday.

4              THE COURT:  The 12th I have what, the Judicial

5    Conference?

6              THE COURTROOM DEPUTY:  Yes.

7              THE COURT:  I have obligations with the Judicial

8    Conference of the United States to run certain meetings

9    beginning late in the morning and extending into the afternoon.

10   So I don't think I can do it that day.  What's the 13th look

11   like?

12             THE COURTROOM DEPUTY:  You have a 10:30 sentencing

13   and you're free from there.

14             THE COURT:  How about the afternoon of

15   September 13th?  Will that work for the government?

16             MR. BRASHER:  Yes, Your Honor.

17             THE COURT:  Mr. Cronkright, the afternoon of

18   September 13th?

19             MR. CRONKRIGHT:  I'm available, Your Honor.

20             THE COURT:  All right.  Let's do it at -- you said

21   the other one was 10:30?

22             THE COURTROOM DEPUTY:  10:30.

23             THE COURT:  Let's do it at 2:00 on September 13th.

24   That's an in-person proceeding here in this courtroom.

25             MR. CRONKRIGHT:  Very well.

```
1              THE COURT:  With that as the sentencing date, I'll

2     need sentencing memos from the parties a week beforehand, so

3     that would be the 6th of September.

4              Mr. Padilla has been detained.  Any request from the

5     government to change that?

6              MR. BRASHER:  No, Your Honor.

7              THE COURT:  And, Mr. Cronkright?

8              MR. CRONKRIGHT:  No, Your Honor.

9              THE COURT:  All right.  I think, under the

10    circumstances of this case and the relevant statutory

11    provisions, he should remain detained pending sentencing, and I

12    order that he will remain in the same status, which is detained

13    without bond.

14              With that, anything further today?

15              MR. BRASHER:  No.  Thank you, Your Honor.

16              THE COURT:  Anything from the defense,

17    Mr. Cronkright.

18              MR. CRONKRIGHT:  Nothing further.  Thank you.

19              THE COURT:  I thank everyone for an efficiently and

20    well-presented case, and I will hear from you in your

21    sentencing memos on September 6th and see everyone again on

22    September 13th.  Thank you.

23              (The trial concluded at 3:05 p.m.)

24

25
```

1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, TAMARA M. SEFRANEK, do hereby certify that the

4     above and foregoing constitutes a true and accurate transcript

5     of my stenographic notes and is a full, true and complete

6     transcript of the proceedings to the best of my ability.

7                Dated this 12th day of June, 2023.

8

9

10                           /s/ Tamara M. Sefranek_____
                             Tamara M. Sefranek, RMR, CRR, CRC
11                           Official Court Reporter
                             Room 6714
12                           333 Constitution Avenue, N.W.
                             Washington, D.C.  20001
13

14

15

16

17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 560:10

## 1

**1** [20] - 470:22, 485:15, 485:19, 485:25, 488:19, 495:3, 495:6, 495:16, 495:21, 496:8, 515:20, 515:21, 516:2, 516:3, 516:10, 516:11, 523:4, 525:7, 529:2, 538:10
**10** [7] - 475:23, 523:18, 523:20, 554:17, 556:1, 556:18, 556:22
**10:08** [1] - 462:6
**10:30** [3] - 558:12, 558:21, 558:22
**11** [9] - 466:1, 481:17, 521:10, 522:20, 523:21, 556:3, 556:20, 556:22
**1100** [1] - 462:13
**111** [5] - 486:22, 511:9, 512:1, 512:7, 512:12
**111a** [11] - 484:18, 485:14, 485:19, 494:14, 494:19, 497:15, 498:14, 499:19, 515:15, 515:18, 516:6
**111(a)** [1] - 496:18
**111(a)(1** [1] - 529:6
**111(a)1** [3] - 522:23, 523:3, 525:8
**111(b** [3] - 494:12, 496:21, 515:16
**111(b)** [1] - 516:24
**1114** [4] - 487:9, 512:16, 512:20
**11:13** [1] - 530:25
**11:45** [1] - 521:12
**11th** [2] - 557:24, 558:2
**12th** [3] - 557:25, 558:4, 560:7
**1329** [1] - 533:8
**1341** [1] - 533:8
**13th** [6] - 558:1, 558:10, 558:15, 558:18, 558:23, 559:22
**1404247** [1] - 543:3
**15** [1] - 475:23

**1512(c)(2** [1] - 523:7
**1512(c)(2)** [1] - 541:21
**17** [1] - 543:5
**1752(a)(1** [1] - 523:10
**1752(a)(2** [1] - 523:13
**1752(a)(4** [1] - 523:16
**18** [11] - 522:23, 523:1, 523:3, 523:6, 523:10, 523:13, 523:16, 525:8, 529:6, 541:21, 548:14
**180** [1] - 540:6
**1:21-CR-214** [1] - 462:3, 522:2
**1:37** [2] - 495:9, 495:17
**1:38** [1] - 527:1
**1:39** [2] - 495:16, 495:17
**1:41** [2] - 495:9, 495:16
**1:45** [2] - 521:9, 521:12
**1:59** [1] - 542:16

## 2

**2** [18] - 471:2, 473:4, 477:15, 485:4, 495:14, 495:16, 497:16, 516:3, 516:24, 522:24, 523:7, 529:4, 529:6, 529:25, 531:22, 532:2, 532:3, 556:23
**20** [7] - 473:22, 475:15, 475:23, 477:9, 477:11, 490:1, 516:11
**20-foot-long** [1] - 490:24
**200** [1] - 466:17
**20001** [2] - 462:24, 560:12
**2010** [1] - 533:8
**202-354-3246** [1] - 462:24
**2020** [3] - 547:15, 548:14, 548:22
**2021** [5] - 464:24, 465:3, 483:3, 522:12, 526:9
**2022** [3] - 543:2, 543:5, 543:6
**2023** [3] - 462:5, 522:1, 560:7
**20530** [1] - 462:16
**207** [1] - 527:15
**209** [5] - 527:5,

**528:14, 528:16, 530:17, 530:25
**21-060** [1] - 543:5
**21-214** [2] - 464:3, 522:5
**21-CR-32** [1] - 543:2
**214** [1] - 467:8
**218** [3] - 530:17, 531:4, 543:6
**2187851** [1] - 543:6
**218A** [1] - 513:14
**227** [2] - 478:9, 478:15
**229** [2] - 532:16, 533:12
**231** [1] - 485:14
**231(a)(3)** [1] - 523:1
**250** [1] - 513:18
**2:00** [2] - 531:4, 558:23
**2:09** [2] - 467:4, 527:14
**2:10** [1] - 522:3
**2:47** [1] - 468:18
**2:48** [1] - 467:9

## 3

**3** [15] - 462:5, 462:8, 480:24, 481:12, 516:19, 522:1, 523:1, 532:1, 532:2, 537:6, 537:8, 538:1, 540:24, 541:7, 541:15
**30** [1] - 475:15
**301** [5] - 528:5, 528:19, 544:4, 544:8, 547:12
**333** [2] - 462:23, 560:12
**3:05** [1] - 559:23

## 4

**4** [8] - 485:4, 522:24, 529:4, 529:11, 532:4, 537:4, 541:3, 551:1
**40** [4] - 473:22, 476:8, 523:19, 523:23
**407** [1] - 540:22
**4601** [1] - 462:19
**464** [1] - 463:3
**484** [1] - 463:4
**48917** [1] - 462:19
**4:19** [1] - 468:23
**4:47** [1] - 537:11
**4th** [1] - 557:16

## 5

**5** [7] - 478:8, 480:24, 523:1, 537:6, 537:9, 540:25, 541:18
**510** [1] - 463:5
**5104(e)(2)(D)** [1] - 523:20
**5104(e)(2)(F)** [1] - 523:23
**597** [1] - 533:8

## 6

**6** [11] - 466:3, 470:11, 482:22, 523:7, 526:9, 541:19, 548:25, 552:23, 553:5, 555:10, 555:14
**601** [2] - 462:16, 481:21
**6714** [2] - 462:23, 560:11
**6th** [53] - 464:14, 464:24, 465:3, 468:10, 481:15, 483:2, 484:4, 489:22, 490:1, 522:14, 522:19, 524:9, 524:15, 525:2, 526:15, 528:3, 528:17, 538:13, 539:4, 539:7, 539:19, 540:7, 540:13, 540:21, 541:17, 542:10, 543:9, 543:10, 543:12, 543:15, 543:24, 543:25, 544:6, 544:9, 544:14, 544:17, 544:23, 545:4, 545:6, 545:11, 545:13, 545:23, 546:4, 547:16, 547:21, 548:2, 548:15, 549:23, 555:16, 557:22, 559:3, 559:21

## 7

**7** [5] - 481:17, 523:10, 549:1, 551:8, 552:20
**75242** [1] - 462:14

## 8

**8** [7] - 475:23, 516:11,

523:11, 551:10, 553:12, 555:6, 555:10

## 9

**9** [4] - 523:14, 553:14, 554:15, 556:15
**9:15** [1] - 527:5

## A

**A.M** [1] - 462:6
**a.m** [1] - 521:12
**abetting** [1] - 523:6
**ability** [4] - 514:25, 532:22, 533:19, 560:6
**able** [3] - 510:16, 517:21, 543:22
**abolish** [3] - 465:12, 469:17, 545:7
**absolutely** [2] - 470:16, 508:16
**absurd** [2] - 497:20, 498:4
**abundantly** [1] - 493:16
**accept** [3] - 501:4, 501:16, 501:20
**accident** [2] - 472:2, 538:9, 546:16
**accomplish** [1] - 472:6
**according** [4] - 469:14, 473:21, 504:12, 506:16
**accordingly** [1] - 556:19
**account** [2] - 512:24, 513:3
**accounts** [1] - 524:7
**accumulative** [1] - 506:19
**accurate** [1] - 560:4
**accused** [1] - 494:25
**achieve** [4] - 465:11, 465:21, 547:2, 547:14
**acknowledged** [5] - 533:13, 550:14, 550:21, 555:16, 555:20
**acknowledges** [1] - 532:19
**act** [34] - 472:4, 478:21, 481:1, 481:2, 487:18, 487:23, 500:25, 501:6, 506:12,

506:18, 507:2,
509:7, 523:21,
529:12, 532:6,
536:1, 537:10,
537:15, 537:18,
538:4, 538:9, 541:4,
546:15, 546:22,
546:23, 546:24,
548:8, 553:19,
553:24, 554:2,
556:4, 556:8, 556:12
**Act** [1] - 545:13
**acted** [22] - 468:6,
468:25, 469:3,
472:1, 472:2, 481:1,
526:2, 528:7,
541:25, 542:2,
542:5, 543:7,
546:11, 546:21,
547:13, 548:6,
548:10, 548:23,
555:2, 555:11,
556:10, 556:16
**acting** [3] - 482:21,
488:1, 506:7
**Action** [5] - 462:2,
464:3, 522:5, 543:1,
543:5
**action** [11] - 489:10,
492:18, 497:10,
508:18, 509:13,
509:15, 509:23,
533:23, 536:14,
543:11, 552:7
**actions** [42] - 464:16,
467:13, 469:1,
470:8, 473:3,
494:22, 495:22,
495:23, 506:6,
519:21, 524:14,
525:2, 525:10,
526:7, 527:21,
527:23, 528:12,
529:9, 531:10,
531:20, 533:7,
533:17, 537:7,
538:2, 539:6,
539:21, 540:9,
541:1, 542:23,
543:9, 543:24,
544:9, 546:5,
546:18, 548:2,
552:13, 553:5,
554:1, 554:6,
555:15, 555:23
**activity** [1] - 552:12
**acts** [19] - 486:24,
487:5, 487:21,
500:24, 501:15,
516:14, 516:15,

525:20, 525:21,
528:6, 529:21,
529:22, 529:23,
538:7, 538:23,
541:8, 546:14,
555:12
**actual** [2] - 481:15,
537:18
**add** [2] - 487:7, 487:8
**addition** [4] - 516:17,
516:20, 518:4, 539:9
**additional** [1] - 505:6
**additionally** [1] -
469:24
**address** [2] - 471:9,
511:11
**addressing** [1] -
472:12
**adjourn** [3] - 466:8,
542:12, 553:7
**adjourned** [2] -
542:15, 553:7
**admission** [1] -
470:24
**admits** [3] - 470:23,
472:16, 528:2
**admitted** [9] - 468:9,
468:11, 468:13,
473:16, 484:5,
516:1, 527:9,
536:16, 538:12
**admitting** [1] - 470:6
**adopt** [1] - 470:18
**advance** [2] - 547:19,
547:20
**advancing** [2] -
494:20, 508:14
**adverse** [1] - 540:23
**adversely** [3] - 537:23,
540:13, 541:16
**aerial** [1] - 531:1
**affect** [1] - 484:23
**affected** [3] - 537:23,
540:13, 541:16
**affectionately** [1] -
493:19
**AFTERNOON** [1] -
522:1
**afternoon** [5] - 522:7,
524:15, 558:9,
558:14, 558:17
**afterwards** [1] -
519:22
**agencies** [1] - 511:13
**agency** [3] - 512:22,
513:9, 513:10
**Agent** [5] - 481:13,
514:5, 524:4, 524:6,
525:3
**agents** [1] - 511:21

**aggressive** [2] -
504:25, 527:19
**ago** [1] - 517:20
**agree** [5] - 485:21,
488:18, 502:15,
516:13, 517:17
**ahead** [2] - 471:17,
476:14
**aid** [3] - 504:3, 509:20,
526:15
**aiding** [1] - 523:5
**aimed** [2] - 480:15,
532:13
**aiming** [2] - 533:20,
534:25
**air** [1] - 480:8
**Akhtar** [1] - 464:18
**Akhtar's** [1] - 527:11
**alarmed** [2] - 479:21,
479:24
**allegations** [1] -
486:10
**alleges** [1] - 522:18
**allowed** [1] - 550:22
**alluded** [1] - 547:21
**alludes** [1] - 548:14
**almost** [3] - 489:12,
500:10, 525:6
**alone** [2] - 483:21,
494:15
**alter** [1] - 545:7
**alternative** [2] -
516:22, 516:24
**alternatively** [1] -
494:20
**ambiguous** [2] -
530:5, 531:14
**Amendment** [1] -
471:4
**amendments** [1] -
545:21
**AMERICA** [1] - 462:2
**America** [4] - 464:3,
464:12, 465:14,
522:5
**America's** [1] - 483:8
**American** [6] - 465:16,
483:12, 483:23,
486:7, 486:8, 486:12
**amount** [3] - 475:7,
488:19, 520:13
**analysis** [7] - 476:23,
500:14, 503:22,
503:24, 510:23,
511:5, 513:23
**analytical** [1] - 487:14
**analyze** [3] - 496:14,
500:11, 510:20
**analyzed** [1] - 497:6
**analyzing** [3] - 486:2,

491:2, 497:12
**ANDREW** [1] - 462:15
**angle** [2] - 530:15,
531:1
**angles** [2] - 472:14,
518:1
**answer** [4] - 469:10,
490:8, 490:16,
512:12
**anticipated** [1] -
481:16
**anyway** [3] - 477:14,
496:14, 555:22
**anyways** [1] - 550:15
**apart** [1] - 515:13
**apologize** [2] - 490:6,
501:18
**appeal** [1] - 469:15
**appear** [1] - 476:21
**appeared** [1] - 508:14
**appended** [1] - 530:22
**application** [3] -
498:25, 499:13,
499:14
**applies** [1] - 516:24
**apply** [1] - 512:7
**appreciate** [1] - 522:9
**approach** [2] - 487:14,
491:10
**approached** [1] -
535:2
**approaching** [1] -
535:4
**appropriate** [1] -
484:12
**area** [14] - 466:25,
480:21, 481:20,
517:9, 526:20,
542:14, 542:17,
549:17, 550:1,
550:3, 550:6,
550:13, 550:15,
550:17
**areas** [1] - 526:12
**arguably** [2] - 513:7,
513:8
**argue** [6] - 486:1,
487:8, 489:18,
500:2, 500:5, 500:6
**argued** [1] - 500:16
**argues** [1] - 530:6
**arguing** [6] - 488:1,
488:3, 501:11,
502:1, 502:3, 511:8
**argument** [13] -
486:14, 487:13,
487:23, 496:17,
497:12, 504:5,
506:5, 510:5, 510:6,
513:12, 514:7,

519:12, 530:23
**ARGUMENT** [1] -
463:2
**arguments** [6] - 464:6,
484:18, 500:13,
509:8, 522:8, 525:5
**armor** [1] - 536:25
**army** [1] - 507:16
**article** [1] - 537:24
**assailant** [1] - 510:16
**assault** [24] - 470:22,
471:2, 472:16,
474:14, 477:8,
477:17, 478:8,
482:8, 487:1, 487:2,
487:15, 487:24,
495:23, 496:13,
500:25, 505:20,
512:7, 513:11,
516:13, 516:15,
527:9, 531:7, 534:5,
554:3
**assaulted** [10] -
471:23, 512:1,
517:25, 525:14,
526:3, 529:15,
532:7, 535:19,
547:3, 547:5
**assaulting** [10] -
495:3, 498:21,
500:18, 522:21,
523:2, 525:7, 525:9,
529:4, 529:7, 532:5
**assaults** [5] - 481:8,
488:18, 515:24,
516:4, 554:7
**asserted** [3] - 485:21,
492:9, 515:21
**asserting** [2] - 504:3,
516:12
**assertion** [13] - 492:2,
493:3, 494:10,
497:17, 497:25,
503:16, 504:1,
504:5, 505:3, 505:4,
508:11, 509:16,
509:22
**assertions** [2] -
485:13, 485:16
**assess** [2] - 501:22,
518:23
**assessed** [1] - 493:1
**assesses** [1] - 484:22
**assessing** [1] - 509:9
**assessment** [2] -
502:2, 503:15
**asshole** [1] - 544:21
**assist** [2] - 511:14,
511:22
**assistance** [2] - 513:3,

563

540:3
**assisted** [1] - 511:25
**assisting** [1] - 472:9,
488:9, 512:3, 512:5,
512:6, 513:1, 513:9,
525:18, 525:25,
526:6, 529:18
**assume** [2] - 507:3,
518:21
**assuming** [2] - 514:7,
518:10
**assumption** [1] -
505:15
**astounding** [1] -
517:10
**attached** [1] - 530:13
**attack** [13] - 465:19,
467:23, 467:24,
478:22, 479:8,
479:9, 479:13,
480:4, 508:24,
509:6, 534:8,
544:25, 547:11
**attacked** [1] - 465:6
**attackers** [2] - 508:24,
509:6
**attacking** [3] - 464:17,
467:18, 504:2
**attempt** [12] - 494:1,
494:2, 494:4,
526:24, 527:22,
535:4, 535:5, 544:1,
546:18, 547:6, 550:2
**attempted** [2] - 481:1,
528:7
**attempting** [5] -
467:21, 491:16,
494:25, 544:11,
544:23
**attempts** [1] - 512:20
**attention** [1] - 476:16
**Attorney** [1] - 485:21
**ATTORNEY'S** [2] -
462:12, 462:15
**auditory** [1] - 493:25
**August** [3] - 557:9,
557:10
**authority** [6] - 549:7,
549:11, 549:15,
550:9, 551:20,
552:19
**authorized** [1] -
466:24
**available** [2] - 505:15,
558:19
**avalanche** [1] - 483:18
**Avenue** [2] - 462:23,
560:12
**average** [1] - 464:23
**aware** [7] - 480:22,

487:2, 507:19,
508:2, 538:8,
546:15, 546:18
**awareness** [4] - 468:6,
542:2, 546:12,
546:25
**axe** [2] - 479:2, 504:13

# B

**b)** [3] - 498:14, 522:23,
529:6
**b)(1)(A)** [3] - 523:10,
523:13, 523:17
**babe** [2] - 468:19,
544:1
**backwards** [3] -
472:3, 478:11, 531:3
**ballot** [1] - 465:16
**banner** [6] - 473:24,
510:14, 511:2,
515:16, 516:7, 517:2
**bare** [1] - 485:16
**barely** [1] - 517:7
**barricade** [19] -
475:19, 495:5,
495:24, 496:13,
524:23, 525:11,
526:14, 526:24,
527:3, 527:4, 527:7,
527:13, 527:15,
527:16, 528:22,
530:8, 530:16,
531:18, 555:22
**barricades** [23] -
524:17, 524:20,
526:8, 526:18,
526:19, 526:23,
527:23, 527:25,
528:10, 538:6,
538:11, 538:19,
539:10, 540:8,
544:12, 547:4,
550:1, 550:19,
550:23, 552:14,
554:1, 554:7
**barrier** [4] - 474:24,
477:11, 515:22,
516:10
**barriers** [4] - 465:4,
482:3, 490:2, 538:15
**based** [13] - 471:7,
485:20, 490:22,
494:19, 496:11,
496:12, 504:6,
508:11, 510:5,
510:6, 516:7, 516:8,
535:13
**basement** [2] -
468:20, 544:3

**bases** [1] - 485:10
**bash** [1] - 530:7
**basis** [1] - 470:25
**BATES** [1] - 462:8
**baton** [1] - 479:14
**battering** [8] - 465:7,
476:18, 476:19,
478:3, 490:25,
493:9, 515:3, 530:7
**battle** [1] - 483:6
**bear** [1] - 489:1
**beat** [1] - 534:21
**beaten** [1] - 473:21
**beating** [3] - 533:15,
539:11, 539:16
**became** [2] - 492:3,
534:14
**become** [5] - 475:24,
492:4, 492:12,
492:14
**becomes** [2] - 494:17,
508:2
**becoming** [1] - 548:11
**BEFORE** [1] - 462:8
**beforehand** [1] -
559:2
**began** [2] - 503:6,
527:13
**beginning** [2] -
511:16, 558:9
**begins** [1] - 534:24
**behavior** [1] - 527:20
**behind** [5] - 475:19,
493:10, 527:4,
530:8, 531:17
**belie** [1] - 548:2
**belied** [1] - 534:6
**belief** [2] - 504:7,
520:2
**believability** [1] -
509:9
**believable** [1] - 520:25
**believes** [3] - 496:1,
496:7, 518:16
**bench** [2] - 485:8,
486:19
**BENCH** [2] - 462:4,
462:8
**bend** [1] - 505:12
**bending** [1] - 479:18
**bends** [3] - 505:1,
507:9, 534:19
**benefit** [4] - 470:19,
470:20, 548:8,
548:19
**bent** [1] - 479:22
**best** [1] - 560:6
**better** [1] - 506:24
**between** [5] - 495:16,
498:9, 514:2,

536:24, 540:14
**beyond** [23] - 470:24,
480:11, 485:16,
498:5, 518:24,
525:13, 529:2,
529:13, 531:19,
537:4, 537:13,
541:23, 548:25,
549:5, 551:8,
551:14, 553:12,
553:18, 554:15,
554:20, 556:1,
556:6, 556:20
**Biden** [2] - 548:11,
548:21
**bike** [14] - 465:6,
467:5, 470:23,
514:11, 515:25,
516:20, 524:17,
526:23, 527:13,
528:23, 528:25,
537:8, 538:3, 550:12
**bit** [4] - 488:12,
498:12, 520:14,
521:8
**Blackburn** [1] -
545:15
**bleeding** [1] - 539:22
**block** [3] - 465:11,
480:23, 497:18
**blue** [1] - 465:4
**bodily** [6] - 478:5,
536:4, 536:6, 536:8,
536:14, 554:3
**body** [10] - 472:3,
513:19, 513:21,
517:14, 526:22,
527:3, 527:12,
527:16, 528:9,
536:25
**body-worn** [1] -
527:12
**bombast** [1] - 547:25
**bond** [1] - 559:13
**borders** [1] - 497:20
**bothers** [1] - 545:15
**bottom** [2] - 467:11,
480:20
**bouncing** [1] - 510:2
**box** [2] - 465:16,
465:20
**Boys** [1] - 547:18
**Bradley** [1] - 557:13
**branch** [1] - 512:22
**brasher** [5] - 484:7,
486:9, 498:17,
498:24, 519:11
**Brasher** [2] - 463:3,
464:9
**BRASHER** [28] -

462:12, 464:10,
466:19, 470:16,
471:9, 471:16,
471:19, 471:22,
473:5, 473:7, 474:5,
475:6, 475:11,
476:2, 476:8,
476:15, 476:24,
477:16, 477:20,
478:18, 480:1,
482:13, 482:17,
482:19, 557:3,
558:16, 559:6,
559:15
**bravado** [1] - 547:24
**breach** [9] - 466:7,
524:13, 524:20,
526:24, 542:11,
544:1, 546:19,
547:4, 547:7
**breached** [3] - 466:5,
466:16, 542:9
**breaching** [1] - 555:24
**break** [3] - 472:20,
500:19, 547:14
**breakdown** [1] -
545:11
**breaking** [1] - 538:16
**brief** [5] - 464:7,
472:13, 478:14,
484:15, 484:17
**briefly** [4] - 484:18,
510:11, 517:1,
524:22
**bring** [1] - 517:3
**bringing** [1] - 517:21
**broadside** [1] - 480:16
**broke** [2] - 464:20,
493:7
**brought** [4] - 477:10,
489:3, 511:1, 517:2
**brute** [1] - 465:22
**building** [20] - 466:11,
523:8, 523:12,
523:15, 544:18,
544:20, 549:2,
549:7, 549:10,
549:15, 549:16,
549:17, 550:8,
551:11, 551:17,
551:19, 552:6,
552:18, 553:15,
553:21
**Building** [13] - 466:22,
468:11, 468:14,
482:25, 483:23,
523:19, 526:11,
526:16, 543:17,
550:3, 554:18,
555:25, 556:5

564

**Buildings** [4] - 523:19, 523:22, 554:23, 556:10
**bullhorn** [1] - 530:19
**burden** [7] - 518:13, 518:15, 518:22, 518:24, 520:23, 530:1, 531:12
**BURTON** [1] - 462:12
**business** [6] - 540:18, 551:22, 551:25, 552:22, 553:1, 553:4
**buying** [2] - 547:18, 547:20

## C

**calmly** [1] - 470:3
**camera** [1] - 527:12
**canister** [1] - 479:3
**capable** [8] - 477:24, 478:5, 511:3, 514:4, 536:4, 536:6, 536:7, 536:14
**Capitol** [98] - 465:1, 465:10, 465:19, 466:9, 466:10, 466:13, 466:22, 467:9, 467:19, 467:20, 467:23, 468:10, 468:14, 472:1, 472:10, 482:5, 482:25, 483:5, 483:19, 483:22, 483:25, 488:9, 511:14, 511:17, 511:19, 511:22, 511:25, 522:14, 523:18, 523:22, 524:3, 524:10, 524:13, 524:14, 524:21, 524:25, 526:5, 526:6, 526:9, 526:10, 526:15, 526:16, 527:25, 528:18, 532:17, 532:24, 532:25, 533:2, 535:23, 535:25, 538:14, 539:4, 539:6, 539:18, 540:13, 540:21, 541:12, 541:17, 542:9, 542:14, 542:15, 542:18, 542:22, 543:12, 543:13, 543:17, 543:20, 543:25, 544:2, 544:6, 544:10,
544:11, 544:20, 545:1, 545:23, 546:18, 546:19, 547:5, 547:8, 548:1, 549:22, 549:24, 550:3, 550:5, 552:13, 552:24, 553:25, 554:18, 554:22, 555:5, 555:15, 555:25, 556:4, 556:9, 556:10, 556:13
**Captain** [3] - 466:7, 511:16, 542:11
**captain** [3] - 540:1, 549:22, 550:11
**captured** [2] - 472:13, 528:13
**care** [2] - 491:16, 519:13
**cared** [2] - 519:16, 519:24
**carried** [10] - 482:11, 490:1, 532:12, 536:5, 549:12, 550:24, 552:1, 553:9, 553:22, 554:11
**carry** [1] - 480:6
**carrying** [5] - 474:24, 504:13, 504:15, 505:1, 551:6
**cartridge** [1] - 465:20
**CASE** [1] - 522:2
**case** [26] - 485:9, 485:15, 487:4, 487:20, 489:7, 490:11, 490:17, 491:2, 491:15, 491:22, 491:23, 492:5, 492:7, 500:22, 507:18, 509:1, 509:22, 511:12, 515:25, 520:4, 520:15, 520:23, 556:24, 559:10, 559:20
**cases** [3] - 487:22, 492:5, 542:23
**categories** [1] - 490:18
**category** [2] - 491:22, 494:6
**caused** [9] - 464:14, 466:8, 472:3, 475:7, 475:12, 477:24, 480:18, 542:11, 553:6
**causes** [3] - 533:23, 538:24, 538:25

**causing** [11] - 477:25, 478:5, 481:6, 511:3, 514:4, 535:5, 536:4, 536:6, 536:7, 536:14, 540:3
**central** [1] - 465:14
**certain** [11] - 485:7, 495:4, 499:14, 522:22, 523:2, 525:8, 525:10, 529:5, 529:8, 532:5, 558:8
**certainly** [9] - 492:11, 515:5, 517:17, 519:1, 519:6, 521:2, 521:4, 536:7, 539:4
**certainty** [1] - 536:19
**CERTIFICATE** [1] - 560:1
**certification** [18] - 465:12, 466:6, 469:6, 524:10, 540:4, 542:8, 542:10, 543:11, 543:14, 543:21, 544:16, 545:10, 545:14, 546:10, 546:20, 549:25, 552:25, 553:6
**certify** [2] - 465:2, 560:3
**certifying** [1] - 545:12
**Chamber** [1] - 467:7
**change** [1] - 559:5
**changed** [2] - 469:21, 470:17
**changes** [1] - 510:4
**chaos** [4] - 483:4, 535:5, 535:7, 540:1
**charge** [1] - 512:1
**charged** [5] - 466:1, 515:25, 532:1, 532:3, 537:7
**charges** [13] - 525:9, 529:7, 529:11, 532:4, 537:9, 538:1, 540:25, 541:19, 549:1, 551:10, 553:14, 554:17, 556:3
**charging** [1] - 508:23
**chests** [1] - 465:7
**chew** [1] - 521:8
**choose** [1] - 465:16
**choosing** [1] - 484:1
**chose** [1] - 533:20
**Circle** [1] - 483:7
**circling** [1] - 513:15
**Circuit** [1] - 533:8
**circumstances** [2] -

552:9, 559:10
**cite** [3] - 533:8, 542:25, 543:4
**citing** [1] - 467:24
**citizens** [1] - 464:24
**city** [1] - 488:6
**civil** [23] - 480:24, 481:5, 481:10, 481:11, 516:19, 516:23, 522:25, 537:6, 537:7, 537:21, 537:22, 538:1, 538:21, 538:22, 539:5, 540:7, 540:10, 540:12, 541:1, 541:10, 541:14, 541:16
**claim** [6] - 503:20, 530:21, 534:14, 534:16, 535:12, 548:3
**claimed** [1] - 534:3
**claiming** [1] - 545:25
**claims** [5] - 481:23, 507:6, 530:10, 534:20, 546:6
**clear** [10] - 471:10, 471:22, 476:25, 485:8, 493:16, 500:22, 516:5, 535:13, 555:23
**cleared** [1] - 466:23
**clearly** [9] - 478:10, 494:10, 495:25, 518:5, 518:19, 519:13, 520:3, 533:16, 534:12
**client** [30] - 484:11, 485:5, 485:13, 485:17, 485:23, 485:25, 486:4, 486:6, 486:7, 486:12, 487:14, 487:16, 487:20, 489:11, 492:19, 493:5, 494:18, 494:25, 496:9, 496:18, 497:8, 498:13, 501:13, 504:9, 504:11, 508:2, 508:17, 508:22, 509:2, 510:6
**client's** [3] - 485:2, 493:3, 501:4
**climbing** [1] - 479:13
**clip** [1] - 478:14
**close** [1] - 493:24
**closed** [1] - 550:13
**closely** [1] - 517:4

**closer** [2] - 492:18, 550:3
**closest** [3] - 492:20, 493:3, 494:6
**CLOSING** [1] - 463:2
**closing** [2] - 464:5, 519:11
**closures** [1] - 540:21
**clubbing** [1] - 505:22
**cocking** [1] - 503:1
**cocks** [1] - 534:23
**Code** [5] - 523:3, 523:6, 523:16, 523:20, 541:21
**collapses** [1] - 517:9
**colleague** [1] - 512:10
**collectively** [1] - 467:1
**College** [2] - 465:2, 468:10
**COLUMBIA** [1] - 462:1
**Columbia** [3] - 540:15, 540:16, 540:17
**combination** [1] - 508:13
**coming** [4] - 490:4, 509:20, 511:22, 519:21
**commands** [1] - 465:5
**comments** [1] - 469:22
**commerce** [9] - 481:11, 537:23, 537:24, 540:13, 540:14, 540:16, 540:23, 541:16
**Commerce** [1] - 462:13
**commission** [1] - 551:3
**commit** [8] - 469:13, 481:1, 487:21, 501:5, 516:8, 516:18, 516:22, 526:2
**committed** [9] - 472:16, 481:1, 509:22, 527:9, 537:15, 538:4, 539:18, 541:4, 548:2
**committing** [2] - 500:24, 501:14
**commodity** [1] - 537:24
**common** [1] - 503:14
**communicate** [1] - 491:8
**complete** [1] - 560:5
**completes** [1] - 556:23
**composed** [1] -

565

483:17
**compromise** [1] - 550:19
**computer** [3] - 476:5, 476:6, 476:9
**concealed** [1] - 470:8
**concede** [5] - 489:14, 489:17, 489:21, 509:11, 520:1
**conceded** [3] - 495:23, 496:17, 507:18
**conceding** [1] - 509:24
**concept** [2] - 488:17, 491:4
**conceptual** [1] - 490:9
**concern** [2] - 466:13, 534:16
**concerned** [8] - 469:5, 479:24, 480:2, 480:9, 502:23, 504:16, 505:19, 534:14
**concerning** [1] - 478:20
**concessions** [3] - 484:12, 485:3, 485:6
**conclude** [4] - 470:25, 501:23, 516:12, 531:19
**concluded** [1] - 559:23
**concludes** [1] - 533:25
**conclusion** [3] - 493:22, 510:19, 520:22
**conclusions** [1] - 488:22
**concurrence** [1] - 548:5
**conduct** [30] - 468:7, 481:7, 486:25, 487:8, 515:22, 522:18, 523:11, 523:18, 537:25, 538:8, 538:12, 542:3, 546:12, 546:15, 551:11, 551:16, 551:22, 551:24, 551:25, 552:5, 552:6, 552:11, 552:22, 553:2, 553:3, 554:18, 554:22, 554:25, 555:5, 555:8
**conducted** [1] - 542:22
**conducts** [1] - 486:25

**conference** [1] - 557:25
**Conference** [2] - 558:5, 558:8
**confirming** [1] - 544:15
**confronted** [1] - 483:21
**Congress** [13] - 464:23, 465:1, 466:8, 466:9, 469:5, 542:8, 542:12, 542:13, 548:12, 555:1, 555:9
**Congress's** [1] - 544:16
**congressional** [1] - 466:21
**connection** [1] - 475:25
**consciousness** [2] - 546:24, 547:13
**consequences** [1] - 533:6
**consider** [5] - 473:8, 484:13, 485:3, 496:23, 497:20
**consideration** [2] - 492:6, 494:11
**considered** [2] - 490:22, 495:7
**considering** [1] - 525:4
**consistent** [4] - 486:1, 490:17, 500:17, 544:9
**constituted** [3] - 540:23, 542:24, 554:7
**constitutes** [3] - 527:20, 548:19, 560:4
**Constitution** [2] - 462:23, 560:12
**contact** [15] - 477:16, 477:18, 493:7, 493:12, 514:16, 514:22, 516:7, 516:15, 516:17, 516:21, 525:23, 528:20, 528:23, 528:25, 532:18
**contention** [2] - 481:19
**contest** [1] - 498:9
**contesting** [1] - 496:9
**context** [10] - 487:6, 487:17, 490:11, 491:15, 493:15, 493:24, 497:5,

497:10, 504:24, 531:24
**continue** [1] - 480:6
**continued** [4] - 482:5, 490:2, 546:3, 550:2
**continues** [2] - 468:23, 502:25
**continuing** [2] - 479:8, 479:9
**continuously** [1] - 528:10
**contradicted** [2] - 477:1, 546:4
**contrary** [2] - 535:14, 546:8
**contributed** [1] - 467:3
**control** [5] - 489:8, 492:25, 497:19, 498:1, 546:1
**convenient** [1] - 534:16
**conversation** [2] - 494:16, 500:21
**converting** [1] - 465:23
**converts** [1] - 491:25
**convict** [3] - 485:14, 485:20, 494:18
**convicted** [5] - 495:6, 495:11, 495:20, 495:21, 496:1
**conviction** [5] - 473:4, 477:14, 485:25, 487:1, 496:8
**convictions** [1] - 485:10
**cops** [1] - 470:2
**Corado** [12] - 464:19, 480:19, 517:21, 517:25, 518:7, 532:18, 532:20, 532:25, 535:18, 535:23, 539:20, 541:11
**Corado's** [1] - 478:10
**cordoned** [1] - 549:17
**core** [1] - 465:14
**corner** [1] - 476:7
**corners** [3] - 475:12, 511:2, 511:3
**correct** [3] - 476:21, 502:5, 514:8
**correctly** [3] - 495:10, 496:11, 557:22
**corrupt** [1] - 469:24
**corruptly** [11] - 469:3, 470:14, 541:20, 542:5, 546:22, 548:5, 548:7, 548:24

**counsel** [5] - 464:4, 517:20, 522:6, 522:8, 525:5
**Count** [66] - 466:3, 470:11, 470:22, 473:4, 477:15, 478:8, 482:22, 485:15, 485:19, 485:25, 488:19, 495:3, 495:6, 495:14, 495:16, 495:21, 496:8, 497:16, 515:20, 515:21, 516:2, 516:3, 516:10, 516:19, 516:24, 523:4, 523:7, 523:10, 523:20, 523:21, 525:7, 529:2, 529:25, 531:22, 532:1, 532:2, 532:3, 532:4, 537:4, 537:8, 537:9, 538:1, 538:10, 540:24, 541:3, 541:7, 541:15, 541:18, 548:25, 551:1, 551:8, 552:20, 552:23, 553:5, 553:12, 554:15, 555:6, 555:14, 556:1, 556:15, 556:18, 556:20, 556:23
**count** [24] - 471:1, 471:2, 471:6, 471:15, 482:23, 496:1, 523:11, 523:14, 523:18, 523:21, 525:9, 529:6, 529:11, 529:14, 530:2, 537:14, 540:25, 541:19, 549:1, 551:10, 553:14, 554:17, 556:3
**country** [1] - 465:17
**counts** [35] - 466:1, 480:24, 481:17, 482:2, 482:8, 482:9, 482:14, 482:20, 484:6, 484:16, 484:19, 484:20, 484:22, 484:23, 484:25, 485:4, 488:3, 488:14, 521:10, 522:11, 522:20, 522:21, 522:25, 523:24, 525:6, 529:4, 537:6,

538:17, 553:9, 554:10, 554:14, 556:14, 556:22
**Counts** [5] - 480:24, 485:4, 522:24, 523:1, 555:10
**couple** [2] - 497:14, 523:24
**coupled** [1] - 481:12
**course** [6] - 478:4, 494:23, 502:1, 508:19, 552:12, 552:25
**court** [2] - 469:4, 471:3
**Court** [60] - 462:22, 462:22, 469:24, 470:17, 470:25, 471:12, 473:7, 474:13, 474:17, 478:12, 481:4, 482:1, 482:7, 482:8, 482:21, 484:13, 484:14, 484:15, 484:22, 484:23, 485:3, 485:17, 485:20, 486:17, 487:14, 488:14, 489:3, 490:7, 490:10, 491:2, 493:17, 494:1, 494:11, 494:17, 495:13, 496:1, 496:5, 496:6, 496:11, 499:17, 499:18, 499:21, 499:22, 503:10, 503:13, 503:24, 505:4, 506:4, 507:22, 509:18, 509:21, 510:4, 516:12, 533:25, 534:2, 535:9, 547:23, 556:21, 560:11
**COURT** [98] - 462:1, 464:5, 470:13, 471:6, 471:14, 471:17, 471:20, 472:24, 473:6, 474:4, 474:23, 475:9, 475:17, 476:5, 476:11, 476:20, 477:9, 477:18, 482:11, 482:15, 482:18, 484:7, 489:14, 489:17, 489:21, 489:24, 490:1, 495:3, 495:14,

495:21, 496:3, 496:19, 496:23, 498:16, 498:21, 499:5, 499:25, 500:5, 501:16, 501:20, 502:9, 502:16, 502:19, 503:17, 503:20, 504:20, 505:18, 508:7, 509:8, 510:8, 510:13, 511:7, 511:15, 511:20, 511:24, 512:4, 512:6, 512:12, 512:15, 513:6, 514:17, 515:1, 515:9, 515:14, 515:20, 516:2, 516:10, 516:25, 517:10, 518:10, 518:21, 519:2, 519:7, 519:15, 519:24, 520:17, 520:25, 521:3, 521:5, 521:7, 522:7, 557:7, 557:18, 557:20, 557:23, 558:2, 558:4, 558:7, 558:14, 558:17, 558:20, 558:23, 559:1, 559:7, 559:9, 559:16, 559:19, 560:1

**Court's** [3] - 472:12, 476:16, 556:24

**Courthouse** [1] - 462:23

**courtroom** [3] - 522:10, 558:24

**COURTROOM** [10] - 464:2, 522:4, 557:14, 557:19, 557:21, 557:24, 558:3, 558:6, 558:12, 558:22

**cover** [2] - 513:6, 513:7

**covered** [4] - 511:9, 511:25, 513:10, 518:3

**CRC** [2] - 462:22, 560:10

**credence** [1] - 518:7

**credibility** [2] - 477:2, 530:20

**credible** [4] - 473:10, 479:20, 534:17, 535:13

**credit** [6] - 469:20, 482:1, 534:2, 535:9,

546:6, 547:23

**crime** [9] - 469:12, 469:14, 487:19, 498:15, 502:2, 509:4, 509:22, 510:7, 531:6

**crimes** [2] - 469:13, 486:10

**criminal** [2] - 465:24, 484:4

**Criminal** [5] - 462:2, 464:2, 522:4, 543:1, 543:4

**criminals** [1] - 468:2

**critical** [1] - 492:6

**Cronkright** [9] - 463:4, 464:7, 484:7, 502:10, 510:8, 511:8, 558:17, 559:7, 559:17

**CRONKRIGHT** [35] - 462:18, 462:18, 484:8, 489:16, 489:20, 489:23, 489:25, 490:6, 495:8, 495:18, 495:25, 496:5, 496:20, 497:4, 498:20, 498:24, 499:7, 500:1, 500:7, 501:18, 501:25, 502:15, 502:18, 503:9, 503:19, 503:22, 504:21, 506:2, 508:10, 509:11, 557:5, 558:19, 558:25, 559:8, 559:18

**Cropper** [21] - 464:18, 474:20, 475:3, 475:19, 476:3, 476:13, 476:17, 491:6, 492:20, 511:1, 514:5, 514:10, 514:15, 514:16, 514:19, 514:23, 515:3, 515:7, 526:21

**cross** [3] - 473:16, 550:23, 555:22

**cross-examination** [1] - 473:16

**crowd** [23] - 466:5, 466:12, 466:20, 472:20, 472:21, 472:22, 474:2, 475:15, 478:16, 480:3, 480:4, 480:6, 491:5, 491:11, 497:18, 497:19,

498:1, 508:23, 510:3, 514:11, 524:23, 542:9, 542:21

**crowd-surfed** [1] - 524:23

**crowd-surfing** [1] - 472:21

**crowding** [1] - 552:10

**CRR** [2] - 462:22, 560:10

**crushed** [1] - 469:25

**crutch** [4] - 478:24, 479:8, 479:13, 517:5

**crutches** [2] - 533:15, 539:17

**cues** [1] - 493:25

## D

**D.C** [6] - 462:5, 462:15, 524:9, 526:11, 533:8, 560:12

**Dallas** [1] - 462:14

**damage** [7] - 464:14, 480:18, 536:10, 538:25, 539:2, 539:8, 554:4

**danger** [14] - 474:2, 507:10, 519:11, 519:14, 519:16, 519:17, 519:19, 519:23, 519:25, 520:3, 520:6, 520:8, 538:24, 538:25

**dangerous** [77] - 465:23, 474:15, 474:18, 474:19, 475:5, 475:10, 475:21, 475:24, 476:5, 476:10, 476:14, 478:6, 480:13, 482:8, 482:11, 488:23, 489:5, 489:15, 489:18, 490:5, 490:12, 490:13, 490:15, 490:18, 490:23, 491:1, 491:17, 491:24, 492:3, 492:4, 492:12, 492:14, 492:15, 494:15, 495:4, 495:12, 495:14, 495:15, 500:3, 500:9, 502:16, 504:15, 507:17, 510:12, 510:13, 510:18,

510:24, 511:6, 513:22, 515:17, 517:15, 522:22, 522:23, 523:9, 523:12, 523:15, 529:5, 529:8, 529:24, 531:23, 532:6, 536:2, 536:3, 536:17, 537:3, 549:3, 549:13, 550:25, 551:2, 551:12, 552:2, 553:10, 553:16, 553:23, 554:11, 554:12

**dark** [1] - 483:11

**date** [3] - 557:7, 557:11, 559:1

**Dated** [1] - 560:7

**DAY** [1] - 462:8

**days** [2] - 522:17, 524:1

**DC** [2] - 462:16, 462:24

**deadly** [33] - 474:16, 475:5, 475:10, 475:21, 475:24, 476:5, 476:13, 477:23, 478:6, 480:12, 480:13, 490:5, 497:11, 505:1, 523:9, 523:12, 523:15, 529:24, 531:23, 536:2, 536:3, 537:2, 537:3, 549:3, 549:12, 550:24, 551:2, 551:12, 552:2, 553:9, 553:16, 553:22, 554:12

**deal** [2] - 484:17, 557:1

**death** [3] - 536:4, 536:7, 554:3

**December** [2] - 547:15, 548:14

**decide** [1] - 488:15

**decided** [3] - 492:25, 507:2, 550:15

**decision** [1] - 535:1

**decisions** [2] - 486:21, 492:24

**Declaration** [3] - 467:25, 545:3, 545:6

**decrease** [1] - 540:20

**dedicated** [1] - 464:22

**defeat** [2] - 518:24, 519:4

**defeated** [2] - 519:3,

519:5

**defeats** [1] - 518:12

**defend** [3] - 518:19, 520:5, 520:8

**defendant** [84] - 464:7, 464:20, 465:21, 466:1, 467:4, 467:15, 468:4, 468:6, 468:17, 468:25, 469:3, 469:4, 470:11, 470:18, 470:23, 471:3, 471:23, 472:15, 475:16, 480:3, 480:5, 480:7, 480:25, 482:2, 483:9, 483:12, 483:16, 483:20, 483:22, 500:23, 503:16, 513:12, 513:16, 514:10, 514:12, 514:13, 514:20, 515:17, 516:1, 516:20, 518:12, 518:13, 518:18, 519:10, 519:22, 520:4, 520:7, 520:13, 520:15, 520:22, 525:14, 525:20, 525:21, 525:22, 528:7, 529:15, 529:21, 529:22, 529:23, 536:5, 537:15, 541:24, 541:25, 542:2, 542:5, 546:22, 549:6, 549:9, 549:12, 551:15, 551:18, 551:21, 552:1, 553:19, 553:21, 553:22, 554:21, 554:24, 555:2, 556:8, 556:10

**Defendant** [2] - 462:6, 462:18

**defendant's** [7] - 464:15, 467:16, 468:20, 469:19, 514:8, 537:18, 551:24

**defense** [21] - 471:3, 502:3, 503:12, 503:15, 503:17, 503:20, 504:8, 516:10, 518:25, 519:3, 519:4, 519:8, 520:23, 521:3,

567

524:4, 535:12,
557:5, 559:16
**defined** [1] - 512:14
**definitely** [2] - 514:4,
520:4
**definition** [8] - 470:14,
470:18, 474:17,
499:13, 512:19,
548:4, 548:7, 548:24
**definitions** [1] -
552:16
**degree** [1] - 537:22
**delay** [1] - 540:4
**delayed** [2] - 537:23,
542:20
**deliberately** [1] -
533:21
**democracy** [4] -
464:12, 465:15,
483:1, 483:23
**demonstrate** [1] -
477:3
**demonstrated** [1] -
543:23
**demonstrates** [4] -
506:6, 526:22,
527:12, 548:14
**demonstrating** [1] -
469:21
**demonstrator** [3] -
497:3, 503:4, 503:5
**demonstrators** [2] -
466:5, 542:9
**Department** [3] -
471:25, 483:20,
526:5
**depicting** [1] - 530:4
**deployed** [2] - 526:15,
550:18
**DEPUTY** [10] - 464:2,
522:4, 557:14,
557:19, 557:21,
557:24, 558:3,
558:6, 558:12,
558:22
**described** [5] -
487:10, 487:24,
488:17, 505:4,
522:15
**describing** [2] - 491:3,
545:4
**descriptive** [1] - 487:6
**designated** [2] -
512:19, 550:12
**designed** [1] - 499:2
**despite** [1] - 484:2
**destruction** [2] -
539:18, 554:4
**details** [1] - 522:14
**detained** [3] - 559:4,

559:11, 559:12
**Detective** [2] - 464:18,
527:11
**determination** [2] -
471:7, 502:7
**devote** [1] - 464:19
**differences** [1] -
465:15
**different** [17] - 469:8,
476:11, 491:8,
491:13, 493:11,
494:3, 498:25,
499:10, 505:3,
507:14, 507:19,
515:1, 515:5, 518:1,
520:18, 531:14,
531:16
**direct** [2] - 473:11,
514:9
**directed** [3] - 487:8,
502:12, 527:14
**direction** [2] - 499:14,
501:7
**directions** [1] - 531:17
**directly** [6] - 491:20,
518:8, 527:4,
528:24, 533:22,
534:9
**disagree** [2] - 486:17,
488:20
**discussed** [21] -
515:18, 535:16,
536:11, 538:9,
538:17, 541:3,
541:7, 546:17,
547:9, 551:1,
552:20, 552:23,
553:5, 553:8,
554:10, 554:13,
555:6, 555:10,
555:14, 556:14,
556:17
**discussing** [1] - 489:1
**discussion** [1] -
508:25
**dislodge** [1] - 473:13
**dismiss** [1] - 489:7
**disobey** [2] - 555:13,
555:24
**disorder** [23] - 480:24,
481:6, 481:10,
481:11, 516:19,
516:23, 522:25,
537:6, 537:7,
537:21, 537:22,
538:2, 538:21,
538:22, 539:5,
540:8, 540:11,
540:12, 541:1,
541:10, 541:14,

541:16
**disorderly** [11] -
481:7, 482:21,
523:11, 523:18,
551:11, 551:15,
552:4, 552:6,
554:18, 554:21,
555:4
**dispersed** [1] - 542:21
**dispositive** [1] -
509:12
**dispute** [3] - 481:22,
531:5, 531:11
**disputing** [1] - 530:12
**disregard** [2] - 555:14,
555:24
**disrupt** [7] - 466:25,
524:10, 551:22,
552:22, 553:3,
554:25, 555:8
**disrupted** [4] - 467:1,
467:14, 532:22,
551:25
**disrupting** [1] -
482:20
**disruption** [2] - 467:3,
469:1
**disruptive** [9] - 481:7,
523:11, 551:11,
551:16, 552:5,
552:8, 552:11,
554:22, 555:5
**dissolve** [4] - 467:24,
483:25, 547:10
**dissolving** [3] -
467:22, 544:24,
548:12
**distinct** [1] - 516:4
**distinctly** [1] - 517:6
**distract** [2] - 479:22,
506:1
**distress** [1] - 466:15
**distressed** [1] - 540:2
**DISTRICT** [4] - 462:1,
462:1, 462:9, 462:13
**District** [5] - 540:15,
540:16, 540:17,
540:19, 542:23
**disturb** [2] - 554:25,
555:8
**disturbance** [2] -
538:22, 552:11
**disturbed** [2] - 506:13,
506:14
**disturbing** [1] -
482:20
**divorce** [1] - 486:3
**divorced** [1] - 506:18
**document** [2] -
467:25, 468:1

**dome** [1] - 482:25
**done** [4] - 470:8,
506:3, 508:21,
509:16
**door** [1] - 468:24
**doors** [5] - 467:9,
467:10, 467:19,
482:5, 550:5
**doubt** [29] - 465:25,
467:13, 467:17,
468:20, 471:23,
472:7, 472:14,
502:14, 504:20,
518:17, 518:24,
525:13, 529:3,
529:14, 531:20,
537:5, 537:13,
541:23, 548:25,
549:5, 551:9,
551:14, 553:13,
553:18, 554:16,
554:20, 556:2,
556:7, 556:20
**DOUGLAS** [1] -
462:12
**down** [27] - 479:22,
493:14, 500:19,
502:24, 505:1,
505:9, 505:12,
507:7, 507:9,
507:15, 507:17,
507:20, 507:25,
508:3, 508:5,
508:13, 514:14,
514:21, 514:22,
515:6, 517:22,
528:15, 530:14,
534:5, 534:21,
535:2, 539:23
**downed** [5] - 503:12,
518:8, 518:9,
518:19, 535:4
**dramatic** [1] - 540:20
**dramatically** [1] -
533:14
**draw** [3] - 476:15,
499:12, 499:17
**draws** [1] - 548:5
**droplets** [1] - 483:18
**dude** [1] - 544:18
**due** [3] - 536:23,
540:21
**during** [26] - 466:6,
481:5, 501:1, 514:9,
515:9, 522:16,
522:22, 525:2,
527:9, 527:10,
530:13, 531:14,
537:21, 538:12,
538:21, 539:12,

540:10, 541:10,
542:10, 549:13,
550:25, 551:3,
552:2, 553:10,
553:23, 554:12
**duties** [27] - 472:9,
487:11, 487:15,
487:16, 487:25,
488:2, 500:19,
512:25, 513:2,
525:17, 525:19,
525:25, 526:1,
526:7, 526:10,
529:18, 529:20,
532:23, 533:2,
535:22, 535:24,
536:13, 537:20,
538:20, 540:10,
541:9, 541:12
**duty** [2] - 478:12,
526:18

**E**

**early** [2] - 522:12,
557:10
**easier** [1] - 557:11
**easily** [1] - 552:16
**echo** [1] - 501:18
**edges** [1] - 514:3
**effect** [8] - 468:7,
506:19, 533:17,
540:23, 542:3,
543:19, 546:12,
546:19
**efficiently** [1] - 559:19
**effort** [3] - 477:3,
477:4
**efforts** [6] - 467:12,
473:14, 474:9,
474:11, 477:7,
477:21
**eight** [15] - 474:4,
474:5, 482:15,
489:12, 492:9,
494:9, 497:5,
497:23, 502:16,
505:24, 515:9,
516:16, 530:13,
531:15
**eight-year** [1] - 516:16
**either** [6] - 516:8,
532:23, 548:8,
555:1, 555:9, 556:25
**elaborations** [1] -
508:8
**elected** [2] - 469:9,
548:19
**election** [9] - 466:6,
469:5, 469:10,

568

469:18, 542:10, 543:11, 546:20, 548:17, 548:22
**election-secure** [1] - 548:17
**electoral** [3] - 524:10, 542:8, 549:25
**Electoral** [3] - 465:2, 468:9, 545:12
**element** [5] - 470:10, 472:11, 474:16, 519:16, 554:8
**elementary** [1] - 500:10
**elements** [17] - 485:19, 500:11, 500:16, 510:5, 519:3, 519:9, 520:18, 525:13, 529:13, 537:13, 541:23, 549:5, 551:14, 553:18, 554:20, 556:6
**embarrassment** [1] - 470:7
**employee** [8] - 512:21, 512:24, 513:2, 525:16, 525:23, 529:17, 529:19, 535:21
**encouraging** [2] - 524:18, 552:14
**end** [6] - 480:17, 487:7, 501:2, 501:3, 515:13, 536:24
**energy** [1] - 499:14
**enforcement** [10] - 481:3, 483:6, 511:13, 513:9, 513:10, 537:17, 537:19, 538:5, 538:18, 541:6
**enforcing** [1] - 526:11
**engage** [2] - 524:9, 556:12
**engaged** [18] - 472:8, 512:24, 525:16, 525:18, 525:24, 526:1, 529:17, 535:22, 537:19, 538:19, 541:9, 553:19, 553:24, 554:21, 555:4, 556:8
**engaging** [3] - 523:14, 553:15, 556:4
**enter** [12] - 483:22, 485:11, 524:21, 543:13, 547:4, 549:11, 550:9,

550:15, 550:22, 551:20, 552:19, 552:24
**entered** [7] - 466:10, 481:23, 482:2, 542:14, 549:6, 549:14, 550:1
**entering** [4] - 506:17, 523:8, 549:2, 555:25
**entire** [2] - 513:19, 518:3
**entrance** [3] - 524:25, 532:9, 532:12
**entry** [1] - 541:13
**episode** [1] - 527:10
**equally** [1] - 476:8
**equation** [1] - 494:12
**erect** [11] - 471:4, 471:11, 473:2, 474:1, 474:8, 474:11, 493:17, 494:1, 494:2, 494:4, 494:25
**erected** [3] - 492:23, 494:24, 497:17
**erecting** [2] - 494:20, 499:10
**escalated** [1] - 533:14
**escalating** [1] - 539:14
**especially** [1] - 485:15
**essentially** [2] - 497:24, 503:23
**evacuated** [4] - 467:7, 468:22, 542:12, 542:16
**evacuation** [1] - 540:4
**event** [4] - 488:16, 508:10, 536:22, 552:12
**events** [5] - 483:11, 495:5, 534:3, 540:7
**everywhere** [2] - 505:14, 505:15
**evidence** [63] - 465:25, 466:21, 468:4, 468:16, 469:25, 470:2, 470:4, 470:10, 471:7, 471:10, 471:18, 471:22, 472:24, 473:8, 473:9, 473:10, 474:19, 475:20, 476:13, 476:21, 476:24, 481:4, 481:5, 482:7, 482:20, 482:21, 482:22, 484:5, 488:8, 488:9,

488:21, 492:7, 492:9, 493:16, 496:1, 496:3, 496:4, 496:7, 496:24, 501:23, 502:6, 502:8, 502:9, 502:10, 502:14, 503:7, 503:8, 509:19, 514:17, 518:18, 522:8, 522:9, 522:16, 525:4, 530:3, 530:6, 535:13, 537:4, 546:8, 548:10
**exactly** [2] - 469:16, 499:7
**exaggeration** [1] - 483:24
**examination** [2] - 473:11, 473:16
**example** [8] - 486:6, 489:2, 489:4, 489:22, 491:6, 504:1, 545:4, 545:23
**except** [1] - 488:2
**exception** [1] - 488:3
**exclude** [1] - 494:11
**excuse** [1] - 483:17
**Exhibit** [21] - 466:17, 467:8, 478:9, 478:15, 481:21, 527:5, 527:15, 528:5, 528:14, 528:16, 528:19, 530:17, 530:25, 531:4, 532:16, 533:12, 540:22, 544:4, 544:8, 547:12
**exhibited** [1] - 473:3
**experience** [2] - 507:16
**explain** [4] - 471:13, 473:12, 525:5, 545:25
**explanation** [2] - 534:5, 546:2
**expose** [1] - 536:25
**express** [1] - 538:14
**expressed** [1] - 545:9
**expressing** [1] - 499:21
**expression** [2] - 471:5, 498:10
**extending** [1] - 558:9
**extent** [2] - 482:9, 482:19
**extreme** [1] - 545:22
**eye** [1] - 536:11
**eyes** [3] - 468:2, 503:13, 503:25

# F

**F.3d** [1] - 533:8
**face** [7] - 478:25, 479:15, 480:20, 514:2, 514:12, 518:3, 536:24
**Facebook** [2] - 467:17, 468:18
**fact** [28] - 466:15, 476:12, 477:1, 486:17, 486:18, 486:20, 487:8, 489:11, 491:23, 493:17, 493:19, 497:20, 501:1, 501:23, 505:16, 507:11, 508:22, 509:25, 510:4, 511:5, 517:24, 518:7, 533:5, 536:20, 536:23, 551:24, 553:3
**factor** [2] - 475:22, 503:14
**facts** [19] - 485:9, 485:11, 485:16, 485:17, 485:18, 485:20, 485:22, 485:23, 486:21, 491:2, 491:19, 491:23, 496:15, 499:20, 501:12, 504:4, 504:22, 505:10
**factual** [2] - 470:25, 485:10
**factually** [1] - 493:4
**failed** [1] - 483:13
**fair** [2] - 484:23, 486:16
**fairly** [1] - 486:20
**fall** [1] - 472:3
**falling** [3] - 475:7, 475:13, 476:1
**falls** [1] - 475:4
**familiar** [1] - 474:17
**familiarity** [1] - 545:9
**family** [1] - 549:20
**far** [3] - 494:9, 527:19, 550:4
**Fathers** [1] - 468:2
**FBI** [1] - 524:4
**federal** [16] - 487:10, 487:24, 488:4, 488:7, 488:11, 511:18, 511:19, 511:21, 512:3, 512:5, 512:6, 512:14, 512:15,

522:19, 526:11, 532:25
**federally** [1] - 537:25
**feet** [4] - 477:10, 480:5, 507:23, 534:12
**fellow** [2] - 480:7, 518:2
**felony** [4] - 516:8, 516:18, 516:22, 526:2
**fence** [3] - 473:14, 479:13, 479:15
**fencing** [1] - 550:12
**few** [3] - 481:18, 507:22, 514:9
**fifth** [2] - 474:16, 552:1
**fight** [1] - 547:17
**fighting** [3] - 466:12, 514:1, 550:22
**figure** [1] - 557:15
**finally** [2] - 469:3, 482:19
**finder** [2] - 501:23, 533:5
**findings** [1] - 556:21
**finish** [1] - 489:24
**finishing** [1] - 471:14
**fire** [1] - 503:6
**first** [39] - 464:6, 471:19, 473:7, 473:20, 481:19, 482:3, 485:5, 488:20, 490:6, 491:4, 494:23, 500:1, 500:15, 503:9, 503:12, 503:24, 505:5, 515:25, 525:14, 526:3, 529:15, 529:25, 532:7, 534:7, 537:15, 538:1, 541:24, 542:6, 545:24, 549:6, 549:14, 551:15, 552:4, 553:19, 553:24, 554:21, 555:4, 556:8, 557:13
**First** [1] - 471:4
**Fischer** [1] - 470:17
**fischer** [1] - 548:6
**fit** [1] - 519:7
**fits** [1] - 476:23
**five** [6] - 477:10, 519:3, 519:9, 520:18, 528:4, 551:14
**flag** [12] - 479:11,

480:8, 497:21,
497:23, 498:18,
498:23, 501:17,
505:23, 505:25,
520:20, 521:1, 551:6
**flagpole** [64] - 465:8,
470:5, 478:8,
478:19, 480:13,
480:21, 481:10,
482:12, 482:13,
482:17, 482:18,
499:24, 500:2,
500:8, 500:12,
500:13, 501:6,
501:21, 501:24,
502:4, 502:20,
503:21, 505:9,
507:24, 509:25,
517:1, 517:13,
519:12, 524:24,
529:12, 532:6,
532:9, 532:13,
532:17, 532:21,
533:21, 533:22,
534:1, 534:4,
534:23, 535:10,
535:15, 535:17,
536:7, 536:12,
536:17, 536:22,
537:1, 537:10,
541:1, 541:3,
541:11, 547:5,
551:1, 551:2, 551:5,
551:6, 551:7,
552:15, 553:10,
554:2, 554:7, 554:12
**Floor** [1] - 462:13
**floor** [1] - 468:12
**flying** [1] - 539:24
**focus** [3] - 484:19,
491:19, 501:7
**focused** [2] - 484:16,
501:14
**follow** [2] - 509:5,
546:7
**following** [13] -
502:10, 525:13,
529:13, 537:13,
541:23, 544:14,
545:13, 549:5,
551:14, 553:18,
554:20, 556:6, 558:3
**footage** [21] - 524:13,
524:15, 526:22,
527:12, 528:22,
530:4, 530:11,
531:1, 531:13,
532:11, 533:9,
534:6, 535:6,
536:20, 539:6,

539:10, 539:22,
549:25, 550:21,
555:17, 555:20
**FOR** [3] - 462:1,
462:12, 462:15
**forbids** [1] - 555:13
**force** [25] - 465:11,
465:22, 474:10,
475:7, 475:13,
477:21, 483:13,
498:25, 499:1,
499:4, 499:6, 499:7,
499:10, 499:12,
520:5, 520:13,
528:7, 528:8, 528:9,
528:25, 531:13,
535:18, 544:12,
548:18
**forced** [1] - 541:12
**forcible** [1] - 531:21
**forcibly** [19] - 472:1,
487:7, 487:15,
487:16, 487:24,
488:17, 488:18,
498:18, 498:21,
498:22, 500:18,
501:2, 525:20,
527:8, 528:6, 528:7,
529:21, 535:16,
543:13
**foregoing** [1] - 560:4
**forget** [1] - 484:21
**formed** [4] - 487:20,
500:23, 501:5, 504:7
**former** [2] - 465:12,
484:2
**forming** [1] - 526:23
**formulated** [2] -
497:9, 501:13
**forth** [3] - 486:4,
490:20, 511:18
**fortunately** [1] - 517:7
**forward** [7] - 472:4,
472:20, 513:17,
513:20, 527:17,
530:16, 531:2
**fought** [2] - 483:6,
483:22
**founding** [1] - 468:1
**Founding** [1] - 468:2
**four** [4] - 483:2,
525:13, 529:13,
541:23
**fourth** [8] - 469:3,
470:10, 525:22,
529:23, 535:19,
542:4, 551:24, 553:2
**frame** [6] - 467:12,
473:11, 473:12,
495:9, 514:21,

529:10
**frames** [1] - 514:9
**framework** [1] - 519:7
**fraud** [2] - 469:5,
469:10
**fray** [1] - 506:17
**free** [2] - 557:24,
558:13
**Friedrich** [1] - 543:2
**friends** [1] - 470:7
**front** [10] - 487:7,
497:21, 497:23,
501:2, 504:13,
517:22, 518:8,
527:4, 541:2, 551:4
**frustration** [1] -
545:13
**fucking** [2] - 527:2,
528:14
**full** [1] - 560:5
**fully** [1] - 543:16
**function** [2] - 537:25,
553:1
**functions** [4] - 551:23,
552:1, 552:23, 553:4

## G

**gallows** [1] - 469:16
**gap** [3] - 514:2, 517:2,
536:24
**gas** [2] - 478:25, 518:2
**gathering** [1] - 481:6
**gear** [2] - 480:15,
517:12
**general** [4] - 487:19,
500:24, 501:12,
531:5
**given** [3] - 468:19,
473:9, 536:9
**glean** [1] - 469:24
**gleaned** [1] - 484:15
**goals** [3] - 465:21,
546:3, 547:14
**Government** [13] -
512:22, 527:5,
527:15, 528:16,
528:19, 530:17,
530:25, 531:4,
540:22, 544:4,
544:8, 547:12
**government** [38] -
464:6, 464:8, 468:3,
483:1, 485:22,
486:14, 490:16,
494:20, 495:15,
504:17, 515:22,
516:12, 522:18,
524:1, 524:11,
524:12, 528:5,

530:1, 530:6,
531:12, 532:15,
533:12, 540:18,
545:8, 545:24,
549:4, 551:13,
551:22, 551:25,
552:22, 552:25,
553:3, 553:17,
554:19, 556:6,
557:3, 558:15, 559:5
**government's** [7] -
488:21, 498:16,
502:7, 518:24,
520:17, 520:19,
530:23
**Government's** [5] -
466:17, 467:8,
478:9, 478:15,
481:21
**grab** [1] - 510:16
**grabbed** [1] - 531:9
**grabbing** [3] - 524:22,
530:4, 534:11
**grabs** [2] - 530:18,
530:21
**gravity** [1] - 508:4
**grievances** [1] - 548:1
**grocery** [1] - 540:19
**ground** [15] - 475:18,
476:12, 479:19,
501:9, 502:24,
505:20, 508:5,
508:14, 508:15,
514:14, 517:9,
517:22, 517:25,
539:23, 551:7
**grounds** [21] - 466:23,
481:20, 483:4,
523:9, 523:12,
523:15, 549:2,
549:7, 549:10,
549:15, 549:16,
549:18, 550:8,
551:12, 551:17,
551:19, 552:6,
552:18, 553:16,
553:21, 554:18
**Grounds** [18] - 523:18,
523:22, 524:15,
526:11, 526:17,
527:25, 542:15,
542:18, 546:18,
549:23, 552:13,
553:25, 554:23,
555:5, 555:15,
556:4, 556:9, 556:13
**group** [3] - 476:8,
502:13, 534:11
**groups** [1] - 538:23
**guarding** [3] - 524:25,

532:9, 547:7
**guilt** [1] - 470:24
**guilty** [43] - 466:1,
470:11, 471:1,
471:13, 474:14,
482:2, 484:6, 485:7,
485:14, 486:13,
496:10, 498:13,
500:18, 509:4,
510:6, 515:18,
516:1, 516:6, 525:6,
525:12, 529:2,
529:12, 530:2,
531:21, 532:1,
537:4, 537:12,
540:24, 541:18,
541:22, 548:25,
549:3, 551:8,
551:12, 553:12,
553:17, 554:15,
554:19, 556:1,
556:5, 556:19,
556:22, 556:23
**gun** [1] - 490:20
**guns** [1] - 483:15

## H

**HAAG** [31] - 462:15,
510:10, 510:14,
511:10, 511:16,
511:21, 512:3,
512:5, 512:9,
512:14, 513:4,
513:8, 514:18,
515:5, 515:11,
515:15, 515:24,
516:3, 516:17,
517:1, 517:17,
518:14, 519:1,
519:6, 519:9,
519:20, 520:1,
520:21, 521:2,
521:4, 521:6
**Haag** [2] - 463:5,
510:9
**hand** [7] - 479:13,
482:15, 483:6,
489:8, 492:13,
533:22
**hand-to-hand** [1] -
483:6
**handle** [7] - 479:2,
482:15, 492:13,
496:25, 504:14,
515:10, 530:12
**handled** [1] - 483:20
**hands** [13] - 469:25,
473:12, 478:25,
479:15, 480:2,

491:12, 493:11, 493:12, 510:16, 515:12, 527:7, 527:8, 527:16
**harder** [1] - 544:19
**hat** [1] - 480:10
**head** [6] - 476:7, 478:10, 490:4, 534:18, 536:10, 539:22
**heads** [3] - 465:8, 470:5, 480:15
**hear** [5] - 464:6, 486:20, 489:16, 498:24, 559:20
**heard** [12] - 466:7, 466:15, 484:24, 486:5, 486:15, 493:21, 498:10, 508:11, 522:8, 539:5, 542:11
**hears** [1] - 496:7
**heated** [1] - 486:4
**heavy** [1] - 478:12
**heavy-duty** [1] - 478:12
**hefted** [1] - 478:12
**held** [3] - 478:12, 492:21, 528:4
**helmet** [10] - 478:12, 478:13, 479:16, 480:17, 514:2, 517:12, 517:13, 532:17, 536:21, 536:23
**helmets** [2] - 536:18, 536:20
**help** [5] - 509:2, 520:15, 530:11, 534:15, 535:4
**helped** [1] - 468:1
**helpful** [1] - 504:10
**hence** [12] - 529:2, 531:21, 535:9, 537:1, 540:7, 540:24, 541:17, 548:24, 551:8, 553:12, 554:15, 556:1
**hereby** [1] - 560:3
**hiding** [2] - 468:19, 544:3
**highest** [1] - 464:23
**highly** [1] - 534:21
**Highway** [1] - 462:19
**himself** [7] - 464:13, 470:19, 475:5, 506:2, 513:18, 528:22, 548:9
**historical** [1] - 490:11

**history** [1] - 483:12
**hit** [10] - 476:6, 480:16, 480:17, 480:21, 480:23, 485:18, 490:4, 501:9, 532:17, 539:24
**hits** [3] - 478:11, 496:2, 536:10
**hitting** [3] - 470:5, 478:22, 505:25
**hockey** [7] - 479:4, 479:9, 505:22, 505:24, 517:4, 533:16, 539:16
**hold** [2] - 499:9, 533:19
**holding** [2] - 480:8, 496:25
**holds** [1] - 530:12
**Honor** [41] - 464:2, 464:10, 465:14, 479:19, 482:24, 484:9, 484:10, 485:8, 485:24, 487:2, 497:13, 510:7, 510:10, 510:14, 511:10, 513:5, 513:15, 514:18, 515:11, 515:16, 516:18, 517:2, 517:3, 517:17, 518:16, 518:19, 519:1, 519:21, 520:1, 520:14, 520:21, 521:6, 522:6, 557:4, 557:6, 557:14, 558:16, 558:19, 559:6, 559:8, 559:15
**HONORABLE** [1] - 462:8
**hoped** [1] - 483:10
**horrible** [4] - 504:23, 506:10, 507:4, 507:13
**horrific** [2] - 504:18, 508:16
**hospital** [1] - 475:8
**hours** [8] - 466:20, 482:6, 483:5, 489:11, 542:18, 544:11, 550:6
**House** [3] - 546:2, 555:1, 555:9
**hurt** [1] - 475:25
**hypothetical** [3] - 477:22, 478:1, 510:11

**I**

**iconic** [1] - 482:25
**idea** [12] - 480:9, 488:25, 489:8, 491:6, 491:7, 491:9, 493:8, 494:15, 497:15, 508:22, 514:5, 517:21
**ideas** [2] - 491:13, 494:3
**identifies** [1] - 502:22
**idiot** [1] - 474:25
**idly** [1] - 535:7
**ignorance** [2] - 538:9, 546:16
**ignored** [3] - 465:4, 465:5
**illuminate** [1] - 543:10
**illustrated** [2] - 483:1, 524:13
**imagine** [1] - 510:12
**imagining** [1] - 510:14
**immediate** [3] - 538:24, 538:25, 549:20
**immediately** [1] - 469:15
**imminent** [1] - 507:10
**impact** [1] - 478:9
**impacted** [1] - 481:11
**impaired** [1] - 518:5
**impede** [19] - 467:15, 468:8, 487:3, 496:14, 500:20, 531:8, 533:24, 536:13, 541:24, 542:1, 542:4, 542:6, 543:8, 546:13, 551:21, 552:22, 553:3, 554:25, 555:8
**impeded** [12] - 467:14, 471:24, 525:15, 526:4, 529:16, 531:10, 532:8, 535:20, 538:15, 538:19, 540:9, 551:24
**impediment** [1] - 494:21
**impeding** [20] - 474:8, 481:2, 482:20, 494:21, 495:4, 498:22, 515:19, 522:21, 523:2, 525:8, 525:10, 527:21, 529:5, 529:8, 532:5, 532:22, 533:19, 537:16, 538:5, 541:5

**implications** [1] - 485:3
**important** [3] - 485:10, 486:2, 513:22
**imposed** [1] - 471:24
**imposing** [1] - 474:9
**IN** [1] - 462:1
**in-person** [1] - 558:24
**incident** [8] - 494:17, 496:22, 499:24, 537:20, 538:20, 540:10, 541:10, 541:13
**incite** [2] - 468:14, 543:16
**include** [1] - 515:22
**included** [4] - 494:18, 497:16, 532:1, 532:3
**includes** [2] - 542:7, 549:20
**including** [10] - 467:2, 502:7, 512:22, 517:12, 532:21, 539:9, 539:16, 540:2, 540:15, 540:16
**increasingly** [1] - 506:14
**indeed** [1] - 469:12
**Independence** [3] - 467:25, 545:3, 545:6
**indicate** [3] - 511:1, 528:18, 538:13
**indicated** [2] - 487:9, 511:17
**indicates** [1] - 487:20
**indicating** [2] - 528:3, 550:14
**indictment** [11] - 494:25, 495:1, 495:10, 522:20, 529:7, 541:19, 549:1, 551:10, 553:14, 554:17, 556:3
**indirect** [1] - 528:25
**individual** [9] - 467:2, 483:17, 483:18, 513:18, 517:5, 520:11, 538:25, 539:2, 554:4
**individual's** [3] - 536:25, 539:1, 539:2
**individuals** [3] - 476:22, 477:9, 477:11
**infamous** [1] - 483:7
**infer** [1] - 533:5
**infliction** [1] - 554:3

**inform** [2] - 510:23, 519:22
**information** [2] - 468:19, 495:8
**informed** [1] - 484:14
**informs** [3] - 511:5, 513:22, 519:24
**inherently** [4] - 474:18, 490:19, 507:17, 507:19
**initial** [2] - 518:12, 520:22
**injure** [1] - 539:15
**injured** [1] - 540:6
**injures** [1] - 475:4
**injuries** [2] - 539:20, 539:25
**injury** [16] - 475:8, 475:13, 477:25, 478:6, 511:3, 513:24, 514:4, 536:4, 536:6, 536:8, 536:15, 536:22, 538:24, 539:1, 539:7, 554:4
**input** [1] - 505:6
**inside** [8] - 465:2, 466:12, 466:14, 466:20, 467:10, 468:10, 543:12, 550:4
**insistence** [1] - 546:3
**inspiration** [1] - 467:25
**installing** [2] - 470:20, 548:13
**instance** [7] - 477:23, 488:20, 490:8, 499:1, 505:8, 524:22, 524:24
**instances** [2] - 524:16, 524:19
**instantly** [1] - 504:15
**instead** [1] - 465:6
**institute** [1] - 545:7
**integrity** [1] - 526:19
**intend** [1] - 521:9
**intended** [11] - 467:15, 468:5, 469:17, 481:2, 530:5, 533:25, 535:10, 537:16, 538:4, 541:4, 552:24
**intending** [5] - 471:8, 497:2, 502:4, 530:9, 534:4
**intends** [1] - 533:6
**intent** [39] - 469:20, 469:24, 472:5, 487:19, 487:21,

571

497:9, 500:24,
501:5, 501:12,
501:13, 501:24,
502:2, 516:8,
516:18, 516:22,
524:20, 525:2,
526:2, 531:6, 536:5,
536:12, 542:1,
543:7, 543:13,
543:23, 544:10,
544:15, 545:19,
546:7, 546:9, 548:8,
548:11, 551:21,
552:21, 554:24,
555:7, 555:12,
555:23
**intentional** [1] - 472:4
**intentionally** [8] -
472:2, 525:22,
529:22, 529:23,
531:7, 531:9, 533:5,
536:2
**interested** [1] - 489:3
**interesting** [4] -
494:17, 494:23,
500:12, 508:24
**interfere** [7] - 477:13,
487:3, 500:20,
531:8, 533:24,
536:13, 547:6
**interfered** [10] -
471:24, 497:19,
512:2, 515:7,
525:15, 526:4,
527:24, 529:16,
532:8, 535:20
**interference** [2] -
512:8, 515:18
**interferes** [2] - 477:21,
552:9
**interfering** [9] - 474:9,
474:11, 481:3,
514:24, 514:25,
532:23, 537:16,
538:5, 541:5
**interpretation** [1] -
481:14
**interrupted** [1] - 483:9
**interrupting** [1] -
490:7
**interrupts** [1] - 552:11
**intimidate** [2] - 487:3,
500:20
**intimidated** [6] -
471:24, 525:15,
526:4, 529:16,
532:8, 535:20
**introduced** [2] -
525:3, 540:18
**invite** [2] - 484:1,

548:16
**involved** [3] - 504:23,
516:15, 539:7
**involvement** [1] -
494:10
**involves** [2] - 516:14,
537:8
**involving** [6] - 470:23,
471:2, 529:9, 538:2,
538:23, 554:3
**issue** [7] - 474:15,
488:23, 489:15,
489:17, 493:22,
509:2, 531:22
**issues** [5] - 485:2,
486:17, 486:18,
486:21, 509:1
**itself** [5] - 486:22,
486:23, 492:10,
496:7, 510:21

### J

**J2A** [1] - 462:19
**jabbed** [1] - 517:9
**jabbing** [1] - 517:5
**January** [52] - 464:14,
464:24, 465:3,
468:10, 481:15,
483:2, 484:4,
489:22, 490:1,
522:12, 522:14,
522:19, 524:9,
524:15, 525:2,
526:9, 526:15,
528:3, 528:17,
538:13, 539:4,
539:7, 539:19,
540:7, 540:13,
540:21, 541:17,
542:10, 543:9,
543:10, 543:12,
543:15, 543:24,
543:25, 544:6,
544:9, 544:14,
544:17, 544:23,
545:4, 545:6,
545:11, 545:13,
545:23, 546:4,
547:16, 547:21,
548:2, 548:15,
549:23, 555:16
**javelin** [2] - 502:19,
532:14
**Jayson** [2] - 464:17,
526:21
**jeopardy** [2] - 478:20,
483:9
**job** [3] - 464:25,
527:24, 532:22

**JOHN** [1] - 462:8
**join** [2] - 465:19,
533:20
**joined** [1] - 472:22
**joining** [1] - 544:12
**Jose** [2] - 465:3, 484:4
**jose** [1] - 464:11
**JOSEPH** [1] - 462:5
**Joseph** [2] - 464:3,
522:5
**jostling** [1] - 552:9
**Judge** [3] - 543:2,
543:5, 548:5
**JUDGE** [2] - 462:8,
462:9
**Judicial** [2] - 558:4,
558:7
**jump** [1] - 533:8
**June** [2] - 543:5, 560:7
**jury** [2] - 486:19,
520:24
**justifiable** [1] - 509:23
**justified** [1] - 508:18

### K

**keep** [6] - 465:12,
526:19, 527:22,
528:1, 532:15,
550:22
**keeping** [2] - 527:25,
538:15
**keeps** [2] - 527:7
**kicks** [1] - 547:21
**kill** [1] - 512:21
**kind** [6] - 496:14,
500:9, 500:19,
510:22, 515:12,
517:9
**knife** [1] - 490:20
**knocking** [2] - 467:10,
467:19
**knowing** [1] - 468:11
**knowingly** [22] -
468:6, 468:25,
481:1, 528:13,
537:15, 538:3,
538:7, 538:10,
541:4, 542:2,
546:11, 546:14,
549:9, 550:7,
551:18, 552:17,
553:22, 554:9,
555:3, 555:12,
556:11, 556:17
**known** [1] - 536:19
**Kollar** [1] - 543:5
**Kollar-Kotelly** [1] -
543:5
**Kotelly** [1] - 543:5

### L

**Labor** [3] - 557:11,
557:12, 557:15
**lacked** [4] - 549:11,
550:9, 551:20,
552:19
**laid** [2] - 481:20,
496:20
**language** [4] - 511:9,
512:10, 513:3, 513:4
**Lansing** [1] - 462:19
**large** [14] - 465:7,
466:5, 471:2,
473:24, 475:11,
479:1, 515:23,
524:22, 529:9,
530:4, 537:9, 538:3,
542:9
**larger** [1] - 479:2
**last** [15] - 466:23,
489:2, 517:19,
522:17, 523:21,
524:1, 528:20,
535:3, 536:1,
540:12, 546:21,
550:24, 553:8,
554:10, 555:11
**late** [1] - 558:9
**launch** [2] - 534:10,
535:10
**launched** [4] - 532:13,
534:1, 541:11, 551:3
**launching** [5] -
524:24, 533:21,
536:13, 547:5,
552:15
**laundry** [3] - 486:23,
494:13, 501:1
**LAW** [1] - 462:18
**law** [26] - 464:20,
481:3, 483:5, 487:4,
487:5, 487:20,
490:11, 490:17,
500:22, 511:13,
511:18, 511:19,
513:9, 526:11,
533:5, 537:17,
537:19, 538:5,
538:18, 541:6,
555:13, 555:14,
555:24
**lawful** [13] - 537:20,
538:20, 540:9,
541:9, 545:20,
546:3, 548:21,
549:7, 549:11,
549:15, 550:9,
551:20, 552:19
**lawfully** [3] - 508:18,

509:23, 548:19
**lawmakers** [3] - 544:4,
545:19, 548:1
**lawn** [1] - 481:25
**laws** [2] - 464:20,
547:14
**laying** [2] - 470:1,
474:21
**lead** [4] - 469:15,
485:9, 500:14,
543:15
**lead-up** [1] - 543:15
**learned** [2] - 550:16,
557:15
**least** [12] - 466:20,
481:24, 485:18,
488:2, 488:6, 488:7,
489:3, 492:5, 496:2,
518:21, 536:21,
550:6
**leave** [1] - 467:17
**leaves** [4] - 465:25,
471:23, 472:14,
494:13
**leaving** [1] - 468:20
**left** [2] - 478:11, 489:4
**legal** [1] - 546:7
**legislature** [7] -
465:12, 467:22,
467:24, 469:17,
483:25, 544:24,
547:10
**legs** [1] - 479:12
**lends** [1] - 530:20
**less** [1] - 467:6
**lesser** [4] - 494:18,
497:16, 532:1, 532:3
**level** [2] - 506:13,
540:20
**leverage** [1] - 493:13
**lies** [1] - 469:25
**life** [1] - 507:16
**light** [2] - 470:17,
546:7
**likely** [1] - 552:7
**limiting** [1] - 475:22
**line** [38] - 470:4,
472:15, 472:20,
474:7, 474:12,
474:20, 476:9,
477:13, 491:7,
493:8, 499:17,
503:5, 524:25,
525:11, 530:8,
530:24, 532:9,
532:14, 533:3,
533:10, 533:15,
533:18, 533:19,
533:21, 533:22,
534:8, 535:11,

572

535:25, 536:20, 537:8, 538:11, 541:13, 547:4, 547:7, 550:2, 551:4, 552:14, 552:15
**lines** [2] - 499:12, 555:25
**LINO** [1] - 462:5
**list** [3] - 486:23, 494:14, 501:1
**lives** [2] - 464:19, 464:22
**location** [1] - 527:18
**look** [31] - 473:8, 487:4, 488:8, 488:16, 490:18, 491:4, 491:14, 491:21, 491:25, 492:7, 493:4, 493:6, 495:2, 498:4, 500:23, 502:3, 502:6, 503:13, 504:21, 505:3, 505:5, 506:20, 506:22, 507:1, 509:18, 509:21, 509:25, 510:20, 515:14, 557:11, 558:10
**looked** [2] - 488:16, 503:7
**looking** [11] - 485:11, 495:10, 500:15, 500:16, 504:24, 506:23, 507:3, 513:4, 518:18, 538:1, 557:9
**looks** [6] - 480:3, 503:24, 504:17, 508:17, 508:18, 519:18
**lost** [1] - 536:21
**loud** [1] - 552:8
**loves** [2] - 464:12
**Lower** [9] - 466:11, 467:4, 483:7, 526:25, 532:10, 537:2, 539:12, 541:2, 550:4
**lower** [1] - 481:16
**lowest** [1] - 532:10
**luck** [2] - 472:21, 480:16
**Lunch** [1] - 521:12

### M

**Mac** [1] - 524:4
**maintain** [1] - 526:19
**maintaining** [3] -

533:2, 535:25, 541:13
**maintenance** [1] - 547:6
**man** [13] - 474:25, 479:18, 480:10, 493:18, 493:19, 504:25, 505:24, 506:1, 507:8, 508:13, 508:14, 535:2
**manage** [1] - 490:24
**manner** [2] - 492:23, 494:8, 513:23, 533:11, 536:6, 539:15
**marked** [1] - 483:11
**Marsha** [1] - 545:15
**mask** [3] - 478:25, 518:2
**mass** [1] - 539:18
**matter** [7] - 470:14, 474:13, 480:14, 499:8, 504:4, 506:11, 517:24
**matters** [3] - 471:10, 472:5, 472:7
**MAY** [1] - 522:1
**McAbee** [5] - 504:2, 505:10, 505:16, 505:19, 507:3
**McHugh** [2] - 472:25, 473:1
**mean** [15] - 489:12, 493:9, 494:7, 499:3, 499:4, 500:3, 504:1, 504:18, 506:5, 506:9, 507:11, 508:20, 512:7, 516:11, 519:4
**meaning** [5] - 492:19, 549:9, 550:8, 551:18, 552:17
**means** [9] - 526:10, 538:22, 540:14, 540:16, 546:23, 546:24, 547:2, 549:16, 554:2
**meant** [1] - 472:19
**media** [12] - 468:13, 524:6, 525:3, 528:2, 528:17, 538:13, 543:9, 544:17, 544:22, 545:18, 547:15, 548:13
**medieval** [1] - 483:6
**meet** [3] - 465:1, 498:18, 518:12
**meetings** [1] - 558:8
**meets** [1] - 552:16

**megaphone** [3] - 472:25, 493:18, 493:20
**Mejia** [1] - 533:7
**MEJIA** [1] - 533:7
**member** [1] - 512:23
**Members** [3] - 464:23, 466:9, 542:13
**members** [3] - 480:4, 526:20, 533:14
**memos** [2] - 559:2, 559:21
**Mendoza** [5] - 466:7, 540:1, 542:11, 549:22, 550:11
**Mendoza's** [1] - 511:16
**mentality** [1] - 491:5
**mentioned** [1] - 484:17
**mere** [3] - 475:6, 480:5, 534:12
**merely** [1] - 547:24
**merit** [1] - 509:17
**meritorious** [1] - 509:1
**message** [2] - 544:5, 548:13
**messaged** [1] - 543:24
**messages** [5] - 468:18, 524:7, 543:16, 543:24, 544:14
**messaging** [1] - 468:23
**met** [6] - 518:15, 518:22, 520:22, 530:1, 531:12, 554:8
**metal** [19] - 465:7, 471:3, 475:12, 510:15, 510:17, 510:18, 510:21, 511:1, 511:2, 524:22, 529:9, 529:10, 530:4, 531:7, 531:16, 531:23, 537:9, 538:3
**metaphor** [1] - 498:7
**Metro** [2] - 488:6, 488:9
**Metropolitan** [7] - 471:25, 483:20, 511:8, 511:13, 511:22, 524:3, 526:5
**MI** [1] - 462:19
**MICHAEL** [1] - 462:18
**might** [6] - 464:12, 489:18, 518:15, 519:15, 519:25, 547:17

**mind** [3] - 468:20, 507:14, 525:1
**mindset** [1] - 491:16
**mine** [1] - 528:3
**minor** [2] - 508:20
**minute** [3] - 503:3, 511:24
**minutes** [6] - 467:6, 472:16, 473:22, 523:25, 534:7, 535:7
**misses** [1] - 517:7
**mistake** [2] - 538:9, 546:16
**mob** [11] - 465:19, 466:11, 480:5, 483:16, 533:15, 539:18, 539:21, 539:24, 540:3, 544:12, 553:6
**mob's** [1] - 483:19
**moment** [5] - 472:13, 472:15, 478:9, 493:6, 517:20
**momentum** [2] - 544:18, 544:21
**Monday** [2] - 558:3
**Montana** [3] - 481:13, 524:4, 524:6
**Montana's** [1] - 525:4
**months** [1] - 557:8
**morning** [5] - 484:8, 486:5, 486:15, 487:23, 558:9
**most** [4] - 465:9, 469:13, 494:17, 527:19
**motion** [1] - 502:25
**motivation** [1] - 509:10
**mouth** [4] - 502:13, 503:4, 532:13, 533:10
**move** [8] - 472:4, 499:22, 499:23, 502:22, 503:2, 527:14, 527:18, 530:14
**moved** [3] - 481:24, 496:16, 514:11
**movement** [5] - 472:19, 499:15, 505:9, 505:12, 537:24
**movements** [2] - 496:25, 524:14
**moves** [2] - 478:10, 531:16
**moving** [4] - 474:21, 506:23, 506:24, 530:4

**MPD** [4] - 472:9, 526:9, 526:15, 526:21
**MR** [90] - 464:10, 466:19, 470:16, 471:9, 471:16, 471:19, 471:22, 473:5, 473:7, 474:5, 475:6, 475:11, 476:2, 476:8, 476:15, 476:24, 477:16, 477:20, 478:18, 480:1, 482:13, 482:17, 482:19, 484:8, 489:16, 489:20, 489:23, 489:25, 490:6, 495:8, 495:18, 495:25, 496:5, 496:20, 497:4, 498:20, 498:24, 499:7, 500:1, 500:7, 501:18, 501:25, 502:15, 502:18, 503:9, 503:19, 503:22, 504:21, 506:2, 508:10, 509:11, 510:10, 510:14, 511:10, 511:16, 511:21, 512:3, 512:5, 512:9, 512:14, 513:4, 513:8, 514:18, 515:5, 515:11, 515:15, 515:24, 516:3, 516:17, 517:1, 517:17, 518:14, 519:1, 519:6, 519:9, 519:20, 520:1, 520:21, 521:2, 521:4, 521:6, 557:3, 557:5, 558:16, 558:19, 558:25, 559:6, 559:8, 559:15, 559:18
**muddy** [1] - 481:25
**multiple** [7] - 472:14, 475:15, 481:9, 491:18, 518:1, 550:19
**must** [11] - 525:12, 529:13, 537:12, 541:22, 546:22, 546:23, 549:4, 551:13, 553:17, 554:19, 556:6

## N

**N.W** [1] - 560:12
**naked** [1] - 485:13
**name** [1] - 493:18
**namely** [3] - 508:18, 553:10, 554:12
**narratives** [1] - 530:12
**nation** [1] - 468:1
**natural** [6] - 468:7, 505:15, 533:6, 533:23, 542:2, 546:12
**nature** [3] - 510:20, 538:8, 546:15
**near** [2] - 517:9, 537:10
**necessarily** [2] - 486:13, 491:5
**necessary** [2] - 501:13, 520:5
**neck** [7] - 480:21, 514:2, 517:2, 517:6, 517:8, 517:9, 536:25
**necks** [1] - 514:3
**need** [13] - 471:6, 473:13, 483:13, 491:19, 497:18, 498:1, 502:6, 515:20, 520:20, 531:6, 531:11, 557:7, 559:2
**needed** [5] - 464:25, 478:21, 479:22, 480:10, 492:25
**needs** [6] - 487:20, 491:2, 498:2, 498:11, 509:21, 510:20
**never** [6] - 466:10, 467:21, 473:19, 501:5, 501:13, 501:14
**new** [1] - 545:8
**next** [9] - 466:20, 483:13, 483:15, 493:5, 501:25, 509:14, 530:19, 532:4, 557:18
**nicely** [1] - 497:5
**night** [1] - 489:2
**nine** [2] - 492:11, 492:13
**NO** [1] - 522:2
**nobody** [1] - 504:21
**none** [1] - 510:4
**nonetheless** [2] - 486:15, 490:22
**nonsensical** [1] - 489:13
**nonweapon** [1] - 491:25
**noose** [1] - 469:15
**normal** [2] - 552:12, 557:8
**normally** [1] - 490:21
**NORTHERN** [1] - 462:13
**notably** [1] - 545:9
**note** [3] - 494:24, 555:19, 556:25
**noted** [1] - 539:14
**notes** [1] - 560:5
**nothing** [10] - 464:15, 464:16, 480:1, 484:3, 501:7, 534:9, 534:13, 557:3, 557:5, 559:18
**notwithstanding** [2] - 498:7, 508:15
**number** [7] - 484:12, 484:20, 485:8, 486:24, 486:25, 502:11, 522:19
**numbers** [1] - 483:19
**numerous** [3] - 487:22, 491:11, 538:11
**NW** [2] - 462:16, 462:23

## O

**object** [10] - 469:6, 475:12, 492:2, 500:3, 510:20, 510:21, 536:3, 545:14, 545:15
**objectives** [1] - 511:18
**objects** [11] - 465:22, 490:21, 502:11, 502:16, 532:20, 533:11, 533:18, 534:10, 535:6, 539:15, 539:24
**obligation** [2] - 503:10, 503:12
**obligations** [1] - 558:7
**observations** [1] - 507:21
**observed** [3] - 504:11, 533:17, 539:25
**observes** [1] - 534:9
**obstruct** [14] - 467:15, 468:5, 468:8, 496:14, 541:24, 542:1, 542:3, 542:6, 543:8, 543:21, 544:2, 544:15, 546:9, 546:13
**obstructed** [1] - 537:23
**obstructing** [8] - 481:2, 498:5, 518:3, 537:16, 538:4, 541:5, 541:20, 546:20
**obstruction** [7] - 466:4, 470:11, 482:23, 494:21, 498:1, 523:5, 542:24
**obviously** [11] - 484:12, 485:7, 485:24, 486:9, 486:23, 487:4, 487:19, 490:19, 491:24, 492:8, 492:10
**occasions** [2] - 538:11, 550:20
**occupied** [2] - 467:20, 544:20
**occupy** [6] - 467:23, 467:24, 483:24, 524:9, 543:13, 547:25
**occupying** [1] - 548:12
**occurred** [2] - 540:12, 541:17
**occurring** [1] - 541:14
**occurs** [1] - 552:6
**OF** [5] - 462:1, 462:2, 462:8, 462:13, 560:1
**offense** [21] - 494:18, 516:13, 516:14, 525:12, 529:11, 532:1, 532:3, 537:10, 541:22, 549:4, 549:13, 550:25, 551:3, 551:13, 552:3, 553:11, 553:17, 553:23, 554:13, 554:19, 556:5
**offenses** [3] - 485:7, 529:13, 537:12
**offered** [1] - 470:15
**offering** [1] - 503:11
**office** [1] - 484:2
**OFFICE** [2] - 462:12, 462:15
**officer** [109] - 471:24, 474:6, 478:19, 478:20, 478:22, 479:1, 479:15, 479:16, 479:17, 480:4, 480:19, 487:9, 487:10, 487:11, 487:15,
487:16, 487:24, 487:25, 488:18, 491:6, 493:4, 493:21, 494:5, 497:21, 497:23, 498:6, 500:18, 501:2, 501:8, 501:9, 501:15, 502:4, 502:12, 502:23, 503:12, 504:22, 504:23, 505:21, 507:10, 507:15, 507:17, 507:20, 507:23, 507:25, 508:3, 508:13, 508:15, 509:3, 509:20, 509:25, 510:2, 511:25, 512:3, 512:5, 512:7, 512:14, 512:15, 512:21, 512:23, 513:2, 517:8, 517:12, 517:14, 517:22, 517:25, 518:8, 518:9, 518:19, 519:13, 519:15, 519:18, 519:23, 519:25, 520:3, 520:16, 525:15, 525:23, 526:4, 527:4, 528:8, 529:16, 529:19, 531:8, 531:13, 532:19, 532:20, 532:25, 533:1, 534:5, 534:10, 534:21, 535:2, 535:4, 535:11, 535:21, 535:22, 535:23, 536:13, 536:15, 536:21, 536:23, 537:19, 539:20, 539:22, 539:23
**Officer** [8] - 464:19, 478:10, 517:21, 517:25, 518:7, 532:18, 535:18, 541:11
**officer's** [5] - 480:10, 517:6, 517:8, 529:20, 536:24
**officers** [111] - 464:17, 464:19, 464:24, 465:10, 467:6, 467:11, 470:3, 472:8, 472:13, 474:1, 475:16, 477:12, 477:19, 478:22, 478:24, 479:4, 479:5, 479:6,
479:7, 479:11, 480:2, 480:7, 480:14, 481:3, 483:6, 488:1, 488:4, 488:7, 488:11, 490:4, 493:8, 494:22, 495:4, 496:12, 498:1, 498:3, 498:11, 502:11, 502:13, 505:22, 505:25, 507:13, 507:18, 511:14, 511:22, 513:20, 513:25, 516:21, 517:6, 518:2, 520:9, 522:22, 523:2, 524:3, 524:20, 524:25, 525:8, 525:10, 525:18, 525:25, 526:13, 526:15, 526:18, 527:6, 527:17, 527:21, 528:11, 528:15, 528:21, 528:24, 529:5, 529:8, 530:15, 530:24, 531:3, 531:10, 531:17, 532:5, 532:8, 532:15, 533:10, 533:15, 533:24, 534:10, 534:15, 535:6, 536:18, 536:19, 537:17, 537:19, 538:6, 538:18, 539:11, 539:14, 539:15, 539:20, 539:25, 540:2, 540:6, 540:8, 541:6, 541:8, 547:3, 547:5, 552:16, 553:25, 554:8, 555:24
**officers'** [9] - 474:11, 479:12, 514:25, 524:16, 524:21, 527:22, 527:24, 538:15, 540:10
**official** [38] - 466:4, 467:14, 467:16, 468:5, 468:8, 469:1, 470:12, 512:25, 523:5, 525:17, 525:19, 525:25, 526:1, 526:7, 526:10, 526:18, 529:18, 532:23, 533:2, 535:22, 535:24, 537:20, 538:20, 540:10,

574

541:9, 541:20,
541:25, 542:1,
542:4, 542:7,
542:25, 543:8,
546:13, 551:23,
552:1, 552:23,
553:1, 553:4
**OFFICIAL** [1] - 560:1
**Official** [2] - 462:22,
560:11
**officials** [2] - 469:9,
488:6
**one** [42] - 466:24,
469:12, 469:13,
470:15, 471:9,
475:16, 477:12,
480:2, 481:3,
486:10, 487:21,
488:2, 489:18,
492:18, 493:14,
496:24, 500:24,
501:14, 506:17,
509:7, 510:2, 511:7,
516:7, 516:8,
516:14, 517:5,
517:12, 517:19,
520:9, 520:11,
520:14, 524:21,
530:14, 530:15,
536:21, 537:17,
538:5, 539:17,
539:22, 540:14,
541:5, 558:21
**one-year** [1] - 516:14
**ongoing** [1] - 553:7
**online** [3] - 469:7,
469:23, 470:7
**opening** [3] - 484:14,
534:25, 539:11
**opinions** [1] - 485:9
**oppose** [3] - 477:6,
487:3, 500:20
**opposed** [5] - 525:15,
526:4, 529:15,
532:7, 535:20
**opposing** [3] - 474:9,
498:22, 527:20
**order** [1] - 559:12
**ordered** [1] - 550:17
**orderly** [6] - 551:22,
551:25, 552:22,
553:3, 554:25, 555:8
**orders** [2] - 524:17,
524:21
**ordinary** [2] - 464:24,
490:21
**organic** [1] - 472:19
**Oscar** [2] - 464:19,
532:18
**otherwise** [2] -

465:22, 549:17
**ourselves** [1] - 486:3
**outer** [1] - 466:16
**outside** [3] - 522:10,
532:12, 537:2
**overhead** [1] - 481:8
**overreach** [1] - 498:12
**overthrow** [2] -
483:23, 524:11
**overwhelm** [1] -
533:10
**overwhelming** [2] -
533:18, 546:8
**Owais** [2] - 464:18,
527:11
**own** [8] - 467:16,
469:19, 473:22,
483:24, 484:1,
518:14, 546:4,
548:24

## P

**P.M** [1] - 522:3
**p.m** [9] - 467:4, 467:9,
468:18, 521:12,
527:1, 527:14,
537:11, 542:16,
559:23
**Padilla** [163] - 464:3,
464:11, 465:3,
466:4, 466:10,
466:19, 467:2,
467:9, 468:9,
469:10, 469:12,
473:9, 476:23,
478:16, 481:22,
484:4, 491:14,
491:20, 492:13,
492:15, 492:21,
493:6, 493:16,
494:5, 500:18,
502:19, 503:13,
503:25, 504:24,
506:2, 506:23,
515:10, 517:20,
517:23, 518:23,
519:5, 522:5,
522:12, 524:5,
524:16, 524:19,
524:22, 524:24,
525:1, 525:6, 525:9,
525:12, 526:3,
526:14, 526:17,
526:22, 527:1,
527:8, 527:13,
527:18, 528:2,
528:6, 528:9,
528:12, 528:20,
529:2, 529:7,

529:12, 530:2,
530:4, 530:5, 530:7,
530:10, 530:12,
531:1, 531:7, 531:9,
531:13, 531:21,
531:25, 532:4,
532:7, 532:11,
532:19, 532:21,
533:4, 533:9,
533:13, 533:25,
534:7, 534:12,
534:20, 534:22,
535:3, 535:15,
536:1, 536:12,
536:16, 536:18,
537:1, 537:4, 537:6,
537:12, 538:10,
538:19, 539:9,
539:13, 540:24,
540:25, 541:4,
541:10, 541:18,
541:19, 541:22,
542:6, 542:14,
542:17, 542:24,
543:7, 543:15,
544:5, 544:14,
545:9, 545:17,
546:9, 546:11,
546:17, 546:21,
547:2, 547:15,
548:10, 548:14,
548:23, 548:25,
549:1, 549:14,
549:25, 550:7,
550:13, 550:21,
550:24, 551:1,
551:8, 551:10,
552:4, 552:21,
552:24, 553:9,
553:12, 553:14,
553:16, 553:24,
554:9, 554:11,
554:15, 554:17,
554:19, 555:4,
555:7, 555:11,
555:15, 556:1,
556:3, 556:5,
556:12, 556:16,
556:19, 559:4
**PADILLA** [2] - 462:5,
522:2
**Padilla's** [19] - 467:13,
478:18, 494:10,
524:7, 524:14,
530:20, 531:20,
534:2, 535:9, 538:2,
540:9, 541:8,
543:23, 547:23,
548:4, 548:7,
552:13, 553:2, 554:6
**PAGE** [1] - 463:2

**painstakingly** [1] -
473:11
**paired** [1] - 501:2
**pale** [2] - 480:11,
498:5
**panic** [1] - 466:15
**papers** [1] - 519:2
**parenthetically** [2] -
488:5, 488:25
**part** [12] - 466:4,
466:11, 466:19,
471:4, 473:14,
481:10, 483:16,
505:16, 508:7,
508:8, 542:8, 552:8
**participated** [1] -
522:13
**participating** [1] -
494:5
**participation** [1] -
522:15
**particular** [2] - 502:12,
542:25
**particularly** [3] -
536:10, 556:15,
557:10
**parties** [2] - 531:5,
559:2
**parts** [1] - 549:22
**party** [1] - 465:17
**past** [5] - 465:9,
465:10, 514:11,
544:11, 550:1
**patriot** [2] - 464:12,
486:7
**patriotic** [5] - 464:15,
464:16, 465:24,
484:3, 486:8
**patriots** [1] - 465:16
**Paul** [2] - 464:18,
539:23
**PD** [2] - 488:6, 488:9
**Peace** [1] - 483:7
**peaceful** [4] - 465:17,
465:22, 483:1, 483:8
**peacefully** [1] - 547:25
**penalty** [1] - 516:16
**Pence** [2] - 467:6,
549:24
**pending** [2] - 557:2,
559:11
**people** [18] - 464:22,
466:13, 468:14,
475:15, 476:8,
481:6, 481:9,
483:11, 491:11,
491:12, 493:24,
494:3, 504:17,
507:11, 507:12,
543:17, 545:7

**pepper** [2] - 547:17,
550:18
**per** [1] - 508:3
**perception** [1] -
492:22
**performance** [19] -
472:8, 487:11,
487:25, 488:1,
512:24, 513:2,
525:17, 525:19,
525:24, 526:1,
526:6, 529:18,
529:19, 535:22,
537:20, 537:25,
538:20, 540:9, 541:9
**performed** [1] -
528:12
**performing** [7] -
487:15, 487:16,
500:18, 526:18,
533:1, 535:24,
541:12
**perhaps** [4] - 488:2,
489:11, 493:19,
509:1
**perimeter** [4] - 466:6,
466:8, 466:16,
550:12
**period** [4] - 492:8,
497:22, 515:12,
557:8
**permits** [1] - 533:5
**person** [35] - 466:24,
475:13, 492:18,
492:20, 502:21,
503:2, 503:6,
504:13, 506:12,
506:17, 512:6,
512:19, 513:1,
513:6, 520:6, 520:8,
525:17, 525:23,
529:18, 533:6,
535:19, 536:5,
538:7, 546:14,
546:25, 548:9,
548:20, 549:18,
549:19, 552:6,
552:9, 552:10,
553:20, 555:12,
558:24
**personal** [2] - 539:7,
554:5
**personally** [2] -
470:21, 539:24
**persons** [4] - 475:16,
512:3, 512:5, 538:23
**pertinent** [1] - 491:20
**physical** [19] - 465:4,
477:16, 477:18,
516:7, 516:15,

516:17, 516:21,
523:14, 523:21,
525:22, 528:20,
528:23, 553:15,
553:19, 553:25,
554:2, 556:4, 556:8,
556:13
**physically** [2] - 490:3,
508:24
**physics** [3] - 499:8,
499:13, 499:16
**pick** [7] - 479:19,
479:23, 490:24,
505:12, 505:16,
507:9, 534:19
**picked** [2] - 501:6,
551:7
**picking** [1] - 505:19
**picks** [1] - 505:2
**piece** [1] - 476:14
**pillow** [9] - 474:24,
474:25, 475:5,
489:2, 489:4, 489:5,
489:18, 490:11
**pipe** [2] - 510:18,
510:22
**pivotal** [1] - 509:21
**place** [10] - 485:5,
489:9, 491:4,
494:23, 497:24,
500:1, 503:10,
505:5, 527:25,
538:16
**placed** [2] - 483:9,
518:6
**places** [1] - 528:16
**Plaintiff** [2] - 462:3,
462:12
**plan** [1] - 543:16
**planned** [4] - 468:13,
483:10, 547:18,
547:20
**plans** [1] - 524:8
**plastic** [2] - 518:4,
532:12
**play** [1] - 478:14
**played** [4] - 466:18,
471:21, 478:17,
479:25
**plea** [2] - 485:11,
485:12
**PLLC** [1] - 462:18
**point** [28] - 469:19,
469:21, 473:23,
474:1, 475:6,
481:18, 481:24,
486:16, 492:10,
493:10, 499:17,
506:11, 506:15,
506:16, 506:20,

507:14, 508:2,
509:11, 511:10,
511:11, 513:19,
514:11, 514:13,
517:19, 520:3,
530:14, 531:14
**pointed** [3] - 482:22,
514:10, 519:11
**pointing** [1] - 518:20
**points** [1] - 531:14
**pointy** [1] - 480:17
**pole** [16] - 478:11,
478:16, 479:11,
479:12, 480:11,
492:13, 510:15,
510:17, 510:18,
530:13, 530:22,
531:2, 531:3,
531:16, 535:3
**police** [77] - 464:17,
465:20, 465:24,
467:5, 470:3, 470:5,
472:15, 472:17,
472:20, 472:22,
473:21, 474:1,
474:6, 475:1, 476:9,
477:6, 477:12,
482:4, 488:4, 489:8,
490:3, 490:4, 491:7,
492:25, 495:24,
514:25, 524:19,
524:21, 524:23,
524:25, 525:10,
526:8, 526:14,
526:23, 527:3,
527:6, 527:13,
527:21, 528:10,
528:23, 530:8,
530:24, 532:9,
532:14, 532:19,
533:3, 533:15,
533:18, 533:21,
533:22, 534:8,
535:11, 535:25,
536:20, 537:8,
538:6, 538:11,
539:10, 539:11,
539:14, 539:15,
540:8, 541:13,
544:12, 547:4,
547:7, 550:2,
550:17, 551:4,
552:14, 554:8,
555:18, 555:21,
555:24
**Police** [26] - 466:13,
471:25, 472:1,
472:10, 483:19,
483:20, 488:10,
511:9, 511:13,

511:14, 511:17,
511:19, 511:22,
511:23, 511:25,
524:3, 526:5, 526:6,
526:9, 526:16,
532:18, 533:1,
535:23
**policing** [1] - 526:10
**political** [1] - 465:21
**politicians** [7] -
468:11, 468:15,
468:21, 470:20,
484:1, 543:18,
543:20
**portion** [1] - 514:19
**posing** [1] - 506:4
**position** [11] - 470:13,
470:16, 478:4,
493:13, 493:15,
496:15, 498:14,
499:20, 506:23,
534:24
**possibly** [1] - 536:19
**post** [2] - 528:2,
547:15
**posted** [7] - 467:16,
469:22, 543:15,
544:14, 545:13,
545:17, 549:16
**posting** [1] - 468:13
**posts** [5] - 524:7,
525:3, 528:17,
538:13, 543:9
**posture** [1] - 484:16
**potentially** [5] -
474:15, 478:21,
505:19, 505:20,
513:23
**pounds** [1] - 513:18
**power** [9] - 465:13,
465:18, 467:18,
467:23, 483:2,
483:8, 544:25,
547:11, 548:16
**powerful** [1] - 482:25
**preference** [1] -
470:20
**prepared** [2] - 499:23,
547:14
**prescribed** [10] -
486:24, 486:25,
487:5, 487:17,
487:21, 487:23,
500:24, 500:25,
501:6, 501:15
**presence** [3] - 466:24,
542:18, 542:19
**present** [3] - 464:4,
468:12, 522:6
**presentation** [1] -

488:21
**presented** [10] -
465:25, 485:18,
485:23, 490:17,
495:8, 509:19,
510:5, 522:16,
537:4, 559:20
**presenting** [2] -
486:15, 486:17
**presidency** [2] -
548:16, 548:20
**President** [14] -
465:13, 467:6,
484:2, 540:4,
542:12, 542:16,
548:11, 548:13,
548:18, 548:21,
549:20, 549:21,
549:24
**press** [1] - 482:5
**presumably** [3] -
499:3, 544:1, 544:3
**pretty** [5] - 508:19,
508:20, 511:11,
517:10, 520:6
**prevent** [4] - 477:7,
538:16, 543:13,
548:11
**previous** [3] - 538:17,
554:10, 554:14
**previously** [1] -
504:14
**pride** [1] - 483:8
**primarily** [1] - 484:16
**principal** [1] - 484:19
**probable** [6] - 468:7,
533:6, 533:23,
542:3, 546:12,
546:19
**probe** [1] - 550:2
**problem** [1] - 492:24
**proceed** [1] - 557:1
**proceeded** [1] - 527:6
**proceeding** [17] -
466:4, 467:14,
467:16, 468:5,
468:8, 469:2,
470:12, 523:5,
541:20, 541:25,
542:1, 542:4, 542:7,
542:25, 552:25,
558:24
**proceedings** [13] -
466:6, 466:22,
466:25, 467:2,
468:21, 540:5,
542:10, 542:20,
543:8, 544:2,
546:13, 553:6, 560:6
**process** [8] - 496:6,

501:7, 503:6,
545:10, 545:11,
545:20, 546:10,
552:12
**processes** [1] - 546:7
**procure** [1] - 548:8
**produce** [1] - 552:7
**production** [2] -
518:12, 518:22
**projected** [2] - 481:15,
540:20
**proofs** [2] - 488:12,
488:19
**properly** [1] - 518:11
**property** [5] - 539:1,
539:3, 539:8,
553:20, 554:5
**proposed** [3] - 548:4,
548:7, 548:24
**proposition** [1] -
487:5
**protect** [5] - 464:25,
474:12, 478:22,
527:25
**protected** [5] - 480:14,
511:19, 537:25,
549:18, 549:19
**protecting** [6] -
464:23, 481:25,
532:23, 533:2,
535:24, 541:12
**protection** [2] -
480:19, 517:14
**protective** [1] - 480:15
**protest** [4] - 471:5,
473:23, 497:9,
497:25
**protesting** [1] -
469:21
**protestor** [2] - 497:21,
505:21
**protestors** [4] - 490:1,
498:9, 502:11,
524:23
**protests** [1] - 524:9
**proud** [2] - 483:14
**Proud** [1] - 547:18
**prove** [2] - 554:19,
556:6
**proved** [3] - 549:4,
551:13, 553:17
**proves** [1] - 505:17
**provide** [1] - 508:6
**provided** [1] - 518:23
**provision** [4] - 512:17,
512:18, 516:16
**provisions** [1] -
559:11
**proximity** [4] - 493:25,
551:16, 552:5,

576

553:20
**pseudonym** [1] -
469:7
**public** [3] - 526:20,
538:22, 549:23
**pull** [4] - 495:2, 512:9,
513:14, 530:15
**pulling** [4] - 474:6,
491:10, 512:11,
531:2
**pulls** [1] - 480:2
**purpose** [9] - 481:2,
537:16, 538:4,
538:14, 538:15,
541:5, 546:23,
547:3, 547:9
**purposes** [1] - 534:15
**Push** [2] - 527:2,
528:14
**push** [25] - 473:1,
473:2, 493:10,
493:14, 513:17,
513:20, 514:12,
514:14, 514:21,
514:22, 515:25,
527:2, 527:3, 527:6,
527:17, 528:10,
528:14, 528:18,
530:16, 530:22,
544:19, 545:1,
552:15
**pushed** [14] - 465:6,
465:7, 467:18,
474:22, 490:3,
506:18, 526:14,
526:17, 526:22,
527:8, 528:4, 538:6,
538:10, 550:18
**pushing** [34] - 467:5,
467:10, 468:23,
470:23, 472:1,
472:5, 472:6,
472:12, 472:15,
472:20, 473:13,
474:3, 475:15,
491:9, 495:23,
496:12, 508:23,
513:25, 514:19,
516:20, 524:18,
527:7, 527:13,
528:21, 530:24,
531:2, 538:14,
538:19, 539:9,
540:8, 547:3, 550:1,
552:14, 554:1
**put** [16] - 473:1, 475:1,
477:4, 477:11,
477:12, 477:14,
486:4, 493:20,
497:3, 497:7, 499:2,

499:3, 500:13,
513:13, 514:8,
530:20
**Put** [1] - 530:19
**puts** [2] - 527:16,
534:23
**putting** [2] - 478:25,
498:6

## Q

**qualifies** [1] - 478:6
**qualify** [3] - 477:17,
477:23, 490:5
**questions** [4] -
472:12, 491:1,
499:23, 511:7
**quickly** [1] - 539:13
**quite** [1] - 484:11
**quote** [2] - 527:2,
543:16
**quotes** [1] - 545:3

## R

**rack** [6] - 515:25,
516:20, 524:17,
527:13, 528:23,
529:1
**racks** [8] - 465:6,
467:5, 470:23,
514:11, 526:23,
537:8, 538:3, 550:12
**radio** [1] - 466:16
**raging** [1] - 483:17
**railing** [3] - 470:1,
528:3, 528:4
**railings** [1] - 528:5
**raise** [2] - 493:2,
556:25
**raised** [1] - 518:11
**raising** [3] - 473:24,
505:8, 513:12
**rally** [3] - 469:22,
473:19, 544:6
**ram** [8] - 465:8,
476:18, 476:19,
478:3, 490:25,
493:9, 515:3, 530:7
**ramming** [3] - 472:22,
524:17, 527:23
**ranking** [1] - 464:23
**rather** [2] - 480:17,
535:11
**rationale** [1] - 516:23
**raucous** [1] - 507:7
**reach** [3] - 506:15,
510:19, 531:22
**reached** [2] - 506:16,
550:5

**reaching** [2] - 494:15,
508:13
**read** [3] - 487:6,
490:10, 545:11
**ready** [2] - 480:22,
522:10
**real** [2] - 468:16, 554:4
**real-time** [1] - 468:16
**reality** [7] - 473:25,
498:8, 498:20,
501:4, 504:11,
506:7, 509:6
**realized** [1] - 474:1
**realizes** [2] - 538:7,
546:14
**really** [10] - 486:14,
491:15, 503:3,
504:10, 506:11,
508:25, 509:2,
512:12, 545:15,
545:18
**reason** [6] - 473:10,
510:19, 510:25,
511:4, 513:21, 551:5
**reasonable** [29] -
485:2, 504:6,
506:12, 508:19,
509:14, 509:15,
509:16, 510:1,
518:24, 520:2,
520:13, 525:13,
529:3, 529:14,
531:20, 537:5,
537:13, 541:23,
548:25, 549:5,
551:9, 551:14,
553:13, 553:18,
554:16, 554:20,
556:2, 556:7, 556:20
**reasonableness** [1] -
506:6
**reasonably** [1] -
520:10
**reasons** [19] - 480:12,
515:1, 515:5, 525:5,
531:25, 535:16,
541:2, 541:7,
541:15, 546:17,
552:20, 553:4,
553:8, 554:10,
554:13, 555:6,
555:9, 556:13,
556:17
**rebuttal** [1] - 464:8
**recalling** [2] - 495:9,
522:4
**recess** [1] - 521:12
**recoils** [1] - 517:8
**record** [2] - 470:25,
516:5

**records** [2] - 481:14,
540:18
**recovered** [1] - 524:7
**red** [1] - 480:10
**refer** [2] - 493:18,
512:13
**reference** [4] - 495:11,
495:12, 495:18,
495:22
**referred** [2] - 493:18,
495:15
**referring** [3] - 544:1,
544:3, 545:25
**Reffitt** [1] - 543:1
**REFFITT** [1] - 543:1
**reflected** [1] - 469:22
**regaining** [1] - 546:1
**regard** [1] - 496:24
**regards** [6] - 488:19,
494:16, 500:12,
501:15, 503:10,
507:2
**register** [1] - 474:23
**reigned** [1] - 483:4
**related** [3] - 529:11,
537:10, 541:1
**relating** [1] - 495:5
**relation** [11] - 549:13,
550:25, 552:2,
553:8, 553:10,
553:23, 554:13,
554:14, 555:14,
556:14, 556:17
**release** [1] - 557:2
**relevant** [4] - 509:9,
509:12, 536:2,
559:10
**relying** [1] - 486:20
**remain** [8] - 484:2,
549:11, 550:9,
551:20, 552:19,
553:7, 559:11,
559:12
**remained** [7] - 466:19,
482:3, 482:6,
542:17, 549:6,
549:14, 550:6
**remaining** [2] - 523:8,
549:2
**remarked** [1] - 539:13
**remember** [1] - 557:22
**remind** [1] - 507:22
**removed** [1] - 527:8
**render** [3] - 504:3,
521:10, 522:10
**rendering** [1] - 556:24
**repeat** [1] - 501:19
**repeated** [2] - 487:21,
545:22
**repeatedly** [6] -

464:21, 528:15,
538:6, 545:3,
550:17, 552:13
**replace** [1] - 483:25
**REPORTER** [1] -
560:1
**Reporter** [3] - 462:22,
462:22, 560:11
**republic** [5] - 467:18,
467:22, 544:23,
544:25, 545:2
**Republican** [1] - 546:1
**request** [1] - 559:4
**require** [3] - 482:10,
482:20, 499:15
**required** [2] - 475:8,
535:17
**requirement** [1] -
498:19
**resist** [6] - 467:12,
480:23, 487:2,
487:16, 488:17,
500:20
**resistance** [1] -
500:25
**resistant** [1] - 527:21
**resisted** [6] - 471:23,
525:14, 526:3,
529:15, 532:7,
535:19
**resisting** [11] - 495:3,
498:22, 522:21,
523:2, 524:16,
525:7, 525:9,
527:20, 529:4,
529:8, 532:5
**resolve** [1] - 531:11
**resolved** [1] - 488:24
**resolving** [1] - 530:11
**resort** [1] - 465:20
**respect** [16] - 496:25,
497:1, 501:17,
501:21, 503:21,
510:11, 515:15,
516:7, 517:2, 526:8,
531:10, 531:20,
538:2, 538:10,
552:23, 554:7
**responded** [1] - 544:2
**response** [7] - 498:17,
506:3, 506:7,
508:20, 520:18,
520:19
**restarted** [1] - 466:22
**restore** [3] - 467:21,
544:23, 545:1
**restored** [1] - 548:16
**restricted** [31] - 466:5,
466:7, 466:23,
481:20, 523:8,

577

523:12, 523:15,
526:20, 542:14,
542:17, 549:2,
549:7, 549:10,
549:15, 549:16,
549:17, 549:23,
550:1, 550:3, 550:6,
550:8, 550:11,
550:15, 550:17,
551:11, 551:16,
551:19, 552:5,
552:18, 553:15,
553:21
**result** [2] - 531:9,
533:25
**resulted** [1] - 539:7
**results** [2] - 539:1,
539:2
**resume** [1] - 542:20
**revenue** [1] - 481:15
**review** [1] - 466:3
**reviewed** [1] - 522:9
**reviewing** [1] - 545:12
**revisit** [1] - 520:22
**revolution** [3] -
469:22, 544:7,
547:11
**rhetoric** [4] - 486:4,
486:5, 545:22,
547:24
**ridiculous** [1] - 499:5
**rifle** [2] - 547:19,
547:20
**Riley** [7] - 464:18,
467:11, 476:16,
476:17, 514:24,
515:2, 539:23
**riot** [7] - 467:21,
479:6, 522:13,
539:4, 540:21,
547:22, 553:7
**rioter** [27] - 466:24,
467:2, 478:23,
478:24, 479:1,
479:3, 479:4, 479:5,
479:6, 479:7, 479:8,
479:10, 479:11,
479:12, 479:14,
479:17, 479:22,
480:1, 517:7,
530:19, 534:4,
534:18, 534:19,
534:20, 534:24,
535:11
**rioters** [29] - 464:14,
466:16, 467:1,
481:9, 518:1,
520:11, 526:17,
527:18, 527:19,
527:22, 528:1,

532:15, 533:10,
533:20, 534:8,
534:9, 534:11,
535:5, 538:16,
539:6, 539:9,
539:11, 539:13,
539:14, 539:16,
541:13, 542:19,
547:7, 548:15
**rioters'** [1] - 533:17
**rise** [1] - 512:1
**risk** [1] - 478:21
**river** [1] - 483:17
**rivera** [1] - 543:4
**RMR** [2] - 462:22,
560:10
**Room** [2] - 462:23,
560:11
**rule** [1] - 464:20
**run** [3] - 468:14,
543:17, 558:8
**running** [1] - 543:20

---

## S

**safe** [2] - 466:9,
542:13
**safety** [2] - 480:10,
542:21
**Safeway** [3] - 481:12,
481:14, 540:19
**Safeway's** [1] - 481:15
**Saginaw** [1] - 462:19
**sake** [1] - 514:7
**sales** [1] - 540:20
**satisfied** [2] - 472:11,
481:4
**satisfies** [2] - 470:10,
470:13
**saw** [11] - 473:17,
477:2, 478:19,
481:22, 504:25,
505:13, 507:2,
534:22, 539:5,
539:20, 550:14
**scattered** [1] - 505:14
**scenario** [3] - 500:4,
510:15, 548:19
**scene** [2] - 504:18,
506:10
**schedule** [1] - 557:1
**screen** [2] - 479:10,
513:15
**seat** [5] - 467:18,
467:23, 544:25,
547:11, 548:18
**second** [29] - 467:15,
490:8, 491:22,
495:1, 497:12,
503:10, 505:8,

520:2, 520:20,
525:20, 528:6,
529:21, 533:4,
534:18, 537:18,
538:18, 541:7,
541:25, 543:7,
549:9, 550:7,
551:18, 552:17,
553:21, 554:9,
554:24, 555:7,
556:10, 556:16
**seconds** [17] - 474:4,
474:6, 478:15,
482:15, 489:12,
492:9, 492:11,
492:13, 494:9,
497:5, 497:23,
515:9, 530:13,
530:18, 531:2,
531:15
**Secret** [2] - 549:18,
549:19
**Section** [10] - 512:20,
523:1, 523:3, 523:7,
523:20, 523:23,
525:8, 529:6, 541:21
**secure** [5] - 465:1,
468:1, 470:19,
548:17
**securing** [1] - 526:16
**security** [1] - 466:13
**see** [14] - 475:4,
500:21, 502:19,
502:21, 506:22,
507:1, 516:4, 517:6,
517:22, 517:23,
518:8, 519:18,
521:11, 559:14
**seeing** [5] - 505:6,
506:21, 507:4,
507:5, 507:6
**seem** [3] - 499:19,
509:17, 531:5
**sees** [6] - 505:12,
507:6, 507:7, 507:8,
507:15, 508:12
**SEFRANEK** [1] -
560:3
**Sefranek** [3] - 462:22,
560:10, 560:10
**seize** [1] - 548:15
**seized** [1] - 475:1
**seizing** [1] - 548:12
**self** [6] - 476:25,
483:1, 503:15,
503:17, 503:20,
546:6
**self-defense** [3] -
503:15, 503:17,
503:20

**self-government** [1] -
483:1
**self-serving** [2] -
476:25, 546:6
**Senate** [2] - 467:7,
546:2
**senator** [1] - 545:16
**senators** [1] - 545:14
**send** [1] - 469:6
**sending** [1] - 545:25
**sense** [3] - 475:21,
485:21, 505:18
**sent** [1] - 544:5
**sentencing** [9] -
557:1, 557:2, 557:7,
557:16, 558:12,
559:1, 559:2,
559:11, 559:21
**separate** [1] - 515:24
**September** [8] -
557:13, 557:16,
558:15, 558:18,
558:23, 559:3,
559:21, 559:22
**sequence** [1] - 515:13
**Sergeant** [24] -
464:17, 464:18,
467:11, 474:19,
475:3, 475:19,
476:3, 476:13,
476:16, 476:17,
492:20, 511:1,
514:5, 514:10,
514:15, 514:16,
514:19, 514:23,
514:24, 515:7,
526:21, 527:11
**sergeant** [4] - 514:23,
515:2, 515:3, 539:23
**serious** [9] - 469:13,
469:14, 475:7,
478:5, 536:4, 536:6,
536:7, 536:9, 536:14
**seriously** [1] - 548:1
**Service** [2] - 549:18,
549:20
**services** [1] - 512:23
**serving** [2] - 476:25,
546:6
**SESSION** [1] - 522:1
**session** [5] - 466:8,
542:13, 542:15,
554:25, 555:8
**set** [5] - 465:4, 489:9,
511:18, 522:19,
547:11
**settle** [1] - 465:15
**several** [8] - 482:6,
503:7, 524:16,
524:19, 526:24,

535:7, 539:10,
542:21
**severely** [2] - 533:18,
545:22
**shape** [1] - 536:9
**sheer** [1] - 480:16
**shield** [5] - 479:6,
479:15, 480:20,
518:4, 536:24
**shit** [1] - 547:21
**shocked** [1] - 504:22
**short** [5] - 469:15,
469:16, 477:10,
488:13, 492:8
**shove** [1] - 476:9
**shoving** [1] - 479:5
**show** [3] - 471:19,
502:9, 502:10
**showed** [4] - 466:21,
524:16, 539:22,
540:19
**showing** [5] - 471:17,
481:9, 481:14,
524:8, 531:12
**shown** [2] - 527:1,
533:16
**shows** [22] - 468:4,
478:10, 484:5,
501:23, 502:14,
503:8, 514:17,
515:6, 520:3,
528:22, 530:6,
531:1, 532:11,
532:16, 533:9,
533:12, 535:6,
536:21, 539:10,
548:10, 549:25,
550:21
**side** [6] - 474:21,
481:24, 493:14,
526:14, 528:24
**sidewalk** [1] - 481:23
**sight** [1] - 477:13
**sign** [97] - 465:7,
471:3, 471:4, 471:8,
472:1, 472:4, 472:6,
472:7, 472:12,
473:14, 473:17,
474:10, 474:15,
474:18, 474:20,
476:18, 477:5,
477:10, 480:12,
482:13, 482:16,
488:22, 489:14,
489:17, 489:21,
490:2, 490:5,
490:15, 490:24,
491:12, 491:14,
491:17, 492:21,
492:22, 493:7,

578

493:12, 493:17,
494:2, 494:4,
494:21, 494:24,
494:25, 495:6,
495:12, 495:16,
495:19, 495:22,
496:21, 496:25,
497:9, 497:11,
497:17, 498:6,
498:7, 498:13,
499:2, 499:3,
499:10, 499:11,
511:5, 513:13,
513:23, 514:1,
514:2, 514:3, 514:8,
514:13, 514:14,
514:20, 514:21,
514:22, 514:23,
514:25, 515:6,
515:10, 515:12,
515:23, 524:22,
529:9, 529:10,
530:5, 530:6,
530:10, 530:13,
530:18, 530:21,
530:22, 531:7,
531:9, 531:10,
531:16, 531:21,
531:23, 537:9, 538:3

**significant** [1] -
488:23

**signs** [4] - 481:22,
550:13, 550:14,
550:16

**similar** [2] - 503:23,
506:4

**similarly** [2] - 510:25,
514:24

**simple** [1] - 516:13

**simpler** [1] - 517:11

**simplistically** [1] -
519:4

**simply** [4] - 470:1,
475:24, 535:12,
551:6

**sitting** [2] - 475:18,
476:12

**situation** [6] - 484:10,
493:1, 506:13,
508:4, 508:16, 513:8

**six** [3] - 502:16,
505:24, 524:1

**size** [1] - 536:9

**skin** [1] - 517:6

**slate** [2] - 484:1,
545:20

**slide** [1] - 490:17

**slow** [1] - 479:22

**slowed** [1] - 544:21

**small** [1] - 539:17

**smooth** [1] - 483:1

**snapshot** [1] - 539:17

**snow** [1] - 550:12

**snowflakes** [1] -
483:18

**social** [12] - 468:13,
524:6, 525:3, 528:2,
528:17, 538:12,
543:8, 544:17,
544:22, 545:18,
547:14, 548:13

**solid** [1] - 475:9

**someone** [11] -
465:18, 474:24,
475:25, 476:6,
510:15, 512:1,
517:13, 519:10,
536:10, 536:11,
548:18

**soon** [3] - 493:12,
505:9

**sorry** [6] - 488:18,
489:25, 492:21,
522:22, 543:6,
543:11

**sort** [7] - 486:3, 489:7,
494:18, 497:15,
498:8, 500:13, 519:4

**sorts** [1] - 507:8

**speaking** [1] - 470:3

**speaks** [1] - 492:10

**spear** [2] - 465:8,
480:15

**Special** [4] - 481:13,
524:4, 524:6, 525:3

**specific** [9] - 486:10,
486:18, 495:9,
502:2, 512:9, 531:6,
544:15, 546:9

**specifically** [7] -
476:17, 485:6,
492:5, 495:2,
514:20, 522:18,
530:3

**spend** [2] - 480:25,
481:17

**spray** [2] - 547:17,
550:18

**sprayed** [1] - 473:21

**spread** [2] - 493:12,
493:13

**square** [1] - 475:12

**staff** [1] - 489:2

**stairs** [1] - 508:23

**stance** [1] - 502:20

**stand** [6] - 484:11,
496:9, 507:18,
530:10, 530:21,
543:19

**standalone** [1] -

497:16

**standard** [1] - 501:12

**standing** [14] - 493:7,
493:20, 494:14,
504:13, 505:21,
506:9, 515:7,
517:12, 518:7,
527:4, 528:24,
532:15, 533:10,
551:4

**standoff** [1] - 507:12

**stands** [5] - 480:8,
487:5, 534:7, 535:7,
545:24

**start** [5] - 502:20,
502:22, 510:10,
525:7, 547:10

**started** [7] - 467:19,
470:2, 470:4, 474:3,
474:6, 477:11, 540:3

**starting** [1] - 466:3

**starts** [4] - 503:1,
503:2, 505:8, 557:20

**state** [4] - 525:1,
540:14, 540:15,
547:19

**statements** [3] -
545:17, 546:4,
547:24

**States** [25] - 462:23,
464:3, 471:25,
472:10, 482:24,
483:5, 512:21,
512:22, 522:5,
522:14, 525:16,
525:18, 525:24,
525:25, 529:17,
532:17, 533:7,
535:21, 543:1,
543:4, 548:6,
554:22, 556:9, 558:8

**states** [2] - 469:7,
546:1

**STATES** [3] - 462:1,
462:2, 462:9

**stating** [2] - 544:6,
550:13

**status** [1] - 559:12

**statute** [13] - 486:22,
486:23, 487:7,
487:9, 487:12,
487:17, 498:3,
498:4, 498:19,
512:10, 512:12,
529:6

**statutes** [1] - 522:19

**statutory** [1] - 559:10

**stayed** [1] - 544:11

**stenographic** [1] -
560:5

**stepping** [1] - 520:12

**stick** [6] - 479:1,
479:4, 479:7, 479:9,
505:22, 505:24

**sticks** [3] - 517:4,
533:16, 539:16

**still** [12] - 464:13,
471:12, 473:4,
474:14, 482:2,
504:7, 510:17,
515:17, 517:8,
536:22, 548:6

**stipulation** [1] -
481:12

**Stipulation** [1] -
481:12

**stitches** [1] - 475:8

**stomping** [1] - 479:17

**stop** [5] - 469:9,
506:1, 510:16,
535:5, 552:24

**stopped** [4] - 473:20,
477:10, 520:10,
544:18

**store** [1] - 540:21

**stores** [1] - 540:19

**storm** [3] - 465:18,
468:14, 543:17

**story** [4] - 469:4,
469:7, 478:18, 514:8

**Street** [2] - 462:13,
462:16

**strength** [1] - 483:19

**stretch** [3] - 517:16,
520:6, 520:12

**stretched** [1] - 515:12

**strike** [5] - 500:8,
520:8, 533:24,
534:4, 536:12

**striking** [1] - 517:13

**struck** [10] - 507:24,
509:25, 510:1,
510:17, 517:8,
533:1, 535:12,
535:18, 535:24,
536:11

**struggle** [1] - 477:24

**struggling** [1] -
534:12

**stuff** [1] - 545:18

**stupid** [1] - 545:18

**style** [1] - 547:18

**subsidiary** [1] -
515:15

**substantial** [1] -
488:19

**subverting** [1] -
469:13

**sudden** [2] - 475:24,
505:19

**suddenly** [1] - 534:14

**suffice** [1] - 516:9

**sufficient** [5] - 473:4,
496:8, 517:14,
531:19, 548:23

**suggest** [2] - 492:17,
494:1

**suggesting** [4] -
496:5, 496:6,
498:12, 499:18

**suggestion** [1] - 497:7

**Suite** [1] - 462:19

**summarize** [1] - 485:1

**summarizes** [1] -
497:5

**superseding** [2] -
495:1, 522:20

**support** [7] - 473:23,
473:24, 485:11,
485:23, 485:25,
487:1, 491:7

**supports** [1] - 493:3

**suppose** [3] - 490:25,
497:2, 509:15

**surely** [1] - 550:16

**surfed** [1] - 524:23

**surfing** [1] - 472:21

**surround** [1] - 480:4

**suspended** [1] -
468:21

**sustain** [2] - 539:21,
539:25

**swarmed** [1] - 534:11

**sweeps** [1] - 542:21

**swell** [1] - 540:3

**swinging** [4] - 479:4,
479:11, 479:12,
510:15

**swings** [1] - 505:25

**swung** [1] - 517:4

**symbol** [2] - 482:25,
497:9

---

# T

**tactical** [7] - 491:10,
492:24, 493:22,
497:18, 498:2,
498:11

**TAMARA** [1] - 560:3

**Tamara** [3] - 462:22,
560:10, 560:10

**tangle** [1] - 479:22

**tangled** [1] - 473:14

**target** [2] - 502:22,
520:11

**taunting** [1] - 524:19

**teach** [1] - 507:16

**temporarily** [1] -
549:19

579

**ten** [1] - 490:4
**tenet** [1] - 465:15
**term** [8] - 486:8,
526:10, 538:22,
540:14, 542:7,
549:16, 549:19,
554:2
**terms** [4] - 487:6,
497:14, 507:21,
516:13
**Terrace** [9] - 466:11,
467:5, 483:7,
526:25, 532:10,
537:2, 539:12,
541:2, 550:5
**testified** [24] - 480:19,
485:23, 485:25,
491:6, 492:20,
492:21, 493:4,
496:18, 506:2,
507:23, 508:17,
511:12, 524:6,
525:1, 526:13,
532:20, 539:20,
539:23, 540:1,
545:10, 545:17,
549:22, 550:11
**testify** [1] - 508:12
**testimony** [44] -
465:25, 469:20,
473:9, 476:16,
476:25, 481:13,
482:1, 484:5, 497:1,
501:5, 501:17,
501:20, 504:9,
504:12, 505:13,
506:16, 508:3,
508:5, 508:8,
511:17, 514:9,
518:14, 518:16,
518:22, 524:12,
525:4, 526:21,
527:9, 527:11,
532:20, 533:13,
534:3, 535:10,
536:16, 538:12,
539:5, 539:12,
543:10, 546:4,
547:23, 550:14,
555:17, 555:20
**TEXAS** [1] - 462:13
**text** [1] - 545:12
**thankfully** [1] - 467:10
**THE** [110] - 462:1,
462:1, 462:8,
462:13, 464:2,
464:5, 470:13,
471:6, 471:14,
471:17, 471:20,
472:24, 473:6,

474:4, 474:23,
475:9, 475:17,
476:5, 476:11,
476:20, 477:9,
477:18, 482:11,
482:15, 482:18,
484:7, 489:14,
489:17, 489:21,
489:24, 490:1,
495:3, 495:14,
495:21, 496:3,
496:19, 496:23,
498:16, 498:21,
499:5, 499:25,
500:5, 501:16,
501:20, 502:9,
502:16, 502:19,
503:17, 503:20,
504:20, 505:18,
508:7, 509:8, 510:8,
510:13, 511:7,
511:15, 511:20,
511:24, 512:4,
512:6, 512:12,
512:15, 513:6,
514:17, 515:1,
515:9, 515:14,
515:20, 516:2,
516:10, 516:25,
517:10, 518:10,
518:21, 519:2,
519:7, 519:15,
519:24, 520:17,
520:25, 521:3,
521:5, 521:7, 522:4,
522:7, 557:7,
557:14, 557:18,
557:19, 557:20,
557:21, 557:23,
557:24, 558:2,
558:3, 558:4, 558:6,
558:7, 558:12,
558:14, 558:17,
558:20, 558:22,
558:23, 559:1,
559:7, 559:9,
559:16, 559:19
**themselves** [2] -
474:12, 475:25
**theoretical** [1] -
490:14
**theories** [1] - 476:11
**theory** [8] - 474:13,
475:17, 475:18,
494:19, 496:13,
503:11, 508:7,
518:22
**therefore** [11] -
470:11, 475:9,
478:6, 498:3,

511:15, 511:20,
511:21, 516:16,
530:1, 531:22, 537:3
**they've** [1] - 518:21
**thickness** [1] - 510:22
**thinking** [11] - 468:17,
484:24, 501:11,
504:14, 504:25,
506:10, 507:9,
515:2, 515:3, 517:20
**thinks** [1] - 496:10
**third** [17] - 468:6,
481:11, 484:17,
497:2, 525:21,
528:12, 529:21,
534:23, 535:15,
537:22, 542:1,
546:11, 549:12,
551:21, 552:21,
553:22, 555:2
**Third** [1] - 462:13
**thousands** [3] - 481:9,
483:21, 542:19
**threat** [2] - 478:23,
479:18
**threaten** [1] - 465:20
**threatened** [1] - 528:8
**three** [11] - 466:20,
467:6, 481:6,
496:23, 515:24,
537:13, 538:23,
549:5, 550:6,
553:18, 557:8
**threw** [16] - 465:8,
470:5, 478:16,
478:19, 479:10,
481:10, 501:17,
501:21, 520:20,
521:1, 532:8,
532:21, 534:3,
535:3, 535:15,
535:17
**throughout** [3] -
487:22, 524:14,
526:7
**throw** [11] - 480:11,
480:23, 502:4,
502:20, 502:21,
503:1, 503:3,
505:22, 505:25,
519:13, 535:1
**throwing** [18] - 479:3,
479:6, 501:24,
502:11, 503:4,
503:21, 517:11,
517:13, 529:12,
532:6, 533:11,
533:17, 534:24,
535:6, 537:10,
541:1, 541:3, 554:1

**thrown** [5] - 480:21,
502:17, 507:8,
532:21, 539:24
**throws** [1] - 502:25
**thrust** [1] - 528:22
**timeline** [1] - 473:22
**tipping** [2] - 506:15,
506:16
**Title** [6] - 523:3, 523:6,
523:16, 523:19,
525:8, 541:21
**title** [1] - 512:20
**today** [2] - 487:13,
559:14
**together** [4] - 497:8,
500:13, 521:9, 553:6
**took** [6] - 496:9,
497:23, 505:24,
509:7, 509:13,
555:15
**top** [2] - 513:15, 518:4
**torque** [2] - 513:12,
513:16
**total** [1] - 540:6
**touched** [2] - 474:4,
489:11
**touching** [2] - 515:10,
531:16
**tough** [1] - 557:9
**toward** [4] - 524:23,
524:24, 531:17,
532:13
**towards** [4] - 487:9,
502:22, 508:14,
515:13
**tracked** [1] - 524:13
**traffic** [1] - 466:16
**trampled** [1] - 472:18
**TRANSCRIPT** [1] -
462:8
**transcript** [2] - 560:4,
560:6
**transfer** [3] - 465:17,
483:2, 483:8
**travel** [2] - 524:8,
540:14
**traveled** [1] - 522:13
**trial** [13] - 465:25,
469:16, 484:5,
484:15, 484:17,
486:6, 486:7,
486:19, 522:16,
534:16, 557:12,
557:17, 559:23
**TRIAL** [2] - 462:4,
462:8
**trials** [1] - 557:12
**tried** [6] - 465:9,
465:21, 544:10,
550:19, 555:22

**trier** [1] - 486:20
**tries** [1] - 545:24
**trigger** [1] - 508:12
**triggers** [1] - 506:12
**trip** [2] - 472:3, 476:6
**tripped** [3] - 474:21,
489:9, 489:10
**tripping** [4] - 489:1,
510:25, 511:4, 514:5
**trips** [4] - 475:4,
475:19, 476:13,
489:4
**trouble** [1] - 501:10
**true** [4] - 465:16,
470:8, 560:4, 560:5
**Trump** [13] - 467:21,
469:18, 473:19,
473:20, 473:23,
473:24, 488:22,
498:6, 498:7,
548:13, 548:16,
548:21
**truths** [1] - 470:6
**try** [3] - 506:1, 509:19,
547:4
**trying** [45] - 466:20,
467:17, 470:18,
471:4, 471:11,
472:6, 473:25,
474:8, 474:10,
477:5, 477:6,
493:16, 501:8,
503:3, 504:2,
506:24, 509:2,
513:12, 513:13,
513:16, 513:17,
513:19, 514:8,
514:12, 514:14,
514:21, 514:22,
518:19, 520:7,
520:8, 520:11,
520:15, 526:19,
528:18, 530:7,
530:10, 530:21,
532:15, 544:12,
544:24, 545:1,
547:7, 557:14
**Tuesday** [1] - 557:20
**tunnel** [20] - 480:7,
482:6, 483:8, 495:6,
502:12, 502:13,
503:4, 532:10,
532:12, 532:13,
532:14, 533:11,
534:25, 537:2,
537:11, 539:12,
541:2, 544:13,
550:5, 551:4
**turn** [1] - 529:25
**turned** [2] - 473:1,

580

534:18
**turning** [6] - 470:22, 478:8, 480:24, 513:11, 517:1, 532:4
**turns** [1] - 475:20
**two** [21] - 471:10, 476:11, 481:6, 484:16, 484:22, 490:18, 491:1, 493:24, 500:12, 511:7, 515:1, 516:4, 516:8, 522:17, 522:21, 522:25, 524:1, 542:18, 556:6, 557:12, 557:13
**TX** [1] - 462:14
**type** [1] - 510:21

### U

**u.S** [1] - 462:12
**U.S** [13] - 462:15, 485:21, 523:3, 523:6, 523:16, 523:19, 526:5, 526:6, 526:10, 526:16, 532:25, 535:23, 541:21
**U.S.C** [6] - 522:23, 523:1, 523:10, 523:13, 523:23, 529:6
**ultimately** [9] - 483:13, 488:21, 506:12, 507:24, 509:24, 535:12, 540:3, 548:20, 550:4
**unable** [2] - 491:8, 542:20
**unauthorized** [1] - 526:20
**under** [13] - 469:7, 478:22, 479:15, 487:9, 494:24, 495:1, 497:11, 503:14, 511:9, 548:4, 548:24, 552:8, 559:9
**undermines** [2] - 477:2, 530:23
**understood** [2] - 508:3, 508:4
**undoubtedly** [1] - 527:20
**unfold** [1] - 535:8
**uniformed** [1] - 512:23
**United** [25] - 462:23, 464:3, 471:25,

472:9, 472:10, 482:24, 483:5, 512:21, 512:22, 522:5, 522:14, 525:16, 525:18, 525:24, 525:25, 529:17, 532:17, 533:7, 535:21, 542:25, 543:4, 548:6, 554:22, 556:9, 558:8
**UNITED** [3] - 462:1, 462:2, 462:9
**unlawful** [9] - 546:22, 546:23, 547:2, 547:3, 547:9, 548:8, 548:18, 548:19, 555:16
**unless** [2] - 477:23, 499:22
**unlikely** [1] - 534:21
**unnecessarily** [1] - 552:10
**unpatriotic** [1] - 486:12
**unreasonably** [1] - 552:8
**up** [62] - 465:4, 473:1, 473:2, 473:14, 477:10, 477:12, 477:13, 477:14, 477:24, 479:19, 479:22, 479:23, 482:5, 484:21, 489:3, 490:2, 490:24, 493:14, 493:20, 495:2, 495:5, 497:3, 498:6, 499:2, 499:4, 499:10, 501:6, 502:20, 502:21, 505:2, 505:11, 505:12, 505:16, 505:19, 507:9, 508:23, 509:5, 511:1, 512:9, 512:11, 513:13, 513:14, 513:16, 513:17, 514:8, 514:15, 517:2, 517:3, 517:21, 530:11, 530:14, 530:19, 530:20, 530:21, 530:23, 534:19, 534:23, 543:15, 551:7
**upgrading** [1] - 547:21
**upholding** [1] - 464:20
**upright** [2] - 473:15,

477:5
**urge** [1] - 548:1
**USA** [2] - 522:2, 548:17
**uses** [3] - 474:13, 527:16, 552:7

### V

**valid** [1] - 504:7
**various** [1] - 528:16
**verdict** [4] - 521:10, 522:11, 556:23, 556:24
**verdicts** [2] - 556:21, 556:22
**version** [1] - 534:2
**versus** [1] - 481:15
**vest** [1] - 480:20
**Vice** [7] - 467:6, 540:4, 542:12, 542:19, 549:20, 549:21, 549:24
**victim** [3] - 510:15, 510:16, 516:15
**video** [51] - 471:19, 471:22, 472:13, 473:3, 473:18, 476:24, 477:2, 478:10, 492:10, 493:5, 496:4, 496:24, 501:23, 504:10, 505:5, 506:21, 506:22, 507:1, 507:3, 509:25, 514:17, 514:19, 515:6, 518:18, 519:18, 520:2, 522:16, 524:13, 524:15, 526:22, 527:12, 528:13, 528:22, 530:3, 530:11, 531:1, 531:13, 532:11, 533:9, 533:16, 534:6, 535:6, 535:13, 536:20, 539:5, 539:10, 539:21, 549:25, 550:21, 555:17, 555:20
**Video** [4] - 466:18, 471:21, 478:17, 479:25
**view** [4] - 481:8, 490:17, 497:18, 506:24
**viewed** [1] - 476:18
**violated** [1] - 522:19
**violation** [17] - 494:14,

494:19, 496:18, 496:21, 497:15, 498:3, 499:19, 522:23, 522:25, 523:3, 523:6, 523:9, 523:13, 523:16, 523:19, 523:22, 541:21
**violence** [16] - 506:13, 523:14, 523:22, 533:14, 538:23, 539:7, 539:13, 539:17, 552:7, 553:15, 553:20, 553:25, 554:2, 554:4, 556:9, 556:13
**violent** [4] - 504:18, 524:9, 539:21, 548:2
**violently** [6] - 464:16, 469:11, 479:5, 483:22, 534:8, 539:11
**vision** [4] - 498:2, 498:6, 518:3, 518:4
**visit** [1] - 475:8
**visiting** [2] - 549:19, 549:24
**visual** [1] - 493:25
**vital** [1] - 464:25
**vocalizing** [1] - 524:20
**voice** [1] - 498:10
**voluntarily** [4] - 525:21, 528:13, 529:22, 533:4
**vote** [8] - 465:2, 465:18, 468:10, 468:12, 543:21, 543:22, 544:16
**voted** [1] - 469:18
**voters** [2] - 469:14, 484:3
**votes** [3] - 469:6, 545:12, 546:1
**voting** [1] - 465:11
**vs** [2] - 462:4, 533:7
**vulnerable** [1] - 480:20

### W

**wait** [3] - 503:2, 511:24
**walk** [2] - 469:16, 534:24
**Walker's** [1] - 548:5
**walking** [5] - 475:3, 499:6, 499:7, 519:9, 519:12
**wants** [1] - 556:25
**warned** [1] - 472:17

**warnings** [1] - 465:5
**warranted** [1] - 464:8
**Washington** [6] - 462:5, 462:16, 462:24, 522:13, 524:8, 560:12
**watches** [2] - 517:3, 534:7
**watching** [6] - 505:21, 506:9, 506:13, 506:24, 533:9, 535:7
**water** [1] - 483:18
**wave** [2] - 497:23, 499:4
**waving** [3] - 497:21, 498:18, 498:23
**ways** [1] - 504:10
**weapon** [91] - 472:21, 474:16, 475:5, 475:10, 475:21, 476:4, 476:6, 476:10, 476:14, 476:19, 477:23, 478:7, 480:13, 482:8, 482:11, 488:23, 489:5, 489:15, 489:18, 490:5, 490:12, 490:13, 490:15, 490:18, 490:22, 490:23, 491:1, 491:17, 491:24, 492:4, 492:12, 492:14, 492:15, 493:2, 493:23, 494:7, 494:11, 494:16, 495:4, 495:12, 495:14, 495:15, 497:11, 498:8, 500:3, 500:9, 504:15, 505:1, 505:2, 505:11, 505:16, 505:20, 507:9, 508:13, 509:5, 510:11, 510:12, 510:13, 510:18, 510:24, 511:6, 513:22, 515:17, 517:15, 522:23, 523:13, 523:16, 529:5, 529:9, 529:24, 531:23, 532:6, 534:19, 536:2, 536:3, 537:3, 547:21, 549:3, 549:13, 550:25, 551:2, 551:12, 552:2, 553:10,

553:16, 553:23, 554:12

**weapons** [6] - 465:23, 475:24, 490:19, 497:12, 505:14, 523:9

**wearing** [4] - 518:2, 536:18, 536:20, 536:23

**Wednesday** [3] - 545:5, 557:20, 557:21

**week** [6] - 557:17, 557:18, 557:19, 558:2, 559:2

**weeks** [1] - 557:13

**weight** [7] - 472:3, 513:19, 513:21, 526:23, 527:3, 527:17, 528:9

**well-presented** [1] - 559:20

**West** [10] - 462:19, 466:11, 467:4, 483:7, 526:25, 532:10, 537:2, 539:12, 541:2, 550:4

**Westlaw** [2] - 543:3, 543:6

**whacking** [1] - 507:12

**wheel** [2] - 473:13, 477:2

**wheels** [1] - 473:17

**whitewater** [1] - 483:17

**wholly** [1] - 540:17

**wife** [4] - 468:18, 543:24, 544:2, 544:5

**willfully** [5] - 555:2, 555:11, 555:12, 556:10, 556:16

**wind** [1] - 502:20

**winding** [1] - 502:21

**winner** [2] - 469:18, 548:22

**wish** [1] - 544:19

**wished** [1] - 506:3

**witness** [2] - 511:12, 524:5

**witnesses** [4] - 522:15, 524:2, 524:12

**wonderful** [1] - 498:7

**wooden** [2] - 479:1, 479:7

**words** [7] - 467:9, 467:16, 469:19, 476:18, 483:24, 552:7, 555:23

**world** [1] - 482:24

**worn** [1] - 527:12

**worried** [1] - 534:20

**worst** [1] - 504:19

**worth** [1] - 478:21

**wrap** [1] - 484:21

**wrap-up** [1] - 484:21

**wrongdoing** [2] - 546:24, 547:13

## Y

**year** [2] - 516:14, 516:16

**years** [2] - 483:2, 485:8

**yelled** [2] - 477:12, 530:19

**yelling** [3] - 527:2, 527:17, 528:13

**yellow** [1] - 507:7

**yesterday** [1] - 483:14